**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DWIGHT G. TYNDALL,
   Plaintiff,

           v.

DEPARTMENT OF THE ARMY, U.S.
ARMY CLAIMS SERVICE,
   Defendant.

Civil Action No.
1:22-cv-03136-SDG

**OPINION AND ORDER**

This matter is before the Court on the United States of America's motions [ECF 17] to substitute itself as the defendant and to dismiss Plaintiff Dwight Tyndall's complaint for lack of subject matter jurisdiction. For the following reasons, the motion to substitute is **GRANTED**, but the motion to dismiss is **DENIED without prejudice**.

## I.      BACKGROUND

This case arises out of the death from cancer of Tyndall's wife, Deborah. The complaint alleges as follows: From 1977 to 1982, Tyndall and Deborah lived in a house about 200 yards from Fort Gillem,[1] a former Army base near Atlanta, Georgia.[2] In 1987, at the age of 32, Deborah was diagnosed with stage four non-

---

[1]    ECF 1, ¶ 1.

[2]    *Id.* ¶ 2.

1

Hodgkin's lymphoma.[3] After ten years of treatment—including three and a half rounds of chemotherapy, total body irradiation, and an allogenic bone marrow transplant—Deborah died in 1996.[4] Tyndall alleges that Deborah's cancer was caused by toxic compounds, illegally dumped for years by the Army at Fort Gillem, that turned his family home into a "cauldron of carcinogens."[5]

Tyndall accordingly sued the Department of the Army for wrongful death under the Federal Tort Claims Act (FTCA), asserting that the Army breached its duty of care by (1) improperly disposing of toxic waste, (2) failing to remediate its toxic waste, and (3) failing to warn nearby landowners of—or to protect them from—the dangers posed by its toxic waste. The United States now moves to substitute itself as the proper defendant under the FCTA,[6] which motion is granted. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994) (explaining that a "federal agency cannot be sued 'in its own name'" for claims cognizable under the FTCA (citing 28 U.S.C. § 2679(a))). The United States further moves to dismiss Tyndall's claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, asserting that Tyndall's suit is barred by sovereign immunity.[7]

---

[3]    *Id.* ¶ 7.

[4]    *Id.*

[5]    *Id.* ¶ 9.

[6]    ECF 17, at 7 n.1.

[7]    *Id.* at 7.

## II.    DISCUSSION

Under the doctrine of sovereign immunity, courts lack subject matter jurisdiction over claims against the United States except where the government has explicitly consented to be sued. *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1157 (11th Cir. 2020). With the FTCA, Congress generally waived the government's sovereign immunity from state law tort claims. *Id.* (citing 28 U.S.C. § 1346(b)). However, "that which the Sovereign gives, it may also take away," and the FTCA is subject to several statutory exceptions that, in effect, preserve the government's sovereign immunity from state tort claims in certain situations. *Zelaya v. United States*, 781 F.3d 1315, 1322 (11th Cir. 2015). One such exception is the "discretionary function exception," which preserves sovereign immunity as to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Foster Logging*, 973 F.3d at 1157 (quoting 28 U.S.C. § 2680(a)).

Courts use a two-step analysis to determine whether the discretionary function exception applies in a particular case. *OSI, Inc. v. United States*, 285 F.3d 947, 950 (11th Cir. 2002). In the first step, courts ask whether the government employee's allegedly tortious act involved "an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz ex rel. Berkovitz*

*v. United States*, 486 U.S. 531, 536 (1988)). This often depends on whether a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* If so, then "the employee has no rightful option but to adhere to the directive," meaning he has no discretion, meaning the discretionary function exception does not apply. *Id.*

If the allegedly tortious act *did* involve an element of judgment, courts proceed to the second step of the analysis and ask "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23. As the Supreme Court has explained, the purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political *policy* through the medium of an action in tort." *Id.* at 323 (emphasis added) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). Thus, the discretionary function exception "protects only actions and decisions based on considerations of public policy." *Id.* Courts apply a rebuttable presumption that a government employee's discretionary acts are "grounded in policy." *OSI*, 285 F.3d at 951.

The government asserts that the Court lacks subject matter jurisdiction over this case because the discretionary function exception applies to Tyndall's theories of (1) improper disposal, (2) failure to remediate, and (3) failure to protect or

warn.[8] As to the second and third theories, the Court tends to agree. Tyndall has

not identified, nor has the Court found, any directive prescribing a mandatory

course of conduct for the Army to follow, either in remediating toxic waste or in

protecting the public from toxic waste exposure, at least not before Tyndall moved

away from Fort Gillem in 1982. Nor has Tyndall rebutted the presumption that the

Army's discretion in remediating toxic waste and in protecting the public from

toxic waste exposure was grounded in policy.

But Tyndall's improper disposal theory, in the Court's view, may be

different. The parties' filings refer to at least three directives that appear to

prescribe mandatory waste disposal practices during the relevant time period.

First is the Resource Conservation and Recovery Act of 1976 (RCRA), which

prohibits the "open dumping of solid waste or hazardous waste," 42 U.S.C.

§ 6945(a), where "open dump" is defined as any waste disposal site that is neither

a sanitary landfill nor a hazardous waste facility, 42 U.S.C. § 6903(14).[9] The second

is Army Regulation 200-1 (AR 200-1), first published in 1975, which provides in

part that "The Department of the Army will … [p]rohibit the disposal (by open

dumping, water dumping, well injection, or open burning) of pesticides,

hazardous chemical stocks, [or] pharmaceutical stocks and drugs … directly into

---

[8]    *Id.* at 17.

[9]    Tyndall references the RCRA in his complaint. ECF 1, ¶ 21.

the air, water, or land environment in a manner hazardous to man."[10] The third is the Georgia Water Quality Control Act of 1964 (GWQCA), which forbids the "use of any waters of the state for the disposal of sewage, industrial wastes, or other wastes."[11] O.C.G.A. § 12-5-29(a). These directives arguably imposed mandatory duties on the Army to refrain from certain waste disposal practices.

OSI, to which the government liberally cites, does not necessarily require a different result. In that case, a landowner sued the Air Force under the FTCA, alleging that toxic waste from a neighboring Air Force base had contaminated its soil and groundwater. 285 F.3d at 949. The Eleventh Circuit affirmed the dismissal of the FTCA claim, ruling that the Air Force manuals cited by the plaintiff did not create any mandatory obligation sufficient to overcome the discretionary function exception. Id. at 952. The holding in OSI, however, was limited to agency manuals that provided "only objectives and principles" for government employees to follow. Id. In fact, OSI expressly did not rule on whether the discretionary function exception could be overcome by alleged violations of the RCRA, which is one of the statutes at issue here. Id. at 951.

---

[10]  ECF 17-4, at 29 (Policies for Hazardous and Toxic Material Management, 40 Fed. Reg. 55962, 55988 (Dec. 2, 1975) (originally codified at 32 C.F.R. pt. 650)). The government discusses AR 200-1 in its brief and attached two versions of it to its motion. ECF 17, at 10.

[11]  The GWQCA is referenced in a 1980 Installation Assessment of Fort Gillem, attached by Tyndall to his response brief. ECF 20-1, at 46.

However, the Court will not definitely rule on whether the RCRA, AR 200-1, the GWQCA, or any other directive precludes the application of the discretionary function exception at this juncture, because the government's motion to dismiss suffers from a more fundamental defect: It asks the Court to assess the factual existence of subject matter jurisdiction on an incomplete record.

Challenges to subject matter jurisdiction are either facial or factual. S*carfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999). In a *facial* attack, the allegations in the pleadings are assumed to be true for purposes of establishing jurisdiction. *Id.* In a *factual* attack, by contrast, a court has "substantial authority" to make factual findings without regard to the procedural posture. Thus, even on a motion to dismiss, a court is free to look beyond the pleadings, consider "testimony and affidavits," and "evaluat[e] for itself" the factual basis of its jurisdiction." *Id.* The government's brief makes clear that its jurisdictional attack here is factual: it invites the Court to "consider and weigh evidence outside the pleadings to

determine whether facts exist to support its jurisdiction,"[12] and asks the Court to draw factual conclusions[13] based on exhibits attached to its motion to dismiss.[14]

By choosing to contest the Court's jurisdiction as a factual matter, the government has limited the court's procedural discretion. *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981).[15] As *Williamson* explained, where the defendant's motion to dismiss "raises factual issues," the plaintiff is entitled to "an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence." *Id.* Here, the government has raised factual issues regarding its waste disposal and remediation practices that are highly relevant to subject matter jurisdiction: Without a clear idea of how the Army was disposing

---

[12]  ECF 17, at 15.

[13]  *Id.* at 19 (asserting that "the Army's handling and disposal of waste of its installations were consistent with waste disposal practices followed by the military and private industry during this period before 1974"); *id.* at 21 (asserting that "the Army conducted multiple investigational studies between 1979 and 1996, and began remediation efforts in 1998, which continued through completion in 2022").

[14]  ECF 17-1 (1992 Geophysical Survey of Fort Gillem); ECF 17-2 (2010 Defense Environmental Restoration Program Annual Report to Congress); ECF 17-8 (2007 Defense Environmental Restoration Program Annual Report to Congress); ECF 17-9 (2023 Department of Defense Base Realignment and Closure Executive Summary); ECF 17-10 (1999 Fort Gillem Environmental Restoration Program Pamphlet); ECF 17-11 (2023 Final Finding of Suitability to Transfer).

[15]  Fifth Circuit cases decided before October 1, 1981, are binding precedent in the Eleventh. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

of waste at Fort Gillem during the relevant time period, it is difficult to determine what statutes, regulations, or policies—if any—were applicable to the Army's conduct.

Nor is this merely an academic question, because Tyndall has created a factual dispute as to the Army's compliance with potentially applicable waste disposal directives. He has submitted evidence that the Army at Fort Gillem was burning and burying narcotics and petroleum products outside of landfills,[16] was draining industrial wastewater directly into streams,[17] and had likely poisoned fish in a nearby lake with the insecticide DDT.[18] Under *Williamson*, that is enough to entitle Tyndall to jurisdictional discovery on the Army's waste disposal practices at Fort Gillem in the 1960s, '70s, and '80s.

Furthermore, the Court finds that appointment of counsel for Tyndall would be helpful, given the technical nature of the legal issues in this case.[19] One such issue, of course, is the existence of mandatory directives—whether those be

---

[16]  ECF 20-1, at 54.

[17]  *Id.* at 40–46.

[18]  *Id.* at 57. DDT stands for dichloro-diphenyl-trichloroethane.

[19]  The Court at an earlier stage in the case denied Tyndall's motion to appoint counsel without prejudice. ECF 9, at 1. At the time, judgment had been entered against Tyndall for failure to timely effect service. ECF 5, at 1. Now, with the government having been served and the issues having been clearly presented to the Court, it is appropriate to revisit the need to appoint counsel.

federal agency regulations, state environmental statutes, or something else—

governing the Army's conduct at Fort Gillem. But there are potential wrinkles to

the applicability of the discretionary function exception here that the Court has not

discussed in detail.

In particular, the Court takes no position as to whether Tyndall could

introduce evidence sufficient to rebut the factual presumption that waste disposal

practices at military installations will implicate policy considerations. *See OSI*, 285

F.3d at 953 ("The nature of the military's function requires that it be free to weigh

environmental policies against security and military concerns"); *see also Aragon v.*

*United States*, 146 F.3d 819, 827 (10th Cir. 1998) (ruling that "military exigencies at

the time" supported a finding that the military's "industrial waste disposal

decisions" were grounded in policy). Furthermore, whether the Army's waste

disposal practices were an exercise of policy choice could depend in part on how

the Army "interprets and applies [its own] regulations" on environmental

compliance, *Berkovitz*, 486 U.S. at 545—a potential legal quagmire that Tyndall can

hardly be expected to navigate alone. *See, e.g.*, *United States v. Boler*, 115 F.4th 316,

322 n.4, 328 (4th Cir. 2024) (deferring to an agency's interpretation of its own

ambiguous regulation but noting the tension between the Supreme Court's recent

decisions in *Kisor v. Wilkie*, 588 U.S. 558 (2019), and *Loper Bright Enterprises v.*

*Raimondo*, 603 U.S. 369 (2024)). The Court therefore finds that the legal issues in

this case are sufficiently "novel [and] complex as to require the assistance of a trained practitioner." *Poole v. Lambert*, 819 F.2d 1025, 1028 (11th Cir. 1987).

## III.    CONCLUSION

The United States's motions [ECF 17] are **GRANTED** as to substitution but **DENIED without prejudice** as to dismissal. The Court will endeavor to appoint counsel for Tyndall by separate order. All proceedings in this case are **STAYED** until further notice.

The Clerk of Court is **DIRECTED** to substitute the United States as the sole defendant on the docket. The Clerk is also **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case for docket management purposes only, pending the potential appointment of counsel. Administrative closure neither prejudices the rights of the parties nor precludes the filing of documents. Either party may move to reopen the case and lift the stay if counsel has not been appointed after 60 days.

**SO ORDERED** this 26th day of March, 2025.

_____
Steven D. Grimberg
United States District Judge

11