## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No. 1:22-cv-03136-SDG

## AMENDED COMPLAINT

1. This is a civil action for damages arising out of the wrongful death and associated damages suffered by Plaintiff Dwight G. Tyndall and his deceased wife Deborah E. Tyndall ("Decedent").

2. For decades, Defendant United States of America improperly disposed of hazardous waste at Fort Gillem in Clayton County, Georgia, in a manner that contaminated surface water, groundwater, soil, and sediment on the installation. That hazardous waste migrated off-base and into surrounding residential areas and streams, contaminating property where Plaintiff and Decedent lived for more than five years.

1

3.    As a result of the environmental contamination released by Defendant, Decedent was unknowingly exposed to many chemical carcinogens and other harmful substances as she went about her daily life. Because of this exposure, Decedent developed non-Hodgkin lymphoma, a form of cancer that affects white blood cells in the lymphatic system. After 10 years of grueling cancer treatments, Decedent succumbed to her illness.

4.    Before and during the time when Plaintiff and Decedent lived near Fort Gillem, Defendant knew that its hazardous waste was migrating outside the installation boundaries. Yet Defendant did not take the steps necessary to abate the sources of the environmental contamination or to remediate the private properties affected by it. Nor did Defendant make any effort to warn nearby residents, including Plaintiff and Decedent, about their risk of exposure to the contamination.

5.    Decedent's death was devastating for Plaintiff and his family. Plaintiff was deprived of years of companionship and lost his life partner. Plaintiff's children, Rebekah and Andy, have suffered immeasurably. Both were under ten years old when their mother was diagnosed with cancer, and they were forced to go through childhood without the comfort, aid, and love of their mother. Both children went through counselling to deal with the emotional trauma from their mother's illness and death. And none of Plaintiff's eight grandchildren will ever know their

grandmother, who undoubtedly would have played a loving and vital role in their lives.

6.      Defendant's acts and omissions were tortious under Georgia law, and it is liable for the harms inflicted on Plaintiff and Decedent under the Federal Tort Claims Act.

## PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Dwight G. Tyndall is the widower of Decedent Deborah E. Tyndall. Plaintiff and Decedent resided at 1743 Slate Road, Conley, Georgia 30288, from March 1977 until June 1982. Plaintiff now resides in Wills Point, Texas.

8.      Plaintiff brings this action under the Federal Tort Claims Act (the "FTCA"). 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671–2680. The FTCA grants subject matter jurisdiction to federal courts over claims against Defendant the United States of America, which includes the Department of the Army (the "Army"), seeking money damages for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1)

9.      Plaintiff has complied with all jurisdictional conditions precedent under 28 U.S.C. § 2675 of the FTCA.

10.    Plaintiff served the Army with notice of his and Decedent's claim on September 18, 2020. The Army denied his claim on February 28, 2022. Plaintiff commenced this civil action on August 8, 2022, within the six-month deadline under 28 U.S.C. § 2401.

11.    Plaintiff's claim to the Army contained all required information for a properly presented administrative claim.

12.    Venue is proper in this Court under 28 U.S.C. §§ 1402(b) and 1346(b), as the relevant events or omissions giving rise to this case occurred in Clayton County, Georgia, which is situated in this judicial district and division. 28 U.S.C. § 90(a)(2).

## **FACTUAL BACKGROUND**

13.    Plaintiff and Decedent owned and resided at 1743 Slate Road in Conley, Georgia (the "Tyndall Property"), from March 1977 to June 1982. The Tyndall Property was located less than 200 yards north of Fort Gillem, a military installation then operated by the Army, as shown in the graphic below.



14.     The Tyndall Property was crossed by an unnamed, perennial stream, known as the Western Stream, that originates on or near Fort Gillem and flows north through the Tyndall Property until it enters Conley Creek, a tributary of the South River, and ultimately, the Ocmulgee River, both traditional navigable waters of the United States. The Western Stream is a non-tidal stream that is not capable of transporting boats loaded with freight in the course of trade. As the owner of land adjacent to a non-navigable stream, Plaintiff held title to the bed and bank of the Western Stream on the Tyndall Property.

15.     In 1982, while Plaintiff and Decedent were living at the Tyndall Property, Decedent first experienced symptoms of an illness that her family doctor

5

was not able to diagnose at the time. Decedent's symptoms persisted, however, and she was diagnosed in 1987 with a type of non-Hodgkin lymphoma known as nodular poorly differentiated lymphocytic lymphoma. By the time Decedent was diagnosed, the cancer had progressed to stage IV and was considered incurable. Decedent was 32 years old.

16.   Over the next 10 years, Decedent underwent a series of painful treatments for non-Hodgkin lymphoma, including three complete rounds and one partial round of chemotherapy, total body radiation therapy, and an allogenic bone marrow transplant. While recovering from the bone marrow transplant, Decedent developed and received treatment for graft-versus-host disease, which required multiple doctor visits each week for approximately 18 months, until her death.

17.   Decedent died on June 12, 1997, due to a bacterial infection, from which her severely weakened immune system was not able to overcome.

**A. For decades, Defendant contaminated the surface water, groundwater, soil, and sediment at Fort Gillem and beyond its boundaries.**

18.   From the 1940s until the installation was closed in 2011, the Army used Fort Gillem for training and material supply, providing the Army with weapons and equipment, research and development, procurement, production, storage, distribution, inventory management, maintenance, and disposal of surplus and waste materials.

19.     Pursuant to these operations, the Army generated and disposed of solid wastes and hazardous constituents at Fort Gillem, including strong acids, bases, solvents, heavy metals, pesticides, waste oils, and materials associated with laboratory operations and vehicle maintenance.

20.     The Army's industrial operations and waste disposal activities at Fort Gillem resulted in contamination of surface water, groundwater, soil, and sediment by volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), metals, and pesticides, including, but not limited to, trichloroethene ("TCE"), tetrachloroethene, and 1,1,2,2-tetrachloroethane. These contaminants were discharged, disposed of, and migrated outside the installation boundaries into surrounding residential areas, including the Tyndall Property and the Western Stream before and while Plaintiff and Decedent lived at their property.

21.     The invasion of neighboring property and streams with hazardous materials was not only foreseeable in advance, but the Army continued the invasion even after it had actual knowledge of both the invasion and the resulting harm. While Plaintiff and Decedent lived at the Tyndall Property, the Army never removed the contaminants that it had previously caused to invade the Tyndall Property and the Western Stream. Further, the Army continuously allowed new contaminants from Fort Gillem to invade the Tyndall Property and the Western Stream.

22.     The Army has investigated and known about the environmental contamination at Fort Gillem at least since 1979. These investigations have documented many sources of the contamination on the Tyndall Property, which can be grouped into five categories detailed below: (1) the "North Landfill Area," (2) the "Industrial Waste Treatment Plants," (3) the "Holding Pond," (4) the "Sewage Treatment Plants," and (5) the "Storm Drain System."

### *North Landfill Area*

23.     Located near the northern boundary of Fort Gillem, the North Landfill Area comprises more than 300 acres where the Army disposed of waste from 1941 to at least the mid-1970s in 356 burial locations, trenches, and pits. Portions of the area were used for disposal, landfilling, trenching, burning, indiscriminate burial, and surface disposition. Exploratory trenching, drum removals, and other excavation work confirmed the presence of metals, solvents, waste petroleum, waste motor oil, XXCC3 powder (carbon tetrachloride and chloroform), VOCs, SVOCs, and pesticides, as well as drums, tanks, medical supplies, debris, and a former burn pit in the North Landfill Area.

24.     The hazardous waste discarded in the North Landfill Area was conveyed by multiple pathways into surface water, groundwater, soil, and sediment and ultimately onto the Tyndall Property. By way of example:

a. Some burial sites were located in or near the floodplains of the Western Stream and its tributaries. As a result, contaminants and solid materials were discharged either directly or through permeable sediment into the Western Stream and its tributaries, upstream of the Tyndall Property.

b. Surface runoff from rainfall flowed over and into burial sites, some of which were eroded and therefore had waste exposed directly to the elements. As a result, the surface runoff transported contaminants and solid materials and discharged them into the Western Stream and its tributaries, upstream of the Tyndall Property. This effect was exacerbated due to the large quantity of non-permeable paved and "roofed-over" areas on the installation, which caused excessive amounts of stormwater.

c. Rainfall infiltrated through burial sites and into the soil, contaminating groundwater. The contaminated groundwater was then discharged into the Western Stream and its tributaries, upstream of the Tyndall Property, or migrated as a plume downgradient toward the Tyndall Property.

d. Contaminated leachate flowed out of burial sites and was discharged into the Western Stream and its tributaries either

9

directly, through permeable sediment, or by surface runoff, upstream of the Tyndall Property. Contaminated leachate also infiltrated into groundwater, where it was discharged to the Western Stream and its tributaries or migrated as a plume downgradient toward the Tyndall Property.

### *Industrial Waste Treatment Plants*

25.    The first Industrial Waste Treatment Plant at Fort Gillem was constructed in the mid to late 1940s. The first Industrial Waste Treatment Plant received waste from industrial operations at Fort Gillem and discharged effluent following treatment into a tributary of Conley Creek.

26.    A second Industrial Waste Treatment Plant was constructed and became operational in 1972.

27.    This second Industrial Waste Treatment Plant received waste from industrial operations at Fort Gillem consisting of oils and greases, paint chips, paint stripper, phosphates, phenols, chromates, rust, solvents, suspended matter, alkaline cleaning solutions, cleaning compounds, stripping compounds, soil, and rinse water. Miscellaneous waste, such as concentrated solutions discharged periodically from process tanks, was also transported by truck to holding tanks at the Industrial Waste Treatment Plant for treatment.

28.    Effluent from the second Industrial Waste Treatment Plant was discharged into a tributary of Conley Creek.

29.    As a byproduct of the treatment process, the first and second Industrial Waste Treatment Plants generated sewage sludge containing hazardous contaminants from the waste received, among other substances. This sewage sludge was removed to drying beds, where effluent from the underdrains was discharged, untreated, to a tributary of Conley Creek. The dried sewage sludge was disposed of in the North Landfill Area until at least 1972.

30.    One or both Industrial Waste Treatment Plants were placed on standby in 1978, when the Army began discharging industrial effluent generated at Fort Gillem to the Forest Park sanitary sewer system.

### *Holding Pond*

31.    The Holding Pond at Fort Gillem was located at or near the Industrial Waste Treatment Plants. The pond held effluent from the plants until it overflowed into a tributary of Conley Creek.

32.    Although the Holding Pond was placed on standby in 1978, it continued to accumulate rainwater while inactive. And because the pond was unlined and contained contaminants from past treatment operations, contaminants were continually discharged to a tributary of Conley Creek by surface water flow and groundwater infiltration.

### *Sewage Treatment Plants*

33.     The first Sewage Treatment Plant for domestic waste was located along the northern boundary of Fort Gillem and was in operation from 1941 to 1951. The treatment process used at the first Sewage Treatment Plant included a trickling filter, sludge digester, and a sludge drying bed.

34.     In 1951, a second Sewage Treatment Plant became operational, and the original plant was placed on standby. The new plant used a low-rate, single-stage trickling filter process followed by secondary clarification. From 1971 to 1972, the Sewage Treatment Plant received and treated 568,000 to 1,136,000 liters of sewage per day.

35.     Upon information and belief, the effluent from the first and second Sewage Treatment Plants was discharged into tributaries of Conley Creek, including the Western Stream, upstream of the Tyndall Property. That effluent was not chlorinated until the early 1970s.

36.     The sewage sludge generated at the first and second Sewage Treatment Plants was removed to drying beds and then disposed of in the North Landfill Area.

37.     The second Sewage Treatment Plant ceased operations in 1978 when the sanitary sewer system at Fort Gillem was connected to the Forest Park sanitary sewer system.

### *Storm Drain System*

38.    At Fort Gillem, an east-to-west trending ridge crosses the entire width of the installation and divides it into two major drainage basins—one flowing north to the Western Stream, Conley Creek, and their tributaries, and the other flowing south to Cotton Indian Creek and Upton Creek.

39.    The Storm Drain System in the northern drainage basin consisted of eight culverts or streams that discharged stormwater from the northern half of Fort Gillem, which included the Industrial Waste Treatment Plants, the Sewage Treatment Plants, the North Landfill Area, and multiple warehouses and other storage areas.

40.    When surface runoff came into contact with the hazardous waste handled and disposed of on the northern half of Fort Gillem, it became contaminated and was discharged into the Western Stream, Conley Creek, and their tributaries, upstream of the Tyndall Property.

**B. It was foreseeable and known to Defendant that Fort Gillem's contaminants would migrate onto the Tyndall Property.**

41.    For more than 20 years before Plaintiff and Decedent moved near Fort Gillem, the Army had actual or constructive knowledge that the hazardous contaminants in its waste were migrating beyond the installation boundaries and causing serious harm to private property and natural resources. It was foreseeable

13

to the Army that the contaminants disposed of at the site would migrate into the Western Stream and onto the Tyndall Property, just downstream of Fort Gillem.

42.     Military and government literature made clear that contamination of surface water and groundwater was foreseeable when disposing of waste near waterways. For example, decades before the Plaintiff and Decedent moved near Fort Gillem, the United States Department of War (the "War Department") issued technical manual TM 5-634 on the collection and disposal of refuse, which contained the following directives: "e. RAVINES. Do not use ravines if other sites are available. Before using a ravine for sanitary fill operation, reroute flow of excess drainage water"; and "g. WATER POLLUTION. Do not select sites which have surface or subsurface drainage to the water supply."

43.     Likewise, in 1941 and 1967, the United States Army Corps of Engineers (the "Corps") issued a manual on general safety requirements, containing the following: "08.E POISONS, ACIDS, CAUSTICS AND HARMFUL CHEMICALS . . . 08.e.03 Disposal of surplus or excess materials shall be by burial in a manner which will not contaminate or pollute water supply, ground water, or streams."

44.     In 1956, the United States Air Force issued a manual on "Refuse Collection and Disposal," AFM 85-11, which stated that "terrain for a sanitary fill

14

should permit good drainage and, at the same time, provide disposal of runoff without polluting surface or subsurface water supplies."

45.    In 1968, the United States Department of Health, Education and Welfare published a "Sanitary Landfill Facts" document, which stated:

Under certain geological conditions, the burial of solid wastes is a real potential for chemical and bacteriological pollution of ground and surface water. … Some of the common preventative measures used are: (1) locating the site at a safe distance from streams, lakes, wells, and other water sources; (2) avoiding site location above the kind of subsurface stratification that will lead the leachate from the landfill to water sources, i.e., fractured limestone; (3) using an earth cover that is nearly impervious; (4) providing suitable drainage trenches to carry the surface water away from the site.

46.    The Army knew about the geology of the Fort Gillem area, including the open and obvious existence of the east-to-west trending ridge and associated drainage patterns, such that it was foreseeable that waste disposed of in the North Landfill Area would come into contact with surface runoff flowing to the Western Stream, Conley Creek, and their tributaries. During rain events, the flow of stormwater through the burial sites and into surface waters would have been observable.

47.    Given the close proximity of burial sites to the installation boundary and to surface waters, it was foreseeable that buried contaminants would leach into underlying groundwater and aquifers, and that contaminated groundwater plumes

15

would migrate to surface waters, including the Western Stream, Conley Creek, and their tributaries, and to surrounding residential areas.

48.    Further, the Army had actual knowledge that it was contaminating nearby properties and waters outside the Fort Gillem boundaries. For example, multiple fish kills occurred in Joy Lake, a private recreational lake just south of Fort Gillem, in 1952, 1956, and 1966, which the Army suspected were caused by contamination discharged from the installation. In 1973, the presence of DDT in Joy Lake caused another fish kill, for which the Army accepted responsibility and paid the lake owner a settlement of $40,000.

49.    Between 1960 and 1962, there was a fish kill in Slate Pond just north of Fort Gillem that was caused by paint stripper compounds discharged from the installation. Again, the Army agreed to compensate the pond's owner by replacing the fish.

50.    In 1972, the Army's Environmental Hygiene Agency ("USAEHA") studied surface water quality at Fort Gillem while the Industrial Waste Treatment Plant and the Sewage Treatment Plant were operational.

51.    The USAEHA study concluded that the water quality in Conley Creek was so degraded that it could not support a stable, diverse aquatic community as far as 3.2 kilometers north of Fort Gillem. The study found that effluent from the Industrial Waste Treatment Plant and the Sewage Treatment Plant was responsible,

16

at least in part, for the water quality problems. In particular, the study classified the effluent from the Industrial Waste Treatment Plant as "toxic" based on its suppression of biological diversity.

52.    At least since 1973, the Army was also on notice that the waste buried at Fort Gillem was discharged into streams, such as the Western Stream, Conley Creek, and their tributaries, and flowing into surrounding residential areas. That year, for example, nearby residents found dextrose kits with needles that had washed into on-base streams and were transported beyond the installation boundaries.

53.    In March 1980, the Army's Toxic and Hazardous Materials Agency published an Installation Assessment of Fort Gillem (Report No. 167) (the "1980 Installation Assessment") that documented the widespread pollution problems at the installation and the risk of migration and exposure to nearby residential areas.

54.    Among other findings, the 1980 Installation Assessment explained: "The most serious water quality impact concerns the contaminated materials buried in the installation perimeter areas during the period from 1948 to 1972. These materials are known to be causing direct, continuing impacts to surface water quality." This statement referred at least in part to the downstream effects of the North Landfill Area.

55.    The 1980 Installation Assessment concluded that there was a potential for the contamination at Fort Gillem to migrate beyond the installation boundaries by surface and subsurface means. In particular, the report explained that contaminants could be spread by surface runoff, migration through groundwater, leachate flow, and migration through permeable sediment.

56.    The Army failed to disclose the contamination to the neighboring property owners, former owners, or the public. The contamination was not known to the Plaintiff and could not have been known using reasonable diligence.

57.    Plaintiff discovered the fact of the contamination in 2019 through an Atlanta Journal-Constitution article.

## C. The Tyndall Property was in fact contaminated with carcinogenic substances from Fort Gillem, exposing Decedent to an elevated risk of developing non-Hodgkin lymphoma.

58.    When Plaintiff and Decedent lived at the Tyndall Property, the surface water, groundwater, soil, sediment, and air at the property was highly contaminated with hazardous substances as a result of the Army's industrial operations and waste disposal activities at Fort Gillem.

### *Environmental Sampling Data*

59.    For decades, the Army has authorized environmental studies in the area north of Fort Gillem to determine whether, and to what extent, contamination was migrating outside the installation. The inescapable conclusion of these studies

18

is that migration has long been occurring, with some of the highest levels of contamination detected on or near the Tyndall Property.

60.    For example, four groundwater contamination plumes, three of which have migrated beyond the Fort Gillem boundary and into surrounding property, have been detected at the North Landfill Area. Groundwater contaminants have been documented at least since 1995, including benzene, carbon tetrachloride, chloroform, cis-1,2-dichloroethene, 1,1,2,2-tetrachloroethane, trans-1,2-dichloroethene, trichloroethene, 1,2,2-trimethylbenzene, and vinyl chloride. In certain areas, the concentrations of these contaminants meet or exceed federal thresholds for drinking water quality and cancer risk screening.

61.    In the mid-1990s, surface water that was collected from the Western Stream and its tributary exceeded Georgia in-stream standards for VOCs and metals.

62.    In 2000, groundwater sampling detected a contaminated plume with TCE concentrations exceeding Georgia standards, which flowed north-northeast from the North Landfill Area in the direction of the Tyndall Property and the Western Stream.

63.    Also in 2000, surface water and sediment sampling in the Western Stream reinforced that a contaminated groundwater plume was migrating from the North Landfill Area and discharging into the Western Stream. In particular, this

study found that concentrations of 1,1,2,2-tetrachloroethane exceeded Georgia in-stream standards at sampling points immediately adjacent to the Tyndall Property. TCE was also present in all of the water samples collected from the Western Stream, both within and outside the Fort Gillem boundaries. The highest concentrations of TCE were found at sampling points immediately adjacent to the Tyndall Property.

64.   In March 2016, additional groundwater samples were collected immediately adjacent to the Tyndall Property, which continued to show elevated concentrations of TCE, chloroform, and benzene.

65.   Numerous contaminants have also been detected in soil gas from both the North Landfill Area and off-site residential areas, including the Tyndall Property. At least since 1993, soil gas collected from the North Landfill Area has exhibited the following contaminants: dichlorobenzene, 1,1-dichloroethane, trichlorofluoromethane, vinyl chloride, methylene chloride, ethylbenzene, trichloroethene, benzene, toluene, xylene, chlorobenzene, trans-1,2-dichloroethene, isopropyltoluene, tetrachloroethene, and l,2-dichloropropane.

66.   In 2003, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, tetrachloroethene, toluene, ethylbenzene, and xylene were found in soil gas in residential areas directly north of the North Landfill Area near Slate Road and Mallard Road, the exact location of the Tyndall Property.

67. In 2014, additional soil gas samples taken north of Fort Gillem showed elevated concentrations of several contaminants, including 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, 1,2-dichloropropane, benzene, chloroform, naphthalene, xylene, tetrachloroethene, trichloroethene, and toluene.

68. And as recently as 2016, soil gas in the vicinity of the Tyndall Property continued to exhibit elevated concentrations of TCE, ethylbenzene, and chloroform.

69. The Army also conducted a vapor intrusion study at homes and businesses with known or suspected groundwater contamination from Fort Gillem, which included sampling the air inside the home formerly occupied by Plaintiff and Decedent on the Tyndall Property.

70. The study documented numerous contaminants in the crawl space and indoor air of Plaintiff and Decedent's former home, many of which were present in concentrations well above the listed background levels. Those contaminants included, among others, acetone, benzene, n-butane, carbon disulfide, carbon tetrachloride, chloroform, chloromethane, cyclohexane, dichlorodifluoromethane, 1,2-dichloroethane, ethylbenzene, n-heptane, n-hexane,  isopropyl alcohol, 4-isopropyltoluene, methyl ethyl ketone, methyl isobutyl ketone, methyl methacrylate, methylene chloride, n-propylbenzene, styrene, tetrachloroethene, toluene, freon 11, 1,2,4-trimethylbenzene, 1,3,5-trimethybenzene, and xylene.

21

71.     Upon information and belief, the contaminants described above were present in equivalent or greater concentrations in the surface water, groundwater, soil, sediment, and air of the Tyndall Property while Plaintiff and Decedent were living there.

72.     The Army's industrial operations and waste disposal activities at Fort Gillem are solely responsible for the contamination found on and near the Tyndall Property.

73.     The United States Environmental Protection Agency ("EPA") likewise has attributed the contamination solely to the Army, as communicated in a letter dated December 29, 2014, from Cynthia Giles, EPA Assistant Administrator, to Katherine Hammack, Assistant Secretary of the Army for Installations, Energy and Environment. In the letter, EPA explained: "There are . . . no industrial sources of contamination between the homes sampled during the Army's air study and Ft. Gillem. Further, there are no significant sources from the homeowners to account for the pattern of contamination. . . . As such, the available data provide compelling evidence that subsurface contamination in these areas is related to past Army operations."

### *Sources and Health Effects of Toxic Exposure to Decedent*

74.     As a stay-at-home mother, Decedent was almost continuously exposed to the Army's dangerous contamination through multiple pathways,

22

including through direct skin contact with soil and surface water, ingestion of surface water, and inhalation of toxic vapors.

75.    In particular, Decedent was an avid gardener. When tending to her plants, she routinely came into direct skin contact with contaminated soil on the Tyndall Property, and with contaminated surface water in the Western Stream, which she used for irrigation. Decedent also consumed the vegetables and fruits from her garden, which were contaminated by the soil and surface water used to grow them.

76.    Further, Decedent often played with her family using surface water from the Western Stream, including by spraying one another with a hose connected to the stream. This exposed Decedent to contaminated surface water through direct skin contact and ingestion.

77.    Decedent was also unknowingly forced to inhale toxic vapors each time she breathed, both from the air inside her home and from the ambient air on the Tyndall Property and in her neighborhood. The contamination of Decedent's home and property was exacerbated by flooding from the Western Stream, which occurred multiple times while Decedent lived there and which on some occasions inundated the crawl space under her home.

78.    In short, as a result of the exposure pathways described above, Decedent was exposed to toxic contaminants at a level greater than she would have

23

otherwise been, which in turn contributed to her developing, and ultimately dying from, non-Hodgkin lymphoma.

79.     Many of the contaminants present on the Tyndall Property are known or suspected carcinogens that are linked specifically to an increased risk of non-Hodgkin lymphoma, including at low exposure levels.

80.     For example, TCE is characterized by EPA as "carcinogenic in humans by all routes of exposure." This determination is shared by both the National Toxicology Program, an inter-agency program within the United States Department of Health and Human Services, and the International Agency for Research on Cancer. In particular, EPA has found that "the human evidence of carcinogenicity from epidemiological studies of TCE exposure is strong for non-Hodgkin Lymphoma," among other types of cancer.

81.     Benzene is likewise classified by EPA as a "known human carcinogen for all routes of exposure." A review of scientific literature reports that there is an association between benzene exposure and an increased risk of non-Hodgkins lymphoma.

82.     The Army knew or should have known, based on readily available chemical safety data sheets, government literature, and scientific research, that the specific chemicals disposed of at Fort Gillem were hazardous to human health and the environment.

83.    For example, the association between chronic benzene exposure and blood disorders was first observed in 1897, in a report of nine women, four of whom died, who worked in a rubber tire factory. Benzene was identified as the principle agent that caused their disease. Similar cases were reported at Johns Hopkins Hospital in the 1910s. Animal studies on benzene exposure took place in the 1910s and 1920s. By the 1930s, benzene had been linked to human cancer, and specifically cancer of the blood.

84.    In 1956, the United States Department of the Interior issued its publication Safety with Solvents which identified various solvents including TCE as hazardous and toxic. The 1956 Safety with Solvents publication specifically states: "Tetrachloroethane [TCE] is currently considered the most toxic of the chlorinated-hydrocarbon solvents in industrial use. Personal protective equipment is not a substitute for good, safe working conditions, adequate ventilation, and intelligent conduct on the part of persons working with [TCE] or in the area of its use."

**D. Defendant violated multiple mandatory legal obligations when it disposed of waste at Fort Gillem in a manner that foreseeably invaded private property and waterways, and when it failed timely to remediate its contamination and warn nearby residents of the hazards posed by the contamination.**

*Army Manuals & Executive Orders*

85. Several Army manuals, executive orders, and other directives prescribed mandatory duties that the Army had to follow in carrying out its industrial operations and waste disposal activities at Fort Gillem.

86. In 1946 and 1958, the War Department issued technical manual TM 5-634 on the collection and disposal of refuse. At least the 1958 version of the manual contained the following: "e. RAVINES. Do not use ravines if other sites are available. Before using a ravine for sanitary fill operation, reroute flow of excess drainage water"; and "g. WATER POLLUTION. Do not select sites which have surface or subsurface drainage to the water supply."

87. In 1941 and 1967, the Corps issued a manual on general safety requirements, which contained the following: "08.e.03. Disposal of surplus or excess materials shall be by burial in a manner which will not contaminate or pollute water supply, ground water, or streams."

88. In 1948, President Truman issued an Executive Order 10014, which directed:

> the heads of the departments, agencies, and independent establishments of the executive branch of the Government to take such action as may

26

be practicable, in cooperation with State and local authorities concerned with control of water pollution, to insure the disposal of sewage, garbage, refuse, and other wastes accumulated in the course or as a result of Federal activities, and industrial or manufactured foodstuffs and other products destroyed by order or under the supervision of Federal regulatory authorities, in such manner as will conform with programs formulated under State law and applicable to State agencies and the public generally for the preservation and improvement of the quality of surface and underground waters.

89.    In 1970, President Nixon issued Executive Order 11507, which required heads of agencies to:

ensure that all facilities under their jurisdiction are designed, operated, and maintained so as to meet the following requirements: … (5) No waste shall be disposed of or discharged in such a manner as could result in the pollution of ground water which would endanger the health or welfare of the public.

90.    The Army violated these mandatory directives—and, upon information and belief, other applicable manuals, policies, and contracts—when it failed to consider the impacts on water resources of its waste disposal activities, including the selection of poorly suited disposal sites, at Fort Gillem.

### *Refuse Act of 1899*

91.    Under Section 13 of the Rivers and Harbors Act of 1899, known as the Refuse Act of 1899, it is unlawful to discharge "any refuse matter of any kind or description whatever . . . into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed

27

into such navigable water," without first obtaining a permit from the Secretary of the Army. 33 U.S.C. § 407.

92.     The Western Stream, Conley Creek, and their tributaries are tributaries of the South River, which is a navigable-in-fact water of the United States.

93.     The Army had no discretion to discharge or cause to be discharged hazardous contaminants into the Western Stream, Conley Creek, and their tributaries, without first obtaining a permit under the Refuse Act. Upon information and belief, the Army failed at any time to apply for, much less obtain, a Refuse Act permit.

### Clean Water Act and Georgia Water Quality Control Act

94.     In 1972, Congress amended the Federal Water Pollution Control Act, commonly known as the Clean Water Act (the "CWA"), to prohibit the discharge of any pollutant from a point source into navigable waters, unless a permit was issued under the National Pollutant Discharge Elimination System ("NPDES"). Pub. L. No. 92-500, § 301(a), 86 Stat. 816, 844 (1972) (codified at 33 U.S.C. § 1311(a)).

95.     Section 402(k) of the CWA directed all owners or operators of point sources to apply for a NPDES permit within 180 days of the enactment date. *Id.* § 402(k), 86 Stat. at 883 (codified at 33 U.S.C. § 402(k)). The CWA also provided

28

that a copy of each permit application "shall be available to the public" and "shall further be available on request for the purpose of reproduction." *Id.* § 402(j), 86 Stat. at 883 (codified at 33 U.S.C. § 402(j)).

96.    Under Section 313 of the 1972 amendments, all federal departments and agencies "(1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants" were directed to comply with "Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements[.]" *Id.* § 313, 86 Stat. at 975 (codified as amended at 33 U.S.C. § 1323(a)). In 1977, Congress revised Section 313 to make clear that, among other state and local requirements, federal facilities must comply with "any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever)[.]" Pub. L. No. 95-217, § 61(a), 91 Stat. 1566, 1598 (1977) (codified at 33 U.S.C. § 1323(a)).

97.    The Georgia Water Quality Control Act (the "GWCA") sets forth limitations and procedures that facilities must follow to discharge pollutants into the waters of the state. Originally enacted in 1964, the GWCA made it "unlawful to use any water of the State for the disposal of sewage, industrial wastes, or other wastes, except in such manner as to conform to and comply with all rules,

29

regulations, orders, and permits established under the provisions of" the statute.

Ga. L. 1964, § 10 at 427–28 (codified as amended at O.C.G.A. § 12-5-29(a)). To

that end, the GWCA forbids any person, without first securing a permit from the

Georgia Water Quality Control Board,[1] to:

> construct, install or modify any system for disposal of sewage, industrial wastes, or other wastes or any extension or addition thereto when the disposal of the sewage, industrial wastes, or other wastes constitutes pollution as defined in this Act; increase the volume or strength of any sewage, industrial wastes or other wastes in excess of permissive discharges specified under any existing permit; or construct or use any new outlet for the discharges of any sewage, industrial wastes or other wastes into the waters of the state which constitutes pollution as defined in this Act.

*Id.* § 10 at 428 (codified as amended at O.C.G.A. § 12-5-29(b)).

98.    In 1974, the GWCA was amended to align Georgia's water pollution

control scheme with the CWA and to implement the NPDES permitting program

on the state level. Ga. L. 1974, at 599.

99.    The revised GWCA provided that "[a]ny person who owns or operates

a facility of any type or who desires to erect, modify, alter, or commence operation

of a facility of any type which results or will result in the discharge of pollutants

from a point source into the waters of the State," must obtain a permit from

GAEPD. *Id.* § 8 at 603 (codified at O.C.G.A. § 12-5-30(a)). For existing facilities

---

[1] The statute was later amended to make the Georgia Environmental Protection Division ("GAEPD") the permitting authority.

with pollutant discharges, the deadline to apply for a permit was 90 days after the effective date of the statute, or September 29, 1974. *Id.* § 8 at 603 (codified at O.C.G.A. § 12-5-30(a)). If, however, an existing facility's discharges presented "an immediate health hazard to the public," the GWCA expressly prohibited the discharges from continuing until GAEPD had taken final action on the facility's permit application. *Id.* A permit could be issued only after "public notice and an opportunity for public hearing" respecting the proposed discharge. *Id.*

100.   EPA delegated authority to the State of Georgia to issue NPDES permits in 1974. The State of Georgia was further delegated authority to issue permits regulating federal facilities like Fort Gillem in 1980, during the period when Plaintiff and Decedent resided at the Tyndall Property.

101.   Since Fort Gillem became operational in 1941, the Army discharged pollutants into waters of the State and waters of the United States. These discharges happened from the North Landfill Area, the Industrial Waste Treatment Plants, the Holding Pond, the Sewage Treatment Plants, and the Storm Drain System through several discernible, confined, or discrete conveyances, including pipes, culverts, ditches, channels, dump trucks and other vehicles, refuse piles, landfills, and other waste burial sites. Each of these conveyances constitutes a "point source" for purposes of the CWA and GWCA.

31

102.   As a result of these pollutant discharges, the Army had a non-discretionary duty to comply with the substantive and procedural requirements of the CWA and GWCA at least since 1964. In particular, the Army was required to cease its pollutant discharges, which posed an immediate hazard to the public, and secure a permit before the discharges could be allowed to resume. Yet, upon information and belief, only one permit was ever obtained for the discharges throughout Fort Gillem's history. That was a single NPDES permit covering effluent discharges from the Sewage Treatment Plant, obtained in the mid-1970s and in effect only until September 1978.

103.   The Army's failure to apply for, much less obtain, permits for the remaining discharges at Fort Gillem was a violation of mandatory duties imposed by the CWA and GWCA. In fact, in the 1980 Installation Assessment, the Army admitted that it had violated the GWCA by discharging effluent from the sludge drying beds at the Industrial Waste Treatment Plant rather than returning the effluent to the head of the plant.

104.   Further, by failing to submit the necessary permit applications, the Army deprived Plaintiff, Decedent, and other residents near Fort Gillem of critical information about the hazardous discharges at the installation.

105.   Had the Army applied for the required permits, information about the pollutants being discharged by the Army would have been made public under the

CWA and GWCA. Further, the State of Georgia or the EPA would have exercised regulatory control over the Army's discharges, establishing limitations to protect human health and the environment. None of that occurred, however, because the Army failed to apply for and obtain permits required by law.

### *Failure to Follow Mandatory Procedures in Taking Private Property*

106.    As described above, the Army invaded the Tyndall Property and the Western Stream with hazardous waste, a condition which persisted for decades, including the entire duration of Plaintiff and Decedent's occupation of the Tyndall Property. This physical invasion was the foreseeable, direct, and natural result of the Army's industrial operations and waste disposal activities at Fort Gillem.

107.    Under federal law, the Army's disposal of waste in a manner that foreseeably resulted in a permanent physical invasion of private property constituted a taking of private property for public use. The Army appropriated a property interest in the Tyndall Property and the Western Stream. In so doing, the Army deprived Plaintiff and Decedent of various protected property interests, including the right to exclude and the riparian right to receive water in its natural, unadulterated quality.

108.    Depending on the time period, the Army's authority to take private property for military use, including for operation of military forts, was conferred by the War Purposes Act of 1917, 40 Stat. 241 (eff. 1917-1956), or the Land

33

Acquisitions Authority Statute of 1956, 70A Stat. 148 (eff. 1956) (codified as amended at 10 U.S.C. § 2663(a)).

109. Through these statutes, Congress established specific, mandatory procedures for the Army to follow before it could take or use private property. Specifically, prior to taking and using any private property for public use, the Army was required to file a petition for condemnation in a court of proper jurisdiction. 10 U.S.C. § 2663(a)(2). Under Federal Rule of Civil Procedure 71A,[2] when filing such petition, the Army was obligated to provide detailed notice to affected property owners. The provisions of Rule 71A are specific and mandatory. Together, the Land Acquisitions Authority Statute and Rule 71A, or their predecessors, prescribe a specific course of conduct the Army must follow before it takes and uses private property for public use. These statutes removed any choice, authority, or discretion the Army had to take and use private property without first filing a petition for condemnation and providing notice.

110. In addition, the Army's taking of private property after 1970 was subject to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. This Act, which applied to all federal agencies, requires: "If

---

[2] Before promulgation of Rule 71A in 1951, federal law required the Army to follow state law procedures when filing a condemnation petition. Georgia law, like Rule 71A, prescribed specific actions the Army was required to follow, including providing notice to affected property. Ga. L. 1914 § 1, at 92.

any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings." Pub. L. 91-646, § 301(8), 84 Stat. 1894, 1905 (1971) (codified at 42 U.S.C. § 4651(8)).

111. The Army's own regulations independently required that it institute condemnation proceedings when taking private property. As recited in the relevant regulation, "[f]ee title, easements, or leasehold interests may be acquired by the exercise of right of eminent domain through the institution of condemnation proceedings." 32 CFR § 552.37(h)(1) (eff. 1957). The Army's own regulations do not permit it to take private property through any method other than institution of condemnation proceedings.

112. By disposing of waste in a manner that foreseeably and naturally resulted in a permanent invasion of private property, the Army took and used private property and failed to follow the mandatory procedures that both Congress and the Army itself established for taking private property for military use.

113. Neither before nor after taking Plaintiff and Decedent's property did the Army petition for condemnation or provide notice to the affected property owners.

114. The Army also never provided just compensation for the property taken, as required by the Fifth Amendment to the United States Constitution.

35

## COUNT I
### Negligence
**(Asserted by Plaintiff under the FTCA individually, as surviving spouse and personal representative for Decedent and as executor of Decedent's estate)**

115. Plaintiff restates and incorporates by reference, as if fully set forth herein, the above paragraphs 1 through 114.

116. As Decedent's surviving spouse, personal representative, and executor of Decedent's estate, Plaintiff may assert this claim on Decedent's behalf.

117. Under Georgia law, the elements of negligence are (1) the existence of a duty of care owed by the defendant, (2) a breach of that duty, (3) causation of the alleged injury, and (4) damages resulting from the alleged breach of the duty.

118. In carrying out its industrial operations and waste disposal activities at Fort Gillem, Defendant was subject to multiple duties under both Georgia and federal law.

119. Defendant had a duty to handle, discharge, and dispose of waste at Fort Gillem in a reasonable and lawful manner so as not to pollute State waters and expose nearby residents such as Decedent to hazardous contamination.

120. Defendant had a duty to warn nearby residents, including Decedent, of the hazards posed by Defendant's contamination of the environment on and around Fort Gillem.

121. Defendant had a duty to promptly remediate its known contamination of the environment on and around Fort Gillem.

122.   Defendant breached each of these duties to Decedent by engaging in the acts and omissions alleged in this Complaint.

123.   In particular, Defendant had actual or constructive knowledge that contaminants—including VOCs, SVOCs, metals, and pesticides—were handled, discharged, and disposed of at Fort Gillem.

124.   Defendant had actual or constructive knowledge that the contaminants handled, discharged, and disposed of at Fort Gillem were toxic and extremely hazardous to human health and the environment.

125.   Defendant had actual or constructive knowledge that the contaminants handled, discharged, and disposed of at Fort Gillem would, and did in fact, migrate outside the installation boundaries and, specifically, onto the Tyndall Property.

126.   Defendant had actual or constructive knowledge that the contaminants handled, discharged, and disposed of at Fort Gillem caused environmental contamination on Fort Gillem and in surrounding areas, including the Tyndall Property.

127.   As a direct, proximate, and foreseeable result of Defendant's negligent acts and omissions, Decedent was exposed to toxic contaminants at a level greater than she would have otherwise been, which in turn contributed to her developing non-Hodgkin lymphoma.

128. Defendant's failure to warn Decedent of the hazards posed by Defendant's contamination directly and proximately prevented Decedent from knowing the risks associated with living on the Tyndall Property, and prevented Decedent from seeking medical treatment in time to effectively mitigate or treat her cancer.

129. Defendant's failure to remediate the contamination of Fort Gillem and nearby properties, including the Tyndall Property, directly and proximately caused Decedent to be exposed to hazardous contaminants at a level greater than she would have otherwise been, which in turn contributed to her developing, and ultimately dying from, non-Hodgkin lymphoma.

130. Defendant's negligent acts and omissions directly and proximately caused Decedent pre-death physical and mental pain and suffering. Decedent underwent ten years of excruciating cancer treatment, including three complete rounds and one partial round of chemotherapy, total body radiation therapy, an allogenic bone marrow transplant, unsuccessful treatment for graft-versus-host disease, and countless doctor and hospital visits.

131. As Decedent's surviving spouse, personal representative, and executor of Decedent's estate, Plaintiff may recover for Decedent's pre-death pain and suffering.

132.   Defendant's negligent acts and omissions also directly and proximately caused Plaintiff to suffer a loss of consortium during Decedent's ten-year cancer battle. Decedent's cancer battle significantly limited her ability to provide Plaintiff society, companionship, love, and affection.

133.   As Decedent's surviving spouse, Plaintiff is entitled to recover for the loss of consortium he experienced as a result of Defendant's negligent acts and omissions.

## COUNT II
### Trespass
**(Asserted by Plaintiff under the FTCA as surviving spouse and personal representative for Decedent and as executor of Decedent's estate)**

134.   Plaintiff restates and incorporates by reference, as if fully set forth herein, the above paragraphs 1 through 133.

135.   As Decedent's surviving spouse, personal representative, and executor of Decedent's estate, Plaintiff may assert this claim on Decedent's behalf.

136.   Under Georgia common law and statute, including O.C.G.A. §§ 51-9-7 and 44-8-1, the pollution of a stream so as to interfere with a riparian landowner's enjoyment of the stream constitutes a trespass to property.

137.   The riparian right to have water flow upon land in its natural state, free from adulteration, is a private property right within the protection of the Georgia Constitution.

138.   Defendant's waste disposal activities at Fort Gillem caused hazardous contaminants to be discharged into the Western Stream, Conley Creek, and their tributaries and ultimately, onto the Tyndall Property. This contamination of the surface water, as well as the soil and groundwater, at the Tyndall Property with hazardous contaminants constituted a trespass, an unlawful invasion of Decedent's property, and a wrongful and prolonged interference with Decedent's right to the exclusive use and benefit of her property.

139.   As a direct, proximate, and foreseeable result of Defendant's trespass of the Tyndall Property, Decedent was exposed to hazardous contaminants at a level greater than she would have otherwise been, which in turn contributed to her developing, and ultimately dying from, non-Hodgkin lymphoma.

140.   Defendant's trespass directly and proximately caused Decedent pre-death physical and mental pain and suffering. Decedent underwent ten years of excruciating cancer treatment, including three complete rounds and one partial round of chemotherapy, total body radiation therapy, an allogenic bone marrow transplant, unsuccessful treatment for graft-versus-host disease, and countless doctor and hospital visits.

141.   Defendant's trespass also directly and proximately caused Plaintiff to suffer a loss of consortium during Decedent's ten-year cancer battle. Decedent's

cancer battle significantly limited her ability to provide Plaintiff society, companionship, love, and affection.

142.    As Decedent's surviving spouse, Plaintiff is entitled to recover for the loss of consortium he experienced as a result of Defendant's trespass.

## COUNT III
### Nuisance
**(Asserted by Plaintiff under the FTCA as surviving spouse and personal representative for Decedent and as executor of Decedent's estate)**

143.    Plaintiff restates and incorporates by reference, as if fully set forth herein, the above paragraphs 1 through 142.

144.    As Decedent's surviving spouse, personal representative, and executor of Decedent's estate, Plaintiff may assert this claim on Decedent's behalf.

145.    Georgia law recognizes that the discharge or release of harmful pollutants or substances may constitute a nuisance.

146.    Plaintiff and Decedent had the right to peacefully enjoy their property and reside there without fear of hazardous exposure to contaminants discharged from Fort Gillem.

147.    Defendant invaded Decedent's interest in the Tyndall Property by improperly handling, discharging, and disposing of contaminants at Fort Gillem, which caused surface water, groundwater, soil, and air on the Tyndall Property to become contaminated and harmful to human health.

41

148.   Defendant's improper handling, discharge, and disposal of contaminants at Fort Gillem caused hurt, inconvenience, and damage to Decedent and therefore constituted a nuisance.

149.   Defendant had exclusive control over the process for handling, discharging, and disposing of contaminants at Fort Gillem, and therefore exclusive control over the nuisance.

150.   Defendant knew that the contaminants it handled, discharged, and disposed of at Fort Gillem were toxic and extremely hazardous to human health.

151.   Defendant knew that these contaminants would, and did in fact, migrate outside the Fort Gillem boundaries and onto nearby properties, including the Tyndall Property.

152.   Defendant knew that these pollutants would cause environmental contamination of nearby properties, including the Tyndall Property.

153.   Decedent suffered special harms from the nuisance created and maintained by Defendant. After years of exposure to the nuisance created by Defendant, Decedent developed non-Hodgkin lymphoma, from which she ultimately died after ten years of excruciating treatment.

## COUNT IV
### Wrongful Death
### (Asserted by Plaintiff under the FTCA individually and as personal representative for Decedent)

154. Plaintiff restates and incorporates by reference, as if fully set forth herein, the above paragraphs 1 through 153.

155. Plaintiff is the surviving spouse and personal representative of Decedent Deborah E. Tyndall.

156. Plaintiff is entitled to recover for the wrongful death of Decedent, which resulted from Defendant's tortious acts. *See* O.C.G.A. §§ 51-4-2; 51-4-5.

157. Plaintiff is entitled to recover the full value of Decedent's life, O.C.G.A. §§ 51-4-1(2); 51-4-2(a), as well as the funeral, medical, and other necessary expenses for Decedent. O.C.G.A. § 51-4-5(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dwight Tyndall respectfully prays that this Court:

(a) Enter judgment for Plaintiff and against Defendant on all claims set forth herein;

(b) Award damages compensating Plaintiff for the full value of Decedent's life, under O.C.G.A. § 51-4-2(a);

(c) Award damages compensating Plaintiff for Decedent's funeral, medical, and other necessary expenses resulting her injury and death, under O.C.G.A. § 51-4-5(b);

43

(d)    Award damages compensating Plaintiff, on Decedent's behalf, for Decedent's pre-death physical and mental pain and suffering;

(e)    Award damages compensating Plaintiff for loss of consortium; and

(f)    Award all of other necessary and appropriate relief.

[signature on following page]

Respectfully submitted this 28th day of August, 2025.

*/s/ John L. Fortuna*
John L. Fortuna
Mathieu Erramuzpe
Ari Gordin
Michael Creswell
JONES FORTUNA LP
111 New Street, Suite A
Decatur, GA 30030
Phone: 404-850-3832
Email: jfortuna@jonesfortuna.com
     merramuzpe@jonesfortuna.com
     agordin@jonesfortuna.com
     mcreswell@jonesfortuna.com

*/s/ Michael A. Caplan*
Michael A. Caplan
Cameron B. Roberts
Alex Estroff
CAPLAN COBB LLC
75 Fourteenth Street NE, Suite 2700
Atlanta, GA 30309
Phone: 404-596-5600
Email: mcaplan@caplancobb.com
     croberts@caplancobb.com
     aestroff@caplancobb.com

*Counsel for Plaintiff Dwight G. Tyndall*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused a true and correct copy of the foregoing document to be filed with the clerk's office by this Court's CM/ECF system, which will serve a true and correct copy of the same upon all counsel of record.

This 28th day of August, 2025.

/s/ Michael A. Caplan
Michael A. Caplan
Georgia Bar No. 601039

*Counsel for Plaintiff Dwight G. Tyndall*