**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 1:22-cv-03136-SDG |

## SECOND AMENDED COMPLAINT[1]

1.    This is a civil action for damages arising out of the wrongful death and associated damages suffered by Plaintiff Dwight G. Tyndall and his deceased wife Deborah E. Tyndall ("Decedent").

2.    For decades, Defendant United States of America improperly disposed of harmful waste at Fort Gillem in Clayton County, Georgia, in a manner that contaminated surface water, groundwater, soil, and sediment on the

---

[1] Defendant consents to Plaintiff filing this Second Amended Complaint. *See* Joint Motion to Modify the Scheduling Order, Dkt. 44 at 3 ("Defendant consents to Plaintiff's filing of a Second Amended Complaint"); Fed. R. Civ. P. 15(a)(2) (stating that a pleading may be amended before trial "with the opposing party's written consent").

installation. As a result, harmful substances migrated off-base and into surrounding residential areas and streams, contaminating property where Plaintiff and Decedent lived for more than five years.

3.      As a result of the environmental contamination released by Defendant, Decedent was unknowingly exposed to many chemical carcinogens and other harmful substances as she went about her daily life. Because of this exposure, Decedent developed non-Hodgkin lymphoma, a form of cancer that affects white blood cells in the lymphatic system. Decedent succumbed to her illness after 10 years of grueling cancer treatments.

4.      Before and during the time when Plaintiff and Decedent lived near Fort Gillem, Defendant knew that its harmful waste was migrating outside the installation boundaries. Yet Defendant did not take the steps necessary to abate the sources of the environmental contamination or to remediate the private properties affected by it. Nor did Defendant make any effort to warn nearby residents, including Plaintiff and Decedent, about their risk of exposure to the contamination.

5.      Decedent's death was devastating for Plaintiff and his family. Plaintiff lost his life partner and was deprived of years of companionship. Plaintiff's children, Rebekah and Andy, have suffered immeasurably. Both were under ten years old when their mother was diagnosed with cancer, and they were forced to go through childhood without the comfort, aid, and love of their mother. Both children

went through counselling to deal with the emotional trauma from their mother's illness and death. And none of Plaintiff's eight grandchildren will ever know their grandmother, who undoubtedly would have played a loving and vital role in their lives.

6.     Defendant's acts and omissions were tortious under Georgia law, and it is liable for the harms inflicted on Plaintiff and Decedent under the Federal Tort Claims Act.

## PARTIES, JURISDICTION, AND VENUE

7.     Plaintiff Dwight G. Tyndall is the widower of Decedent Deborah E. Tyndall. Plaintiff and Decedent resided at 1743 Slate Road, Conley, Georgia 30288, from March 1977 until June 1982. Plaintiff now resides in Wills Point, Texas.

8.     Plaintiff brings this action under the Federal Tort Claims Act (the "FTCA"). 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671–2680. The FTCA grants subject matter jurisdiction to federal courts over claims against Defendant the United States of America, which includes the Department of the Army (the "Army"), seeking money damages for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1).

3

9.     Plaintiff has complied with all jurisdictional conditions precedent under 28 U.S.C. § 2675 of the FTCA.

10.     Plaintiff served the Army with notice of his and Decedent's claim on September 18, 2020. The Army denied his claim on February 28, 2022. Plaintiff commenced this civil action on August 8, 2022, within the six-month deadline under 28 U.S.C. § 2401.

11.     Plaintiff's claim to the Army contained all required information for a properly presented administrative claim.

12.     Venue is proper in this Court under 28 U.S.C. §§ 1402(b) and 1346(b), as the relevant events or omissions giving rise to this case occurred in Clayton County, Georgia, which is situated in this judicial district and division. 28 U.S.C. § 90(a)(2).

## FACTUAL BACKGROUND

13.     Plaintiff and Decedent owned and resided at 1743 Slate Road in Conley, Georgia (the "Tyndall Property"), from March 1977 until June 1982. The Tyndall Property was located less than 200 yards north of Fort Gillem, a military installation then operated by the Army, as shown in the graphic below.



14.    The Tyndall Property was crossed by an unnamed, perennial stream, known as the Western Stream, that originates on or near Fort Gillem and flows north through the Tyndall Property until it enters Conley Creek, a tributary of the South River, which is in turn a tributary of the Ocmulgee River. Conley Creek, the South River, and the Ocmulgee River are traditional navigable waters of the United States. The Western Stream is a non-tidal stream that is not capable of transporting boats loaded with freight in the course of trade. As the owner of land adjacent to a non-navigable stream, Plaintiff held title to the bed and bank of the Western Stream on the Tyndall Property.

5

15.     In 1982, while Plaintiff and Decedent were living at the Tyndall Property, Decedent first experienced symptoms of an illness that her family doctor was not able to diagnose at the time. Decedent's symptoms persisted, however, and she was diagnosed in 1987 with a type of non-Hodgkin lymphoma known as nodular poorly differentiated lymphocytic lymphoma. By the time Decedent was diagnosed, the cancer had progressed to stage IV and was considered incurable. Decedent was 32 years old.

16.     Over the next 10 years, Decedent underwent a series of painful treatments for non-Hodgkin lymphoma, including three complete rounds and one partial round of chemotherapy, total body radiation therapy, and an allogenic bone marrow transplant. While recovering from the bone marrow transplant, Decedent developed and received treatment for graft-versus-host disease, which required multiple doctor visits each week for approximately 18 months, until her death.

17.     Decedent died on June 12, 1997, due to a bacterial infection which her severely weakened immune system could not overcome.

A. For decades, Defendant contaminated the surface water, groundwater, soil, and sediment at Fort Gillem and outside its boundaries.

18.     From the 1940s until the installation was closed in 2011, the Army used Fort Gillem for training and material supply, research and development, procurement, production, storage, distribution, inventory management, maintenance, and disposal of surplus and waste materials.

19.    Pursuant to these operations, the Army generated and disposed of solid waste and harmful substances at Fort Gillem, including strong acids, bases, solvents, heavy metals, pesticides, waste oils, and materials associated with laboratory operations and vehicle maintenance.

20.    The Army's industrial operations and waste disposal activities at Fort Gillem resulted in contamination of surface water, groundwater, soil, and sediment by volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), metals, and pesticides, including, but not limited to, trichloroethene ("TCE"), tetrachloroethene, and 1,1,2,2-tetrachloroethane. These substances were discarded, discharged, and migrated outside the installation boundaries via groundwater and surface water, including the Western Stream, into surrounding residential areas such as the Tyndall Property. The contamination of the Tyndall Property occurred before and during the period when Plaintiff and Decedent lived at the property.

21.    The invasion of neighboring property and natural resources with harmful substances was not only foreseeable to the Army, but the Army continued the invasion even after it had actual knowledge of both the invasion and the resulting environmental harm. While Plaintiff and Decedent lived at the Tyndall Property, the Army never removed the contaminants that it had previously caused to invade the Tyndall Property and the Western Stream. Further, the Army

continuously allowed additional contaminants from Fort Gillem to invade the Tyndall Property and the Western Stream.

22. The Army has investigated and known about the environmental contamination at Fort Gillem, and the potential for off-base migration, at least since 1979. These investigations have documented many sources at the installation from which the Army released the toxic and harmful contamination to which Decedent was exposed, including: (1) the "North Landfill Area," (2) the "Industrial Waste Treatment Plant," (3) the "Holding Pond," (4) the "Eastern and Western Sewage Treatment Plants," and (5) the "Storm Drain System."

### *North Landfill Area*

23. Located near the northern boundary of Fort Gillem, the North Landfill Area comprises more than 300 acres where the Army disposed of waste from 1941 until approximately 1980.

24. The topography of the North Landfill Area varies from a gently rolling central highland to a hill and valley sequence that extends out from this central area. Surface runoff flows toward the north and northwest through two major stream valleys/ravines, one of which includes the Western Stream and its tributaries. Elevations range from approximately 855 feet above mean sea level along the stream valleys/ravines to approximately 965 feet above mean sea level on top of hills.

25.    The Army developed the North Landfill Area without any master plan or engineer's plan. As such, the Army's disposal of waste there was not confined to sanitary landfills but was spread, often randomly, across some 356 locations used for localized landfilling, trenching, burning, indiscriminate burial, and surface disposition.

26.    The North Landfill Area was the principal location for the disposal of surplus equipment, industrial waste, and other materials, including food products; sludge from the Industrial Waste Treatment Plant and the Eastern and Western Sewage Treatment Plants; dichlorodiphenyltrichloroethane ("DDT") drums; rubber products; pharmaceutical and surgical supplies; petroleum, oil, and lubricants; XXCC-3 (carbon tetrachloride and chloroform); and gas mask parts. Exploratory trenching, drums removals, and other excavation work have confirmed the presence of metals, solvents, waste petroleum, waste motor oil, XXCC-3 powder, VOCs, SVOCs, and pesticides, as well as a former burn pit near the Western Stream.

27.    The harmful waste disposed of in the North Landfill Area was conveyed by multiple pathways into surface water, groundwater, soil, and sediment onto the Tyndall Property. By way of example:

  a. Some burial sites were located in or near the floodplains of the Western Stream and its tributaries, including in stream

valleys/ravines. For example, environmental investigations of the North Landfill Area describe waste disposal by random dumping over the edge of ravines. As a result, harmful substances and solid materials were discharged either directly or through permeable sediment into the Western Stream and its tributaries, upstream of the Tyndall Property.

b. Surface runoff from rainfall flowed over and into burial sites, some of which were eroded and therefore had waste exposed directly to the elements. As a result, the surface runoff transported harmful substances and solid materials and discharged them via drainage swales, ditches, and other conveyances into the Western Stream and its tributaries, upstream of the Tyndall Property. This effect was exacerbated due to the large quantity of non-permeable paved and "roofed-over" areas on the installation, which increased the rate and volume of stormwater flow and caused excessive amounts of stormwater to be discharged.

c. Rainfall infiltrated through burial sites and into the soil below, contaminating groundwater. The contaminated groundwater was discharged into the Western Stream and its tributaries, upstream of

the Tyndall Property, or migrated as a plume downgradient toward the Tyndall Property.

d. Contaminated leachate flowed out of burial sites and was discharged into the Western Stream and its tributaries either directly, as leachate springs or seeps, through permeable sediment, or by surface runoff, upstream of the Tyndall Property. Contaminated leachate also infiltrated into groundwater, where it was discharged into the Western Stream and its tributaries or migrated as a plume downgradient toward the Tyndall Property.

e. Waste was discarded in trenches that were excavated to depths below or in close proximity to the ground water table, resulting in waste being placed in direct and continuous contact with groundwater. As a result, harmful substances freely entered the groundwater, where they migrated to groundwater-fed streams, including the Western Stream and its tributaries, upstream of the Tyndall Property.

28.    In addition to contaminating the Tyndall Property, harmful substances migrated from the North Landfill Area via the pathways described above into private wells and springs that were used as drinking water sources in the vicinity of the Tyndall Property.

29.     The discharge and migration of harmful substances into natural resources and onto private property began as early as the 1940s, when the Army started to use the North Landfill Area, and continued throughout the entire period when Plaintiff and Decedent lived at the Tyndall Property.

### *Industrial Waste Treatment Plant*

30.     The Army began operation of the Industrial Waste Treatment Plant at Fort Gillem in the mid- to late 1940s. The plant received waste consisting of oils and greases, paint chips, paint stripper, phosphates, phenols, chromates, rust, solvents, suspended matter, alkaline cleaning solutions, cleaning compounds, stripping compounds, soil, and rinse water. Miscellaneous waste, such as concentrated solutions discharged periodically from process tanks, was also transported by the Army to holding tanks at the Industrial Waste Treatment Plant for treatment.

31.     The Army discharged polluted effluent from the Industrial Waste Treatment Plant into a tributary of Conley Creek.

32.     Upon information and belief, the Army's operation of the Industrial Waste Treatment Plant contaminated soil and groundwater in the area with harmful substances.

33.     The Tyndall Property was located approximately 1.25 miles from, and downgradient of, the Industrial Waste Treatment Plant. Upon information and

belief, contaminated groundwater migrated from the Industrial Waste Treatment Plant toward the Tyndall Property, causing and contributing to the contamination on the property and in the Western Stream.

34.    At the Industrial Waste Treatment Plant, the Army generated sewage sludge containing harmful substances as a byproduct of the treatment process. This sewage sludge was removed to drying beds, where effluent from the underdrains was discharged, untreated, into a tributary of Conley Creek. The Army disposed of dried sewage sludge in the North Landfill Area at least until 1972, thereby exacerbating, causing, and contributing to the toxic and harmful releases and discharges from the North Landfill Area, described above.

35.    The Industrial Waste Treatment Plant was closed in 1978.

### *Holding Pond*

36.    The Army owned and operated the Holding Pond located at or near the Industrial Waste Treatment Plant. The Army used the Holding Pond to hold polluted effluent from the Industrial Waste Treatment Plant until the effluent overflowed into a tributary of Conley Creek.

37.    Although the Holding Pond was placed on standby in 1978, it continued to accumulate rainwater while inactive. And because the pond was unlined and contained contaminants from past treatment operations, those

contaminants were continually discharged into a tributary of Conley Creek by surface water flow and groundwater infiltration.

38.    Upon information and belief, the Army's operation of the Holding Pond contaminated soil and groundwater in the area with harmful substances.

39.    The Tyndall Property was located approximately 1.25 miles from, and downgradient of, the Holding Pond. Upon information and belief, contaminated groundwater migrated from the Holding Pond toward the Tyndall Property, causing and contributing to the contamination on the property and in the Western Stream.

### *Eastern and Western Sewage Treatment Plants*

40.    The Army operated the Eastern Sewage Treatment Plant from 1941 until 1951. The plant was located along the northern boundary of Fort Gillem, east and upgradient of the North Landfill Area. Upon information and belief, the Army received and treated both domestic waste and, until the construction of the Industrial Waste Treatment Plant, industrial waste containing harmful substances at the Eastern Sewage Treatment Plant.

41.    The Army began operation of the Western Sewage Treatment Plant in 1951 until it closed in 1978. From 1971 to 1972, the Western Sewage Treatment Plant received and treated 568,000 to 1,136,000 liters of sewage per day.

42. Upon information and belief, the Army discharged polluted effluent from the Eastern and Western Sewage Treatment Plants into tributaries of Conley Creek.

43. Upon information and belief, the Army's operation of the Eastern and Western Sewage Treatment Plants contaminated soil and groundwater in their respective areas with harmful substances.

44. The Tyndall Property was located approximately 1,800 feet from the Eastern Sewage Treatment Plant; less than one mile from the Western Sewage Treatment Plant; and downgradient of both the Eastern and Western Sewage Treatment Plants. Upon information and belief, contaminated groundwater migrated from the Eastern and Western Sewage Treatment Plants toward the Tyndall Property, causing and contributing to the contamination on the property and in the Western Stream.

45. Upon information and belief, the Army disposed of the sewage sludge that it generated at the Eastern and Western Sewage Treatment Plants in the North Landfill Area, thereby exacerbating, causing, and contributing to the toxic and harmful releases and discharges from the North Landfill Area, described above.

### *Storm Drain System*

46. At Fort Gillem, an east-to-west trending ridge crosses the entire width of the installation and divides it into two major drainage basins—one flowing north

15

to Conley Creek and its tributaries, including the Western Stream, and the other flowing south to Cotton Indian Creek and Upton Creek.

47.    The Storm Drain System in the northern drainage basin consisted of eight culverts or streams that discharged stormwater from the northern half of Fort Gillem, which included the Industrial Waste Treatment Plant, the Eastern and Western Sewage Treatment Plants, the North Landfill Area, and multiple warehouses and other storage areas.

48.    When precipitation and surface runoff came into contact with the harmful materials stored, discarded, or otherwise exposed on the northern half of Fort Gillem, the water became contaminated and was discharged into the Western Stream, Conley Creek, and their tributaries, upstream of the Tyndall Property.

**B. It was foreseeable and known to Defendant that Fort Gillem's contaminants would migrate onto the Tyndall Property.**

49.    For more than 20 years before Plaintiff and Decedent moved to the Tyndall Property, the Army had actual or constructive knowledge that the harmful substances in its waste were migrating beyond the boundaries of Fort Gillem and causing serious harm to private property and natural resources. It was foreseeable to the Army that, when it disposed of and discharged contaminants at Fort Gillem, they would migrate into the Western Stream, Conley Creek, and their tributaries and onto the Tyndall Property, which is mere yards from the installation boundaries and just downstream of Fort Gillem.

50.     Military and government literature made clear that contamination of groundwater and surface water was foreseeable when disposing of waste near waterways. For example, in 1946, the United States Department of War (the "War Department"), now the Army, issued technical manual TM 5-634 on the collection and disposal of refuse, which contained the following mandatory directives regarding the disposal of waste: "Do not use ravines if other sites are available. Before using a ravine for sanitary fill operation, reroute flow of excess drainage water." TM 5-634 further directed Army personnel: "Do not select sites which have surface or subsurface drainage to the water supply."

51.     As early as 1958, the United States Army Corps of Engineers ("USACE") issued engineer manual EM 385-1-1 on general safety requirements, which contained the following mandatory directive: "Contamination or pollution of any river, stream, or public waters is prohibited and compliance with all Federal, State, and local laws concerning contamination of water resources shall be strictly observed." A revision to EM 385-1-1 published in 1967 reiterated this prohibition on water pollution and contained an additional requirement concerning waste disposal: "Disposal of surplus or excess materials and containers shall be by burial in a manner which will not contaminate or pollute water supply, ground water, or streams."

52.     In 1968, the United States Department of Health, Education and Welfare published a guidance document called *Sanitary Landfill Facts*, which warned: "the potential danger of ground and surface water pollution resulting from the landfill cannot be overlooked." The document explained that, when waste "is intermittently or continuously in contact with ground water, the ground water can become grossly polluted and unfit for domestic or irrigational use."

53.     *Sanitary Landfill Facts* directed that, prior to disposing of waste, the "ground water table must be located and information obtained on the historical high ground water level and on the general movement of the ground water." The document also mandated that "drainage must be provided both during the filling operation and for the completed landfill," and cautioned that, "if pumping or good drainage is not provided, the trenches will fill with water, resulting in possible ground or surface water pollution."

54.     In 1969, 42 C.F.R. § 76.8(a)(4) was promulgated to make compliance with *Sanitary Landfill Facts* mandatory for landfills at federal facilities, including Fort Gillem.

55.     The Army knew or should have known about the topography of the North Landfill Area, including the existence of stream valleys/ravines, rolling hills, and associated surface drainage patterns, such that it was foreseeable that waste disposed of in this area would come into contact with surface runoff flowing to the

Western Stream, Conley Creek, and their tributaries. During rain events, the flow of stormwater over and through burial sites and into surface waters would have been observable to the Army.

56.     It was also observable to the Army that leachate springs or seeps had formed in the North Landfill Area such that groundwater was rising directly out of disposal sites and flowing overland via drainage swales and other conveyances into the Western Stream and its tributaries. These leachate springs were discolored, malodorous, and featured a chromatic sheen, which distinguished them from normal stream flow or surface runoff. As such, the release and discharge of this contaminated leachate would have been observable to the Army.

57.     Given the close proximity of burial sites to the installation boundary and to surface waters, it was foreseeable that buried waste would leach contaminants into groundwater, and that contaminated groundwater plumes would migrate to surface waters, including the Western Stream, Conley Creek, and their tributaries, and to surrounding residential areas.

58.     Further, the Army had actual knowledge that it was contaminating nearby properties and waters outside the Fort Gillem boundaries. For example, multiple fish kills occurred in Joy Lake, a private recreational lake just south of Fort Gillem, in 1952, 1956, and 1966, which the Army suspected were caused by contamination discharged from the installation. In 1973, the presence of DDT in

Joy Lake caused another fish kill, for which the Army accepted responsibility and paid the lake owner a settlement of $40,000, which is equivalent to approximately $300,000 in 2026 dollars.

59.    Between 1960 and 1962, there was a fish kill in Slate Pond just north of Fort Gillem that was caused by paint stripper compounds discharged from the installation. Again, the Army agreed to compensate the pond's owner by replacing the fish.

60.    In 1972, the Army's Environmental Hygiene Agency ("USAEHA") studied surface water quality at Fort Gillem while the Industrial Waste Treatment Plant and the Western Sewage Treatment Plant were operational. The USAEHA study concluded that the effluent from each plant was so polluted that it could not support a stable, diverse aquatic community in Conley Creek within 3.2 kilometers of Fort Gillem. In particular, the study classified the effluent from the Industrial Waste Treatment Plant as "toxic" based on its suppression of biological diversity.

61.    At least since 1973, the Army was also on notice that the waste buried at Fort Gillem was being washed into streams, such as the Western Stream, Conley Creek, and their tributaries, and transported into surrounding residential areas. That year, for example, nearby residents found dextrose kits with needles that had originated from disposal sites on the installation.

20

62.     In March 1980, the Army's Toxic and Hazardous Materials Agency published an Installation Assessment of Fort Gillem (Report No. 167) (the "1980 Installation Assessment") that documented the widespread pollution problems at the installation and the risk of migration and exposure to nearby residential areas.

63.     Among other findings, the 1980 Installation Assessment explained: "The most serious water quality impact concerns the contaminated materials buried in the installation perimeter areas during the period from 1948 to 1972. These materials are known to be causing direct, continuing impacts to surface water quality." This statement referred at least in part to the harmful waste disposed of in the North Landfill Area.

64.     The 1980 Installation Assessment concluded that there was a potential for the contamination at Fort Gillem to migrate beyond the installation boundaries by surface and subsurface means. In particular, the report explained that contaminants could be spread by surface runoff, migration through groundwater, leachate flow, and migration through permeable sediment.

65.     Despite its actual knowledge of the contamination emanating from Fort Gillem reflected in the 1980 Installation Assessment and other sources, the Army failed to disclose the contamination to neighboring property owners, former owners, or the public.

21

66.    The contamination was not known to Plaintiff and could not have been known using reasonable diligence. Indeed, Plaintiff did not discover the fact of the contamination until 2019 through an Atlanta Journal-Constitution article.

**C. The Tyndall Property was in fact contaminated with carcinogenic substances from Fort Gillem, exposing Decedent to an elevated risk of developing non-Hodgkin lymphoma.**

67.    When Plaintiff and Decedent lived at the Tyndall Property, the surface water, groundwater, soil, sediment, and air at the property was highly contaminated with harmful substances as a result of the Army's industrial operations and waste disposal activities at Fort Gillem.

*Environmental Sampling Data*

68.    For decades, the Army has authorized environmental studies in the area north of Fort Gillem to determine whether, and to what extent, contamination was migrating outside the installation. The inescapable conclusion of these studies is that migration has long been occurring, with some of the highest levels of contamination detected on or near the Tyndall Property.

69.    For example, four groundwater contamination plumes, three of which have migrated beyond the Fort Gillem boundary and into surrounding property, have been detected at the North Landfill Area. Groundwater contaminants have been documented at least since 1995, including benzene, carbon tetrachloride, chloroform, cis-1,2-dichloroethene, 1,1,2,2-tetrachloroethane, trans-1,2-

dichloroethene, trichloroethene (TCE), 1,2,2-trimethylbenzene, and vinyl chloride. The concentrations of these contaminants measured in the groundwater plumes emanating from the North Landfill Area meet or exceed federal thresholds for drinking water quality and cancer risk screening.

70.    In the mid-1990s, surface water collected from the Western Stream exceeded Georgia in-stream standards for VOCs and metals.

71.    In 2000, groundwater sampling detected a contaminated plume with TCE concentrations exceeding Georgia standards, which flowed north-northeast from the North Landfill Area in the direction of the Tyndall Property and the Western Stream.

72.    Also in 2000, surface water and sediment sampling in the Western Stream reinforced that a contaminated groundwater plume was migrating from the North Landfill Area and discharging into the Western Stream. In particular, this study found that concentrations of 1,1,2,2-tetrachloroethane exceeded Georgia in-stream standards at sampling points immediately adjacent to the Tyndall Property. TCE was also present in all of the water samples collected from the Western Stream, both within and outside the Fort Gillem boundaries. The highest concentrations of TCE were found at sampling points immediately adjacent to the Tyndall Property.

73.    In March 2016, additional groundwater samples were collected immediately adjacent to the Tyndall Property, which continued to show elevated concentrations of TCE, chloroform, and benzene.

74.    Numerous contaminants have also been detected in soil gas from both the North Landfill Area and off-site residential areas, including the Tyndall Property. At least since 1993, soil gas collected from the North Landfill Area has exhibited the following contaminants: dichlorobenzene, 1,1-dichloroethane, trichlorofluoromethane, vinyl chloride, methylene chloride, ethylbenzene, trichloroethene, benzene, toluene, xylene, chlorobenzene, trans-1,2-dichloroethene, isopropyltoluene, tetrachloroethene, and l,2-dichloropropane.

75.    In 2003, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, tetrachloroethene, toluene, ethylbenzene, and xylene were found in soil gas in residential areas directly north of the North Landfill Area near Slate Road and Mallard Road, the exact location of the Tyndall Property.

76.    In 2014, additional soil gas samples taken north of Fort Gillem showed elevated concentrations of several contaminants, including 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, 1,2-dichloropropane, benzene, chloroform, naphthalene, xylene, tetrachloroethene, trichloroethene (TCE), and toluene.

77.    And as recently as 2016, soil gas in the vicinity of the Tyndall Property continued to exhibit elevated concentrations of TCE, ethylbenzene, and chloroform.

78.    In or around 2014, the Army also conducted a vapor intrusion study at homes and businesses with known or suspected groundwater contamination from Fort Gillem, which included sampling the air inside the home formerly occupied by Plaintiff and Decedent on the Tyndall Property.

79.    The study documented numerous contaminants in the crawl space and indoor air of Plaintiff and Decedent's former home, many of which were present in concentrations well above the listed background levels. Those contaminants included, among others, acetone, benzene, n-butane, carbon disulfide, carbon tetrachloride, chloroform, chloromethane, cyclohexane, dichlorodifluoromethane, 1,2-dichloroethane, ethylbenzene, n-heptane, n-hexane, isopropyl alcohol, 4-isopropyltoluene, methyl ethyl ketone, methyl isobutyl ketone, methyl methacrylate, methylene chloride, n-propylbenzene, styrene, tetrachloroethene, toluene, freon 11, 1,2,4-trimethylbenzene, 1,3,5-trimethybenzene, and xylene.

80.    Upon information and belief, the contaminants described above were present in equivalent or greater concentrations in the surface water, groundwater, soil, sediment, and air of the Tyndall Property and the Western Stream while Plaintiff and Decedent were living at the property.

81.     The Army's industrial operations and waste disposal activities at Fort Gillem are solely responsible for the contamination found on and near the Tyndall Property.

82.     The United States Environmental Protection Agency ("EPA") likewise has attributed the contamination solely to the Army, as communicated in a letter dated December 29, 2014, from Cynthia Giles, EPA Assistant Administrator, to Katherine Hammack, Assistant Secretary of the Army for Installations, Energy and Environment. In the letter, EPA explained: "There are . . . no industrial sources of contamination between the homes sampled during the Army's air study and Ft. Gillem. Further, there are no significant sources from the homeowners to account for the pattern of contamination. . . . As such, the available data provide compelling evidence that subsurface contamination in these areas is related to past Army operations."

### *Sources and Health Effects of Toxic Exposure to Decedent*

83.     As a stay-at-home mother, Decedent was almost continuously exposed to the Army's dangerous contamination through multiple pathways, including through direct skin contact with soil and surface water, ingestion of surface water, and inhalation of toxic vapors.

84.     In particular, Decedent was an avid gardener. When tending to her plants, she routinely came into direct skin contact with contaminated soil on the

Tyndall Property and with contaminated surface water in the Western Stream, which she used for irrigation. Decedent also consumed the vegetables and fruits from her garden, which were contaminated by the soil and surface water used to grow them.

85. Further, Decedent often played with her family using surface water from the Western Stream, including by spraying one another with a hose connected to the stream. This exposed Decedent to contaminated surface water through direct skin contact and ingestion.

86. Decedent was also unknowingly forced to inhale toxic vapors each time she breathed, both from the air inside her home and from the ambient air on the Tyndall Property and in her neighborhood. The contamination of Decedent's home and property was exacerbated by flooding from the Western Stream, which occurred multiple times while Decedent lived there and which on some occasions inundated the crawl space under her home.

87. In short, as a result of the exposure pathways described above, Decedent was exposed to toxic contaminants at a level greater than she would have otherwise been, which in turn caused or contributed to her developing, and dying from, non-Hodgkin lymphoma.

27

88.    Many of the contaminants present on the Tyndall Property are known or suspected carcinogens that are linked specifically to an increased risk of non-Hodgkin lymphoma, including at low exposure levels.

89.    For example, TCE is characterized by EPA as "carcinogenic in humans by all routes of exposure." This determination is shared by both the National Toxicology Program, an inter-agency program within the United States Department of Health and Human Services, and the International Agency for Research on Cancer. In particular, EPA has found that "the human evidence of carcinogenicity from epidemiological studies of TCE exposure is strong for non-Hodgkin Lymphoma," among other types of cancer.

90.    Benzene is likewise classified by EPA as a "known human carcinogen for all routes of exposure." A review of scientific literature reports that there is an association between benzene exposure and an increased risk of non-Hodgkins lymphoma.

91.    The Army knew or should have known, based on readily available chemical safety data sheets, government literature, and scientific research, that the specific chemicals disposed of at Fort Gillem were harmful to human health and the environment.

92.    For example, the association between chronic benzene exposure and blood disorders was first observed in 1897, in a report of nine women, four of

28

whom died, who worked in a rubber tire factory. Benzene was identified as the principle agent that caused their disease. Similar cases were reported at Johns Hopkins Hospital in the 1910s. Animal studies on benzene exposure took place in the 1910s and 1920s. By the 1930s, benzene had been linked to human cancer, and specifically cancer of the blood.

93.     In 1956, the United States Department of the Interior issued its publication Safety with Solvents which identified various solvents including TCE as hazardous and toxic. The 1956 Safety with Solvents publication specifically states: "Tetrachloroethane [TCE] is currently considered the most toxic of the chlorinated-hydrocarbon solvents in industrial use. Personal protective equipment is not a substitute for good, safe working conditions, adequate ventilation, and intelligent conduct on the part of persons working with [TCE] or in the area of its use."

**D. Defendant violated multiple mandatory legal obligations when it disposed of waste at Fort Gillem in a manner that foreseeably invaded private property and waterways, and when it failed timely to remediate its contamination and warn nearby residents of the hazards posed by the contamination.**

94.     Statutes, regulations, executive orders, and agency manuals imposed mandatory duties on the Army that governed its industrial operations and waste disposal activities. The Army was required to follow these mandatory duties in carrying out industrial operations and waste disposal activities at Fort Gillem.

29

95.     However, as detailed below, the Army not only violated each of these duties by its actions at Fort Gillem, but it made little, if any, attempt at compliance to the point that the Army demonstrated blatant disregard for its environmental obligations spanning many decades. The Army was careless and inattentive in its failure to perform nondiscretionary duties, causing the injuries suffered by Decedent and Plaintiff.

### *Refuse Act of 1899*

96.     Under section 13 of the Rivers and Harbors Act of 1899, known as the Refuse Act of 1899, it is unlawful to discharge or to cause or suffer to be discharged "any refuse matter of any kind or description whatever . . . into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water . . . ." 33 U.S.C. § 407.

97.     The Western Stream is a tributary of Conley Creek, a navigable water of the United States, which is in turn a tributary of the South River, also a navigable water of the United States.

98.     The Army discharged, or caused or suffered to be discharged, refuse into the Western Stream, Conley Creek, and their tributaries from the North Landfill Area, the Industrial Waste Treatment Plant, the Holding Pond, the Eastern and Western Sewage Treatment Plants, and the Storm Drain System. Upon

discharge, this refuse was susceptible to float or be washed, and, upon information and belief, in fact did float and was washed, into the South River.

99.    The Army had no discretion to discharge, or to cause or suffer to be discharged, refuse into the Western Stream and Conley Creek.

100.    While the Refuse Act allows certain material to be discharged in strict compliance with a permit, *see* 33 U.S.C. § 407, the Army failed at any time to apply for, much less obtain, authorization for its discharges of refuse into the Western Stream and Conley Creek.

101.    The Army's failure to comply with the prohibitions contained in the Refuse Act caused refuse to migrate onto the Tyndall Property and surrounding areas, and in turn exposed Decedent to harmful contamination. This violation of a specific and mandatory duty was a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

### *Army Manual TM 5-634*

102.    In 1946, the War Department issued technical manual TM 5-634 concerning the collection and disposal of waste. (Ex. 1.) The manual contained the following mandatory directives for selecting disposal sites: "Do not use ravines if other sites are available. Before using a ravine for sanitary fill operation, reroute flow of excess drainage water." (Ex. 1 at US_00037066.) TM 5-634 further

provides: "Do not select [disposal] sites which have surface or subsurface drainage to the water supply." (*Id.*)

103. The 1946 version of TM 5-634 also contained specific operational requirements for disposal sites, including covering waste routinely, sealing and revegetating trenches upon completion, and prohibiting open dumps. (Ex. 1 at US_00037051, US_00037070–75, US_00037077.)

104. In 1958, the Army amended and re-promulgated TM 5-634. (Ex. 2.) The 1958 version contained similar operational requirements as the 1946 version. (Ex. 2 at US_00034903–06, US_00034911.) It additionally required that trenches and landfills be graded in a gradual slope to the original ground level to minimize erosion and exposure of the refuse. (Ex. 2 at US_00034906, US_00034911.) The manual stressed that "the necessity for complete sealing and compaction cannot be overemphasized." (Ex. 2 at US_00034906.) And it mandated that a "maintenance program will be established for the first several years to periodically inspect the completed sanitary fill and make corrections where indicated." (Ex. 2 at US_00034911.)

105. The 1958 version also continued the site selection requirements from the 1946 version with minor revisions, instructing: "Do not select sites which have surface or subsurface drainage which may pollute a water supply." (Ex. 2 at

US_0034901.) The Army was further required to "[c]onsult specialists from higher headquarters before a final selection [for a disposal site] is made." (*Id.*)

106. The Army violated both the 1946 and 1958 versions of TM 5-634 during the periods when they were effective by, at a minimum:

a. Disposing of waste in ravines in the North Landfill Area when other sites were available and without considering the availability of other sites;

b. Failing to reroute flow of excess drainage water before using ravines for sanitary fill operations;

c. Selecting sites for waste disposal which had surface or subsurface drainage to water supplies and which had the potential to pollute water supplies;

d. Engaging in open dumping of waste and failing to cover, seal, grade, and revegetate disposal sites as directed;

e. Failing to establish or implement a maintenance plan for completed disposal sites;

f. Selecting sites for disposal of waste without first consulting specialists from higher headquarters; and

g. Failing to provide consideration to the duties set forth in (a) through (f) above in the course of its waste disposal activities.

107.   As a result of its failure to comply with the site selection and operational requirements of TM 5-634, the Army disposed of waste at sites in the North Landfill Area that had high potential to, and in fact did, contaminate groundwater and surface water, including the Western Stream, Conley Creek, and their tributaries, as well as the Tyndall Property. These violations of specific and mandatory duties were a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

*USACE Manual EM 385-1-1*

108.   In 1958, USACE issued engineer manual EM 385-1-1 which established general safety requirements for all USACE activities and operations. (Ex. 3.) The manual was revised and reissued in 1967 and 1977, respectively. (Ex. 4 (1967 version); Ex. 5 (1977 version).)

109.   All three versions of EM 385-1-1 expressly prohibited contamination or pollution of any river, stream, or public water by poisonous and harmful substances. (Ex. 3 at 12: Ex. 4 at US_00034361; Ex. 5 at US_00034553.)

110.   In 1967, USACE included an additional directive in the manual specifically addressed at waste disposal, which provided: "Disposal of surplus or excess materials and containers shall be by burial in a manner which will not contaminate or pollute water supply, ground water, or streams." (Ex. 4 at US_00034365.) The 1977 version similarly required that "[d]isposal of surplus or

34

excess materials and containers shall occur in a manner which will not contaminate or pollute water supply, ground water, or streams, and will comply with Federal, State, and local regulations and guidelines." (Ex. 5 at US_00034556.)

111. Upon information and belief, USACE had control over, or had assumed operation of, at least in part, the disposal of waste at Fort Gillem, including in the North Landfill Area. As such, EM 385-1-1 was applicable to waste disposal activities at the installation and the North Landfill Area.

112. While each version of EM 385-1-1 was effective, USACE violated the manual by disposing of waste, including harmful substances, in a manner that caused contamination of groundwater and surface water, including the Western Stream, which migrated onto the Tyndall Property. Moreover, USACE failed to consider the potential for groundwater or surface water contamination in the course of its waste disposal activities, such that it could have avoided the contamination that in fact occurred and therefore complied with EM 385-1-1. These violations of specific and mandatory duties were a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

### *42 C.F.R. Part 76*

113. In 1969, the United States Department of Health, Education, and Welfare promulgated 42 C.F.R. § 76.8(a)(4), which mandated in relevant part: "Wastes that are disposed of in sanitary landfills [at federal facilities] shall be

35

disposed of in accordance with procedures described in 'Sanitary Landfill Facts' . . . ." (Ex. 6 at 7.) This requirement applied to "both new and existing Federal facilities and buildings," including Fort Gillem. (Ex. 6 at 4 (codified at 42 C.F.R. § 76.3(a)).)

114.   *Sanitary Landfill Facts* required that disposal of waste at federal facilities be preceded by a geological study in which "the ground water table must be located and information obtained on the historical high ground water level and on the general movement of the ground water." (Ex. 7 at 14.)

115.   *Sanitary Landfill Facts* further mandated that "drainage must be provided both during the filling operation and for the completed fill." (Ex. 7 at 23.) It emphasized that "[p]articular attention [to drainage] must be given to landfills when the trench method is being used" because, "[i]f pumping or good drainage is not provided, the trenches will fill with water, resulting in possible ground or surface water pollution." (Ex. 7 at 24.)

116.   To ensure proper drainage and other requirements are satisfied, *Sanitary Landfill Facts* directed that "detailed plans" be prepared for each landfill "showing the existing topography and the designed contours of the completed landfill," as well as "the overall plan for landfilling, the drainage features, location of the cover material, and the wet weather operation site."  (Ex. 7 at 14–15.)

117. *Sanitary Landfill Facts* also contained numerous, specific requirements with respect to selection of disposal sites and covering, compaction, and sealing of waste after disposal. (*E.g.*, Ex. 7 at 18, 24.)

118. In addition to the mandatory procedures outlined in *Sanitary Landfill Facts*, 42 C.F.R. § 76.8(a)(3) required that "[w]astes shall not be left in open dumps." (Ex. 6 at 7.)

119. Following promulgation of 42 C.F.R. § 76.8(a), the Army failed to comply with duties set forth in *Sanitary Landfill Facts* at Fort Gillem. The Army continued to dispose of waste at existing disposal sites and initiated new disposal sites in the North Landfill Area without, at a minimum:

    a. Locating the groundwater table and obtaining information on the historical high groundwater level and on the general movement of the groundwater;

    b. Providing adequate drainage during filling and for the completed fill;

    c. Preparing detailed plans showing the existing topography and designed contours of the completed landfill, as well as the overall plan for landfilling, the drainage features, location of the cover material, and the wet weather operation site;

d. Ensuring adequate cover, compaction, and sealing of waste in landfill areas; and

e. Providing consideration to the duties set forth in (a) through (d) above in the course of its waste disposal activities.

120. The Army also left waste in open dumps in the North Landfill Area in violation of 40 C.F.R. § 76.8(a)(3).

121. The Army's violations of 42 C.F.R. § 76.8(a) resulted in improper site selection and operation of its waste disposal areas, and the continued existence of open dumps in the North Landfill Area, causing harmful contaminants to migrate into groundwater and surface water, including the Western Stream, and onto the Tyndall Property. These violations of specific and mandatory duties were a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

### *Executive Order 11507*

122. In 1970, President Richard Nixon issued Executive Order ("EO") 11507 concerning the prevention, control, and abatement of air and water pollution at federal facilities. (Ex. 8.)

123. Section 4(a)(5) of the EO mandated that "[n]o waste shall be disposed of or discharged in such a manner as could result in the pollution of ground water which would endanger the health or welfare of the public." (Ex. 8 at US_00034854.)

124.   Following the promulgation of EO 11507, the Army disposed of or discharged waste in the North Landfill Area at disposal sites and with disposal methods that could, and in fact did, result in pollution of groundwater which endangered the health or welfare of the public, including Decedent. Moreover, the Army failed to consider the potential for groundwater pollution—and the danger to the health or welfare of the public—in the course of its waste disposal activities, such that it could have avoided the pollution that in fact occurred and therefore complied with EO 11507. These violations of specific and mandatory duties were a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

### Army Manual TM 5-814-5

125.   In 1973, the Army promulgated TM 5-814-5 which set forth engineering criteria and construction requirements for the study and design of sanitary landfills at Army installations. (Ex. 9.)

126.   TM 5-814-5 directed that "[t]he engineering design must result in a sanitary landfill which, when operated correctly, will preclude . . . [p]ollution of surface and ground waters." (Ex. 9 at US_00035219.) To that end, the manual specified that a landfill site "must not have subsurface drainage which will result in water pollution." (Ex. 9 at US_00035220.) And a geological investigation was required "to verify that a site has satisfactory subsurface conditions to prevent [landfill] leachate contaminating groundwater." (*Id.*) Even more specifically, TM

5-814-5 mandated that "[t]he ground water table must be located and information obtained on subsurface soil conditions, fluctuations in the ground water level, and the ground water movement," and that "[a]n analysis will be made for each proposed sanitary landfill to verify that ground water pollution will not result" from operation of the landfill. (*Id.*)

127.   TM 5-814-5 also directed that a soil "investigation is required to determine the suitability of the area to receive the [sanitary] fill" so as to verify that "soil conditions [are] suitable for preventing ground water pollution." (Ex. 9 at US_00035221).

128.   Under TM 5-814-5, the geological investigation and soil investigation were required to be summarized in a feasibility report, and, where a sanitary landfill was recommended, the feasibility report had to show "the topography at the landfill site, surface drainage, quantity and the locations of cover material, supporting facility requirements, and recommended operational procedures . . . ." (Ex. 9 at US_00035223).

129.   Following promulgation of TM 5-814-5 in 1973, the Army continued to dispose of waste at existing disposal sites and initiated new disposal sites in the North Landfill Area without conducting the required geological investigation and soil investigation, and without producing the required feasibility report. The Army further continued to dispose of waste at existing disposal sites and initiated new

disposal sites in the North Landfill Area that would cause water pollution due to inappropriate subsurface drainage.

130. The Army's violations of TM 5-814-5 resulted in improper site selection and operation of its disposal sites, causing harmful substances to migrate into groundwater and surface water, including the Western Stream, and onto the Tyndall Property. These violations of specific and mandatory duties were a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

### *40 CFR Part 241 and Army Regulation AR 420-47*

131. In 1974, EPA promulgated 40 C.F.R. Part 241 (Ex. 10), which imposed guidelines for the land disposal of solid waste pursuant to the Solid Waste Disposal Act, Pub. L. No. 91-512, 84 Stat. 1227 (1970) (the "Resource Recovery Act"). In relevant part, section 211(a)(1)(A) of the Resource Recovery Act requires that, if an executive agency has jurisdiction over any real property or facilities the operation or administration of which involves the agency in solid waste disposal activities, then the agency "shall insure compliance with the guidelines recommended under section 209 and the purposes of this Act in the operation or administration of such property or facility, or the performance of such contract, as the case may be." Section 211(a)(1)(A), 84 Stat. at 1233 (current version at 42 U.S.C. § 6964(a)(1)(A)).

132.   40 C.F.R. Part 241 contained requirements that were intended as the "minimum acceptable level of performance to provide for environmentally safe operations and must be satisfied by all facilities to which they are applicable," including the Army's waste disposal activities at Fort Gillem. (Ex. 10 at US_00032480.) The regulation expressly states that "these guidelines are mandatory for Federal agencies." (Ex. 10 at US_00032486.)

133.   For example, 40 C.F.R. § 241.201-1 mandated: "the responsible agency" shall "determine specific wastes to be excluded [from the disposal site] and shall identify them in the plans. . . . The criteria used in considering whether a waste is unacceptable shall include the hydrogeology of the site, the chemical and biological characteristics of the waste, alternative methods available, environmental and health effects, and the safety of personnel." (Ex. 10 at US_00032487.)

134.   40 C.F.R. § 241.202-1 required that "[s]ite selection and utilization shall be consistent with public health and welfare, and air and water quality standards." (Ex. 10 at US_00032487.).

135.   40 C.F.R. § 241.203-1 mandated that "plans for the design, construction, and operation of new sites or modifications to existing sites shall be prepared or approved by a professional engineer." (Ex. 10 at US_00032487.)

136.   40 C.F.R. § 241.204-1 further required that "[t]he location, design, construction, and operation of the land disposal site shall conform to the most stringent of applicable water quality standards established in accordance with or effective under the provisions of the Federal Water Pollution Control Act," commonly known as the Clean Water Act (the "CWA"). (Ex. 10 at US_00032487.)

137.   During the relevant period, at least the following water quality standards were applicable to all waters of the state of Georgia, including the Western Stream, under the CWA, such that the Army was required to conform its waste disposal activities at Fort Gillem to those standards:

    a.   All waters shall be free from materials associated with municipal or domestic sewage, industrial waste, or any waste which will settle to form sludge deposits that become putrescent, unsightly, or otherwise objectionable;

    b.   All waters shall be free from oil, scum, and floating debris associated with municipal or domestic sewage, industrial waste, or other discharges in amounts sufficient to be unsightly or to interfere with legitimate water uses;

    c.   All waters shall be free from material related to municipal, industrial, or other discharges which produce turbidity, color, odor,

or other objectionable conditions which interfere with legitimate water uses; and

d.  All waters shall be free from toxic, corrosive, acidic, and caustic substances discharged from municipalities, industries, or other sources in amounts, concentrations, or combinations which are harmful to humans, animals, or aquatic life.

138.  The planning requirements of 40 C.F.R. Part 241 were reiterated and confirmed with the promulgation of Army regulation AR 420-47 in 1977. (Ex. 11.) Specifically, AR 420-47 required the Army to have plans for the design, construction, and operation of new or modified disposal sites that were prepared or approved by a professional engineer. (Ex. 11 at US_00000394.) The regulation also required that the Army determine specific wastes to be excluded and identify them in the design of disposal sites. (*Id.*)

139.  Following promulgation of both 40 C.F.R. Part 241 and AR 420-47, the Army continued to operate existing disposal sites, modified disposal sites, and initiated new disposal sites at Fort Gillem, while failing to comply with the requirements to, at a minimum:

a.  Determine and identify those specific wastes to be excluded based on consideration of site- and waste-specific criteria;

44

b.  Select and utilize disposal sites consistent with public health and welfare, and air and water quality standards;

c.  Enlist a professional engineer to prepare or approve plans for the design, construction, and operation of new or modified disposal sites; and

d.  Conform the location, design, construction, and operation of disposal sites to the most stringent of applicable water quality standards.

140.  The Army's violations of 40 C.F.R. Part 241 and AR 420-47 resulted in the disposal of waste in the North Landfill Area, including harmful substances, that should have been excluded based on the groundwater and surface water characteristics of the area and the potential environmental and health effects of the waste. The Army's violations of 40 C.F.R. Part 241 and AR 420-47 further resulted in improper design, construction, and operation of disposal sites at Fort Gillem, such that the waste disposed of was susceptible to, and in fact did, contaminate groundwater and surface water, including the Western Stream, and migrate onto the Tyndall Property. As a result of this surface water contamination, the Army failed to conform to applicable water quality standards, in further violation of 40 C.F.R. Part 241. These violations of specific and mandatory duties

45

were a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

### *Army Regulation AR 200-1*

141. In 1978, the Army promulgated an update to Army regulation AR 200-1 concerning the protection and preservation of environmental quality. (Ex. 12.)

142. AR 200-1 required the Army to "[p]rohibit the disposal (by open dumping, water dumping, well injection, or open burning) of pesticides, hazardous chemical stocks, [and] pharmaceutical stocks and drugs . . . directly into the air, water, or land environment in a manner hazardous to man or animals or if it will cause unreasonable adverse effects on the environment . . . ." (Ex. 12 at US_00000079.)

143. In particular, AR 200-1 mandated: "Major Army commands (MACOM's) have the responsibility to ensure that they and their subordinate elements develop programs which will—(1) Identify, quantify, and report all sources of water pollution and take appropriate action to eliminate or reduce them to acceptable levels." (Ex. 12 at US_00000056.)

144. Following promulgation of AR 200-1, the Army failed to conform its waste disposal activities at Fort Gillem to applicable requirements by, at a minimum:

    a. Disposing of waste directly into the air, water, or land environment in a manner hazardous to man or animals and that will cause unreasonable adverse effects on the environment; and

    b. Failing to develop programs to identify, quantify, and report all sources of water pollution and take appropriate action to eliminate or reduce them to acceptable levels.

145. The Army's violations of AR 200-1 resulted in the disposal and migration of waste into groundwater and surface water, including the Western Stream, and onto the Tyndall Property, causing harm to humans and animals and unreasonable adverse effects on the environment. The Army's violations of AR 200-1 further resulted in its failure to timely identify, quantify, report, and appropriately abate the contamination that caused Decedent's cancer. These violations of specific and mandatory duties were a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

### *Clean Water Act and Georgia Water Quality Control Act*

146. In 1972, Congress enacted the CWA to prohibit the discharge of any pollutant from a point source into navigable waters, unless a permit was issued under the National Pollutant Discharge Elimination System ("NPDES"). Pub. L. No. 92-500, § 301(a), 86 Stat. 816, 844 (1972) (codified at 33 U.S.C. § 1311(a)).

147.   Section 402(k) of the CWA directed all owners or operators of point sources to apply for a NPDES permit within 180 days of the enactment date. Section 402(k), 86 Stat. at 883 (codified at 33 U.S.C. § 402(k)). The CWA also provided that a copy of each permit application "shall be available to the public" and "shall further be available on request for the purpose of reproduction." Section 402(j), 86 Stat. at 883 (codified at 33 U.S.C. § 402(j)).

148.   Under section 313 of the 1972 version of the CWA, all federal departments and agencies "(1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants" were directed to comply with "Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements . . . ." Section 313, 86 Stat. at 975 (codified as amended at 33 U.S.C. § 1323(a)). In 1977, Congress revised section 313 to make clear that, among other state and local requirements, federal facilities must comply with "any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever) . . . ." Pub. L. No. 95-217, § 61(a), 91 Stat. 1566, 1598 (1977) (codified at 33 U.S.C. § 1323(a)).

149.   The Georgia Water Quality Control Act (the "GWCA") sets forth limitations and procedures that facilities must follow to discharge pollutants into

48

the waters of the state. Originally enacted in 1964, the GWCA made it "unlawful to use any water of the State for the disposal of sewage, industrial wastes, or other wastes, except in such manner as to conform to and comply with all rules, regulations, orders, and permits established under the provisions of" the statute. Ga. L. 1964, § 10 at 427–28 (codified as amended at O.C.G.A. § 12-5-29(a)). To that end, the GWCA forbids any person, without first securing a permit from the Georgia Water Quality Control Board,[2] to:

> construct, install or modify any system for disposal of sewage, industrial wastes, or other wastes or any extension or addition thereto when the disposal of the sewage, industrial wastes, or other wastes constitutes pollution as defined in this Act; increase the volume or strength of any sewage, industrial wastes or other wastes in excess of permissive discharges specified under any existing permit; or construct or use any new outlet for the discharges of any sewage, industrial wastes or other wastes into the waters of the state which constitutes pollution as defined in this Act.

*Id.* § 10 at 428 (codified as amended at O.C.G.A. § 12-5-29(b)).

150. In 1974, the GWCA was amended to align Georgia's water pollution control scheme with the CWA and to implement the NPDES permitting program on the state level. Ga. L. 1974, at 599.

151. The revised GWCA provided that "[a]ny person who owns or operates a facility of any type or who desires to erect, modify, alter, or commence operation

---

[2] The statute was later amended to make the Georgia Environmental Protection Division ("GAEPD") the permitting authority.

of a facility of any type which results or will result in the discharge of pollutants from a point source into the waters of the State," must obtain a permit from GAEPD. *Id.* § 8 at 603 (codified at O.C.G.A. § 12-5-30(a)). For existing facilities with pollutant discharges, the deadline to apply for a permit was 90 days after the effective date of the statute, or September 29, 1974. *Id.* If, however, an existing facility's discharges presented "an immediate health hazard to the public," the GWCA expressly prohibited the discharges from continuing until GAEPD had taken final action on the facility's permit application. *Id.* A permit could be issued only after "public notice and an opportunity for public hearing" respecting the proposed discharge. *Id.*

152.   EPA delegated authority to the state of Georgia to issue NPDES permits in 1974. The state of Georgia was further delegated authority to issue permits regulating federal facilities like Fort Gillem in 1980, during the period when Plaintiff and Decedent resided at the Tyndall Property.

153.   Since Fort Gillem began operation in 1941, the Army discharged pollutants into waters of the state and waters of the United States. These discharges happened from the North Landfill Area, the Industrial Waste Treatment Plant, the Holding Pond, the Eastern and Western Sewage Treatment Plants, and the Storm Drain System through discernible, confined, or discrete conveyances, including pipes, culverts, ditches, channels, groundwater, dump trucks and other vehicles,

refuse piles, landfills, and other waste burial sites. Each of these conveyances constitutes a "point source" for purposes of the CWA and GWCA.

154.    As a result of its pollutant discharges, the Army had a non-discretionary duty to comply with the substantive and procedural requirements of the CWA and GWCA at least since 1964. In particular, the Army was required to cease its pollutant discharges, which posed an immediate hazard to the public, and secure a permit before the discharges could be allowed to resume.

155.    Yet, upon information and belief, only one permit was ever obtained under the CWA or GWCA throughout Fort Gillem's history. That was a single NPDES permit covering effluent discharges from the Western Sewage Treatment Plant, obtained in the mid-1970s and in effect only until September 1978.

156.    The Army's failure to cease its unpermitted pollutant discharges at Fort Gillem, or else obtain permits authorizing them, was a violation of mandatory duties imposed by the CWA and GWCA. In fact, in the 1980 Installation Assessment, the Army admitted that it had violated the GWCA by discharging effluent from the sludge drying beds at the Industrial Waste Treatment Plant rather than returning the effluent to the head of the plant.

157.    Further, by failing to submit the necessary permit applications, the Army deprived Plaintiff, Decedent, and other residents near Fort Gillem of critical information about the harmful discharges at the installation.

158. Had the Army applied for the required permits, information about the pollutants being discharged by the Army would have been made public under the CWA and GWCA. Further, GAEPD or EPA would have exercised regulatory control over the Army's discharges, establishing limitations to protect human health and the environment. For example, the Army would have been required to abide by permit limitations designed to bring its pollutant discharges into compliance with applicable water quality standards, including those standards discussed above in reference to 40 C.F.R. § 241.204-1. None of that occurred, however, because the Army failed to apply for and obtain permits required by law.

159. These violations of specific and mandatory duties were a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

### Mandatory Procedures in Taking Private Property

160. As described above, the Army invaded the Tyndall Property and the Western Stream with harmful waste, a condition which persisted for decades, including the entire duration of Plaintiff and Decedent's occupation of the Tyndall Property. This physical invasion was the foreseeable, direct, and natural result of the Army's industrial operations and waste disposal activities at Fort Gillem.

161. Under federal law, the Army's disposal of waste in a manner that resulted in a permanent physical invasion of private property constituted a taking of private property for public use. The Army appropriated a property interest in the

Tyndall Property and the Western Stream. In so doing, the Army deprived Plaintiff and Decedent of various protected property interests, including the right to exclude and the riparian right to receive water in its natural, unadulterated quality.

162.    Depending on the time period, the Army's authority to take private property for military use, including for operation of military forts, was conferred by the War Purposes Act of 1917, 40 Stat. 241 (eff. 1917–1956), or the Land Acquisitions Authority Statute of 1956, 70A Stat. 148 (eff. 1956) (codified as amended at 10 U.S.C. § 2663(a)).

163.    Through these statutes, Congress established specific, mandatory procedures for the Army to follow before it could take or use private property. Specifically, prior to taking and using any private property for public use, the Army was required to file a petition for condemnation in a court of proper jurisdiction. 10 U.S.C. § 2663(a)(2). Under Federal Rule of Civil Procedure 71A,[3] when filing such a petition, the Army was obligated to provide detailed notice to affected property owners. The provisions of Rule 71A are specific and mandatory. Together, the Land Acquisitions Authority Statute and Rule 71A, or their predecessors, prescribe a specific course of conduct the Army must follow before it

---

[3] Before promulgation of Rule 71A in 1951, federal law required the Army to follow state law procedures when filing a condemnation petition. Georgia law, like Rule 71A, prescribed specific actions the Army was required to follow, including providing notice to affected property. Ga. L. 1914 § 1, at 92.

takes and uses private property for public use. These statutes removed any choice, authority, or discretion the Army had to take and use private property without first filing a petition for condemnation and providing notice.

164.   In addition, the Army's taking of private property after 1970 was subject to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. This Act, which applied to all federal agencies, requires: "If any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings." Pub. L. 91-646, § 301(8), 84 Stat. 1894, 1905 (1971) (codified at 42 U.S.C. § 4651(8)).

165.   The Army's own regulations independently required that it institute condemnation proceedings when taking private property. As recited in the relevant regulation, "[f]ee title, easements, or leasehold interests may be acquired by the exercise of right of eminent domain through the institution of condemnation proceedings." 32 CFR § 552.37(h)(1) (eff. 1957). The Army's own regulations do not permit it to take private property through any method other than institution of condemnation proceedings.

166.   By disposing of waste in a manner that foreseeably and naturally resulted in a permanent invasion of private property, and that further rendered Plaintiff's and Decedent's property unsafe and unfit for human habitation, the

54

Army took and used private property and failed to follow the mandatory procedures that both Congress and the Army itself established for taking private property for military use.

167.  Neither before nor after taking Plaintiff and Decedent's property did the Army petition for condemnation or provide notice to the affected property owners.

168.  The Army also never provided just compensation for the property taken, as required by the Fifth Amendment to the United States Constitution.

169.  Had the Army initiated the required condemnation proceedings to use the Tyndall Property for waste disposal, Plaintiff and Decedent would have been put on notice about the harmful contaminants located on the Tyndall Property and, as a matter of property law, would have been excluded from areas contaminated with those contaminants. This violation of a specific and mandatory duty was a substantial, direct, and proximate cause of Plaintiff's and Decedent's injuries.

## COUNT I
**Negligence**
**(Asserted by Plaintiff under the FTCA individually, as surviving spouse and personal representative for Decedent and as executor of Decedent's estate)**

170.  Plaintiff restates and incorporates by reference, as if fully set forth herein, the above paragraphs 1 through 169.

171.  As Decedent's surviving spouse, personal representative, and executor of Decedent's estate, Plaintiff may assert this claim on Decedent's behalf.

55

172. Under Georgia law, the elements of negligence are (1) the existence of a duty of care owed by the defendant, (2) a breach of that duty, (3) causation of the alleged injury, and (4) damages resulting from the alleged breach of the duty.

173. In carrying out its industrial operations and waste disposal activities at Fort Gillem, Defendant was subject to multiple duties under Georgia law.

174. Under Georgia law, Defendant had a duty to handle, discharge, and dispose of waste at Fort Gillem in a reasonable and lawful manner so as not to pollute State waters and expose nearby residents such as Decedent to harmful contamination.

175. Under Georgia law, Defendant had a duty to warn nearby residents, including Decedent, of the hazards posed by Defendant's contamination of the environment on and around Fort Gillem.

176. Under Georgia law, Defendant had a duty to promptly remediate its known contamination of the environment on and around Fort Gillem.

177. Defendant breached each of these duties to Decedent by engaging in the acts and omissions alleged in this Complaint.

178. In particular, Defendant had actual or constructive knowledge that contaminants—including VOCs, SVOCs, metals, and pesticides—were handled, discharged, and disposed of at Fort Gillem.

179. Defendant had actual or constructive knowledge that the contaminants handled, discharged, and disposed of at Fort Gillem were toxic and extremely harmful to human health and the environment.

180. Defendant had actual or constructive knowledge that the contaminants handled, discharged, and disposed of at Fort Gillem would, and did in fact, migrate outside the installation boundaries and, specifically, onto the Tyndall Property.

181. Defendant had actual or constructive knowledge that the contaminants handled, discharged, and disposed of at Fort Gillem caused environmental contamination on Fort Gillem and in surrounding areas, including the Tyndall Property.

182. As a direct, proximate, and foreseeable result of Defendant's negligent acts and omissions, Decedent was exposed to toxic contaminants at a level greater than she would have otherwise been, which in turn caused or contributed to her developing non-Hodgkin lymphoma.

183. Defendant's failure to warn Decedent of the hazards posed by Defendant's contamination directly and proximately prevented Decedent from knowing the risks associated with living on the Tyndall Property, and prevented Decedent from seeking medical treatment in time to effectively mitigate or treat her cancer.

184.    Defendant's failure to remediate the contamination of Fort Gillem and nearby properties, including the Tyndall Property, directly and proximately caused Decedent to be exposed to harmful contaminants at a level greater than she would have otherwise been, which in turn caused or contributed to her developing, and dying from, non-Hodgkin lymphoma.

185.    Defendant's negligent acts and omissions directly and proximately caused Decedent pre-death physical and mental pain and suffering. Decedent underwent ten years of excruciating cancer treatment, including three complete rounds and one partial round of chemotherapy, total body radiation therapy, an allogenic bone marrow transplant, unsuccessful treatment for graft-versus-host disease, and countless doctor and hospital visits.

186.    As Decedent's surviving spouse, personal representative, and executor of Decedent's estate, Plaintiff may recover for Decedent's pre-death pain and suffering.

187.    Defendant's negligent acts and omissions also directly and proximately caused Plaintiff to suffer a loss of consortium during Decedent's ten-year cancer battle. Decedent's cancer battle significantly limited her ability to provide Plaintiff society, companionship, love, and affection.

188.   As Decedent's surviving spouse, Plaintiff is entitled to recover for the loss of consortium he experienced as a result of Defendant's negligent acts and omissions.

## COUNT II
**Trespass**
**(Asserted by Plaintiff under the FTCA as surviving spouse and personal representative for Decedent and as executor of Decedent's estate)**

189.   Plaintiff restates and incorporates by reference, as if fully set forth herein, the above paragraphs 1 through 188.

190.   As Decedent's surviving spouse, personal representative, and executor of Decedent's estate, Plaintiff may assert this claim on Decedent's behalf.

191.   Under Georgia common law and statute, including O.C.G.A. §§ 51-9-7 and 44-8-1, the pollution of a stream so as to interfere with a riparian landowner's enjoyment of the stream constitutes a trespass to property.

192.   The riparian right to have water flow upon land in its natural state, free from adulteration, is a private property right within the protection of the Georgia Constitution.

193.   Defendant's waste disposal activities at Fort Gillem caused harmful contaminants to be discharged into the Western Stream, Conley Creek, and their tributaries and to migrate onto the Tyndall Property. This contamination of the surface water, as well as the soil and groundwater, at the Tyndall Property with harmful contaminants constituted a trespass, an unlawful invasion of Decedent's

59

property, and a wrongful and prolonged interference with Decedent's right to the exclusive use and benefit of her property.

194. As a direct, proximate, and foreseeable result of Defendant's trespass of the Tyndall Property, Decedent was exposed to harmful contaminants at a level greater than she would have otherwise been, which in turn caused or contributed to her developing, and dying from, non-Hodgkin lymphoma.

195. Defendant's trespass directly and proximately caused Decedent pre-death physical and mental pain and suffering. Decedent underwent ten years of excruciating cancer treatment, including three complete rounds and one partial round of chemotherapy, total body radiation therapy, an allogenic bone marrow transplant, unsuccessful treatment for graft-versus-host disease, and countless doctor and hospital visits.

196. Defendant's trespass also directly and proximately caused Plaintiff to suffer a loss of consortium during Decedent's ten-year cancer battle. Decedent's cancer battle significantly limited her ability to provide Plaintiff society, companionship, love, and affection.

197. As Decedent's surviving spouse, Plaintiff is entitled to recover for the loss of consortium he experienced as a result of Defendant's trespass.

## COUNT III
**Nuisance**
**(Asserted by Plaintiff under the FTCA as surviving spouse and personal representative for Decedent and as executor of Decedent's estate)**

198.    Plaintiff restates and incorporates by reference, as if fully set forth herein, the above paragraphs 1 through 197.

199.    As Decedent's surviving spouse, personal representative, and executor of Decedent's estate, Plaintiff may assert this claim on Decedent's behalf.

200.    Georgia law recognizes that the discharge or release of harmful pollutants or substances may constitute a nuisance.

201.    Plaintiff and Decedent had the right to peacefully enjoy their property and reside there without fear of harmful exposure to contaminants discharged from Fort Gillem.

202.    Defendant invaded Decedent's interest in the Tyndall Property by improperly handling, discharging, and disposing of contaminants at Fort Gillem, which caused surface water, groundwater, soil, and air on the Tyndall Property to become contaminated and harmful to human health.

203.    Defendant's improper handling, discharge, and disposal of contaminants at Fort Gillem caused hurt, inconvenience, and damage to Decedent and therefore constituted a nuisance.

204. Defendant had exclusive control over the process for handling, discharging, and disposing of contaminants at Fort Gillem, and therefore exclusive control over the nuisance.

205. Defendant knew that the contaminants it handled, discharged, and disposed of at Fort Gillem were toxic and extremely harmful to human health.

206. Defendant knew that these contaminants would, and did in fact, migrate outside the Fort Gillem boundaries and onto nearby properties, including the Tyndall Property.

207. Defendant knew that these pollutants would cause environmental contamination of nearby properties, including the Tyndall Property.

208. Decedent suffered special harms from the nuisance created and maintained by Defendant. After years of exposure to the nuisance created by Defendant, Decedent developed non-Hodgkin lymphoma, from which she died after ten years of excruciating treatment.

### COUNT IV
**Wrongful Death**
**(Asserted by Plaintiff under the FTCA individually and as personal representative for Decedent)**

209. Plaintiff restates and incorporates by reference, as if fully set forth herein, the above paragraphs 1 through 208.

210. Plaintiff is the surviving spouse and personal representative of Decedent Deborah E. Tyndall, and the executor of her estate.

211.   Plaintiff is entitled to recover for the wrongful death of Decedent, which resulted from Defendant's tortious acts. *See* O.C.G.A. §§ 51-4-2; 51-4-5.

212.   Plaintiff is entitled to recover the full value of Decedent's life, O.C.G.A. §§ 51-4-1(2); 51-4-2(a), and he and Decedent incurred funeral, medical, and other necessary expenses for Decedent to which he is further entitled. O.C.G.A. § 51-4-5(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dwight Tyndall respectfully prays that this Court:

(a)   Enter judgment for Plaintiff and against Defendant on all claims set forth herein;

(b)   Award damages compensating Plaintiff for the full value of Decedent's life, under O.C.G.A. § 51-4-2(a);

(c)   Award damages compensating Plaintiff for Decedent's funeral, medical, and other necessary expenses resulting her injury and death, under O.C.G.A. § 51-4-5(b);

(d)   Award damages compensating Plaintiff, on Decedent's behalf, for Decedent's pre-death physical and mental pain and suffering;

(e)   Award damages compensating Plaintiff for loss of consortium; and

(f)   Award all of other necessary and appropriate relief.

[signatures on following page]

63

Respectfully submitted this 13th day of February, 2026.

*/s/ John L. Fortuna*
John L. Fortuna
Mathieu Erramuzpe
Ari Gordin
Michael Creswell
**JONES FORTUNA LP**
111 New Street, Suite A
Decatur, GA 30030
Phone: 404-850-3832
Email: jfortuna@jonesfortuna.com
merramuzpe@jonesfortuna.com
agordin@jonesfortuna.com
mcreswell@jonesfortuna.com

*/s/ Michael A. Caplan*
Michael A. Caplan
Cameron B. Roberts
Alex Estroff
**CAPLAN COBB LLC**
75 Fourteenth Street NE, Suite 2700
Atlanta, GA 30309
Phone: 404-596-5600
Email: mcaplan@caplancobb.com
croberts@caplancobb.com
aestroff@caplancobb.com

*Counsel for Plaintiff Dwight G. Tyndall*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused a true and correct copy of the foregoing document to be filed with the clerk's office by this Court's CM/ECF system, which will serve a true and correct copy of the same upon all counsel of record.

This 13th day of February, 2026.

/s/ Michael A. Caplan
Michael A. Caplan
Georgia Bar No. 601039

*Counsel for Plaintiff Dwight G. Tyndall*