# EXHIBIT 8

# Presidential Documents

## Title 3—THE PRESIDENT
### Proclamation 3958
### 1976 OLYMPIC GAMES
#### By the President of the United States of America
#### A Proclamation

For many decades the Olympic Games have contributed in a unique way to greater understanding, friendship, and mutual respect among all the peoples of the world. The XXI Olympiad of the modern era is to be held in the year 1976, a year in which the United States of America is to celebrate its Bicentennial—when this nation will be reaffirming principles that have much in common with the purposes of the Olympic Games.

The Congress of the United States, by Senate Joint Resolution 131, has authorized and requested the President of the United States to issue a proclamation inviting and welcoming all authorized Olympic delegations to the 1976 Olympic Games if they are to be held in the United States.

NOW, THEREFORE, I, RICHARD NIXON, President of the United States of America, do hereby extend the warm welcome of the United States to all authorized Olympic delegations and ask them to come to the United States to take part in the 1976 Olympic Games if they are to be held in the cities of Los Angeles and Denver; and further, I hereby pledge that the United States will take every appropriate measure to insure the entry and full participation of all authorized delegations.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of February, in the year of our Lord nineteen hundred seventy, and of the Independence of the United States of America the one hundred ninety-fourth.

*Richard Nixon*

[F.R. Doc. 70–1565; Filed, Feb. 4, 1970; 12:32 p.m.]

US_00034851



US_00034852

## Executive Order 11507

### PREVENTION, CONTROL, AND ABATEMENT OF AIR AND WATER POLLUTION AT FEDERAL FACILITIES

By virtue of the authority vested in me as President of the United States and in furtherance of the purpose and policy of the Clean Air Act, as amended (42 U.S.C. 1857), the Federal Water Pollution Control Act, as amended (33 U.S.C. 466), and the National Environmental Policy Act of 1969 (Public Law No. 91–190, approved January 1, 1970), it is ordered as follows:

SECTION 1. *Policy.* It is the intent of this order that the Federal Government in the design, operation, and maintenance of its facilities shall provide leadership in the nationwide effort to protect and enhance the quality of our air and water resources.

SEC. 2. *Definitions.* As used in this order:

(a) The term "respective Secretary" shall mean the Secretary of Health, Education, and Welfare in matters pertaining to air pollution control and the Secretary of the Interior in matters pertaining to water pollution control.

(b) The term "agencies" shall mean the departments, agencies, and establishments of the executive branch.

(c) The term "facilities" shall mean the buildings, installations, structures, public works, equipment, aircraft, vessels, and other vehicles and property, owned by or constructed or manufactured for the purpose of leasing to the Federal Government.

(d) The term "air and water quality standards" shall mean respectively the quality standards and related plans of implementation, including emission standards, adopted pursuant to the Clean Air Act, as amended, and the Federal Water Pollution Control Act, as amended, or as prescribed pursuant to section 4(b) of this order.

(e) The term "performance specifications" shall mean permissible limits of emissions, discharges, or other values applicable to a particular Federal facility that would, as a minimum, provide for conformance with air and water quality standards as defined herein.

(f) The term "United States" shall mean the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, and Guam.

SEC. 3. *Responsibilities.* (a) Heads of agencies shall, with regard to all facilities under their jurisdiction:

(1) Maintain review and surveillance to ensure that the standards set forth in section 4 of this order are met on a continuing basis.

(2) Direct particular attention to identifying potential air and water quality problems associated with the use and production of new materials and make provisions for their prevention and control.

(3) Consult with the respective Secretary concerning the best techniques and methods available for the protection and enhancement of air and water quality.

(4) Develop and publish procedures, within six months of the date of this order, to ensure that the facilities under their jurisdiction are in conformity with this order. In the preparation of such procedures there shall be timely and appropriate consultation with the respective Secretary.

(b) The respective Secretary shall provide leadership in implementing this order, including the provision of technical advice and assistance to the heads of agencies in connection with their duties and responsibilities under this order.

(c) The Council on Environmental Quality shall maintain continuing review of the implementation of this order and shall, from time to time, report to the President thereon.

US_00034853

SEC. 4. *Standards.* (a) Heads of agencies shall ensure that all facilities under their jurisdiction are designed, operated, and maintained so as to meet the following requirements:

(1) Facilities shall conform to air and water quality standards as defined in section 2(d) of this order. In those cases where no such air or water quality standards are in force for a particular geographical area, Federal facilities in that area shall conform to the standards established pursuant to subsection (b) of this section. Federal facilities shall also conform to the performance specifications provided for in this order.

(2) Actions shall be taken to avoid or minimize wastes created through the complete cycle of operations of each facility.

(3) The use of municipal or regional waste collection or disposal systems shall be the preferred method of disposal of wastes from Federal facilities. Whenever use of such a system is not feasible or appropriate, the heads of agencies concerned shall take necessary measures for the satisfactory disposal of such wastes, including:

(A) When appropriate, the installation and operation of their own waste treatment and disposal facilities in a manner consistent with this section.

(B) The provision of trained manpower, laboratory and other supporting facilities as appropriate to meet the requirements of this section.

(C) The establishment of requirements that operators of Federal pollution control facilities meet levels of proficiency consistent with the operator certification requirements of the State in which the facility is located. In the absence of such State requirements the respective Secretary may issue guidelines, pertaining to operator qualifications and performance, for the use of heads of agencies.

(4) The use, storage, and handling of all materials, including but not limited to, solid fuels, ashes, petroleum products, and other chemical and biological agents, shall be carried out so as to avoid or minimize the possibilities for water and air pollution. When appropriate, preventive measure shall be taken to entrap spillage or discharge or otherwise to prevent accidental pollution. Each agency, in consultation with the respective Secretary, shall establish appropriate emergency plans and procedures for dealing with accidental pollution.

(5) No waste shall be disposed of or discharged in such a manner as could result in the pollution of ground water which would endanger the health or welfare of the public.

(6) Discharges of radioactivity shall be in accordance with the applicable rules, regulations, or requirements of the Atomic Energy Commission and with the policies and guidance of the Federal Radiation Council as published in the FEDERAL REGISTER.

(b) In those cases where there are no air or water quality standards as defined in section 2(d) of this order in force for a particular geographic area or in those cases where more stringent requirements are deemed advisable for Federal facilities, the respective Secretary, in consultation with appropriate Federal, State, interstate, and local agencies, may issue regulations establishing air or water quality standards for the purpose of this order, including related schedules for implementation.

(c) The heads of agencies, in consultation with the respective Secretary, may from time to time identify facilities or uses thereof which are to be exempted, including temporary relief, from provisions of this order in the interest of national security or in extraordinary cases where it is in the national interest. Such exemptions shall be reviewed periodically by the respective Secretary and the heads of the agencies concerned. A report on exemptions granted shall be submitted to the Council on Environmental Quality periodically.

US_00034854

SEC. 5. *Procedures for abatement of air and water pollution at existing Federal facilities.* (a) Actions necessary to meet the requirements of subsections (a)(1) and (b) of section 4 of this order pertaining to air and water pollution at existing facilities are to be completed or under way no later than December 31, 1972. In cases where an enforcement conference called pursuant to law or air and water quality standards require earlier actions, the earlier date shall be applicable.

(b) In order to ensure full compliance with the requirements of section 5(a) and to facilitate budgeting for necessary corrective and preventive measures, heads of agencies shall present to the Director of the Bureau of the Budget by June 30, 1970, a plan to provide for such improvements as may be necessary to meet the required date. Subsequent revisions needed to keep any such plan up-to-date shall be promptly submitted to the Director of the Bureau of the Budget.

(c) Heads of agencies shall notify the respective Secretary as to the performance specifications proposed for each facility to meet the requirements of subsections 4 (a)(1) and (b) of this order. Where the respective Secretary finds that such performance specifications are not adequate to meet such requirements, he shall consult with the agency head and the latter shall thereupon develop adequate performance specifications.

(d) As may be found necessary, heads of agencies may submit requests to the Director of the Bureau of the Budget for extensions of time for a project beyond the time specified in section 5(a). The Director, in consultation with the respective Secretary, may approve such requests if the Director deems that such project is not technically feasible or immediately necessary to meet the requirements of subsections 4 (a) and (b). Full justification as to the extraordinary circumstances necessitating any such extension shall be required.

(e) Heads of agencies shall not use for any other purpose any of the amounts appropriated and apportioned for corrective and preventive measures necessary to meet the requirements of subsection (a) for the fiscal year ending June 30, 1971, and for any subsequent fiscal year.

SEC. 6. *Procedures for new Federal facilities.* (a) Heads of agencies shall ensure that the requirements of section 4 of this order are considered at the earliest possible stage of planning for new facilities.

(b) A request for funds to defray the cost of designing and constructing new facilities in the United States shall be included in the annual budget estimates of an agency only if such request includes funds to defray the costs of such measures as may be necessary to assure that the new facility will meet the requirements of section 4 of this order.

(c) Heads of agencies shall notify the respective Secretary as to the performance specifications proposed for each facility when action is necessary to meet the requirements of subsections 4(a) (1) and (b) of this order. Where the respective Secretary finds that such performance specifications are not adequate to meet such requirements he shall consult with the agency head and the latter shall thereupon develop adequate performance specifications.

(d) Heads of agencies shall give due consideration to the quality of air and water resources when facilities are constructed or operated outside the United States.

SEC. 7. *Procedures for Federal water resources projects.* (a) All water resources projects of the Departments of Agriculture, the Interior, and the Army, the Tennessee Valley Authority, and the United States Section of the International Boundary and Water Commission shall be consistent with the requirements of section 4 of this order. In addition, all such projects shall be presented for the consideration of the Secretary of the Interior at the earliest feasible stage if they involve proposals or recommendations with respect to

US_00034855

the authorization or construction of any Federal water resources project in the United States. The Secretary of the Interior shall review plans and supporting data for all such projects relating to water quality, and shall prepare a report to the head of the responsible agency describing the potential impact of the project on water quality, including recommendations concerning any changes or other measures with respect thereto which he considers to be necessary in connection with the design, construction, and operation of the project.

(b) The report of the Secretary of the Interior shall accompany at the earliest practicable stage any report proposing authorization or construction, or a request for funding, of such a water resource project. In any case in which the Secretary of the Interior fails to submit a report within 90 days after receipt of project plans, the head of the agency concerned may propose authorization, construction, or funding of the project without such an accompanying report. In such a case, the head of the agency concerned shall explicitly state in his request or report concerning the project that the Secretary of the Interior has not reported on the potential impact of the project on water quality.

SEC. 8. *Saving provisions.* Except to the extent that they are inconsistent with this order, all outstanding rules, regulations, orders, delegations, or other forms of administrative action issued, made, or otherwise taken under the orders superseded by section 9 hereof or relating to the subject of this order shall remain in full force and effect until amended, modified, or terminated by proper authority.

SEC. 9. *Orders superseded.* Executive Order No. 11282 of May 26, 1966, and Executive Order No. 11288 of July 2, 1966, are hereby superseded.

*Richard Nixon*

THE WHITE HOUSE,
    *February 4, 1970.*
        [F.R. Doc. 70–1566; Filed, Feb. 4, 1970; 12:33 p.m.]

US_00034856

# Rules and Regulations

## Title 7—AGRICULTURE

### Chapter III—Agricultural Research Service, Department of Agriculture

### PART 301—DOMESTIC QUARANTINE NOTICES

### Subpart—European Chafer

#### REGULATED AREAS

Under the authority of § 301.77–2 of the European Chafer Quarantine regulations, 7 CFR 301.77–2, as amended, 33 F.R. 10274, a supplemental regulation designating regulated areas is hereby issued to appear in 7 CFR 301.77–2a, as follows:

**§ 301.77–2a Regulated areas; suppressive and generally infested areas.**

The civil divisions, and parts of civil divisions, described below, are designated as European chafer regulated areas within the meaning of the provisions of this subpart; and such regulated areas are hereby divided into generally infested areas or suppressive areas as indicated below:

#### CONNECTICUT

(1) *Generally infested area.*

*Hartford County.* The towns of Berlin and Southington.

*Middlesex County.* The city of Middletown.

*New Haven County.* The city of Meriden.

(2) *Suppressive area.* None.

#### MASSACHUSETTS

(1) *Generally infested area.*

*Essex County.* The towns of Lynnfield and Saugus, and the city of Lynn.

*Middlesex County.* The towns of Arlington, Belmont, Stoneham, Wakefield, and Winchester, and the cities of Cambridge, Everett, Malden, Medford, Melrose, Somerville, and Woburn.

*Suffolk County.* That portion of the city of Boston lying north of the Charles River known as Charlestown and East Boston, and the cities of Chelsea and Revere.

(2) *Suppressive area.* None.

#### NEW YORK

(1) *Generally infested area.*

*Albany County.* The towns of Bethlehem, Colonie, and Guilderland.

*Bronx County.* The entire county.

*Broome County.* The towns of Binghamton, Union, and Vestal, and the city of Binghamton.

*Cayuga County.* The towns of Aurelius, Brutus, Cato, Conquest, Ira, Mentz, Montezuma, Sennett, Sterling, Throop, and Victory, and the city of Auburn.

*Chautauqua County.* The towns of Portland, Ripley, and Westfield.

*Chemung County.* The towns of Ashland, Big Flats, Catlin, Chemung, Elmira, Horseheads, Southport, and Veteran, and the city of Elmira.

*Chenango County.* The towns of North Norwich, Norwich, and Plymouth, and the city of Norwich.

*Cortland County.* The town of Cortlandville and the city of Cortland.

*Erie County.* The towns of Amherst, Cheektowaga, Clarence, Grand Island, Hamburg, Lancaster, Tonawanda, and West Seneca, and the cities of Buffalo, Lackawanna, and Tonawanda.

*Fulton County.* The city of Johnstown.

*Genesee County.* The towns of Batavia, Bergen, Elba, Le Roy, and Stafford, and the city of Batavia.

*Herkimer County.* The town and city of Herkimer.

*Jefferson County.* The towns of Ellisburg, Hounsfield, and Watertown, and the city of Watertown.

*Kings County.* The entire county.

*Livingston County.* The towns of Caledonia and York.

*Madison County.* The town of Sullivan.

*Monroe County.* The entire county.

*Montgomery County.* The towns of Amsterdam, Florida, Glen, and Mohawk, and the city of Amsterdam.

*New York County.* The entire county.

*Niagara County.* The towns of Cambria, Hartland, Lewiston, Lockport, Newfane, Niagara, Pendleton, Porter, Royalton, Wheatfield and Wilson, and the cities of Lockport, Niagara Falls, and North Tonawanda.

*Oneida County.* The towns of Marcy, New Hartford, and Whitestown, and the cities of Rome and Utica.

*Onondaga County.* The towns of Camillus, Cicero, Clay, De Witt, Elbridge, Geddes, Lysander, Manlius, Mercellus, Onondaga, Salina, Skaneateles, and Van Buren, and the city of Syracuse.

*Ontario County.* Towns of Canandaigua, East Bloomfield, Farmington, Geneva, Gorham, Hopewell, Manchester, Phelps, Seneca, Victor, and West Bloomfield, and the cities of Canandaigua and Geneva.

*Orange County.* The town of Newburgh.

*Orleans County.* The towns of Albion, Gaines, and Murray.

*Oswego County.* The towns of Granby, Hannibal, Hastings, New Haven, Oswego, Richland, Schroeppel and Scriba, and the cities of Fulton and Oswego.

*Queens County.* The entire county.

*Richmond County.* The entire county (Staten Island).

*Schenectady County.* The town of Glenville.

*Schuyler County.* The towns of Dix, Hector, Montour, Orange, Reading, and Tyrone.

*Seneca County.* The towns of Fayette, Junius, Seneca Falls, and Tyre, the village and town of Waterloo, and the city of Seneca Falls.

*Steuben County.* The town and city of Corning.

*Tioga County.* The town of Barton.

*Ulster County.* The town of Ulster, and the city of Kingston.

*Wayne County.* The entire county.

*Westchester County.* The town of Greenburgh and the city of Yonkers.

*Yates County.* The towns of Milo, Starkey, and Torrey.

(2) *Suppressive area.* None.

#### PENNSYLVANIA

(1) *Generally infested area.*

*Bradford County.* The township of Athens; and the boroughs of Athens, Sayre, and South Waverly.

*Carbon County.* The boroughs of Lehighton and Weissport and that section of Mahoning Township bounded on the north by the borough of Jim Thorpe, on the east by the Lehigh River, on the south by the borough of Lehighton, and on the west by Pennsylvania highway Route 209.

*Erie County.* The townships of Harborcreek, Lawrence Park, Millcreek, and North East; and the boroughs of Lake City, North East, and Wesleyville; and the city of Erie.

*Lackawanna County.* The city of Scranton.

*Lehigh County.* The township of Whitehall; and the boroughs of Catasauqua and Coplay, and the city of Allentown.

*Luzerne County.* The borough of Duryea.

*Lycoming County.* The city of Williamsport.

(Secs. 8 and 9, 37 Stat. 318, sec. 106, 71 Stat. 33; 7 U.S.C. 161, 162, 150ee; 29 F.R. 16210, as amended; 7 CFR 301.77–2)

This supplemental regulation shall become effective upon publication in the FEDERAL REGISTER, when it shall supersede 7 CFR 301.77–2a effective January 30, 1969.

The Director of the Plant Protection Division has determined that infestations of the European chafer exist or are likely to exist in the civil divisions, and parts of civil divisions listed above, or that it is necessary to regulate such areas because of their proximity to European chafer infestations or their inseparability for quarantine enforcement purposes from European chafer infested localities. The Director has further determined that each of the quarantined States is enforcing a quarantine or regulation with restrictions on intrastate movement of the regulated articles substantially the same as the restrictions on interstate movement of such articles imposed by the quarantine and regulations in this subpart, and that designation of less than the entire State as a regulated area will otherwise be adequate to prevent the interstate spread of the European chafer. Accordingly, such civil divisions, and parts of civil divisions listed above, are designated as European chafer regulated areas.

This supplemental regulation adds the entire county of Queens and portions of Chautauqua, Fulton, Orange, and Ulster Counties in New York; and a portion of Middlesex County in Connecticut to the list of regulated areas for the first time. It also extends regulated areas in some previously regulated counties.

This document imposes restrictions that are necessary in order to prevent the dissemination of the European chafer and should be made effective promptly to accomplish its purpose in the public interest. Accordingly, it is found upon good cause under the administrative procedure provisions of 5 U.S.C. 553, that notice and other public procedure with respect to the foregoing regulation are impracticable and contrary to the public interest, and good cause is found for making it effective less than 30 days after publication in the FEDERAL REGISTER.

US_00034857

Done at Hyattsville, Md., this 30th day of January 1970.

D. R. SHEPHERD,
*Director, Plant Protection Division.*

[F.R. Doc. 70-1409; Filed, Feb. 4, 1970; 8:45 a.m.]

---

## Chapter IX—Consumer and Marketing Service (Marketing Agreements and Orders; Fruits, Vegetables, Nuts), Department of Agriculture

[Navel Orange Regulation 195]

## PART 907—NAVEL ORANGES GROWN IN ARIZONA AND DESIGNATED PART OF CALIFORNIA

### Limitation of Handling

§ 907.495   Navel Orange Regulation 195.

(a) *Findings.* (1) Pursuant to the marketing agreement, as amended, and Order No. 907, as amended (7 CFR Part 907, 33 F.R. 15471), regulating the handling of Navel oranges grown in Arizona and designated part of California, effective under the applicable provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), and upon the basis of the recommendations and information submitted by the Navel Orange Administrative Committee, established under the said amended marketing agreement and order, and upon other available information, it is hereby found that the limitation of handling of such Navel oranges, as hereinafter provided, will tend to effectuate the declared policy of the act.

(2) It is hereby further found that it is impracticable and contrary to the public interest to give preliminary notice, engage in public rule-making procedure, and postpone the effective date of this section until 30 days after publication hereof in the FEDERAL REGISTER (5 U.S.C. 553) because the time intervening between the date when information upon which this section is based became available and the time when this section must become effective in order to effectuate the declared policy of the act is insufficient, and a reasonable time is permitted, under the circumstances, for preparation for such effective time; and good cause exists for making the provisions hereof effective as hereafter set forth. The committee held an open meeting during the current week, after giving due notice thereof, to consider supply and market conditions for Navel oranges and the need for regulation; interested persons were afforded an opportunity to submit information and views at this meeting; the recommendation and supporting information for regulation during the period specified herein were promptly submitted to the Department after such meeting was held; the provisions of this section, including its effective time, are identical with the aforesaid recommendation of the committee, and information concerning such provisions and effective time has been disseminated among handlers of such Navel oranges; it is necessary, in order to effectuate the declared policy of the act, to make this

regulation effective during the period herein specified; and compliance with this section will not require any special preparation on the part of persons subject hereto which cannot be completed on or before the effective date hereof. Such committee meeting was held on February 3, 1970.

(b) *Order.* (1) The respective quantities of Navel oranges grown in Arizona and designated part of California which may be handled during the period February 6, through February 12, 1970, are hereby fixed as follows:

(i) District 1: 820,000 cartons;
(ii) District 2: 170,000 cartons;
(iii) District 3: 10,000 cartons.

(2) As used in this section, "handled," "District 1," "District 2," "District 3," and "carton" have the same meaning as when used in said amended marketing agreement and order.

(Secs. 1–19, 48 Stat. 31, as amended; 7 U.S.C. 601–674)

Dated: February 4, 1970.

PAUL A. NICHOLSON,
*Acting Director, Fruit and Vegetable Division, Consumer and Marketing Service.*

[F.R. Doc. 70-1549; Filed, Feb. 4, 1970; 11:29 a.m.]

---

# Title 14—AERONAUTICS AND SPACE

## Chapter I—Federal Aviation Administration, Department of Transportation

[Docket No. 9814; Amdts. 13–7; 47–10; 91–72]

### PART 13—ENFORCEMENT PROCEDURES

### PART 47—AIRCRAFT REGISTRATION

### PART 91—GENERAL OPERATING AND FLIGHT RULES

### Aircraft Registration Eligibility, Identification, and Activity; and Certain Enforcement Procedures

The purpose of these amendments to Parts 47 and 91 of the Federal Aviation Regulations is to provide for obtaining updated knowledge as to registration eligibility, identification, and activity of aircraft, by the means of new and modified reporting provisions. The amendments to Part 13 add procedures for suspending or revoking issued certificates of aircraft registration in appropriate circumstances.

These amendments were proposed in Notice 69–37, and published in the FEDERAL REGISTER on September 5, 1969 (34 F.R. 14079). Approximately one-quarter of the nearly 100 public comments received on the notice supported the proposals. The remainder of the comments opposed the proposals upon grounds that fall generally into categories that are stated and answered as follows:

(1) *The information is presently available, or present procedures can be ex-*

*panded to procure the needed data.* Approximately one-half of the public comments received urged that FAA Form 8520–3 (Aircraft Use and Inspection Report) and existing reporting procedures for air carrier aircraft either allow, or can be used for, the collection of the needed information; or that all or most of the requested information is available from the Federal Communications Commission, State aviation agencies, or aviation industry organizations.

(a) The information presently collected by the use of FAA Form 8320–3 does not meet the needs of the FAA, as stated in Notice 69–37, since the form does not apply to the entire aircraft fleet, and since it does not require activity data from the owner, who is more familiar with data on aircraft activity than the persons who periodically inspect the aircraft and who must execute that form. Also, the information provided by FAA Form 8320–3 does not break down the number of hours flown by use categories (purpose of flight), an element that is needed for development of safety measures, as stated in Notice 69–37.

(b) With respect to aircraft operated under Parts 121 and 127, the amendment to Part 91 now issued concerns only reporting of the make and model of the engines installed in the aircraft, since the other information sought by new § 91.53 is obtained from other sources concerning those aircraft.

(c) The FAA considered expanding FAA Form 8320–3 to include the needed additional data elements before issuing Notice 69–37, and it determined that the procedures now adopted provide a more adequate alternative.

(d) Not all of the requested information on communications equipment is available from the Federal Communications Commission. Also, the records maintained by that agency cannot practicably be correlated with individual aircraft records.

(e) Information collected through the FAA aircraft registration system is made available to most State governments and to aviation industry organizations. Information available from those sources would be the same information already provided to them, therefore they would not be fruitful sources for the additional information now sought.

(2) *Collection of the information will cause an increase in the workload and costs of the FAA that in turn will be passed on to the public, will create an unnecessary reporting burden on the aviation public, and may result in imposing additional filing or user fees.* (a) Very little increase in the workload and costs of the FAA will result from the new provisions. A purification of FAA files of records on aircraft no longer eligible for registration will be allowed, with an accompanying decrease in total workload.

(b) The increased reporting burden on the aviation public will be minimal, consisting of information on communications and navigational aids capability of equipment in aircraft, and on hours flown and purpose of flight. Also, as stated in Notice 69–37, the FAA expects

US_00034858