# EXHIBIT 12

00 -1

REFERENCE

HEADQUARTERS
DEPARTMENT OF THE ARMY
WASHINGTON, DC, 23 December 1980

S/s AR 200-1
15 June 1982

AR 200-1
INTERIM CHANGE
NO. I01
Expires 23 December 1981

ENVIRONMENTAL QUALITY

ENVIRONMENTAL PROTECTION AND ENHANCEMENT

This interim change provides policy and guidance that have a direct and immediate impact pertaining to Memoranda of Agreement to meet the requirements of the National Historic Preservation Act of 1966, as amended, and the regulations of the Advisory Council on Historic Preservation contained in 36 CFR 800, "Protection of Historic and Cultural Properties." The information in this interim change is in addition to and modifies that given in paragraph 8-11, Chapter 8, in order to provide for development and review of Programmatic Memoranda of Agreement that will eliminate waste of Army funds, manhours, and resources; expires 1 year from date of publi- cation, and will be destroyed at that time unless sooner superseded by a formal printed change; is distributed by 1st class mail through the publications pinpoint distribution system to all holders of AR 200-1; and will be included in a revised Chapter 8 of AR 200-1 to be issued within the year.

Page 8-4, paragraph 8-11d, add the following paragraphs:

d.1. Department of the Army installations and major commands may develop programs for the management of historic and archaeological resources that may become the basis for a Programmatic Memorandum of Agreement. Execution of such an agreement indicates the Army's compliance, on a programmatic basis, with the federal laws and regulations, and reduces the risk of misunderstandings regard- ing the application of the federal regulations to an Army undertaking or mission. The Memorandum of Agreement indicates also that the Advisory Council on Historic Preservation and the State Historic Preservation Officer(s) support the program covered in the agreement.

d.2. Memoranda of Agreement are to be prepared in consultation with Head- quarters, Department of the Army (DAEN-MPO-B) and signed by the Executive Director, Advisory Council on Historic Preservation, the appropriate State Historic Preservation Officer, and the installation commander (or MACOM commander, if executed at that level), and are forwarded through channels to DAEN-MPO-B for ratification. Any agreements which involve real estate used by the Reserve Components will be coordinated with the Chief of the appropriate component. Ratified agreements are then forwarded to the Advisory Council for the final signature by the Chairman of the Council, pursuant to the National Historic Preservation Act of 1966, as amended, and 36 CFR 800.

The Army Library (ANRAL)
ATTN:
Room 1A 518, Pentagon
Washington DC 20310

US_00000001

IOI, AR 200-1                                        23 December 1980

(DAEN-MPO-B)

By Order of the Secretary of the Army:

                                                    E. C. MEYER
                                        General, United States Army
Official:                                   Chief of Staff

        J. C. PENNINGTON
Major General, United States Army
        The Adjutant General

DISTRIBUTION:
   To be distributed in accordance with DA Form 12-9A requirements for AR,
Installations plus Facilities Engineering.
        Active Army:  C
        ARNG:  A
        USAR:  A

2



| ARMY REGULATION<br>No. 200-1 | HEADQUARTERS<br>DEPARTMENT OF THE ARMY<br>WASHINGTON, DC, *20 January 1978* |



## ENVIRONMENTAL QUALITY

# ENVIRONMENTAL PROTECTION AND ENHANCEMENT

### *Effective 15 March 1978*

*This regulation is codified as 32 CFR 650 in the Federal Register issue of 29 Dec 77.*

*This regulation implements DOD Directives 4165.60, 6050.4 and provides general Department of the Army policy on environmental protection. The regulation is revised due to the numerous editorial changes, modifications in terminology, and the addition of a new Chapter Five on Solid Waste Management. The following changes are made on Requirements Control Symbols: RCS DD–H&E(A)1269, RCS DD–H&E(Q)1326, RCS DD–H&E(AR)1327, and RCS DD–I&L(SA)1088 are replaced by RCS DD–I&L(A)1269, RCS DD–I&L(Q)1326, RCS DD–I&L(AR)1327, and RCS DD–I&L(SA)1383 respectively. Local limited supplementation of this regulation is permitted, but is not required. If supplements are issued, Army Staff agencies and major Army commands will furnish one copy of each to the Office of the Chief of Engineers, DAEN–ZCE. Other commands will furnish one copy of each to the next higher headquarters.*

| | | | Paragraph | Page |
|---|---|---|---|---|
| CHAPTER | 1. | GENERAL | | |
| | | Purpose | 1-1 | 1-1 |
| | | Applicability | 1-2 | 1-1 |
| | | Explanation of terms | 1-3 | 1-1 |
| | | Goal | 1-4 | 1-1 |
| | | Policy | 1-5 | 1-2 |
| | | Implementing guidance | 1-6 | 1-3 |
| | | Responsibilities | 1-7 | 1-3 |
| | | Installation, State and EPA relationships | 1-8 | 1-4 |
| | | Annual Status Reports on Environmental Programs and Activities (RCS DD–I&L(A)1269) | 1-9 | 1-5 |
| | | Environmental Quality Award | 1-10 | 1-5 |
| | | Reporting requirements | 1-11 | 1-6 |
| | | Executive Order 11752 | 1-12 | 1-7 |
| | | Endangered species | 1-13 | 1-7 |
| | 2. | ENVIRONMENTAL CONSIDERATIONS IN DA ACTIONS | | |
| Section I. | | General | | |
| | | Purpose | 2-1 | 2-1 |
| | | Background | 2-2 | 2-1 |
| | | Applicability | 2-3 | 2-1 |
| | | Scope | 2-4 | 2-1 |
| | | Policies and objectives | 2-5 | 2-3 |
| | | Responsibilities | 2-6 | 2-4 |
| | II. | Reports | | |
| | | RCS DD–I&L(Q)1326, RCS DD–I&L(AR)1327 | 2-7 | 2-6 |
| | III. | Environmental Impact Assessments and Environmental Impact Statements | | |
| | | General | 2-8 | 2-6 |
| | | Major actions significantly affecting the quality of the human environment (MASAQHE) | 2-9 | 2-7 |
| | | Environmental effects | 2-10 | 2-9 |
| | IV. | Preparation of Environmental Impact Statement | | |
| | | General | 2-11 | 2-9 |
| | | Content of the EIS | 2-12 | 2-10 |

---

\* This regulation supersedes AR 200–1, 7 December 1973, including all changes.

The Army Library (ANRAL)
ATTN: Military Documents
Room 1A518 Pentagon
Washington DC 20310

i

US_00000003

| | | Paragraph | Page |
|---|---|---|---|
| Section V. | Processing Environmental Impact Statements | | |
| | General | 2–13 | 2–12 |
| | Draft EIS's | 2–14 | 2–13 |
| | Circulation for comment | 2–15 | 2–13 |
| | Final EIS | 2–16 | 2–14 |
| | Time restrictions | 2–17 | 2–14 |
| | Review of EIS prepared by another Federal agency | 2–18 | 2–15 |
| | Related publications | 2–19 | 2–15 |
| CHAPTER 3. | WATER RESOURCES MANAGEMENT | | |
| Section I. | General | | |
| | Purpose | 3–1 | 3–1 |
| | Goals and objectives | 3–2 | 3–1 |
| | Explanation of terms | 3–3 | 3–1 |
| | Policy | 3–4 | 3–3 |
| | Responsibilities | 3–5 | 3–3 |
| | Related publications | 3–6 | 3–5 |
| II. | Standards and Procedures | | |
| | Water supply standards | 3–7 | 3–5 |
| | Water quality standards | 3–8 | 3–5 |
| | Effluent limitations | 3–9 | 3–5 |
| | Ocean dumping standards | 3–10 | 3–7 |
| | Activities in navigable waters | 3–11 | 3–7 |
| | Storage of hazardous materials | 3–12 | 3–8 |
| | Water supply treatment procedures | 3–13 | 3–8 |
| | Water conservation | 3–14 | 3–8 |
| | Minor industrial and municipal operations | 3–15 | 3–8 |
| | NPDES permits | 3–16 | 3–8 |
| | Ocean dumping permits | 3–17 | 3–10 |
| | Corps of Engineer permits | 3–18 | 3–10 |
| | State permits | 3–19 | 3–10 |
| | Operator training and certification | 3–20 | 3–11 |
| | Waivers | 3–21 | 3–11 |
| | Investigation of complaints | 3–22 | 3–11 |
| | Water Pollution Control Report—(RCS DD–I&L(SA)1383) | 3–23 | 3–11 |
| CHAPTER 4. | AIR POLLUTION ABATEMENT | | |
| Section I. | General | | |
| | Purpose | 4–1 | 4–1 |
| | Goal and objectives | 4–2 | 4–1 |
| | Explanation of terms | 4–3 | 4–1 |
| | Policies | 4–4 | 4–2 |
| | Responsibilities | 4–5 | 4–2 |
| | Reports | 4–6 | 4–3 |
| | References | 4–7 | 4–3 |
| II. | Standards and Procedures | | |
| | Standards | 4–8 | 4–3 |
| | Assessment of air quality | 4–9 | 4–4 |
| | Air pollution sources | 4–10 | 4–4 |
| | Air pollution abatement and control | 4–11 | 4–4 |
| | Air emission monitoring and reporting | 4–12 | 4–5 |
| | EPA air pollution project review | 4–13 | 4–5 |
| | Consent agreements | 4–14 | 4–6 |
| | Exemptions | 4–15 | 4–6 |
| | Transportation control plans | 4–16 | 4–6 |
| | Air pollution emergency episode plans | 4–17 | 4–7 |
| CHAPTER 5. | SOLID WASTE MANAGEMENT | | |
| Section I. | General | | |
| | Purpose | 5–1 | 5–1 |
| | Goal | 5–2 | 5–1 |

US_00000004

|  |  |  | Paragraph | Page |
|---|---|---|---|---|
| | Objective | | 5-3 | 5-1 |
| | Policy | | 5-4 | 5-1 |
| | Responsibilities | | 5-5 | 5-2 |
| Section II. | Standards and Procedures | | | |
| | Standards | | 5-6 | 5-2 |
| | Procedures | | 5-7 | 5-3 |
| | Reports | | 5-8 | 5-3 |
| | References | | 5-9 | 5-3 |
| CHAPTER 6. | HAZARDOUS AND TOXIC MATERIALS MANAGEMENT | | | |
| Section I. | General | | | |
| | Purpose | | 6-1 | 6-1 |
| | Goal and objectives | | 6-2 | 6-1 |
| | Explanation of terms | | 6-3 | 6-1 |
| | Policies | | 6-4 | 6-3 |
| | Responsibilities | | 6-5 | 6-3 |
| II. | Pesticide Management Program | | | |
| | Implementing guidelines | | 6-6 | 6-5 |
| | Procedures | | 6-7 | 6-6 |
| | Monitoring | | 6-8 | 6-7 |
| | Reports (RCS DD–I&L(AR)1080) and (RCS DD–I&L(SA)1383) | | 6-9 | 6-7 |
| III. | Hazardous Chemical Stocks (Excluding Chemical Warfare Agents) | | | |
| | Implementing guidelines | | 6-10 | 6-8 |
| | Procedures | | 6-11 | 6-9 |
| | Special authorization | | 6-12 | 6-10 |
| | Monitoring | | 6-13 | 6-10 |
| | Reports | | 6-14 | 6-10 |
| IV. | Pharmaceutical Stocks, Biological Wastes, and Drugs | | | |
| | Procedures | | 6-15 | 6-10 |
| | Special authorizations | | 6-16 | 6-11 |
| | Monitoring | | 6-17 | 6-11 |
| | Reports | | 6-18 | 6-11 |
| V. | Radioactive Materials, Explosives, and Chemical Warfare Agents | | | |
| | Radioactive materials and nuclear accidents and incidents | | 6-19 | 6-11 |
| | Explosive ordnance | | 6-20 | 6-12 |
| | Chemical warfare agents | | 6-21 | 6-12 |
| CHAPTER 7. | ENVIRONMENTAL NOISE ABATEMENT | | | |
| Section I. | General | | | |
| | Purpose | | 7-1 | 7-1 |
| | Goal and objectives | | 7-2 | 7-1 |
| | Explanation of terms | | 7-3 | 7-1 |
| | Policies | | 7-4 | 7-2 |
| | Responsibilities | | 7-5 | 7-2 |
| | Reports | | 7-6 | 7-3 |
| | References | | 7-7 | 7-3 |
| II. | Standards and Procedures | | | |
| | Standards | | 7-8 | 7-4 |
| | Noise measurement standards | | 7-9 | 7-4 |
| | Assessment of noise | | 7-10 | 7-4 |
| | Noise sources | | 7-11 | 7-5 |
| | Noise control | | 7-12 | 7-5 |
| | Noise complaints | | 7-13 | 7-6 |
| | Low-noise-emission products | | 7-14 | 7-6 |
| | Waivers and exemptions from noise standards | | 7-15 | 7-6 |
| CHAPTER 8. | HISTORIC PRESERVATION | | | |
| Section I. | General | | | |
| | Purpose | | 8-1 | 8-1 |
| | Goal and objectives | | 8-2 | 8-1 |

US_00000005

| | | Paragraph | Page |
|---|---|---|---|
| | References | 8–3 | 8–1 |
| | Policy | 8–4 | 8–1 |
| | Definitions | 8–5 | 8–1 |
| | Responsibilities | 8–6 | 8–2 |
| Section II. | Standards and Procedures | | |
| | Standards | 8–7 | 8–3 |
| | Procedures for preparing nominations to the National Register (RCS DOI–1005) | 8–8 | 8–3 |
| | Funding of historic preservation activities | 8–9 | 8–3 |
| | Utilization of historic properties | 8–10 | 8–3 |
| | Compliance procedures | 8–11 | 8–4 |
| | Archeological sites | 8–12 | 8–5 |
| | National Historic Landmarks | 8–13 | 8–6 |
| CHAPTER 9. | OIL AND HAZARDOUS SUBSTANCES SPILL CONTROL AND CONTINGENCY PLANS | | |
| Section I. | General | | |
| | Purpose | 9–1 | 9–1 |
| | Goal and objectives | 9–2 | 9–1 |
| | Explanation of terms | 9–3 | 9–1 |
| | Policies | 9–4 | 9–4 |
| | Implementing guidelines | 9–5 | 9–4 |
| | Responsibilities | 9–6 | 9–5 |
| | References | 9–7 | 9–6 |
| II. | Spill Prevention Control and Countermeasure Plan | | |
| | General | 9–8 | 9–6 |
| | Preparation and implementation of plan | 9–9 | 9–7 |
| | Review and evaluation | 9–10 | 9–7 |
| | Minimum plan requirements | 9–11 | 9–7 |
| | Detailed guidance | 9–12 | 9–8 |
| III. | Installation Spill Contingency Plan | | |
| | General | 9–13 | 9–8 |
| | Minimum plan requirements | 9–14 | 9–8 |
| IV. | Reports of Army Accidental Oil and Hazardous Substance Discharges | | |
| | General | 9–15 | 9–9 |
| | Pollution Incident Report (RCS EPA–1001) | 9–16 | 9–9 |
| | Reports on DA support provided to control non-DA spills | 9–17 | 9–10 |
| | Exclusions | 9–18 | 9–10 |
| CHAPTER 10. | ENVIRONMENTAL POLLUTION PREVENTION, CONTROL, AND ABATEMENT REPORT (RCS DD–I&L(SA)1383) | | |
| Section I. | General | | |
| | Purpose | 10–1 | 10–1 |
| | Explanation of terms | 10–2 | 10–1 |
| | Applicability | 10–3 | 10–1 |
| | Scope | 10–4 | 10–1 |
| | Responsibilities | 10–5 | 10–2 |
| II. | Instructions for the Preparation and Submission of Exhibits | | |
| | Exhibit 1—Proposed Project | 10–6 | 10–2 |
| | Exhibit 2—Status Report | 10–7 | 10–6 |
| | Exhibit 3—Narrative Report | 10–8 | 10–7 |
| APPENDIX. | PROCEDURES FOR THE PROTECTION OF HISTORIC AND CULTURAL PROPERTIES | | A–1 |

US_00000006

# CHAPTER 1

# GENERAL

**1-1. Purpose** This regulation prescribes policies, assigns responsibilities, and establishes procedures for the protection and preservation of environmental quality for the Department of the Army in peacetime.

**1-2. Applicability.** This regulation applies to—

a. All active, semiactive, and Army Reserve installations and activities located in the United States.

b. National Guard installations and sites supported with Federal appropriated funds.

c. Army installations and activities overseas in accordance with the general provisions set forth in paragraph 1-5c.

d. Contractor activities and lessees located on real property in the United States under the jurisdiction of the Department of the Army.

e. The Civil Works activities under the jurisdiction of the Secretary of the Army and implemented by the Chief of Engineers are excluded from the provisions of this regulation. Separate environmental regulations promulgated for Civil Works activities by the Chief of Engineers (COE) are found generally in 33 CFR, Chapter II and Engineering Regulations.

**1-3. Explanation of terms.** For the purpose of this regulation, the following apply:

a. *Facility.* (AR 310-25.) Facilities include buildings, installations, structures, public works, equipment, aircraft, vessels, and other vehicles and property under the control of or constructed or manufactured for leasing to the Army.

b. *Environmental quality standard.* The Federal, State and regional quality standards adopted pursuant to the Clean Air Act; Water Pollution Control Act, Noise Control Act and other Federal statutes established for the protection and enhancement of environmental quality.

c. *Environmental performance specifications.* Permissible limits of emissions, discharges, or other values applicable to activities which would provide for conformance to environmental quality standards to protect health and welfare.

d. *Environmental pollution.* The condition resulting from the presence of chemical, physical, radiological, or biological forces which alter the natural environment and thus adversely affect human health or the quality of life, biosystems, structures and equipment, recreational opportunity, aesthetics, and natural beauty.

e. *Environmental enhancement.* All actions taken to improve the environment, including but not limited to, those to abate environmental pollution and meet environmental quality standards and performance specifications.

f. *Substantive standards and limitations.* The qualitative and quantitative pollution control provisions contained in approved State implementation plans promulgated under Federal environmental protection statutes.

g. *United States.* The 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Canal Zone, Guam, American Samoa, the Virgin Islands, and the Trust Territory of the Pacific Islands.

h. *Installation.* A grouping of facilities, located in the same vicinity, which support particular functions.

i. *Activity.* A unit, organization or installation performing a function or mission.

**1-4. Goal.** It is the Department of the Army's goal to plan, initiate, and carry out all actions and programs to minimize the adverse effects on the quality of the human environment without impairment to the Army's mission. Inher-

1-1

ent in this goal is the requirement to achieve the following objectives:

a. Eliminate the discharge of potentially harmful pollutants produced by Army activities.

b. Conserve and wisely use natural and material resources provided for use throughout the Army.

c. Maintain, restore, and enhance the natural and manmade environment in terms of its visual attractiveness and productivity.

d. Demonstrate initiative and leadership in the formulation and execution of a program that contributes to the national goal of preserving and enhancing the environment.

1-5. Policy. a. All Department of Defense agencies are required to—

(1) Comply with the provisions of the National Environmental Policy Act and all other Federal environmental laws, executive orders, and regulations.

(2) Demonstrate leadership in environmental pollution abatement and enhancement of the environment consistent with the security interests of the Nation.

b. The Department of the Army policy is that—

(1) The achievement of environmental objectives is an integral part of the Army mission.

(2) The environmental consequences of any proposed action will be considered during the planning process and will be evaluated along with the technical and economic factors in the decisionmaking process.

(3) A detailed environmental impact statement will be prepared and processed in accordance with the National Environmental Policy Act when an environmental assessment reveals that the proposed action may significantly affect the quality of the human environment, is highly environmentally controversial, or is anticipated to evoke litigation based upon environmental issues. "Environmentally controversial" relates to cases in which substantive disagreement, real or purported, exists as to the extent, nature, or effect of the action on the environment.

(4) Insofar as essential mission constraints permit, all programs and actions will be planned, initiated, and carried out in a manner

to minimize polluting or degrading the environment.

(5) All activities subject to Federal, State, or local applicable standards and monitored to ensure compliance with such standards.

(6) All material and energy resources will be procured and used in a manner that will minimize the emission of pollutants and the production of wastes in keeping with the national policies for energy conservation. Wastes generated will be reprocessed or reclaimed for other productive uses to the maximum extent practicable.

(7) An understanding of the urgent need to preserve and restore the natural environment and to conserve material resources and an appreciation of the Army's support of the environmental protection effort will be fostered throughtout the Army. Initiative, leadership, and cooperation in achieving these environmental objectives are encouraged of all personnel.

(8) Commanders will cooperate, to the extent practicable, in beneficial community environmental action programs.

(9) Historic and cultural sites, structures, and objects under Army jurisdiction will be preserved, restored, and maintained for the benefit and enjoyment of future generations.

(10) An integrated, multiuse, natural resources, land management program will be conducted for forests and woodlands, fish and wildlife, open space, soil, water vegetation, outdoor recreation, natural beauty, and increased public access and nonconsumptive utilization on lands under Army jurisdiction within the provisions of AR 405-80 and AR 420-74.

c. At locations outside the United States, Department of the Army activities will comply with the requirements of the National Environmental Policy Act as set forth in chapter 2 and conform at all times to the environmental quality standards of the host country, international agreements, and Status of Forces Agreements. The provisions of this regulation will be used, to the extent applicable, in fulfilling environmental protection requirements in overseas locations.

d. When, in the interest of national defense, it is not considered practicable to comply with the foregoing policies, the matter will be re-

US_00000008

ferred with full particulars to HQDA (DAEN-ZCE) WASH DC 20310.

**1-6. Implementing guidance.** Guidance for implementing DA environmental policies are—

*a.* The environment must be considered as a single, integrated system characterized by the continuous interaction of air, land, and water.

*b.* For planning purposes, the environmental system will be regarded as closed; nothing can be thrown away. Wastes must be either recycled and reclaimed or confined and contained so they will not migrate to re-emerge in pollutant form.

*c.* Pollutants are potential resources which are out of place.

**1-7. Responsibilities.** *a.* Army Environmental Council will—

(1) Review and redirect, as necessary, Army environmental policy and programs to ensure the Army fulfills its responsibility under the National Environmental Policy Act and other Federal laws and regulations pertaining to pollution control and environmental protection.

(2) Provide policy guidance on those matters which fall within the cognizance of the Council and on such matters as referred for consideration by the Secretariat or the Army Staff.

*b.* Army Environmental Committee will assist the Army Environmental Council by—

(1) Proposing new environmental policies and programs as directed by the Council.

(2) Serving as a forum for the exchange of information and ideas related to the formulation of the Army Environmental Program.

(3) Assisting in the resolution of interagency probelms on environmental matters.

(4) Assisting in the formulation of Army-wide implementing instructions for the Army Environmental Program.

(5) Maintaining surveillance over the ongoing Army Environmental Program and activities.

(6) Reviewing Army Environmental Impact Statements and requests for exemption from Federal and State pollution control standards prior to formal approval by the Assistant Secretary of the Army (Civil Works).

(7) Providing reports and information as directed by the Army Environmental Council.

*c.* Chief of Engineers will—

(1) Exercise primary Army Staff responsibility for directing and coordinating environmental activities within the Army.

(2) Recommend such actions as will enable DA to comply with the intent, purposes, and procedures of the National Environmental Policy Act and other Federal legislation relative to environmental quality.

(3) Apply Army environmental policy and direct programs so that applicable environmental and pollution control laws and regulations are observed in the acquisition, construction, operations, and disposal of real property.

(4) Maintain positive surveillance over and report progress of the design and construction of pollution control facilities for Army installations.

(5) Ensure that environmental research and development (R&D) projects fully support the environmental program goals.

(6) Promote participation by engineer troop units in the Army's environmental program.

(7) Provide technical and engineering assistance on the pollution control aspects of construction and the Real Property Maintenance Activities.

(8) Prepare an annual Department of the Army Environmental Quality Status Report (paras 1-9 and 1-11).

(9) Conduct, with the assistance of the Army Staff agencies concerned, a continuing review of DA statutory authority, administrative regulations, policies, procedures, and programs (including those relating to loans, grants, contracts, leases, licenses, or permits) to eliminate deficiencies or inconsistencies which might prohibit or limit full compliance with the National Environmental Policy Act of 1969, Executive Orders 11514 and 11752, DOD Instruction 4120.14 and DOD Directives 4150.7, 5030.41, 5100.50, 6050.1 and 6050.2.

*d.* The Surgeon General will—

(1) Monitor, evaluate, and disseminate data on health and welfare aspects of environmental pollution within the Department of the Army to ensure that the required degree of environmental enhancement is maintained.

(2) Provide health and medical policy guid-

1-3

US_00000009

ance in respect to instructions and recommendations received from other Federal agencies assigned responsibility for environmental enhancement at Federal installations.

(3) Provide personnel for conducting field investigations and special studies concerning environmental pollution and recommend enhancement measures required for protection of health.

(4) Provide technical assistance and guidance on the health and environmental aspects of management and disposal of hazardous and toxic materials.

(5) Provide technical consultation to the Office, Chief of Engineers (OCE) and appropriate commanders on health aspects in the development of environmental enhancement policy and programs.

e. The Chief of Information will—

(1) Ensure that the public is informed of the Army's accomplishments in environmental protection and enhancement.

(2) Develop and execute a command information program designed to stimulate understanding and participation by all Army personnel.

f. Heads of Army Staff agencies will—

(1) Integrate environmental considerations into regularly assigned staff management functions and activities to ensure compliance with applicable pollution control and environmental protection laws and to demonstrate the Army's leadership in the national effort to preserve the environment.

(2) Ensure that the environmental consequences of each proposed project, program, regulation, or action for which they are the Army Staff proponent are assessed at an early stage of planning and are made an integral part of the decisionmaking process. Further, ensure that environmental damage is mitigated to the maximum extent feasible.

g. Major Army commanders will—

(1) Establish an organizational structure to plan, execute, and monitor environmental programs.

(2) Formulate and execute an environmental program which fully supports the acievement of the Army's environmental goals and objectives.

(3) Monitor and control the environmental

projects and activities of the subordinate commands and the installations and activities under their jurisdiction.

(4) Review, consolidate, and forward to higher authority, reports from subordinate installations and activities concerning their environmental projects and activities.

h. Army installation and activity commanders will—

(1) Establish an organizational structure to plan, execute, and monitor environmental programs.

(2) Formulate and execute an environmental program based on the policies set forth in paragraph 1-5 to achieve the Army's environmental goals and objectives.

(3) Cooperate with State and local authorities in formulation and execution of projects and activities required to bring an installation into compliance with applicable Federal, State, and regional pollution control standards.

(4) Integrate environmental protection and preservation activities, to the fullest extent feasible, into the planning and execution of the command's basic mission.

(5) Report, as required, to major commanders on the progress and effectiveness of environmental projects and activities to detect, quantify, and correct pollution sources in accordance with published laws, standards, and guidelines.

**1-8. Installation, State, and Environmental Protection Agency (EPA) relationships.** a. Federal installations are not required to comply with State or local administrative procedures with respect to pollution abatement and control. However, the majority of Federal environmental protection statutes contain provisions that require compliance with Federal, State, interstate and local substantive standards and limitations.

b. Permits required by Federal statute, notably the National Pollutant Discharge Elimination System (NPDES) permits, will be obtained from the Environmental Protection Agency in accordance with regulations promulgated pursuant to the Federal Water Pollution Control Act and the guidance contained in this regulation.

c. Compliance schedules required by State Implementation plan for air pollution control,

US_00000010

reflecting the major increments of progress for projects designed to meet specified standards, will be negotiated with state regulatory authorities and coordinated with the Regional Office of EPA. When established, such compliance schedules are enforceable and may only be changed by renegotiation.

*d.* Performance reports as specified in this regulation on the operation of wastewater treatment facilities, sources of air pollutant emissions, oil spills and such other reports as may be directed by DAEN-ZCE will be submitted to EPA regional authorities, as appropriate, who in turn will transmit appropriate information to State authorities. Requests for substantive reports not provided for by this regulation will be promptly referred to HQDA (DAEN-ZCE) WASH DC 20310 for guidance.

*e.* Military authorities are to cooperate fully with EPA, State, regional and local authorities requesting access to Army installations for the purpose of inspecting pollution control facilities and activities.

**1-9. Annual Status Reports on Environmental Programs and Activities (RCS DD-I&L(A)1269).** HQDA (DAEN-ZCE) will prepare the DA Annual Status Report on Environmental Programs and Activities (RCS DD-I&L(A)1269). The DA report will include information on the programs and activities of the major Army commands, the Army Reserve, and the Army National Guard.

*a.* Major Army commanders will submit an annual report to DAEN-ZCE not later than 15 February convering actions and activities of the preceding calendar year. The command report should be based on feeder reports from active and semiactive installations. Command and installation reports will include the information outlined in paragraph 1-11 to the extent that it is applicable. Further, the installation report will contain information identified in paragraph 1-11*c, d, e, f* and *g* for tenant activities and satellited Army Reserve facilities.

*b.* The State adjutants will submit an annual report to the Chief, National Guard Bureau not later than 1 March. Negative reports are required. The Chief, National Guard Bureau will consolidate and forward reports containing facilities/sites that are not in compliance with Federal/State standards to HQDA (DAEN-

ZCE) WASH DC 20310. The report will contain the following information:

(1) Status of compliance with Federal/State pollution control standards for those facilities/sites which receive support from federally appropriated funds. Those not in compliance will be listed separately with the reasons for noncompliance.

(2) Status of programs and actions by facility/site currently ongoing that will bring the facility/site into compliance with Federal/State pollution control requirements.

(3) Those requirements along with estimated cost needed to bring facilities/sites not addressed in (2) above, into compliance with Federal/State pollution control standards.

(4) Significant accomplishments by ARNG units to protect and enhance the environment.

*c.* Commander in Chief, USAREUR; Commanding Generals, Eighth US Army, and US Army, Japan will submit an annual report covering only those elements of paragraph 1-11 which may be applicable. This should include an analysis of the scope of host nation environmental quality laws and regulations, their impact on US Army installations and activities, status of compliance with specific host nation requirements, and a summary of plans to correct any deficiencies.

**1-10. Environmental Quality Award.** *a. Secretary of Defense award.* The Secretary of Defense presents an annual award to the Department of Defense installation which conducted the best environmental quality program during the preceding calendar year and gives recognition to other installations having particularly noteworthy programs. Department of the Army nominees will be selected by the Army Environmental Council from the list of Active Army installations nominated to receive the Secretary of the Army Award.

*b. Secretary of the Army Award.* The Secretary of the Army will present an Environmental Quality Award to the Army installation that evidences the most noteworthy contribution to protecting and preserving the quality of the environment. The basis of selection will be the annual Status Report on Environmental Programs and Activities prepared by an installation and used as a feeder report by the major

US_00000011

command to its overall report (RCS DD-I&L(A)1269, para 1-9).

*c. Nominating instructions.*

(1) Army commanders may nominate active or semiactive installations or separate and distinct geographically identifiable activities (e.g., USA Materiel Development and Readiness Command (DARCOM) depot activity and subinstallations) as candidates for the Environmental Quality Award, not to exceed the number listed below:

| Command | Number of nominees |
|---|---|
| US Army Training and Doctrine Command | 3 |
| US Army Forces Command | 3 |
| US Army Materiel Development and Readiness Command | 3 |
| US Army Health Services Command | 1 |
| US Army Military District of Washington | 1 |
| US Army Intelligence and Security Command | 1 |
| US Army Communications Command | 1 |
| US Armies overseas | 1 |

(2) The list of nominations will be accompanied by six copies of each installation annual report and submitted to HQDA (DAEN-ZCE) WASH DC 20310 by 31 March. Reports will be typewritten or printed, fastened or bound in folders approximately 9 × 11 inches and narrative in style covering the topics in paragraph 1-11.

**1-11. Reporting requirements.** The annual status reports required under the provisions of paragraph 1-9 (RCS DD-I&L(A)1269) will be prepared, using the following format. Each topic will be addressed in sufficient detail to give the next higher headquarters an understanding of the overall environmental program, specific accomplishments, problem areas, and planned new initiatives.

*a. Environmental protection organization.*

(1) Organizational structure for environmental matters.

(2) Staffing and management procedures.

*b. National Environmental Policy Act implementation.*

(1) Summary of environmental assessments made.

(2) Environmental impact statements prepared and their status.

*c. Air pollution control.*

(1) Status of compliance with applicable air quality standards.

(2) Status of corrective projects.

(3) Summary of litigation actions, if any.

*d. Water pollution control.*

(1) Status of National Pollutant Discharge Elimination System (NPDES) permits requested and issued.

(2) Status of compliance with applicable water quality standards and permit provisions.

(3) Status of corrective projects.

(4) Summary of litigation actions, if any.

*e. Noise pollution control.*

(1) Summary of major sources.

(2) Status of corrective measures.

(3) Summary of complaints/litigation, if any.

*f. Radiation pollution control.*

(1) Summary of ionizing sources.

(2) Status of protective measures.

*g. Solid waste management.*

(1) Summary of waste disposal operations.

(2) Waste recycling (equipment installed and in use, quantities and types of materials recycled, funds derived from sale of waste materials and use made of such funds).

*h. Toxic and hazardous materials management.*

(1) Identification of significant toxic materials being controlled.

(2) Summary of types and protective measures for control of oil spills, disposal of toxic chemicals, etc.

(3) Identification of unique problems.

*i. Land management.*

(1) Summary of conservation activities (forest, fish and wildlife management, etc.).

(2) Summary of historical and archeological sites and facilities and related preservation activities.

(3) Summary of installation attractiveness program and activities.

*j. Environmental research programs (if applicable).*

(1) Summary of ongoing environmental research activities by pollution control media (air, water, etc.).

(2) Summary of technology-application activities.

(3) Identification of new research requirements.

**1-6**

*k. Environmental education, training and information programs.*

(1) Status of individual and unit education training activities.

(2) Summary of environmental protection courses given or attended (TRADOC Report will include courses and student attendance at courses in Army School System).

(3) Summary of public information activities.

*l. Environmental enhancement activities.*

(1) Summary of environmental enhancement activities and projects conducted in support of Keep America Beautiful, Defense Community Service Program, etc. (includes activities by Active and Reserve units).

**1-12. Executive Order 11752.** Figure 1-1 is the Presidential Executive Order dated 17 December 1973 which sets forth the policy and standards for the prevention, control, and abatement of environmental pollution at DA installations.

**1-13. Endangered species.** All matters concerning the Army's policy and regulatory guidance reflecting the Endangered Species Act of 1973 (Public Law 93-205) is covered in AR 420-74.

US_00000013

## EXECUTIVE ORDER 11752

### Prevention, Control, and Abatement
### Of Environmental Pollution at Federal Facilities

By virtue of the authority vested in me as President of the United States of America, including section 301 of title 3 of the United States Code, and in furtherance of the purpose and policies of the Clean Air Act, as amended (42 U.S.C. 1857), the Federal Water Pollution Control Act, as amended (33 U.S.C. 1251), the Solid Waste Disposal Act, as amended (42 U.S.C. 3251), the Noise Control Act of 1972 (42 U.S.C. 4901), the Marine Protection, Research, and Sanctuaries Act of 1972 (16 U.S.C. 1431), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended by the Federal Environmental Pesticide Control Act of 1972 (7 U.S.C. 136), and the National Environmental Policy Act of 1969 (42 U.S.C. 4321), it is ordered as follows:

SECTION 1. *Policy.* It is the purpose of this order to assure that the Federal Government, in the design, construction, management, operation, and maintenance of its facilities, shall provide leadership in the nationwide effort to protect and enhance the quality of our air, water, and land resources through compliance with applicable standards for the prevention, control, and abatement of environmental pollution in full cooperation with State and local governments. Compliance by Federal facilities with Federal, State, interstate, and local substantive standards and substantive limitations, to the same extent that any person is subject to such standards and limitations, will accomplish the objective of providing Federal leadership and cooperation in the prevention of environmental pollution. In light of the principle of Federal supremacy embodied in the Constitution, this order is not intended, nor should it be interpreted, to require Federal facilities to comply with State or local administrative procedures with respect to pollution abatement and control.

SEC. 2. *Definitions.* As used in this order:

(1) The term "Administrator" means the Administrator of the Environmental Protection Agency.

(2) The term "Federal agencies" means the departments, agencies, establishments, and instrumentalities of the executive branch.

(3) The term "State, interstate, and local agencies" means any of the following:

(A) a State agency designated by the Governor of that State as an official State agency responsible for enforcing State and local laws relating to the prevention, control, and abatement of environmental pollution;

(B) any agency established by two or more States and having substantial powers or duties pertaining to the prevention, control, and abatement of environmental pollution;

(C) a city, county, or other local government authority charged with responsibility for enforcing ordinances or laws relating to the prevention, control and abatement of environmental pollution; or

(D) an agency of two or more municipalities located in the same State or in different States and having substantial powers or duties pertaining to the prevention, control, and abatement of environmental pollution.

(4) The term "facilities" means the buildings, installations, structures, land, public works, equipment, aircraft, vessels, and other vehicles and property, owned by, or constructed or manufactured for the purpose of leasing to, the Federal Government.

(5) The term "United States" means the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Trust Territory of the Pacific Islands.

SEC. 3. *Responsibilities. (a)* Heads of Federal

*Figure 1-1*

US_00000014

agencies shall, with regard to all facilities under their jurisdiction in the United States:

(1) Ensure that applicable standards specified in section 4 of this order are met on a continuing basis.

(2) Cooperate with the Administrator and State, interstate, and local agencies in the prevention, control, and abatement of environmental pollution and, in accordance with guidelines issued by the Administrator, provide to the Administrator and to those agencies such information as is necessary to determine compliance with applicable standards. Such cooperation shall include development of an abatement plan and schedule for meeting applicable standards.

(3) Present to the Director of the Office of Management and Budget, annually, a plan to provide for such improvement in the design, construction, management, operation, and maintenance of existing facilities as may be necessary to meet applicable standards specified in section 4.

(4) Consider the environmental impact in the initial stages of planning for each new facility or modification to an existing facility in accordance with the National Environmental Policy Act.

(5) Include with all budget requests for the design and construction of new facilities or for modification of existing facilities funds for such measures as may be necessary to meet applicable standards specified in section 4. Budget requests shall reflect the most efficient alternative for meeting applicable standards.

(6) Consult, as appropriate, with the Administrator and with State and local agencies concerning the best techniques and methods available for the prevention, control, and abatement of environmental pollution.

(7) Ensure that any funds appropriated and apportioned for the prevention, control, and abatement of environmental pollution are not used for any other purpose unless permitted by law and unless specifically approved by the Office of Management and Budget.

(b) Where activities are carried out at Federal facilities acquired by leasing or other Federal

agreements, the head of the responsible agency may at his discretion, to the extent permissible under applicable statutes and regulations, require the lessee or permittee to assume full responsibility for complying with standards for the prevention, control, and abatement of environmental pollution.

(c) Heads of Federal agencies responsible for the construction and operation of Federal facilities outside the United States shall assure that such facilities are operated so as to comply with the environmental pollution standards of general applicability in the host country or jurisdictions concerned.

(d) The Administrator shall:

(1) Provide technical advice and assistance to the heads of Federal agencies in connection with their duties and responsibilities under this order.

(2) Maintain such review of Federal facilities' compliance with the standards specific in section 4 as may be necessary.

(3) Provide liaison as required to assure that actions taken by Federal agencies pursuant to this order are coordinated with State, interstate, and local programs for the prevention, control, and abatement of environmental pollution.

(4) Mediate conflicts between Federal agencies and State, interstate, or local agencies in matters affecting the application of, or compliance with, applicable standards specified in section 4.

(5) Develop in consultation with the heads of other Federal agencies a coordinated strategy for Federal facility compliance with applicable standards specified in section 4 which incorporates, to the maximum extent practicable, common procedures for an integrated approach to Federal agency compliance with such standards, and issue such regulations and guidelines as are deemed necessary to facilitate implementation of that strategy and to provide a framework for coordination and cooperation among the Environmental Protection Agency, the other Federal agencies, and the State, interstate, and local agencies.

(6) Maintain a continuing review of the imple-

*Figure 1-1*—Continued.

US_00000015

mentation of this order and from time to time, report to the President on the progress of the Federal agencies in implementing this order.

SEC. 4. *Standards.* (a) Heads of Federal agencies shall ensure that all facilities under their jurisdiction are designed, constructed, managed, operated, and maintained so as to conform to the following requirements:

(1) Federal, State, interstate, and local air quality standards and emission limitations adopted in accordance with or effective under the provisions of the Clean Air Act, as amended.

(2) Federal, State, interstate, and local water quality standards and effluent limitations respecting the discharge or runoff of pollutants adopted in accordance with or effective under the provisions of the Federal Water Pollution Control Act, as amended.

(3) Federal regulations and guidelines respecting dumping of material into ocean waters adopted in accordance with the Marine Protection, Research, and Sanctuaries Act of 1972, and the Federal Water Pollution Control Act, as amended.

(4) Guidelines for solid waste recovery, collection, storage, separation, and disposal systems issued by the Administrator pursuant to the Solid Waste Disposal Act, as amended.

(5) Federal noise emission standards for products adopted in accordance with provisions of the Noise Control Act of 1972 and State, interstate, and local standards for control and abatement of environmental noise.

(6) Federal guidance on radiation and generally applicable environmental radiation standards promulgated or recommended by the Administrator and adopted in accordance with the Atomic Energy Act, as amended (42 U.S.C. 2011), and rules, regulations, requirements, and guidelines on discharges of radioactivity as prescribed by the Nuclear Regulatory Commission.

(7) Federal regulations and guidelines respecting manufacture, transportation, purchase, use, storage, and disposal of pesticides promulgated pursuant to the provisions of the Federal Insecticide, Fungicide, and Rodenticide Act, as amended by the Federal Environmental Pesticide Control Act of 1972.

(b) In those cases in which there are no environmental pollution standards as specified in subsection (a) for a particular geographic area or class of Federal facilities, the Administrator, in consultation with appropriate Federal, State, interstate, and local agencies, may issue regulations, which shall be published in the FEDERAL REGISTER, establishing environmental pollution standards for the purpose of this order.

SEC. 5. *Exemptions.* (a) The heads of Federal agencies, in consultation with the Administrator, may, from time to time, identify facilities or uses thereof which are exempted from applicable standards specified in section 4 in the interest of national security or in extraordinary cases in which it is in the paramount interest of the United States. No such exemptions shall be made except as are permissible under applicable Federal law.

(b) In any case in which the Administrator does not agree with a determination to exempt a facility or use thereof from the provisions of this order, the head of the Federal agency making such a determination must have the approval of the Director of the Office of Management and Budget to exempt that facility or use thereof; except that, the Administrator is solely responsible for approval of exemptions under section 18 of the Federal Insecticide, Fungicide, and Rodenticide Act, as amended by the Federal Environmental Pesticide Control Act of 1972.

(c) The heads of Federal agencies shall present to the Director of the Office of Management and Budget at the end of each calendar year a report of all exemptions made during that year, together with the justification for each such exemption.

SEC. 6 *Saving Provisions.* Except to the extent that they are inconsistent with this order, all outstanding rules, regulations, orders,

*Figure 1-1*—Continued.

US_00000016

delegations, or other forms of administrative action issued, made, or otherwise taken under the order superseded by Section 7 hereof or relating to the subject of this order shall remain in full force and effect until amended, modified, or terminated by proper authority.

SEC. 7. *Order Superseded.* Executive Order No. 11507 of February 4, 1970, is hereby superseded.

/s/RICHARD NIXON

THE WHITE HOUSE

*December 17, 1973*

*Figure 1–1*—Continued.

US_00000017

US_00000018

*Chapter 2 S/S by AR 200-2 1 Sept 1981* (handwritten)

# CHAPTER 2

# ENVIRONMENTAL CONSIDERATIONS IN DA ACTIONS

## Section I. GENERAL

**2-1. Purpose.** This chapter states Department of the Army policy, assigns responsibilities and establishes procedures for assessing the environmental impact of Department of the Army actions on the quality of the human environment as required by Public Law 91-190, "National Environmental Policy Act of 1969," 1 January 1970; and implements DOD Directive 6050.1, Environmental Considerations in DOD Actions, 19 March 1974.

**2-2. Background.** *a.* Section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), Public Law 91-190, requires that a detailed environmental impact statement (EIS) be included in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."

*b.* Executive Order 11514, 7 March 1970, Protection and Enhancement of Environmental Quality, directs the Council on Environmental Quality (CEQ) to issue guidelines for Federal agencies on the preparation of the environmental impact statements required by section 102 (2)(C) of NEPA.

*c.* On 1 August 1973, the CEQ published revised guidelines for the preparation of EIS's. These guidelines contain general guidance for determining when an EIS is required.

**2-3. Applicability.** *a.* The provisions of this chapter apply to Headquarters Department of the Army and all Army commands and agencies (hereafter referred to as "DA agencies") and are effective immediately. The civil works functions of the Corps of Engineers are excluded from complying with these procedures.

See Corps of Engineers regulations ER 1105-2 series.

*b.* The provisions of this regulation apply to DA actions worldwide except for—

(1) Multinational actions (such as NATO) in which the DA is not the primary decisionmaking authority.

(2) Combat or combat-related activities in a combat zone, and

(3) Other emergency activities.

*c.* In countries or areas not under US control or administration, DA actions, with the exception of those noted above, are subject to the environmental laws, regulations and stipulations of the foreign government concerned and whatever agreements may exist between the U.S. and the country involved (Status of Forces Agreements).

**2-4. Scope.** *a.* General—The legislative history of the National Environmental Policy Act of 1969 and the guidelines of the Council on Environmental Quality define actions which are to be assessed for their environmental impact. They include, but are not limited to, the following:

(1) Recommendations or favorable reports relating to legislation, including that for appropriations.

(2) Policies, regulations, and procedure-making.

(3) New and continued projects and program activities—

(a) Directly undertaken by Federal agencies.

(b) Supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance; and

2-1

(c) Involving a Federal lease, permit, license, certificate, or other entitlement for use.

b. Proposals for legislation, annual authorization requests, and favorable reports on legislation.

(1) Legislative proposals other than authorization and appropriation acts. Prior to preparing a legislative proposal, the proponent agency will assess the environmental consequences of the proposal using the factors in this chapter. If it is determined that the proposal could significantly affect the quality of the human environment, an EIS is required and shall be submitted with the proposal.

(2) Annual budget requests. Prior to submitting annual budget requests, the environmental consequences of each line item requested for inclusion therein will be assessed by the proponent of the action using as a minimum the factors in this chapter. For those items which are identified as major actions having a significant effect on the quality of the human environment or which are controversial, a draft environmental impact statement will be prepared which will accompany the budget request through channels. Additional guidance is contained in the Budget Guidance Manual DOD 7110.1–M and DOD Instruction 7040.4 (Military Construction Authorization and Appropriation).

(3) Favorable reports on legislation.

(a) Where the Department of the Army is not the Federal agency that has primary responsibility for a legislative proposal, no EIS is required from the Army. If it is not clear from the legislative item whether the Army is the primary Federal agency responsible for the subject matter involved in the legislative item, advice should be sought from COE, (DA (DAEN–ZCE)).

(b) Where the Army is the Federal agency that has primary responsibility for the subject matter involved in the legislative item, the proponent agency responsible for preparing the Army report on the item will assess the environmental consequences of the proposal, using the factors in this chapter. If the environmental impact assessment indicates that the proposal could or has the potential to significantly affect the quality of the human environment, an EIS is required and should accompany the report.

c. Policy, regulations, and procedure-making.

(1) Environmental Impact Assessments (EIA) will be made for publications including but not limited to, directives, instructions, regulations, manuals, or major policy issuances of the Department of the Army and its commands and agencies.

(2) The publication proponent, at the appropriate command level, will assess the environmental consequences for any proposed publication, using the procedure set forth herein. If it is determined that actions required by the publication could significantly affect the environment, an EIS is required unless the publication is an implementation of a publication from OSD or a higher Army command or agency and the environmental consequence will not basically change from those already presented in an EIS prepared for the basic publication. In addition, appropriate environmental requirements will be addressed in these publications.

(3) Any Department of the Army implementation of a Federal law, of a publication of a Federal agency outside of the Department of the Army, or subsequent action taken based on the quality of the environment, will require an EIS "unless a statement was prepared on the original publication" and the environmental consequences of the Army action will not significantly deviate from those already presented in the basic EIS.

d.(1) Most activities take place on the typical installation on a routine or programed basis. Activities which are of a continuing nature or are projected to take place in the foreseeable future, are to be analyzed to produce an overall installation EIS. Projections on future activities at an installation can be based on the installation mission, Army Stationing and Installation Plan, ASIP, and the installation master plan. The resulting comprehensive environmental impact assessment would eliminate the need for numerous smaller scope assessments. It would remain valid until there is a major change in the installation mission, training requirements, logistic and administrative support, master plan, ASIP, applicable pollution control standards or new information becomes available on local ecological or environmental conditions that would invalidate an earlier assessment. On the basis of the overall installa-

2–2

tion environmental impact assessment, an EIS would be prepared when it is determined that the current and/or projected operations at the installation will have significant impact on the environment. DA projects and activities are generally of the following types:

(a) Construction.

(b) Repair, maintenance and operation of real property.

(c) Procurement.

(d) Real estate acquisition, disposal or outleasing.

(e) Training.

(f) Industrial operations.

(g) Research, development, test and evaluation.

(h) Administrative support.

(i) Personnel.

(j) Resources recycling and conservation.

(2) Projects or actions which cannot be appropriately incorporated in the installation EIS because adequate definitive information is not available will require an individual EIA or EIS.

(3) An EIA for each Army installation worldwide will be completed at the earliest practicable date.

(4) Special consideration must also be given and EIS's prepared, if appropriate, by proponents of those major procurement actions that normally are not accomplished at the installation level. Examples would include the procurement of a new combat vehicle, communications system, weapons systems or major fuel supplies. Those aspects of the actions to be included in an EIA, or an EIS if needed, are the environmental impact of any research and development activities, testing operations, manufacture, transportation, maintenance, storage, use during training and disposal of the materiel being procured. In essence, the EIS covers the life cycle of the materiel. The impact of employing such equipments in combat operations is not required in the EIA or the EIS.

2-5. Policies and objectives. a. It is the continuing policy of the Department of the Army, as a trustee of the environment, to demonstrate leadership and carry out its mission of national security in a manner consistent with national environmental standards, laws and policies. All practical means and measures will be used to minimize or avoid adverse environmental consequences and in attaining the objectives of—

(1) Providing a safe, healthful, productive, and esthetically and culturally pleasing surrounding.

(2) Attaining the widest range of beneficial uses of the environment without degradation, risk to health or safety or other undesirable and unintended consequences.

(3) Preserving important historic, cultural, and national aspects of our national heritage and maintaining where possible an environment which supports diversity and variety of individual choice.

(4) Achieving a balance between resources use and development within the sustained carrying capacity of the ecosystem involved.

(5) Enhancing the quality of renewable natural resources and approaching the maximum attainable recycling of depletable resources.

b. Toward this end, DA agencies will—

(1) Assess at the earliest practical stage in the planning process and in all instances prior to the first significant point of decision, the environmental consequences of proposed actions.

(2) Review those continuing actions initiated prior to enactment of NEPA, for which the environmental consequences have not been assessed and ensure that any remaining actions are consistent with the provisions of this chapter.

(3) Utilize a systematic interdisciplinary approach in planning and decisionmaking.

(4) In Army planning and decisionmaking, consider environmental values and amenities concurrently with economic and technical considerations.

(5) Prepare and process under the criteria and procedures set forth herein a detailed EIS on every recommendation or report on proposals for legislations and other major defense actions which are expected to be environmentally controversial or could cause a significant effect on the quality of the human environment.

(6) Study, develop, and describe appropriate alternatives to the recommended courses of action in any proposal which involves unre-

US_00000021

solved conflicts concerning alternative uses of available resources.

(7) Recognize the worldwide and long-range character of environmental problems and, where consistent with national security requirements and the foreign policy of the United States, lend appropriate support to initiatives, resolutions and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of the world human environment.

(8) Refrain from taking any significant implementing steps on administrative actions until 90 days have elapsed after CEQ publishes notice in the Federal Register of the filing of the draft environmental statement and 30 days have elapsed after CEQ publishes notice in the Federal Register of the filing of the final statement, except as provided elsewhere in this chapter. The time relationships for the preparation and processing an EIS are shown in figure 2–1.

(9) On occasion, laws other than the National Environmental Policy Act require the Department of the Army to gain approval of another Federal agency before commencing certain types of actions that may have environmental consequences. Compliance with the requirements of such laws does not relieve the responsible official from preparing and processing an EIS, if the proposed action is a major action that would significantly affect the quality of the human environment. In this connection, compliance with PL 91–190 is applicable unless existing law applicable to a specific action or activity expressly prohibits or makes compliance impossible. However, insofar as practicable, the draft EIS format should be used in complying with other laws to minimize duplication of efforts.

**2–6. Responsibilities.** *a.* The Assistant Secretary of the Army (Civil Works) will serve as the Secretary of the Army's responsible official for National Environmental Policy Act of 1969 (NEPA) matter.

*b.* The Chief of Engineers, DA, exercises primary staff responsibility for coordinating and monitoring NEPA activities within the Army and will—

(1) Provide assistance and advice on the preparation/processing of EIA's and EIS's.

(2) Designate a single agency or lead office having the responsibility for preparing and processing EIS's and EIA's when more than one DA agency is involved.

(3) Review and comment on draft EIS's submitted by other DOD components and other Federal agencies.

(4) Monitor issuances of the DA which have environmental implications to determine if EIS's are required and to ensure that environmental considerations are built into the decisionmaking process.

(5) Maintain liaison with CEQ, EPA, the Office of Management and Budget (OMB), and other Federal agencies and State and local groups, with respect to the environmental policies affecting the Department of the Army.

(6) Maintain a current quarterly DA consolidated list of actions for which EIS's have been prepared or are under preparation, and a list of negative declarations.

(7) Retain a copy of each draft and final EIS prepared within the Department of the Army until the project or activity is completed.

(8) Direct the preparation of EIS's as appropriate.

(9) Coordinate on the technical aspects of EIS's submitted to HQDA for review and comment within those areas of assigned staff cognizance and technical capability and,

(10) For those actions or activities for which he is normally responsible, fulfill the requirements as defined in paragraph *c* below for HQDA staff agencies.

*c.* Headquarters Department of the Army staff agencies will—

(1) Apply the policies set forth in this chapter on the application of NEPA to continuing and proposed programs and projects within their staff cognizance.

(2) Publish internal procedures for the preparation and review of EIA's and EIS's for programs or projects within assigned areas of responsibility and ensure that EIS's, as may be required, are prepared and processed.

(3) Ensure that all regulations, directives, instructions, and other major policy publications are reviewed for environmental consequences, and, when such consequences are significant, withhold publication or issuance until the requirements concerning an EIS have been fulfilled.

US_00000022

(4) Coordinate, as appropriate, the preparation of EIS's with other elements of the Department of the Army as well as with the OCE, Environmental Office.

(5) Assess continuing and proposed programs and actions for their environmental consequences and initiate the preparation of EIS's where required.

(6) Designate, maintain and report the identity to DAEN-ZCE of the agency's single point of contact for environmental matters.

(7) Prepare and maintain a list of administrative actions for which EIS's have been prepared or are being prepared, and compile the report of negative declarations required by paragraph 2-7a.

(8) As requested, assist in the review of EIA's and EIS's prepared by other Army agencies and EIS's prepared by non-Army agencies.

(9) Coordinate existing and proposed directives, instructions, regulations and major policy publications that have environmental implications with OCE (DAEN-ZCE).

(10) Determine, in accordance with the requirements contained in paragraph 2-12, if a public hearing is necessary for the proposed action and assign the responsibility for the hearing to an appropriate office or agency.

d. The Judge Advocate General will provide legal advice and assistance, as requested, in the interpretation of applicable laws and regulations related to environmental matters and handle litigation before the various courts and regulatory bodies except for the civil works program of the Chief of Engineers and the other specific responsibilities assigned herein to the Chief of Engineers.

e. The Comptroller of the Army will establish necessary procedures to ensure compliance with the requirements for environmental exhibits and data in support of annual budget request. Additionally, for those actions or activities for which the COA is normally responsible, the COA will fulfill the requirements defined in paragraph c above for all HQDA staff agencies.

f. The Surgeon General is responsible for coordinating the health, welfare, and environmental aspects of proposed environmental impact statements submitted to HQDA, and for preparing assessments or proposed EIS's required for actions and programs for which he is the proponent. Army commands, installations, and agencies are encouraged to draw upon the special expertise, within those areas of assigned staff cognizance and technical capability, which are available within the medical department. The Surgeon General will, upon request, furnish assistance and advice in the preparation of those aspects of EIS's which involve health, welfare, or environmental effects or which have monitoring implications.

g. The Adjutant General will institute administrative procedures to preclude the publication of any policy letter, regulation or other DA issuance unless the proponent staff agency stated in writing that actions associated with implementing the publication will have no significant impact on the environment or a final EIS has been prepared and published in the Federal Register and the required time frame has passed.

h. Major field commanders are responsible for monitoring actions and programs proposed for accomplishment within their commands or directed by higher headquarters, and assuring that appropriate EIA's or EIS's are prepared and, if necessary, forwarded to HQDA.

i. All Army commands and agencies will—

(1) Establish internal procedures for assessing environmental consequences for continuing and proposed programs and actions for which they are the proponent agency, in accordance with the policies contained herein, and for the preparation, coordination within their technical staffs, and processing of EIA's and EIS's required for actions within their agencies.

(2) Establish internal procedures to ensure that all regulations, directives, instructions, and other major policy publications for which they are the proponent agency or which implement issuances by higher headquarters, are evaluated for environmental consequences prior to publication.

(3) Establish a continuing program to assure that sufficient personnel within the command or agency are properly trained in the requirements of NEPA and the provisions of this regulation.

US_00000023

## Section II. REPORTS

2-7. RCS DD–I&L (Q) 1326, RCS DD–I&L (AR) 1327. *a.* The Department of the Army is required to report to the OSD at least quarterly, those actions on which EIS's have been prepared, those under preparation, and in certain situations when it has been determined that an EIS is not required. In the latter instance, when it has been decided that an EIS is not required for a project or activity of a type described in paragraph 2–9*b*, a statement (negative declaration) must be prepared for the public record briefly setting forth this decision and the reasons for the determination. The negative declaration should be prepared in the EIS format (fig. 2–4) and kept with the project or activity file subject to forwarding to HQDA upon request. Major commands will submit in quadruplicate to HQDA (ATTN: DAEN–ZCE) a report covering the actions discussed above and in the format shown at figure 2–2. Report will be submitted within ten (10) days following the end of the quarter. Reports will be submitted on quarterly intervals.

*b.* Major commands and HQDA staff elements will maintain cost estimates of the direct costs which are incurred solely for the purpose of preparing and processing EIS's. These estimates must be available upon request and will be identified as follows:

(1) Salaries of military and civilian personnel.

(2) Associated travel costs.

(3) Research costs directly related to the draft EIS's.

(4) Contract and consultant costs directly related.

(5) Administrative costs, and

(6) Costs of public hearings.

*c.* Reports discussed in paragraph *a* above will be submitted within ten (10) days following the end of the quarter. This reporting requirement has been assigned Requirement Control Symbol DD–I&L(Q)1326.

*d.* EIS's prepared in accordance with this regulation have been assigned Requirement Control Symbol DD–I&L(AR)1327.

## Section III. ENVIRONMENTAL IMPACT ASSESSMENTS AND ENVIRONMENTAL IMPACT STATEMENTS

2-8. General. *a.* Both the EIA and the EIS are analyses of ongoing activities or proposed plans and programs and must include systematic analyses of the environmental impact (adverse and beneficial) on land, air, water, man, and other biota. The purpose is to identify—

(1) The environmental impact of the proposed/ongoing action.

(2) Any adverse environmental effects which cannot be avoided.

(3) Alternatives to the proposed action.

(4) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(5) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action.

*b.* Environmental impact assessments.

(1) The preparation of an EIA is the initial step of an environmental analysis. Its purpose is to identify whether the action (ongoing or

proposed) is major and to determine if the action will have significant impact on the quality of the human environment. Further, it is to serve as the basis for determining if an EIS will be required.

(2) For the many routine actions which are largely administrative in nature, require a minimal expenditure of resources and are of generally limited scope, the EIA can be a conscientious mental evaluation with that action reported in the project or activity file. However, where documentation is required in support of a project or action, the documentation will contain a statement that an EIA has been made and that no significant environmental impact will result.

(3) For those actions not clearly identified to fall in the category outlined in (2) above, a written EIA will be prepared. The EIA will follow the format specified for an EIS as outlined in paragraph 2–11, except that alternative courses of action need not be analyzed when it

2–6

is determined that only minimal environmental impact will result from pursuing the preferred course of action selected primarily for economic, technical or mission effectiveness reasons. (However, this exception does not absolve those responsible for implementing the action from taking every reasonable measure to minimize or mitigate any environmental impact that is inherent in the action.)

(4) In concluding any EIA, the preparer will make a specific statement on each of the following:

(a) The action is or is not major.

(b) A significant environmental impact will or will not result from the action.

(c) The implementation of the plan or action will or will not be environmentally controversial.

(5) The written EIA will be made available for consideration and approval by the principal decisionmaker at the level where the EIA is prepared. Each EIA will have a cover sheet as shown in figure 2-3, signed by appropriate decisionmaking officials and the EIA will be retained on file with the agency until the action or project is completed. However, if it is determined that the action is major and will have a significant effect on the environment, an EIS will be prepared and forwarded through command channels to HQDA as specified in paragraph 2-12.

2-9. Major actions significantly affecting the quality of the human environment (MASAQHE).
a. General.

(1) It is impossible to list categorically all DA projects or activities that are "Major Federal actions significantly affecting the quality of the human environment." In making a judgment in a particular case, it will be necessary for the proponent of the action to assess the expected environmental effects of the action in conjunction with the intent of NEPA as implemented by the CEQ and DOD. It is essential that all the environmental effects of an action be assessed, whether those effects are adverse or beneficial. In determining whether or not the effects of an action are significant, the proponent must evaluate the nature and degree of all effects on the environment. These may be significant even though the net environmental effect of the proposed action may be beneficial.

(2) DA agencies shall ensure that the environmental consequences of a proposed action are fully assessed during the decisionmaking process. If the EIA indicates that the decision will either affect the environment on a large geographical scale or have a serious environmental effect in a more restricted geographical area, the proposed action shall be considered a Major Action Significantly Affecting the Quality of the Human Environment (MASAQHE), and the decision shall be deferred until Federal agencies possessing special expertise or persons affected by the environmental effects of the decision have had an opportunity to present their view. It is necessary to consider not only the degree of effect on the environment but also the scope of the action and the potential effect of the action on other persons. The following examples are provided to assist in defining MASAQHE.

(a) An action that will influence subactivities in many subordinate units, and the subactivities will each affect the environment, is probably a MASAQHE even though a single subactivity by itself may not be in that category. For example, a limited maneuver or training exercise by small elements of a command might not be a major action, nor would it normally affect the environment significantly. However, if a major command or HQDA intended to publish a regulation that includes provisions prescribing the environmental considerations that were to be given to the planning of all training exercises or maneuvers of the command for an indefinite period of time, then it might be expected that such a regulation would have a significant effect on the quality of the environment because it would govern numerous activities which individually would have some effect on the environment. Thus the regulation should be construed to be a MASAQHE.

(b) A major realignment plan of the Army involving numerous installations or activities could be a MASAQHE. In this instance, the impact at one installation may be small but because of the numerous installations involved, the overall plan impact may be significant, especially insofar as the secondary impacts are concerned. Although the secondary socio-economic impacts are generally insufficient by

2-7

US_00000025

themselves to require as EIS, these factors should be included in the event that an EIS is required.

(c) An example of an action that should be classified as a MASAQHE because of a localized effect is an extremely noisy activity to be conducted near a residential area, where the resulting noise might seriously affect the comfort of residents of the area over an extended period. In keeping with the intent of NEPA, no decision should be made to take any action until those residents have been given an opportunity to present their views and their views have been carefully considered. Ongoing noisy activities should be given the same type study and review as given to planned or proposed activities.

b. The types of actions listed below require close environmental scrutiny because of the possibility that they may either affect the quality of the environment or create environmental controversy. It is desirable in such cases to have a complete presentation of the environmental aspects of the proposed action available for any interested party. For this reason, consideration should be given to documenting the environmental effects of the following types of actions in writing. (The written EIA need not be elaborate for those actions determined to be minor and for which prudent nonbiased judgement would readily determine that the impact would not be significant. However, negative declarations must be supported by written EIA's which generally meet the EIS format requirements.)

(1) Development or purchase of a new type of aircraft, ship or vehicle.

(2) Development or purchase of a new weapon system.

(3) Real estate acquisition, disposal and outgrants.

(4) Major construction projects.

(5) New installations (bases, posts, etc.) or continued operation of major existing installations or ranges.

(6) Production, storage, transportation, testing or disposal of lethal chemical munitions, and pesticides.

(7) Mission changes and troop deployments which precipitate long-term population increases or decreases in any area with special

attention to the secondary impacts which may cause indirect environmental impact.

(8) Large quarrying, or earth-moving operations.

(9) Constructing or installing fences or other barriers that might prevent significant migration or free movement of wildlife.

(10) Proposed construction of new sanitary landfills, incinerators and sewage treatment plants.

(11) Existing or changes to master plans.

(12) Proposed construction or acquisition of new family housing.

(13) Dredging, and other similar activities in the water.

(14) Training exercises on or off Federal property, where significant environmental damages might occur regardless of unit sizes.

(15) Opening areas that were previously closed to the public or closing or limiting of areas that previously were open to public use, such as roads or recreational areas.

(16) Proposed construction on flood plains or construction that may cause increase flooding erosion or sedimentation, activities on wetlands or proposals which could alter the wetlands environmental value.

(17) Channelization of streams, diversion or impoundment of water.

(18) Disposal of significant quantities of POL waste products.

(19) Proposed construction of roads, transmission lines or pipelines.

(20) New, revised, or established regulations, directives or policy guidance concerning activities that could have an environmental effect. Regulations, directives, or policy guidance which limit any of the alternative means of performing the actions on this list.

(21) Any action which, because of real, potential or purported adverse environmental consequences, is a subject of controversy among people who will be affected by the action, or which, although not the subject of controversy, is likely to create controversy when the proposed action becomes known by the public.

(22) Sole source aquifer.

(23) Prime and endangered farm land.

c. Even though a written EIA supports the conclusion that an action is not a MASAQHE,

US_00000026

an EIS is to be written on a proposed action which is highly controversial because of environmental aspects. The EIS should be based on the information contained in the EIA.

**2–10. Environmental effects.** The proponent of the action should consider all aspects of the action to determine if it will interfere unreasonably with the living conditions of man, wildlife, or marine life, or with any ecosystems on an immediate, short-range or long-range basis. Examples of some factors that may be applicable are—

 *a. Effects on water quality to include—*
  (1) Surface resources.
  (2) Subsurface resources.
  (3) Water supply treatment.
  (4) Sewage treatment.
  (5) Regulatory standards (water quality, effluent, toxic or hazardous substances, sedimentation, temperature alteration, etc.)
 *b. Effects on air quality to include—*
  (1) Fixed pollution sources (heating plants).
  (2) Mobile pollution sources (vehicles, aircraft).
  (3) Regulatory standards (ambient, point source, emissions of toxic or hazardous substances, or significant amounts of other pollutants).
 *c. Effects of noise to include—*
  (1) Continuous (background) noise sources.
  (2) Impact noises (weapons firing).
  (3) Regulatory standards (worker safety, community noise).
 *d. Effects of solid waste to include—*
  (1) Types and sources.

  (2) Disposal methods.
  (3) Regulatory standards (landfill, incinerator).
 *e. Effects of hazardous and toxic substances to include—*
  (1) Types and sources (explosives, chemicals, etc.).
  (2) Disposal methods.
  (3) Regulatory standards.
 *f. Effects on energy resources to include—*
  (1) Types used.
  (2) Expansion capability.
 *g. Land use*
  (1) Current land usage patterns (on and off installation) including population density, neighborhood character, zoning, aesthetics, recreation and,
  (2) Erosion and flooding controls.
 *h. Ecology.*
  (1) Aquatic life.
  (2) Animal life.
   *(a)* Species.
   *(b)* Population.
  (3) Endangered species.
  (4) Wetlands.
  (5) Vegetation.
   *(a)* Open space.
   *(b)* Forrested areas.
  (6) Management.
 *i. Cultural quality.*
  (1) Archeological sites and remains.
  (2) Historical structures and sites.
  (3) Natural sites and remains.
 *j. Preservation.*
  (1) Resources recycling.
  (2) Conservation measures.

## Section IV  PREPARATION OF ENVIRONMENTAL IMPACT STATEMENT

**2–11. General.** The following directions for the preparation of EIS's will be followed to assure general uniformity in preparing statements. DA agencies will institute procedures for identifying definite decision points for determining the need to formally submit an environmental statement. In developing and obtaining the necessary information to prepare an Environmental Impact Statement, early consultation within DA and with other Federal, State and local governmental and private organizations is

encouraged. The statement is to be based on the EIA and should—
 *a.* Carefully detail environmental impacts, alternatives, and implications of proposed projects and activities and should provide reviewers insight into the particulars associated with the action. Reviewers will expect the statements to be a valid source of information on the proposed action, as well as a reflection of how the proponent views environmental factors and seeks to accommodate them. Since the state-

US_00000027

ments are to be made available to the public, it must be assumed that they will receive careful scrutiny.

b. Systemically present the environmental impacts and sufficiently describe the physical and environmental aspects to permit independent appraisal and evaluation of the proposal. It should be simple and concise, yet include all pertinent facts. Length will depend upon the particular proposal and the nature of its impacts.

c. Not be limited to ultimate conclusions, but contain a thorough evaluation of all factors affecting the potential environmental impact of the proposal that will reasonably justify the conclusions presented.

d. Be a complete and objective appraisal of the beneficial and adverse environmental effects of available alternatives, rather than a justification for the proposal. In no case should adverse effects, either real or potential, be ignored or slighted in an attempt to justify an action previously recommended. Similarly, care must be taken to avoid overstating favorable effects.

e. Indicate at appropriate points in the text supporting and related underlying studies, reports and other information obtained and considered in preparing the EIS including applicable cost benefit analyses. Requirements by other statutes such as the Fish and Wildlife Conservation Act, and the National Historic Preservation Act should be combined with the EIS. Care should be taken to ensure that the EIS remains an essentially self-contained document, capable of being understood by the reader without the need for undue cross-reference. If the case references are not easily accessible, the statement should indicate how the information may be obtained.

**2–12. Content of the EIS.** The EIS statement must fulfill and satisfy, to the fullest extent possible at the time the draft is prepared, the requirements established for a final EIS. The body of the EIS will contain the following separable sections (see fig. 2–4) with the length of each being adequate to identify and develop the required information.

a. *Introduction.*

(1) *Project description.* A description of a proposed action, a statement of its purposes, and a description of the environment affected, including information summary technical data; and maps and diagrams where relevant, adequate to permit an assessment of potential environmental impact by commenting agencies and the public. Highly technical and specialized analyses and data should be avoided in the body of the draft impact statement. Such materials should be attached as appendixes with adequate bibliographic references.

(2) *Existing environment of proposed site.* The EIS should succinctly describe the environment of the area affected as it exists prior to a proposed action, including that of other Federal activities in the area affected by the proposed action which are related to the proposed action. Because the interrelationships and cumulative environmental impacts of the proposed action are to be identified later in the EIS, the amount of detail provided in such descriptions should be commensurate with the extent and expected impact of the action, and with the amount of information required at the particular level of decisionmaking (planning, feasibility, design, etc.). In order to ensure accurate descriptions and EIS, site visits should be made where feasible. The proponent agency or command should also take care to identify, as appropriate, population and growth characteristics of the affected area and any population and growth assumptions used to justify the project or program or to determine secondary population and growth impacts resulting from the proposed action and its alternatives. In discussing these population aspects, consideration should be given to using the rates of growth in the region of the project contained in the projection compiled for the Water Resources Council by the Bureau of Economic Analysis of the Department of Commerce and the Economic Research Service of the Department of Agriculture (the "OBERS" projection). In any event, it is essential that the sources of data used to identify, quantify or evaluate any and all environmental consequences be expressly noted.

b. *Relationship of proposed action to land use plans, policies and controls for the affected area.* This requires a discussion of how the proposed action may conform or conflict with the objectives and specific terms of approved or proposed Federal, State, and local land use plans, poli-

2–10

cies, and controls, if any, for the area affected including those developed in response to the Clean Air Act or The Federal Water Pollution Control Act Amendments of 1972. Where a conflict or inconsistency exists, the EIS should describe the extent to which the DA agency has reconciled its proposed action with the plan, policy or control, and the reasons why they decided to proceed notwithstanding the absence of full reconciliation.

*c. The probable impact of the proposed action on the environment.*

(1) This analysis is to include the positive and negative effects of the proposed action as it affects the concerned local and/or State environment, but where applicable, may affect the national and international (Mexico, Canada, and other countries) environment. The attention given to different environmental factors will vary according to the nature, scale, and location of proposed actions. Among factors to consider should be the potential effect of the action on such aspects of the environment as those listed in paragraph 2–10. Primary attention should be given in the statement to discussing those factors most evidently impacted by the proposed action.

(2) Secondary or indirect, as well as primary or direct, consequences for the environment should be included in the analysis. Many major Army actions, in particular those that involve the construction of new installations or the expansion of existing installations stimulate or induce secondary effects, in the form of associated investments and changed patterns of social and economic activities outside an installation. Such secondary effects, through their impacts on existing community facilities and activities through inducing new facilities and activities or through changes in natural conditions, may often be even more substantial than the primary effects of the original action itself. For example, the effects of the proposed action on population and growth impacts should be estimated if expected to be significant and an evaluation made of the effect of any possible change in population patterns or growth upon the resource base, including land use, water, and public services, of the area in question.

*d. Alternatives.* Alternatives to the proposed action, including, where relevant, those not within the existing authority of the Department of the Army. A rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, is essential. Sufficient analysis of such alternatives and their environmental benefits, costs and risks should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects. Examples of such alternatives include: The alternative of taking no action or of postponing action pending further study; alternatives requiring actions of a significantly different nature which would provide similar benefits with different environmental impacts; alternatives related to different designs or details of the proposed action which would present different environmental impacts (e.g., cooling ponds vs. cooling towers for a power plant or alternatives that will significantly conserve energy); alternative measures to provide for compensation of fish and wildlife losses, including the acquisition of land, waters, and interests therein. In a draft EIS, the proponent may decide to favor an alternative or reserve judgment until comments are received from relevant commenting entities. In each case, the analysis should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs and risks of the proposed action and each reasonable alternative. Where an existing EIS already contains such an analysis, its treatment of alternatives may be incorporated in the new EIS provided that such treatment is current and relevent to the precise purpose of the newly proposed action.

*e. Any probable adverse environmental effects which cannot be avoided should the proposal be implemented.* This should be a brief section summarizing in one place those effects that are adverse and unavoidable under the proposed action. Included for purposes of contrast should be a clear statement of how other avoidable adverse effects will be mitigated.

*f. The relationship between local short-term*

US_00000029

*use of man's environment and the maintenance and enhancement of long-term productivity.* This section should contain a brief discussion of the extent to which the proposed action involved tradeoffs between short-term environmental gains and the expense of long-term losses, or vice versa, and a discussion of the extent to which the proposed action forecloses future options. In this context, short-term and long-term do not refer to any fixed time periods, but should be viewed in terms of the environmentally significant consequences of the proposed action.

*g. Any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.* Identify the extent to which the action irreversibly curtails the range of potential uses of the environment. Avoid construing the term "resources" to mean only the labor and materials devoted to an action. "Resources" also means the natural and cultural resources committed to loss or destruction by the action.

*h. Considerations that offset the adverse environmental effects.* Indicate the extent to which these stated countervailing benefits could be realized by following responsible alternatives to the proposed action. In this connection, cost benefit analyses of proposed actions should be attached, or summaries thereof, to the environmental impact statement, and should clearly indicate the extent to which environmental costs have not been reflected in such analyses.

*i. Summary sheet.* The EIS will be accompanied by an executive summary sheet which must provide the following information:

(1) Indicate whether the EIS is draft or final.

(2) Give the names of the action, provide a brief description of it and indicate what geographical region (States and counties) is particularly affected.

(3) Indicate whether it is an *administrative* or *legislative* action.

(4) Summarize the environmental impact and adverse environmental effects.

(5) List alternatives considered.

(6)(*a*) (For draft EIS's) List all Federal, State and local agencies from which comments are being requested.

(*b*) (For final EIS's) List all Federal, State, and local agencies and other sources from which written comments have been received.

(7) Provide the dates the draft statement and final statements were made available to the CEQ and the public.

## Section V  PROCESSING ENVIRONMENTAL IMPACT STATEMENTS

**2–13. General.** *a.* EIS's will be processed as displayed in figure 2–5. Both draft and final EIS's will be approved at HQDA by the OSA for filing with the CEQ, release to the Congress and Federal, State and local authorities and to others outside DA for comment or use. Approval will be obtained using normal staffing procedures by the functional staff agency which is proponent for the basic action in coordination with OCE (DAEN–ZCE) (see fig. 2–6). OCE may request that the Army Environmental Committee review the EIS for actions which have controversial, unusual, or Army-wide environmental impacts.

*b.* Draft EIS's will be reproduced and forwarded to HQDA in sufficient copies for official distribution to Federal, State and local agencies; internal DA staffing; and release to private organizations and individuals that may request same. Final EIS's will be distributed as indicated in paragraphs 2–16 and 2–17. Also, sufficient extra copies (estimate of 30) will be produced for distribution to individuals, universities, private organizations, etc., that may request copies subsequent to approval of the action.

*c.* EIS's are subject to the requirements of DOD 5200.1–R, Information Security Program Regulation, pertaining to the identification, safeguarding, and dissemination of classified information and to DOD Directive 5230.9, Clearance of DOD Public Information, pertaining to security review for public review for public release approval. EIS's, both draft and final, which contain classified information, will be prepared, safeguarded, and disseminated in ac-

US_00000030

cordance with the usual requirements applicable to classified information (DOD 5200.1–R). However, when feasible, the EIS's will be organized in such a manner that classified portions can be included as annexes, so that the unclassified portions can be made available to the public.

*d.* EIS's that have significant public affairs implications will be coordinated with Secretary of the Army, Public Affairs (SAPA), HQDA.

*e.* Until a draft EIS is approved for filing with CEQ and circulating for comment, a protective cover sheet (see fig. 2–7) will be used.

**2-14. Draft EIS's.** *a. Statements on administrative actions.* The processing of draft EIS's for filing with CEQ and circulating for comment will be accomplished by the HQDA functional staff proponent agency. The following distribution will be made for draft EIS's:

(1) One (1) copy, OCE (DAEN–ZCE).

(2) One (1) copy, OASA (CW).

(3) Three (3) copies, OASD (M,RA&L), DASD (E,E&S).

(4) Five (5) copies, CEQ.

(5) One (1) copy, EPA, Washington, DC.

(6) Six (6) copies, EPA Regional Office that has administration over the area in which the action will take place.

(7) Two (2) copies minimum, appropriate Federal agencies having jurisdiction by law or special expertise with respect to any environmental impact involved. Figure 2–8 lists the Federal agencies according to their areas primary cognizance.

(8) Two (2) copies, State and local agencies authorized to develop and enforce environmental standards when the proposed action affects matters within their jurisdiction. These copies will be sent to the appropriate State and regional or metropolitan clearinghouses in accordance with the procedures prescribed in OMB Circular No. A–95 unless the Governor of the State involved has designated some other point of contact for obtaining the State and local agency reviews. The clearinghouses are listed in the Directory of State, Metropolitan, the Regional Clearinghouses under OMB Circular No. A–95 (Revised) of 19 April 1971 (OCE (DAEN–ZCE) should be contacted, when appropriate, to obtain current information).

(9) Two (2) copies to cognizant Committees of the House and Senate in support of legislative proposals not pertaining to budget submissions (also see para *b* below).

(10) EIS's are to be made available to relevant public commenting entities free of charge or at a fee which is not more than the actual cost of reproducing copies required to be sent to Government agencies.

(11) At such time as the draft EIS is forwarded to the CEQ, other Federal, State, and local agencies, it will be made available to the public (to any organization or individual upon request) free of charge or, upon request, at a fee which is not more than the actual cost of reproducing copies required to be sent to Government agencies.

*b. Statements on legislative actions.* Three (3) copies of each draft EIS concerned with the annual budget request must accompany the budget submission through the Comptroller review process to OSD. In those instances where it has been determined that a project or activity will not have a significant impact on the environment, such determination must be stated on the project/activity request. Additional guidance is provided in the Budget Guidance Manual DOD 7110.1–M and DOD Instruction 7040.4. It is the responsibility of the HQDA Budget Director to provide required draft EIS's to the appropriate Congressional Committees at the time the legislative request is forwarded to the Congress. Distribution of the draft EIS to other agencies and to the public for comment shall be withheld until the legislative request has been forwarded to the Congress. However, if the draft EIS does not divulge the fiscal year or the monetary amount involved, it can be distributed for comment when approved by the Assistant Secretary of the Army (Civil Works) (ASA (CW)).

**2-15. Circulation for comment** *a.* Circulation of a draft EIS for comment serves as a guard against objective errors or excessive bias. Further, it makes available expert knowledge from other agencies and the public which can assist the Army in its efforts to protect the environment.

*b.* The HQDA agency requesting review and comments may establish a time limit of not less

US_00000031

than 45 days for reply after CEQ publishes notice of the proposed action in the Federal Register. If the agency consulted does not reply within the established time limit, it may be presumed that the agency has no comment to make, unless a specific request for an extension of time has been made. Requests for extentions of time up to 15 days may be granted by DA unless the urgency of the action precludes such a delay. In determining the length of the review period, consideration will be given to magnitude and complexity of the statement and the possible extent of citizen interest.

*c. Public hearings.*

(1) Informal public hearings will be conducted by the proponent HQDA staff agency or its delegate to obtain representative views from the various segments of the public when it is determined that the proposed action covered by the draft EIS is highly controversial. Such hearing will be publicly announced through local news media. Copies of the draft EIS will be made available to the public at least 15 days prior to the hearing.

(2) No public hearings need be held in connection with proposed legislation in view of the opportunity for public hearings in connection with Congressional consideration of the bill.

(3) Informal public hearings may be appropriate in the following situations:

(*a*) Where the proposed action by the agency will have a direct or peculiar impact on the people residing in a particular geographical area in terms of magnitude of economic costs of commitment of resources.

(*b*) Where public organizations or members of the public possess expertise concerning the impact of the action that may not otherwise be available.

(*c*) Where no overriding consideration of national security or time makes it illegal or impracticable to involve such organizations or members of the public in the consideration of a proposed action in which a high degree of interest by the public or other Federal, State, or local authority is evidenced by a written request that a hearing be held.

**2-16. Final EIS.** *a.* Final EIS's are prepared after receipt of review comments provided by other agencies and the public. In many cases, the final EIS's can be prepared by making minor revisions to the draft EIS and attaching the review comments received from other sources. In other cases, it may be necessary to provide a discussion of problems and objections raised by other Federal, State, and local agencies and by private organizations and individuals and the disposition of the issues involved. Along with the comments received, this discussion will be appended to the final text of the EIS.

*b.* Distribution of the final EIS will be as follows:

(1) One (1) copy, OCE (DAEN-ZCE).

(2) One (1) copy, OASA (CW).

(3) One (1) copy, OASD (M,RA&L), DASD (E,E&S).

(4) Five (5) copies, CEQ.

(5) Five (5) copies, appropriate Congressional Committees of the Senate and House of Representatives on final statements relating to Section 412, Public Law 86-149, as amended, or the annual Military Construction Authorization Bill.

(6) One (1) copy to those who filed substantive comments on the corresponding draft statement.

*c. Supplementing or amending a draft or final EIS.* A proponent agency may at any time supplement or amend a draft or final EIS. This should be accomplished when substantial changes are made in the proposed action or significant new information becomes available concerning its environmental aspects. The proponent agency should consult with OCE (DAEN-ZCE) with respect to the possible need for or desirability of recirculating the EIS.

**2-17. Time restrictions.** *a.* Draft EIS will be prepared, furnished to the CEQ, and circulated for comment early enough before an action needs to be taken to permit meaningful consideration of the environmental issues involved. To the maximum extent practicable, no administrative action (i.e., any proposed action to be taken, other than proposals for legislation or reports on legislation) will be taken sooner than 90 days after notice has been published in the Federal Register that CEQ has received the draft EIS and that it has been circulated for

US_00000032

comment, and, except where advance public disclosure will result in significantly increased costs of procurement, made available to the public. Nor will such administrative action be taken sooner than 30 days after notice of the final text of the EIS (together with comments) has been published in the Federal Register and the final EIS has been made available to commenting agencies and the public. The minimum 30-day and 90-day periods may run concurrently to the extent that they overlap. See figure 2-1.

b. When it is not practical for a proponent agency to comply with the time requirements above, the proponent DA agency may request HQDA (DAEN-ZCE) to request a waiver of a portion of the time requirement for that specific action. Such a request will contain an explanation of the facts and circumstances to justify the waiver and staffing through OSD to CEQ.

**2-18. Review of EIS prepared by another Federal agency.** a. EIS's will be referred to the Department of the Army by other Federal agencies for review when a proposed action may affect matters over which DA has jurisdiction by law, or where a proposed action may have environmental effects in an area where DA has been identified to possess special expertise.

b. Comments by the Army on an EIS prepared by another Federal agency will, as a minimum, address the aspect of the action for which the statement was referred. The com-

ments should be organized in a manner consistent with the structure of the draft statement stating the recommended changes and reasons for change. Modification to the proposed action and/or new alternatives that will enhance environmental quality an avoid or minimize adverse environmental impact are appropriately included. In addition, the comments should indicate whether any Army projects are planned that are not identified in the draft EIS and are sufficiently advanced in planning and related environmentally to the proposed action so that a discussion of the environmental interrelationships should be included in the final EIS. Comments should indicate the value of any monitoring of the environmental effects of the proposed project that appear particularly appropriate.

c. DA review and comment on an EIS prepared by another Federal agency will be coordinated by OCE (DAEN-ZCE). When a request for review and comment is received directly by a DA agency other than OCE, that agency shall reply through OCE (DAEN-ZCE).

**2-19. Related publications.** At table 2-1 is a list of related publications. Some of these publications will be of assistance to the agency preparing a draft EIS while others such as Office of Management and Budget Circular A-95 and the Directory of State, Metropolitan and Regional Clearinghouses, under A-95 will be of assistance to only a few HQDA agencies.

## Table 2-1

Public Law 91-190, "National Environmental Policy Act of 1969," January 1, 1970. (83 Stat. 852)

Pub. L. 91-604, "Clear Air Amendments of 1970," December 31, 1970.

Section 409 of Pub. L. 91-121, "Armed Forces Appropriation Authorization, 1970," November 19, 1969, as amended by section 506 of Pub. L. 91-441, "Armed Forces Appropriation Authorization, 1970," October 7, 1970.

Executive Order 11514, "Protection and Enhancement of Environmental Quality," March 7, 1970 (35 FR 46, 4247 (1970)).

Executive Order 11752, "Prevention, Control, and Abatement of Environmental Pollution at Federal Facilities," December 17, 1973.

Executive Office of the President, Council on Environmental Quality, "Preparation of Environmental Impact Statements," August 1, 1973.

US_00000033

**Table 2–1—continued.**

Executive Office of the President, Office of Management and Budget, "Proposed Federal Actions Affecting the Environment," Bulletin No. 71–3, August 31, 1970.

DOD Directive 5100.50, "Protection and Enhancement of Environmental Quality," May 24, 1973.

DOD Directive 5500.5, "Natural Resources—Conservation and Management," May 24, 1965 (32 CFR Part 263).

Executive Office of the President, Office of Management and Budget, Circular No. A–95 (Revised), February 9, 1971 (Parts I and II).

"Directory of State, Metropolitan and Regional Clearinghouses," under OMB Circular No. A–95 (Revised, April 19, 1971).

Pub. L. 86–149, "To Authorize Certain Construction at Military Installations and for Other Purposes," August 10, 1959.

DOD 5200.1–R, "Information Security Program Regulation," 15 November 1973, authorized by DOD Directive 5200.1, June 1, 1972.

DOD Directive 5230.9, "Clearance of DOD Public Information," December 24, 1966.

DOD Directive 5400.7, "Availability to the Public of DOD Information," 14 February 1975.

DOD Directive 7040.4, "Military Construction Authorization and Appropriations," July 16, 1971.

DOD Directive 6050.1, Environmental Considerations in DOD Actions, March 19, 1974.

US_00000034



NORMAL TIME RELATIONSHIPS FOR
PREPARING & PROCESSING AN EIS

EIA Compl
EIS Initiated

Variable Time    3 To 5 Mos

EIS Received by
DA Staff **Proponent**

Variable
30-40 Days
Review

DEIS to CEQ    2/
1/

Staffing w/in
Army Staff

Min Comments by
Others outside DA
Min Time 3 Mos

45 Days

15 Days
Min

Public Hearings

Comments Received by DA

Revise
Draft to
Incorporate Comments
Received

DA Files Final EIS
With CEQ    2/

1 Mo Min
Time

DA Approves Start

2-17

1/ DEIS Draft EIS (EIS becomes DEIS when approved by responsible DA official)

2/ Effective control date is the date that notice of the receipt by CEQ of the draft or final EIS is
published in the Federal Register (usually within one week of receipt by CEQ).

Figure 2-1

QUARTERLY CEQ REPORT
DEPARTMENT OF THE ARMY
(INCLUSIVE DATES)

(a) Final Statements

   Subject                          Date filed

(b) Draft Statements

   Subject                          Date filed

(c) Statements Under Preparation

   Subject                          Projected date

(d) Lists of Actions for which a statement is not required:

(i) Actions which normally require a statement:

<u>a</u>  Subject, date of determination.

<u>b</u>  Brief reason for determination.

(ii) Actions similar to those for which a significant number of

   statements have been filed:

<u>a</u>  Subject, date of determination.

<u>b</u>  Brief reason for determination.

(iii) Actions previously announced as requiring a statement:

<u>a</u>  Subject, date of determination.

<u>b</u>  Brief reason for determination.

(iv) Actions for which the CEQ requested a statement:

<u>a</u>  Subject, date of determination.

<u>b</u>  Brief reason for determination.

(e) List of actions for which statements are not yet timely.[1]

   Subject                          Date of evaluation


[1] Actions or activities which have been evaluated by the proponent
agency and that agency has concluded that preparation of an EIS is
not yet timely.

*Figure 2-2*

US_00000036

EXAMPLE


DEPARTMENT OF THE ARMY


ARMY COMMAND OR AGENCY

ENVIRONMENTAL IMPACT ASSESSMENT OR DRAFT ENVIRONMENTAL IMPACT STATEMENT

OR

FINAL ENVIRONMENTAL IMPACT STATEMENT


TITLE


INSTALLATION OR AGENCY


Date Prepared


Prepared by:                                    Approved by:


_____                   _____
NAME AND POSITION TITLE                        COMMANDER (COMMAND) INSTALLATION
                                               OR HIS DESIGNEE AND OFFICE

                      Approved by:


                   _____
                   COMMANDER (COMMAND) OR HIS
                   DESIGNEE AND OFFICE


                      Approved by:


                   _____
                              OSA



*Figure 2-3*

US_00000037

OUTLINE FOR EIS CONTENT

A. INTRODUCTION

    1. Project description
      a. Purpose of action
      b. Description of action
        (1) Location and setting of the activity
        (2) Summary of activities
    2. Environmental setting
      a. Environment prior to proposed action
      b. Other related Federal activities

B. LAND-USE RELATIONSHIPS

    1. Conformity or conflict with other land-use plans, policies and controls
      a. Federal, State, and local
      b. Clean Air Act and Federal Water Pollution Control Act Amendments of 1972
    2. Conflicts and/or inconsistent land-use plans
      a. Extent of reconciliation
      b. Reasons for proceeding with action

C. PROBABLE IMPACT OF THE PROPOSED ACTION ON THE ENVIRONMENT

    1. Positive and negative effects
      a. Regional environmental and national/international environment where applicable
      b. Environmental factors to be considered
      c. Impact of proposed action
    2. Direct and indirect consequences
      a. Primary effects
      b. Secondary effects

D. ALTERNATIVES TO THE PROPOSED ACTION

    1. Reasonable alternative actions
      a. Those that might enhance environmental quality
      b. Those that might avoid some or all adverse effects
    2. Analysis of alternatives
      a. Benefits
      b. Risks

E. PROBABLE ADVERSE ENVIRONMENTAL EFFECTS WHICH CANNOT BE AVOIDED

    1. Adverse and unavoidable impacts
    2. How avoidable adverse impacts will be mitigated

F. RELATIONSHIP BETWEEN LOCAL SHORT-TERM USES OF MAN'S ENVIRONMENT AND THE MAINTENANCE AND ENHANCEMENT OF LONG-TERM PRODUCTIVITY

    1. Trade-off between short-term environmental gains at expense of long-term losses

*Figure 2–4*

US_00000038

2. Trade-off between long-term environmental gains at expense of short-term losses
3. Extent to which proposed action forecloses future options

G. IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS OF RE-SOURCES

1. Unavoidable impacts irreversibly curtailing the range of potential uses of the environment
   a. Materials
   b. Natural
   c. Cultural

H. NATIONAL DEFENSE CONSIDERATIONS THAT MUST BE BAL-ANCED AGAINST THE ADVERSE ENVIRONMENTAL EFFECTS OF THE PROPOSED ACTION

1. Benefits of proposed action
2. Benefits of alternatives

*Figure 2–4*—Continued.

US_00000039

EXAMPLE

FINAL DIAGRAM ENVIRONMENTAL IMPACT STATEMENTS



*Figure 2-5*

FLOW DIAGRAM ENVIRONMENTAL IMPACT STATEMENTS WITHIN HQ, DA

Key

—  —  —    Draft EIS

——————    Final EIS

*Figure 2-6*

2-22

US_00000040

PROTECTIVE COVER SHEET

The material contained in the attached Environmental Impact
Statement is for internal coordinating use only and may not be
released to non-Department of Defense agencies or individuals
until coordination has been completed and the material has been
cleared for public release by appropriate authority.

EXAMPLE

NOTE:  This cover sheet will be removed when the DEIS is approved by
HQDA.

*Figure 2-7*

US_00000041

**Areas of Environmental Impact and Federal Agencies and Federal State
Agencies with Jurisdiction by Law or Special Expertise to Comment
Thereon.**

### Air—Air Quality

Department of Agriculture—
  Forest Service (effects on vegetation)
Nuclear Regulatory Commission (radioactive substances)
Department of Health, Education, and Welfare
Environmental Protection Agency
Department of the Interior—
  Bureau of Mines (fossil and gaseous fuel combustion)
  Bureau of Sport Fisheries and Wildlife (effect on wildlife)
  Bureau of Outdoor Recreation (effects on recreation)
  Bureau of Land Management (public lands)
  Bureau of Indian Affairs (Indian lands)
National Aeronautics and Space Administration (remote sensing, aircraft
emissions)
Department of Transportation—
  Assistant Secretary for Systems Developing and Technology (auto
emissions)
Coast Guard (vessel emissions)
Federal Aviation Administration (aircraft emissions)
Federal Air Quality Control Regions

### Weather Modification

Department of Agriculture—
  Forest Service
Department of Commerce—
  National Oceanic and Atmospheric Administration
Department of Defense—
  Department of the Air Force
Department of the Interior—
  Bureau of Reclamation
Federal Energy Administration (Energy & Mobile Sources Emissions)

### Water Resources Council—Water—Water Quality

Department of Agriculture—
  Soil Conservation Service
  Forest Service
Nuclear Regulatory Commission (radioactive substances)
Department of the Interior—
  Bureau of Reclamation
  Bureau of Land Management (public lands)
  Bureau of Indian Affairs (Indian lands)
  Bureau of Sport Fisheries and Wildlife
  Bureau of Outdoor Recreation
  Geological Survey
  Office of Saline Water

*Figure 2–8*

US_00000042

Environmental Protection Agency
Department of Health, Education, and Welfare
Department of Defense—
    Army Corps of Engineers
    Department of the Navy (ship pollution control)
National Aeronautics and Space Administration (remote sensing)
Department of Transportation—
    Coast Guard (oil spills, ship sanitation)
Department of Commerce—
    National Oceanic and Atmosphere Administration
Water Resources Council
River Basin Commissions (as geographically appropriate)[1]
Regional Planning Agency for Area-wide Waste Water Treatment

## Fish And Wildlife

Department of Agriculture—
    Forest Service
    Soil Conservation Service
Department of Commerce—
    National Oceanic and Atmospheric Administration (marine species)
Department of the Interior—
    Bureau of Sport Fisheries and Wildlife
    Bureau of Land Management
    Bureau of Outdoor Recreation
Environmental Protection Agency

## Solid Waste

Federal Energy Administration
Nuclear Regulatory Commission (radioactive waste)
Department of Defense—
    Army Corps of Engineers
Department of Health, Education, and Welfare
Department of the Interior—
    Bureau of Mines (mineral waste, mine acid waste, municipal solid waste, recycling)
    Bureau of Land Management (public lands)
    Bureau of Indian Affairs (Indian lands)
    Geological Survey (geologic and hydrologic effects)
    Office of Saline Water (demineralization)
Department of Transportation—
    Coast Guard (ship sanitation)
Environmental Protection Agency
River Basin Commissions (as geographically appropriate)[1]
Water Resources Council

---

See footnote at end of table.

*Figure 2-8*—Continued.

US_00000043

## Noise

Department of Commerce—
      National Bureau of Standards
Department of Health, Education, and Welfare
Department of Housing and Urban Development (land use and building materials aspects)
Department of Labor—
      Occupational Safety and Health Administration
Department of Transportation—
      Assistant Secretary for Systems Development and Technology
      Federal Aviation Administration, Office of Noise Abatement
Environmental Protection Agency
National Aeronautics and Space Administration

## Radiation

Nuclear Regulatory Commission
Department of Commerce—
      National Bureau of Standards
Department of Health, Education, and Welfare
Department of Labor—Occupational Safety and
Health Administration
National Aeronautics and Space Council
Department of the Interior—
      Bureau of Mines (uranium mines)
      Mining Enforcement and Safety Administration (uranium mines)
Environmental Protection Agency

## Hazardous Substances—Toxic Materials

Nuclear Regulatory Commission (radioactive substances)
Department of Agriculture—
      Agricultural Research Service
      Consumer and Marketing Service
Department of Commerce—
      National Oceanic and Atmospheric Administration
Department of Defense
Department of Health, Education, and Welfare
Environmental Protection Agency

## Marine Pollution, Commercial Fishery Conservation, and Shellfish Sanitation

Department of Commerce—
      National Oceanic and Atmospheric Administration
Department of Defense—
      Army Corps of Engineers
      Office of the Oceanographer of the Navy
Department of Health, Education, and Welfare

*Figure 2-8*—Continued.

US_00000044

Department of the Interior—
    Bureau of Sport Fisheries and Wildlife
    Bureau of Outdoor Recreation
    Bureau of Land Management (outer continental shelf)
    Geological Survey (outer continental shelf)
Department of Transportation—
    Coast Guard
Environmental Protection Agency
National Aeronautics and Space Administration (remote sensing)
Water Resources Council
River Basin Commissions (as geographically appropriate)[1]
Regional Planning Agency for Area-wide Waste Water Treatment

### Waterways Regulation and Stream Modification

Department of Agriculture—
    Soil Conservation Service
Department of Defense—
    Army Corps of Engineers
Department of the Interior—
    Bureau of Reclamation
    Bureau of Sport Fisheries and Wildlife
    Bureau of Outdoor Recreation
    Geological Survey
Department of Transportation—
    Coast Guard
Environmental Protection Agency
Regional Planning Agency for Area-wide Waste Water Treatment

### Food Additives and Contamination of Foodstuffs

Department of Agriculture—
    Consumer and Marketing Service (meat and poultry products)
Department of Health, Education, and Welfare
Environmental Protection Agency

### Pesticides

Department of Agriculture—
    Agricultural Research Service (biological controls, food, and fiber production)
    Consumer and Marketing Service
    Forest Service
Department of Commerce—
    National Oceanic and Atmospheric Administration
Department of Health, Education, and Welfare
Department of the Interior—
    Bureau of Sport Fisheries and Wildlife (fish and wildlife effects)
    Bureau of Land Management (public lands)
    Bureau of Indian Affairs (Indian lands)
    Bureau of Reclamation (irrigated lands)
Environmental Protection Agency

---

See footnote at end of table.

*Figure 2-8*—Continued.

US_00000045

### Transportation and Handling of Hazardous Materials

Nuclear Regulatory Commission (radioactive substances)
Department of Commerce—
   Maritime Administration
   National Oceanic and Atmospheric Administration (effects on marine
life and the coastal zone)
Department of Defense—
   Armed Services Explosive Safety Board
   Army Corps of Engineers (navigable waterways)
Department of Transportation—.
   Federal Highway Administration, Bureau of Motor Carrier Safety
   Coast Guard
   Federal Railroad Administration
   Federal Aviation Administration
   Assistant Secretary for Systems Development and Technology
   Office of Hazardous Materials
   Office of Pipeline Safety
Environmental Protection Agency

### Energy Supply and Natural Resources Development—Electric Energy Development, Generation, and Transmission, and Use

Federal Energy Administration
Nuclear Regulatory Commission (nuclear)
Department of Agriculture—
   Rural Electrification Administration (rural areas)
Department of Defense—
   Army Corps of Engineers (hydro)
Department of Health, Education, and Welfare (radiation effects)
Department of Housing and Urban Development (urban areas)
Department of the Interior—
   Bureau of Land Management (public lands)
   Bureau of Reclamation
   Power Marketing Administrations
   Geological Survey
   Bureau of Sport Fisheries and Wildlife
   Bureau of Outdoor Recreation
   National Park Service
Energy Research and Development Administration
Environmental Protection Agency
Federal Power Commission (hydro, transmission, and supply)
River Basin Commissions (as geographically
appropriate)[1]
Tennessee Valley Authority
Water Resources Council

### Petroleum Development, Extraction, Refining, Transport, and Use

Federal Energy Administration

---

See footnote at end of table.

*Figure 2-8*—Continued.

US_00000046

Department of the Interior—
    Office of Oil and Gas
    Bureau of Mines
    Geological Survey
    Bureau of Land Management (public lands and outer continental shelf)
    Bureau of Indian Affairs (Indian lands)
    Bureau of Sport Fisheries and Wildlife (effects on fish and wildlife)
    Bureau of Outdoor Recreation
    National Park Service
Department of Transportation (Transport and Pipeline Safety)
Environmental Protection Agency
Interstate Commerce Commission

### Natural Gas Development, Production, Transmission, and Use

Federal Energy Administration
Department of Housing and Urban Development (urban areas)
Department of the Interior—
    Office of Oil and Gas
    Geological Survey
    Bureau of Mines
    Bureau of Land Management (public lands)
    Bureau of Indian Affairs (Indian lands)
    Bureau of Sport Fisheries and Wildlife
    Bureau of Outdoor Recreation
    National Park Service
Department of Transportation (transport and safety)
Environmental Protection Agency
Federal Power Commission (production, transmission, and supply)
Interstate Commerce Commission

### Coal and Minerals Development, Mining, Conversion, Processing, Transport, and Use

Federal Energy Administration
Appalachian Regional Commission
Department of Agriculture—
    Forest Service
Department of Commerce
Department of the Interior—
    Office of Coal Research
    Mining Enforcement and Safety Administration
    Bureau of Mines
    Geological Survey
    Bureau of Indian Affairs (Indian lands)
    Bureau of Land Management (public lands)
    Bureau of Sport Fisheries and Wildlife
    Bureau of Outdoor Recreation
    National Park Service

---

See footnote at end of table.

*Figure 2-8*—Continued.

US_00000047

Department of Labor—
    Occupational Safety and Health Administration
Department of Transportation
Environmental Protection Agency
Interstate Commerce Commission
Tennessee Valley Authority

### Renewable Resource Development, Production, Management, Harvest, Transport, and Use

Federal Energy Administration
Department of Agriculture—
    Forest Service
    Soil Conservation Service
Department of Commerce
Department of Housing and Urban Development (building materials)
Department of the Interior—
    Geological Survey
    Bureau of Land Management (public lands)
    Bureau of Indian Affairs (Indian lands)
    Bureau of Sport Fisheries and Wildlife
    Bureau of Outdoor Recreation
    National Park Service
Department of Transportation
Environmental Protection Agency
Interstate Commerce Commission (freight rates)

### Energy and Natural Resources Conservation

Federal Energy Administration
Department of Agriculture—
    Forest Service
    Soil Conservation Service
Department of Commerce—
    National Bureau of Standards (energy efficiency)
Department of Housing and Urban Development—
    Federal Housing Administration (housing standards)
Department of the Interior—
    Office of Energy Conservation
    Bureau of Mines
    Bureau of Reclamation
    Geological Survey
    Power Marketing Administration
Department of Transportation
Environmental Protection Agency
Federal Power Commission
General Services Administration (design and operation of buildings)
Tennessee Valley Authority

---

See footnote at end of table.

*Figure 2–8*—Continued.

US_00000048

## Land Use and Management—Land Use Changes, Planning and Regulation of Land Development

Federal Energy Administration
Department of Agriculture—
    Forest Service (forest lands)
    Agricultural Research Service (agricultural lands)
Department of Housing and Urban Development
Department of the Interior—
    Office of Land Use and Water Planning
    Bureau of Land Management (public lands)
    Bureau of Indian Affairs (Indian lands)
    Bureau of Sport Fisheries and Wildlife (wildlife refuges)
    Bureau of Outdoor Recreation (recreation lands)
    National Park Service (NPS units)
Department of Transportation
Environmental Protection Agency (pollution effects)
National Aeronautics and Space Administration (remote sensing)
River Basin Commissions (as geographically appropriate)[1]

## Public Land Management

Federal Energy Administration
Department of Agriculture—
    Forest Service (forests)
Department of Defense
Department of the Interior—
    Bureau of Land Management
    Bureau of Indian Affairs (Indian lands)
    Bureau of Sport Fisheries and Wildlife (wildlife refuges)
    Bureau of Outdoor Recreation (recreation lands)
    National Park Service (NPS units)
Federal Power Commission (project lands)
General Services Administration
National Aeronautics and Space Administration (remote sensing)
Tennessee Valley Authority (project lands)

## Protection of Environmentally Critical Areas—Floodplains, Wetlands Beaches and Dunes, Unstable Soils, Steep Slopes, Aquifer Recharge Areas, etc.

Department of Agriculture—
    Agricultural Stabilization and Conservation Service
    Soil Conservation Service
    Forest Service
Department of Commerce—
    National Oceanic and Atmospheric Administration (coastal areas)
Department of Defense—
    Army Corps of Engineers
Department of Housing and Urban Development (urban and floodplain areas)

See footnote at end of table.

*Figure 2-8*—Continued.

US_00000049

Department of the Interior—
    Office of Land Use and Water Planning
    Bureau of Outdoor Recreation
    Bureau of Reclamation
    Bureau of Sport Fisheries and Wildlife
    Bureau of Land Management
    Geological Survey
Environmental Protection Agency (pollution effects)
National Aeronautics and Space Administration (remote sensing)
River Basin Commissions (as geographically appropriate)[1]
Water Resources Council

### Land Use In Coastal Areas

Department of Agriculture—
    Forest Service
    Soil Conservation Service (soil stability, hydrology)
Department of Commerce—
    National Oceanic and Atmospheric Administration (impact on marine
life and coastal zone management)
Department of Defense—
    Army Corps of Engineers (beaches, dredge and fill permits, Refuse Act
permits)
Department of Housing and Urban Development (urban areas)
Department of the Interior—
    Office of Land Use and Water Planning
    Bureau of Sport Fisheries and Wildlife
    National Park Service
    Geological Survey
    Bureau of Outdoor Recreation
    Bureau of Land Management (public lands)
Department of Transportation—
    Coast Guard (bridges, navigation)
Environmental Protection Agency (pollution ef-
fects)
National Aeronautics and Space Administra-
tion (remote sensing)

### Redevelopment and Construction in Built-Up Areas

Federal Energy Administration
Department of Commerce—
    Economic Development Administration (designated areas)
Department of Housing and Urban Development
Department of the Interior— 
    Office of Land Use and Water Planning
Department of Transportation
Environmental Protection Agency
General Services Administration
Office of Economic Opportunity

---

See footnote at end of table.

*Figure 2–8*—Continued.

US_00000050

## Density and Congestion Mitigation

Department of Health, Education, and Welfare
Department of Housing and Urban Development
Department of the Interior—
    Office of Land Use and Water Planning
    Bureau of Outdoor Recreation
Department of Transportation
Environmental Protection Agency

## Neighborhood Character and Continuity

Department of Health, Education, and Welfare
Department of Housing and Urban Development
National Endowment for the Arts
Office of Economic Opportunity

## Impacts on Low-Income Populations

Department of Commerce—
    Economic Development Administration (designated areas)
Department of Health, Education, and Welfare
Department of Housing and Urban Development
Office of Economic Opportunity

## Historic, Architectural, and Archeological Preservation

Advisory Council on Historic Preservation
Department of Housing and Urban Development
Department of the Interior—
    National Park Service
    Bureau of Land Management (public lands)
    Bureau of Indian Affairs (Indian lands)
General Services Administration
National Endowment for the Arts

## Soil and Plant Conservation and Hydrology

Department of Agriculture—
    Soil Conservation Service
    Agricultural Service
    Forest Service
Department of Commerce—
    National Oceanic and Atmospheric Administration
Department of Defense—
    Army Corps of Engineers (dredging, aquatic plants)
Department of Health, Education, and Welfare
Department of the Interior—
    Bureau of Land Management
    Bureau of Sport Fisheries and Wildlife
    Geological Survey
    Bureau of Reclamation

*Figure 2–8—*Continued.

US_00000051

Environmental Protection Agency
National Aeronautics and Space Administration (remote sensing)
River Basin Commissions (as geographically appropriate)[1]
Water Resources Council

### Outdoor Recreation

Department of Agriculture—
    Forest Service
    Soil Conservation Service
Department of Defense—
Army Corps of Engineers
Department of Housing and Urban Development (urban areas)
Department of the Interior—
    Bureau of Land Management
    National Park Service
    Bureau of Outdoor Recreation
    Bureau of Sport Fisheries and Wildlife
    Bureau of Indian Affairs
Environmental Protection Agency
National Aeronautics and Space Administration (remote sensing)
River Basin Commissions (as geographically appropriate)[1]
Water Resources Council

---

[1] River Basin Commissions (Delaware, Great Lakes, Missouri, New England, Ohio, Pacific Northwest, Souris-Red Rainy, Susquehanna, Upper Mississippi) and similar Federal-State agencies should be consulted on actions affecting the environment of their specific geographic jurisdictions.

*Figure 2-8*—Continued.

US_00000052

# CHAPTER 3

# WATER RESOURCES MANAGEMENT

## Section I. GENERAL

**3-1. Purpose.** This chapter sets forth guidance and procedure for the DA implementation of the Federal Water Pollution Control Act of 1972 (FWPCA) (PL 92-500) and the water pollution control regulations promulgated by the US Environmental Protection Agency, US Coast Guard, US Army Corps of Engineers, and State and regional water pollution control authorities. Additional guidance regarding discharge of hazardous and toxic materials appears in chapter 6.

**3-2. Goals and objectives.** The Department of Army goal is to conserve water resources and protect them from contamination by controlling all sources of pollutants in accordance with applicable Federal, State, or regional standards and vigorously contribute to the attainment of the national goal of eliminating the discharge of pollutants by 1985. Inherent in this goal are the following objectives:

*a.* Identify, treat, monitor, control, and dispose of all waterborne wastes produced by Army fixed and mobile facilities in accordance with published Federal, State, and regional standards.

*b.* Conserve water resources used in the conduct of basic activities on all Army installations by instituting economy measures and by reuse when practicable.

*c.* Minimize soil erosion and attendant pollution caused by rapid and uncontrolled runoff into streams and rivers.

*d.* Provide drinking water that satisfies the potability standards published by the US Environmental Protection Agency (EPA) as interpreted by The Surgeon General of the Army (para 3-7).

*e.* Comply with the provisions of the Federal Water Pollution Control Act (PL 92-500) by obtaining and complying with permits issued by EPA under the National Pollutant Discharge Elimination System (NPDES) and the Corps of Engineers for the discharge of dredged or fill material.

*f.* Comply with the provisions of the Marine Protection, Research and Sanctuaries Act of 1972 (PL 92-532) by obtaining and complying with permits issued by EPA for the discharge of any material other than dredged material into ocean waters and by the Corps of Engineers for the discharge of dredged material into ocean waters.

**3-3. Explanation of terms.** *a. National Pollutant Discharge Elimination System (NPDES).* The system for issuing and conditioning permits under a schedule of compliance and denying permits for the discharge of pollutants from point sources into the navigable waters, which is administered by the Administrator of the Environmental Protection Agency pursuant to sections 402 and 405 of PL 92-500. The following additional terms have the following meanings with respect to the NPDES program and the FWPCA:

(1) *Pollutant.* Solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. It does not mean "sewage from vessels."

(2) *Point source.* Any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock,

US_00000053

concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

(3) *Discharge of a pollutant.* Any addition of any pollutant to navigable waters from any point source.

(4) *Permit.* Any permit or equivalent document or requirement issued by the EPA to regulate the disposal of pollutants.

(5) *Schedule of compliance.* A schedule of remedial measures including sequence of actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard.

(6) *Navigable waters.* All navigable waters of the United States (33 CFR Part 329); tributaries of navigable waters of the United States; interstate waters; intrastate lakes, rivers, and streams which are utilized by interstate travelers for recreational or other purposes; intrastate lakes, rivers, and streams from which fish or shellfish are taken and sold in interstate commerce; and intrastate lakes, rivers, and streams which are utilized for industrial purposes by industries in interstate commerce.

*b. Treatment works.* Any facility, method or system for the storage, treatment, recycling, or reclamation of municipal sewage or industrial wastes of a liquid nature, including waste in combined storm water and sanitary sewer systems.

*c. Material into ocean waters.* Matter of any kind or description, but not limited to solid waste, incinerator residue, garbage, sewage, sewage sludge, munitions, radiological, chemical, and geological warfare agents, radioactive materials, chemicals, biological and laboratory waste, wrecked or discarded equipment, rock, sand, excavation debris, and industrial, municipal, agricultural, and other waste. It does not mean oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredge material and does not mean sewage from vessels including human body wastes and wastes from toilets and other receptacles intended to receive or retain body wastes.

*d. Ocean waters.* Those waters of the open seas lying seaward of the baseline from which the territorial sea is measured, as provided for in the Convention on the Territorial Sea and the Contiguous Zone (15 UST 1606; TIAS 5639).

*e. Dredge material.* Any material excavated or dredged from navigable waters.

*f. Fill material.* Any material deposited or discharged into navigable waters which may result in creating fastlands or other planned elevations of lands beneath navigable waters of the United States.

*g. Marine sanitation devices.* The following definitions apply to marine sanitation devices:

(1) *Marine sanitation device (MSD).* Any equipment for installation in a vessel which is designated to receive, retain, treat, or discharge sewage, and any process to treat sewage. Four types of marine sanitation devices are defined:

(a) *Type I.* A "flow-through" MSD certified by a DOD Component or the US Coast Guard as being capable of producing an effluent with a fecal coliform bacterial count of not more than 1,000 per 100 milliliters and no visible floating solids.

(b) *Type II.* A "flow-through" MSD certified by a DOD Component or the US Coast Guard as being capable of producing an effluent with a fecal coliform bacterial count of not more than 200 per 100 milliliters and total suspended solids of not more than 150 milligrams per liter.

(c) *Type III–A.* A "non-flow-through" MSD which is designed to treat and hold the treated sewage. This type would include reduced-flush devices which ultimately evaporate or incinerate the sewage to a sterile sludge or ash.

(d) *Type III–B.* A collection, holding, and transfer (CHT) system, consisting of: Drain piping, holding tanks, pumps, valves, connectors, and other equipment used to collect and hold shipboard sewage waste for subsequent transfer to a shore sewage system, sewage barge, or for overboard discharge in unrestricted waters. Also known as Type III–B MSD.

(2) *Flow-through device.* Any marine sanitation device (Type I or Type II) which discharges treated sewage waste overboard.

(3) *Nonflow-through device.* Any marine sanitation device (Type III) which collects, holds and/or treats sewage or holds the untreated or treated sewage on board for disposal in legal areas or for transfer to proper shore

3–2

facilities. This type includes those devices which collect evaporate or incinerate the sewage to a sterile sludge or ash, as well as collection and holding systems.

(4) *Vessel.* Every ship or watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on the navigable waters of the United States.

(5) *Vessels owned and/or operated by the US Army.* Those vessels owned by or bareboat chartered to the US Army.

(6) *New vessel.* Any vessel on which first construction was initiated on or after 1 April 1976.

(7) *Existing vessel.* Any vessel on which first construction was initiated prior to 1 April 1976.

(8) *Sewage.* Human body wastes and wastes from toilets or other receptacles intended to receive human body wastes.

(9) *Discharge.* Includes, but is not limited to, any spillings, leaking, pumping, pouring, emitting, emptying, or dumping.

(10) *Fresh water lakes, reservoirs, and impoundments.* Fresh water bodies whose inlets or outlets prevent the ingress or egress of vessels subject to this regulation; rivers not capable of interstate navigation by vessels subject to this regulation.

**3–4. Policy.** It is the policy of the Army to—

*a.* Conserve all water resources.

*b.* Control or eliminate all sources of pollutants to navigable waters or groundwaters by on-post treatment of wastes, by joining regional or municipal sewage treatment systems or by employing recycling processes.

*c.* Comply with applicable Federal, State, and regional pollutant effluent limitation standards.

*d.* Demonstrate leadership in attaining the national goal of zero pollutant discharge.

*e.* Provide drinking water that satisfies the potability standards published by the Public Health Service/EPA as interpreted by The Surgeon General of the Army (TSG) (para 3–7).

*f.* Cooperate with Federal, State, and regional authorities in the formulation and execution of water pollution control plans.

*g.* Comply with the requirements for permits for the discharge of pollutants into navigable waters (section 402 of the FWPCA and imple-

menting regulations in 40 CFR 125); the transportation of material (other than dredged material) for the purpose of dumping it in ocean waters (section 102 of the Marine Protection, Research and Sanctuaries Act of 1972 and implementing regulations in 40 CFR 220); and for activities in or affecting navigable or ocean waters including the discharge of dredged or fill material and the ocean disposal of dredged material (sections 9 and 10 of the River and Harbor Act of 1899, section 404 of the FWPCA, and section 103 of the Marine Protection, Research and Sanctuaries Act of 1972 and implementing regulations in 33 CFR 324).

**3–5. Responsibilities.** *a.* The Chief of Engineers will exercise Army staff responsibility for directing and coordinating the Army water pollution abatement program for both fixed and mobile facilities. Specifically the Chief of Engineers will—

(1) Promulgate policy and regulations on water resources management which reflect Department of Defense guidance and pertinent provisions of water pollution control laws.

(2) Develop long range policies on wastewater treatment to achieve the 1983 water quality objectives and 1985 goals of PL 92–500.

(3) Manage the identification, reporting, engineering, design and construction of projects required to control and monitor discharges in accordance with applicable Federal, State, and regional water quality standards.

(4) Monitor water conservation practices for the purposes of identifying new potential uses for wastewater and methods for reducing water consumption.

(5) Publish policies on the control and disposal of sewage, galley, bilge and marine engine wastes.

(6) Provide guidance and direction to Army facilities in the preparation of applications for operating permits required by the FWPCA, Marine Protection, Research and Sanctuaries Act of 1972, and River and Harbor Act of 1899.

(7) Monitor the status of all FWPCA and ocean dumping permits and reports submitted in accordance with permit provisions.

(8) Coordinate the promulgation of new or revised water criteria and standards with TSG.

(9) Monitor master plans, construction plans and activities, and natural resource con-

3–3

servation activities to control surface water runoff and minimize erosion.

(10) Review and comment on NPDES and ocean dumping permits issued by EPA to Army installations.

b. The Surgeon General will—

(1) Monitor health and welfare aspects of water and wastewater control criteria and standards promulgated by Federal and State agencies.

(2) Establish and conduct water supply surveillance programs to ensure the maintenance of adequate potable water for Army installations.

(3) Accumulate, evaluate, and disseminate information on water pollution conditions that may adversely affect the health of man and animals.

(4) Conduct field investigations and special studies to determine the effectiveness of wastewater treatment and recommend corrective measures when appropriate.

(5) Provide technical consultation on the health, welfare, and environmental aspects of water and wastewater treatment programs and activities.

(6) Coordinate the development of water and wastewater treatment standards, procedures, surveys and studies with the Chief of Engineers.

(7) Review and comment on NPDES and ocean dumping permits issued by EPA to Army installations.

(8) Assist the Chief of Engineers in the formulation of plans and design criteria for water monitoring systems.

(9) Maintain a record of all FWPCA and ocean dumping permits issued to Army installations, perform a technical evaluation of FWPCA and ocean discharge monitoring reports received, and notify submitting installations of noted deficiencies.

(10) Report semiannually on the status of NPDES permits and NPDES discharge monitoring reports to the HQDA (DAEN–ZCE) WASH DC 20310. (RCS–ENG 237.)

c. Major Army commands (MACOM's) have the responsibility to ensure that they and their subordinate elements develop programs which will—

(1) Identify, quantify, and report all sources of water pollution and take appropriate action

to eliminate or reduce them to acceptable levels. This applies to all Army facilities to include all buildings, installation structures, land, utilities, equipment, aircraft, vessels, and other vehicles and property controlled by or constructed or manufactured for the purpose of leasing to the Army.

(2) Program and budget funds for remedial water pollution control projects to ensure compliance with applicable standards by statutory imposed dates.

(3) Establish routine wastewater control monitoring programs to ensure compliance with discharge limitations established by regulatory agencies and adherence with proper waste treatment operational procedure as specified in TM 5–665, TM 5–814–3, and TM 5–814–6.

(4) Obtain permits from the appropriate EPA Regional Administrator for all discharges of pollutants from installations and activities into navigable waters as required by NPDES and for the transportation of materials for the purpose of dumping them into ocean waters and comply fully with the provisions of such permits.

(5) Obtain permits from the appropriate District Engineer for all other actions in or affecting navigable waters of the United States, including the discharge of dredged or fill material in such waters, and for the transportation of dredged material for the purpose of dumping it in ocean waters.

(6) Control the discharge of sewage and bilge waste from vessels in accordance with US Coast Guard, EPA, DOD, or State regulations.

(7) Control the runoff of surface waters to minimize soil erosion, downstream flooding and pollution of waterways by sediments and contaminants.

(8) Conserve water resources by instituting regulatory measures where needed and by the judicious use of wastewater for nonconsumptive purposes.

(9) Provide all personnel with drinking water that meets the quality standards specified by The Surgeon General.

(10) Commanding General, US Army Materiel Development and Readiness Command will develop appropriate pollution control devices and retrofit vessels in the inventory required to meet specified standards.

3–4

US_00000056

**3-6. Related publications.** *a.* PL 92-500; Federal Water Pollution Control Act Amendments of 1972 (84 Stat 100, 33 U.S.C. 1163).

*b.* PL 92-532; Marine Protection, Research, and Sanctuaries Act of 1972.

*c.* Rivers and Harbors Act of 1899 (33 U.S.C. 401-413).

*d.* Executive Order 11752, "Prevention, Control and Abatement of Environmental Pollution at Federal Facilities," December 17, 1973.

*e.* TB 55-1900-206-14, Control and Abatement of Pollution by Army Watercraft.

*f.* AR 56-9, Watercraft.

## Section II. STANDARDS AND PROCEDURES

**3-7. Water supply standards.** Potable water supply standards must meet, as a minimum, the standards set by the U.S. Public Health Service (42 CFR 72.201-207)/EPA as interpreted by The Surgeon General of the Army (TB MED 229).

**3-8. Water quality standards.** *a.* Under the provisions of PL 92-500 it is the responsibility of the States to establish water quality standards and formulate an overall plan for achieving and enforcing these water quality standards. These criteria are based on the quality of water necessary to achieve and maintain use classifications of water such as recreation, fish and wildlife propagation, public water supply, and industrial and agricultural uses. States are also required to establish effluent discharge limitations necessary to achieve and maintain the desired use classification. For Army installations, implementation and enforcement of the applicable federally or State developed effluent limitations, and water quality standards are accomplished by the regional headquarters of the Environmental Protection Agency through the National Pollutant Discharge Elimination System.

*b.* The following effluent limitations are minimum standards which have been established pursuant to PL 92-500. More stringent effluent limitations may be established by the Administrator, EPA, to attain or maintain the water quality standards established by the State. Permissible effluent limitations, whether based on Federal or State water quality standards or on water quality criteria will be specified by the EPA Regional Administrator in the NPDES permit issued for each point of discharge.

**3-9. Effluent limitations.** *a. Domestic wastewater effluents.*

(1) As an interim limitation, all effluents from predominately domestic sources will be receiving the equivalent of secondary treatment as a minimum by 1 July 1977.

(2) By 1 July 1983, domestic wastewater limitations will be based on the best practicable waste treatment technology. Planning for 1983 discharge requirements will be clarified pending case by case evaluation of EPA criteria for 1983 which should be contained in NPDES permits to be issued in the 1977-1980 time frame. It may be assumed that the 1983 standards would require some form of advanced wastewater treatment (i.e., phosphate, nitrate or carbonate removal; very low values of biochemical/chemical oxygen demand, suspended solids and fecal coliform bacteria; and minimal fluctuations in pH and temperature).

*b. Industrial wastewater effluents.*

(1) As an interim limitation all effluents from existing industrial sources will be treated by processes employing the "best practicable control technology currently available" by July 1977. Guidelines and standards defining effluent limitations for best practicable control technology currently available are published under 40 CFR 401 through 432. At present only two industrial categories apply to Army activities; these are 40 CFR 413, Electro, plating, and 40 CFR 415, Inorganic Chemicals. EPA will publish regulations in the form of effluent limitations guidelines and standards of performance and pretreatment for ammunition production facilities at a later date. DAEN-ZCE will issue guidance as appropriate.

(2) By 1 July 1983, treatment of existing industrial wastewater effluents will employ the "best available technology economically achievable." Effluent limitations based on the best available technology economically achievable have been defined and are published in previously mentioned 40 CFR 401 through 432.

(3) Effluent limitations for new sources are in most cases based on best available technol-

US_00000057

ogy economically achievable and, therefore must necessarily meet the "1983 standards." These effluent limitations are also published with the guidelines and standards in 40 CFR 401 through 432.

c. *Oil.* The discharge of oil or effluents containing oil is limited by the quantity determined to be harmful to the public health or welfare; or by applicable water quality standards; or by the amount which will cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines; or cause a sludge or emulsion to be deposited beneath the surface of the water or adjoining shorelines (40 CFR 110 and chapter 6 of this regulation).

d. *Pretreatment Standards (40 CFR 128).* Nondomestic wastewater effluents from Army installations which are discharged to regional or municipal sewage treatment works must comply with the following limitations:

(1) Effluents will be treated sufficiently to remove wastes which: Would create a fire or explosion hazard; have pH lower than 5.0; would obstruct flow in sewers or interfere with proper operation of the works; or are introduced at an excessive flow or pollutant discharge rate likely to interfere with proper treatment.

(2) If the characteristics of the effluent qualify the Army installation as a "major contributing industry" and the effluent contains "incompatible pollutants" then the effluent will be pretreated prior to discharge, employing technology described in paragraph 3–8b(1), (2) or (3), depending on whether the effluent is from an existing or new source. Such pretreatment is necessary to prevent the discharge of any pollutant into regional or municipal treatment works which may interfere with, pass through or otherwise be incompatible with such works.

e. *Toxic and hazardous pollutants.* The EPA determines and publishes a list of toxic and hazardous pollutants and issues effluent or dumping limitations for these substances. Limitations often include absolute prohibition against discharge. Both The Surgeon General and the Chief of Engineers will maintain a list of such pollutants for which effluent guidelines are issued or are pending and will monitor suspected toxic pollutants until a decision on the actual effects is made. The discharge of these toxic pollutants from all Army facilities will comply with the limitations set by the EPA. In all cases, the discharge of a suspected toxic pollutant will be strictly controlled or prohibited until a determination is made as to the potential dangers involved and effluent limitations are established by the EPA and The Surgeon General of the Army.

(1) *Prohibited substances.* The toxic pollutants which have been prohibited from effluent discharges are listed in 40 CFR 129, EPA Regulations on Listing Toxic Pollutants. Other prohibited substances which may not be ocean dumped are listed in 40 CFR 227.21.

(2) *Hazardous substances.* The EPA listing of hazardous substances which are subject to strict effluent limitations will be addressed in Title 40 CFR 116.

f. *Thermal pollution.* Thermal discharges are subject to the best practicable and best available control technology requirements, as are other nondomestic pollutants. Thermal pollutant standards vary depending on temperature of the receiving water, the temperature and relative volume of the effluent, and effects such discharges will have regarding the protection and propagation of a balanced, idigenous population of shellfish, fish, and wildlife in and on the receiving water. Therefore, cases which involve thermal pollution are highly individual and are generally limited to large sources of thermal pollution such as steam electric power plants (40 CFR 423).

g. *Watercraft.* Effluent limitations from watercraft are established by the US Coast Guard (33 CFR 159), Department of Defense (DOD Dir 6050.4), EPA (40 CFR 140) and the states. Department of the Army will comply with standards and procedures set by the Office, Secretary of Defense (DOD Dir. 6050.4) and by TB 55–1900–206–14, Control and Abatement of Pollution by Army Watercraft.

(1) *Nondomestic waste discharge limitations.* Nondomestic waste (i.e., bilge, fuels, lubricants and other nonhuman wastes) discharges to navigable waters are prohibited (40 CFR 110). Exempt from this prohibition are discharges of oil from properly functioning vessel engines, provided such normal discharges are not deemed harmful.

3–6

(2) *Domestic waste discharge limitations.*

(a) EPA (40 CFR 140), establishes Federal effluent limitation standards for the discharge of sewage from vessels. All vessels (ships, boats, and other watercraft) owned and operated by the US Army within the navigable waters of the United States, except those not equipped with installed toilet facilities, must be equipped to meet MSD standards. Only those vessels scheduled to be decommissioned, inactivated, sold or otherwise disposed of by the end of FY 1981 are excluded from these provisions. In order to meet EPA standards, DARCOM will develop MSD certification testing, acceptance, operation and maintenance procedures for the Army based on guidance provided in paragraph VII, DOD Directive 6050.4 The following standards will apply:

1 Marine sanitation devices will be designed and operated to prevent the overboard discharge of untreated or inadequately treated sewage or any waste derived from sewage, into the navigable waters of the United States, except as hereinafter provided.

2 Any existing vessel equipped with a Type I MSD which was installed on or before 1 April 1976, or within 3 years thereafter, is in compliance so long as the device remains satisfactorily operable. Any existing vessel not equipped with any MSD on or before this date must install either a Type II or Type III MSD on or before 1 April 1981, except those vessels not equipped with installed toilet facilities.

3 Any existing vessel equipped at any time with a Type II or Type III MSD and certified by either DARCOM or the US Coast Guard, is in compliance so long as the device remains satisfactorily operable.

4 All new vessels wil be equipped only with a Type II or a Type III MSD certified by DARCOM or the US Coast Guard, on or before 1 April 1978, except those vessels not equipped with installed toilet facilities.

5 Any vessel operating on a freshwater lake or impoundment will comply with the applicable EPA "no discharge" standard and regulations of the US Coast Guard, to include compliance schedules. If the vessel is equipped with any MSD, the device will be modified as necessary to preclude accidental discharge into such waters.

6 Prior to the compliance dates stated above, more rigid or compelling standards which are imposed by State, regional, or local jurisdictions may prevail. After compliance, a more rigid standard will not take effect sooner than 1 April 1981.

7 Any "no discharge" standard will not apply until the Administrator, EPA, determines that adequate facilities for safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such waters to which the prohibition applies, or that the water quality requires a more stringent standard than that provided by 40 CFR 140.

8 Operators will not be exposed to hazardous chemicals or conditions during normal operation and maintenance of MSD's.

(b) Because of the above standard, MSD's under development or procurement for new vessels or to replace existing equipment should be selected with "no discharge" as a possible parameter and that full consideration be given to systems based on holding tanks rather than actual treatment systems. DARCOM will ensure that appropriate Environmental Protection Control Reports (RCS DD–I&L(SA) 1383) on MSD retrofit costs are forwarded through channels to HQDA (DAEN–FEU) WASH, DC 20314 in accordance with chapter 10, this regulation.

(c) MSD's will be so designed to preclude contamination of potable water supplies.

**3–10. Ocean dumping standards.** The Marine Protection, Research and Sanctuaries Act of 1972 (PL 92–532) EPA prohibits the dumping of certain materials into ocean waters and controls the dumping of all other materials. Army controlled activities will comply with the regulations and standards set by this act and notify HQDA (DAEN–ZCE) WASH DC 20310 of all permit requests. (40 CFR 220–227 and 33 CFR 323–324.)

**3–11. Activities in navigable waters.** The construction of any structure in or over any navigable water of the United States, the excavation from or depositing of material in such waters, or the accomplishment of any other work affecting the course, location, condition or capacity of such waters must have prior approval to the

US_00000059

Chief of Engineers or his authorized representative. Authority for such work is provided by issuance of a permit. Policy, practice and procedures are contained in 33 CFR 322.

**3-12. Storage of hazardous materials.** Storage facilities for materials which are hazardous to health, and for oils, gases, fuels, or other materials capable of causing water pollution, to either surface or ground waters, if accidentally discharged, will be so located as to minimize or prevent any such spillage. Measures necessary to entrap spillage, such as catchment areas, relief vessels, and entrapment dikes, will be installed so as to prevent and/or contain accidental pollution of water (chaps. 6 and 9).

**3-13. Water supply treatment procedures.** Water supplies will be monitored and, where necessary, treated in accordance with AR 420-46, Water and Sewerage, TB MED 229; AR 115-21, Hydrologic Services for Military Purposes and AR 115-20, Field Water Supply.

**3-14. Water conservation.** *a. Reduce consumption.* All uses of water taken to reduce water consumption wherever possible. The design and construction of new facilities and processes will consider minimized consumption of water, in particular potable water, as a major parameter. Vegetation and landscaping will be selected for the particular climate and geographical location so as to minimize or eliminate the need for irrigation.

*b. Reuse-recycle.* In addition to reducing initial water consumption, water conservation measures will include the reuse or recycling of wastewater whenever practicable. The design methodology for new or for modification of old facilities and processes will identify potential reuse or recycling of wastewater alternatives and such alternatives will be selected whenever it is determined economically competitive with "once through" processes. Examples include closed cycle cooling systems for power plants and the use of land based sewage treatment systems.

*c. Erosion control.* Operations will be scheduled and designed to reduce or eliminate the destruction of vegetation and other ground cover which prevents erosion and stream silta-

tion. Siting of new facilities will consider topography and soil conditions to reduce construction in areas sensitive to erosion. Construction techniques and methods that minimize erosion will be identified in all construction contracts and design/construction specifications. Large parking lots, roof areas, aircraft facilities, and roads which result in rapid runoff will be minimized wherever practicable. Periodic surveys will be made to identify areas where erosion has occurred and action will be initiated to control further erosion such as planting vegetation; controlling and, where necessary, impounding stormwater from areas of rapid runoff.

**3-15. Minor industrial and municipal operations.** Wastewater discharge from minor industrial and municipal facilities such as wash racks, engine steam cleaning operations, water treatment plant backwash, swimming pool filter backwash and other similar activities will be connected to the sanitary sewer wherever feasible. It should be noted that effluent from these activities not connected to sanitary sewers requires an NPDES discharge permit. To eliminate costly and difficult treatment and monitoring programs all possible efforts should be directed to connecting with the sanitary lines. At remote locations, a holding tank may be used which is sized to hold all drainage between pumpouts. After pumpout, the wastewater will be transported to another location for treatment and disposal. Other alternatives include on-site treatment which would require a discharge permit, or a closed cycle system which would treat and reuse the waste-water. In the latter case, if there were no discharges, a permit would not be required.

**3-16. NPDES permits.** The NPDES Permit Program (40 CFR 125) requires that all discharges of pollutants from point sources into navigable waters, (para 3-3*a*(6)), will be regulated by a discharge permit. This applies to domestic and industrial wastewater. The permit requirement does not extend to discharges from separate storm sewers except where the storm sewers receive industrial, municipal, and agricultural wastes or runoff, or where the storm runoff discharge has been identified by the Regional Administrator, the State water pollution con-

US_00000060

trol agency, or an interstate agency as a significant contributor of pollution. Also exempted are Army controlled properties (except when needed for public use) which are leased to contractors or others under authority of 10 USC 2667. It is the administrator of the lease who will monitor and institute corrective actions as necessary to insure that the lessee obtains and adheres to the NPDES permit.

a. *Permit applications.* When it is determined that an NPDES permit is required, permit applications will be requested from the applicable EPA Regional Office.

b. *Draft permits.* A draft permit will be issued based on the permit application. The draft permit will contain effluent limitations necessary to meet water quality standards; compliance schedules identifying dates on when the effluent limitations will be met, monitoring programs identifying type of pollutant to be monitored, method of sampling and analysis, frequency of sampling; and method and frequency of reporting monitoring program results.

c. *Draft permit review.* EPA is required to provide copies of the draft permit to the installation commander, the State, and the general public for review and comment. In general there will be not less than 30 days in which to provide comment before the final permit is issued. MACOM's will provide copies of all NPDES permits (both draft and final) received from EPA to the US Army Environmental Hygiene Agency, ATTN: HSE-EW, Aberdeen Proving Ground, MD 21010. USAEHA will accomplish: A technical review of each NPDES permit received; provide advice or assistance to the installation commander; through appropriate command channels establish liaison with the EPA, as necessary, to clarify and discuss permit conditions; and provide written comment back to the permittee for subsequent passage of written comments to the appropriate EPA Regional Office. Installation commanders will report potential problems arising from the terms of the permits which could impact on the operational capability of the installation to the HQDA (DAEN-FEU) WASH DC 20314 through appropriate command channels. In addition, the permits will contain instructions pertaining to reporting changes in quality or quantity of wastewater.

d. *Monitoring reports.* The terms of the permit will, in general, require the monitoring of all wastewater discharges and a periodic report to the EPA Regional Administrator, National Pollutant Discharge Elimination System Discharge Monitoring Report (RCS EPA-1002). In order to determine the effectiveness of the treatment and monitoring programs, copies of all monitoring reports will be forwarded to the USAEHA, ATTN: HSE-EW Aberdeen Proving Ground, MD 21010. Reports are made in accordance with frequency prescribed by each NPDES permit on form EPA 3320-1(10-72). Forms are available from appropriate EPA Regional Office. (See figure 9-1 and table 9-3 for location and addresses).

e. *Compliance schedules.*

(1) NPDES permits will contain a schedule of compliance with regard to any discharge which is not in compliance with applicable effluent standards and limitations, applicable water quality standards, and other applicable requirements. This schedule will be rigidly enforced. The terms of the permit will, in general, require that the permittee provide the EPA Regional Administrator with written notice of the permittee's compliance not later than 14 days following each interim date of compliance. Copies of this notice will be provided to the operating command and to USAEHA.

(2) In the event of noncompliance with the interim or final requirements, the permittee will immediately provide written notification to the EPA Regional Administrator with information copies to the appropriate operating command, USAEHA and DAEN-ZCE and where necessary, will request a revision to the compliance schedule following the procedure established under 40 CFR 125.23.

f. *Installations discharging to regional or municipal treatment works.* Permits are not normally required for discharge of domestic wastewater to regional or municipal sewage treatment facilities. However, those installations which find that pretreatment prior to discharge is required may be required to file for a permit.

g. *Inspections.* The EPA Regional Administrator may, under authority of 40 CFR 125.13 and 125.22, make site visits and inspections for the purpose of evaluating facilities prior to issuance of an NPDES permit and for the

US_00000061

purpose of monitoring compliance with the terms of an issued permit.

*h. Cooperation with state and regional authorities.* The EPA Regional Administrator, or his designated representative has full and legal authority to make site inspections of Army facilities. However, installation commanders will on the basis of reasonable, specific requests extend the same privileges to authorized State and regional pollution control authorities.

*i. Security restrictions.* When representatives from Federal, State, or regional enviromental pollution control agencies inspect facilities, examine operating records, and make tests to determine adherence to environmental performance specifications, security requirement must be met and the inspectors will be accompanied by either engineer or medical technical representatives designated by the appropriate major Army commander.

*j. Information requests.* The EPA regional office is the responsible Federal Agency regarding enforcement of all water pollution control requirements at Federal facilities in that region. Water pollution control information emanating from Federal facilities should go through the applicable EPA regional office. Therefore, requests for permit related information by State or regional authorities or by responsible members of the general public, should be directed to the applicable EPA regional office (chap. 1).

**3-17. Ocean dumping permits.** Permits for the dumping or discharge of materials into ocean waters, other than transportation of dredged material for purpose of dumping in ocean waters, are issued by the EPA. There are two types of permits, one which governs a general category of dumping and one which governs the dumping of special materials. The Administrator of EPA can issue general permits. The authority for issuing most special permits has been delegated to the EPA Regional Offices. Controls governing ocean dumping can be found in 40 CFR 220 through 227, "Regulations and Criteria, Transportation for Dumping, and Dumping of Material into Ocean Waters." Most permits require information on the type of pollutant or effluent being discharged or dumped, its quantity and frequency and loca-

tion of discharge. Permits require monitoring and documentation.

**3-18. Corps of Engineers permits.** The construction of any structure in or over a navigable water of the United States, the excavating from or depositing of dredged or fill material in such waters, the accomplishment of any other work affecting the course condition, location, or capacity of such waters, the discharge of dredged or fill material in navigable waters, and the transportation of dredged material for the purpose of dumping it in ocean waters requires a permit from the Corps of Engineers and will be processed in accordance with 33 CFR 209.120. Application for this permit is made to the local District Engineer. Applications are available from Corps of Engineers District Offices and will be completed for all projects or activities not under the design and supervision of the Chief of Engineers.

**3-19. State permits.** *a.* Cooperating with and providing information to State and regional authorities does not include making application for State permits of any kind nor obtaining a water quality certification from the State for any activity involving the discharge of a pollutant into navigable waters. Where information or data is to be provided a State authority on a prescribed registration form and authenticated, Army installation commanders will comply with all reasonable requests and forward same with a disclaimer that:

> "While Federal law does not require military installations to apply for State permits or obtain State water quality certifications, this installation is desirous of complying with the objectives of State and Federal pollution control programs. However, completion of this form is not to be construed as an application for permit. To the best of my knowledge, the information presented herein is correct."

Under unusual circumstances, when the installation commander considers it prudent to respond contrary to the above guidance, request for waiver will be submitted through appropriate command channels to HQDA (DAEN-ZCE) WASH DC 20310.

*b.* In all cases, waiver request will include a legal opinion by the staff judge advocate of the installation concerned or of the next higher

US_00000062

command having a staff judge advocate to ensure legal sufficiency. Special attention should be given to questions involving registration of sources and compliance schedules to ensure that the legal implications of such instruments are understood.

**3–20. Operator training and certification.** *a.* Operators of water treatment works and sewage treatment works shall meet levels of proficiency consistent with operator certification requirements applicable to the State or region in which the facility is located. (AR 420–15, Certification of Utility Plant Operators and Personnel Performing Inspection and Testing of Vertical Lift Devices.)

*b.* Necessary training of water treatment works and sewage treatment works operators will be accomplished through programs sponsored by the State or regional health department and the local university or college of the State in which the facility is located. In the absence of such State or regional programs, training will be accomplished at qualified institutions designated by the MACOM.

**3–21. Waivers.** *a.* No action which is contrary to the provisions contained in this chapter will be taken without first obtaining a waiver of the requirement from HQDA (DAEN–ZCE) WASH DC 20310.

*b.* Waivers may be granted only if the President or the Administrator of EPA finds that the technology to implement such standards is not available or operation of the facilities in question is required for reasons of national security. Requests for such waivers will not be considered by HQDA unless it can be clearly and conclusively demonstrated that operation of the facilities in question and the proposed construction or modification meets the above criteria. Requests for waivers will be forwarded through command channels to HQDA (DAEN–ZCE) WASH DC 20310.

**3–22. Investigation of complaints.** Each operating commander will establish procedures to investigate water pollution complaints and allegations from individuals and water pollution control authorities. In the case of a legal action of potential legal action, the matter will be reported immediately through judge advocate general channels to HQDA (DAJA–RL) WASH DC 20310.

**3–23. Water Pollution Control Report—(RCS DD–I&L (SA) 1383).** *a.* The water pollution control report portion of the Environmental Protection Control Report is designed to provide HQDA with data on a phased and coordinated plan for control and abatement of water pollution for submission to OSD and OMB; and for development of the five-year Army Environmental Program. Detailed instructions for preparing and submitting this report are provided in chapter 10 of this regulation.

*b.* The report will cover all portions of the water pollution control program where expenditure of funds for corrective actions is required. This includes all fixed facilities, monitoring equipment, watercraft and other mobile facilities.

US_00000063

US_00000064

# CHAPTER 4

# AIR POLLUTION ABATEMENT

## Section I. GENERAL

**4–1. Purpose.** The provisions contained in this chapter implement the Clean Air Act of 1970 (PL 91–604 as amended) and the applicable Federal and State Regulations issued pursuant to this Act; Executive Order 11752, Prevention, Control, and Abatement of Environmental Pollution at Federal Facilities; and DOD Instruction 4120.14, Air and Water Pollution Control.

**4–2. Goal and objectives.** It is the Department of the Army's goal to reduce the emission of pollutants into the air from both stationary and mobile sources to the lowest practicable limits, and at the earliest practicable date. Objectives for obtaining this goal are to—

*a.* Identify air pollution emission sources, determine the kinds and amounts of pollutant emissions, and reduce pollutant levels to those specified by Federal, State, interstate, or local substantive standards.

*b.* Procure commercial equipment and vehicles with internal combustion engines that meet emission standards, except for combat vehicles specifically excluded by Environmental Protection Agency (EPA) regulations.

*c.* Ensure that each piece of military equipment is designed, operated, and maintained so that it meets air emission standards unless specifically exempted.

**4–3. Explanation of terms.** *a. Ambient air quality standards.* Those standards established pursuant to the Clean Air Act, for protecting public health and welfare.

*b. Emission standards.* Permissible limits of emissions established by Federal, State, interstate and local authorities to achieve ambient air quality standards.

*c. Implementation plans.* Plans developed and administered by a State to designate the methods used to implement, maintain, and enforce ambient air quality standards in air quality control regions. The plans present an inventory of emissions and their source; a comparison of current emissions with current ambient air quality conditions; amount of emission reduction necessary to attain the ambient air quality standards for each category of emission sources; and plans, including transportation control plans, for achieving emission reductions.

*d. Mobile sources.* Vehicles, aircraft, watercraft, construction equipment, and other equipment using internal combustion engines as the means of propulsion.

*e. Monitoring.* The assessment of emissions and ambient air quality conditions, using techniques such as emission estimates, visible emission readings, diffusion or dispersion estimates, sampling, or measurement with analytical instruments.

*f. Motor vehicle.* Any self-propelled vehicle designed for transporting persons or property on a street or highway (sec 213, Clean Air Act). Further defined in 40 CFR 85.

*g. National Emission Standards for Hazardous Air Pollutants.* EPA emission standards established for specified hazardous air pollutants emitted by both new and existing stationary sources (sec 112, Clean Air Act).

*h. Parking facility.* Any off-street area or space, lot, garage, building or structure, or combination or portion thereof, in or on which motor vehicles are parked.

*i. Standards of performance for new stationary sources.* Emission standards established for specified pollutant sources, such as industrial facilities (sec 111, Clean Air Act).

4–1

US_00000065

**4-4. Policies.** *a.* Control and monitor fixed air pollutant sources to ensure compliance with Federal, State, interstate and local substantive air emission standards.

*b.* Monitor ambient air quality in the vicinity of Army industrial-type activities, or cooperate with others in such monitoring to determine whether current ambient air standards are being met.

*c.* Control emissions from mobile sources in accordance with Federal regulations or by State regulations when authorized by law.

*d.* Cooperate with Regional EPA and State authorities in achieving the objectives of State Implementation Plans.

**4-5. Responsibilities.** *a.* The Chief of Engineers will—

(1) Publish the basic policies and procedures for the identification, reporting, and programming of projects to control and monitor air pollutants emitted by Army fixed facilities and mobile sources, including aircraft and watercraft (DAEN-ZCE).

(2) Report requirements for projects to control sources of air pollution and the installation of air quality monitoring systems in accordance with this regulation and DOD Instruction 4120.14.

(3) Process requests for exemption from compliance in accordance with the provisions of the Clean Air Act and Executive Order 11752.

(4) Include in the Army R&D Program such research as may be needed or required for the development of technology to control Army-unique air pollutants.

(5) Perform technical review and evaluation of remedial projects for the control of existing sources of air pollution at fixed facilities and ensure that provisions are made for air pollution control in the design of new structures and facilities.

(6) Coordinate the requirement of the adoption of new air emission standards for the Army fixed facilities with The Surgeon General.

(7) Provide technical advice and assistance for the control of air pollution in the operation and maintenance of fixed facilities.

(8) Ensure all new construction or major modifications are reviewed by the applicable US EPA Regional Office to ensure compliance with the State Implementation Plan.

*b.* The Deputy Chief of Staff for Logistics will issue implementing policies, procedures and instructions for the control of air pollution which pertain to the maintenance, repair and modification of mobile sources including vehicles, aircraft and watercraft.

*c.* The Deputy Chief of Staff for Research, Development and Acquisition will—

(1) Conduct research and development programs designed to provide low-pollution, high efficiency engines for Army vehicles, mobile power sources, aircraft, and watercraft; and for the development of clean burning fuels.

(2) Incorporate air pollution controls, where required, in the development of new equipment and weapons systems to the maximum extent possible, without degrading the operational capabilities to an unacceptable level.

(3) Ensure that mobile equipment and engines developed for the Army comply with applicable current and projected Federal emission standards to the extent that priority defense and national security requirements permit.

*d.* The Surgeon General, will—

(1) Monitor the health and welfare aspects of the air pollution control program within the Department of the Army.

(2) Issue health and medical policy guidance on air pollution control and abatement.

(3) Consult with COE and appropriate commanders in the establishment of air pollution control standards which are unique to the Army.

(4) Provide staff assistance and guidance on the health and environmental aspects of management of hazardous and toxic air pollutants.

(5) Provide support to the basic Army R&D Program in terms of identification/designation of R&D needs.

(6) Review proposed Federal, State, interstate and local emission/ambient air quality standards and coordinate DA input to the standard-setting process.

*e.* Major Army commanders will—

(1) Develop a program, consistent with this regulation, and DOD guidelines to control and monitor air pollutant emissions from fixed and mobile facilities to comply with applicable Federal, State, interstate and local emission standards and ambient air quality standards.

**4-2**

US_00000066

(2) Ensure that personnel having responsibilities for controlling air pollution emissions (e.g. equipment operators and mechanics, heating plant operators, etc.) are properly trained to perform such duties. Further, provide training in the inspection, test and maintenance of pollution control devices and emissions measurement equipment.

*f.* Commanding General, US Army Materiel Development and Readiness Command. In addition to responsibilities assigned in *e* above, the Commanding General, US Army Materiel Development and Readiness Command will—

(1) Require that Army materiel equipped with internal combustion engines meet air emission standards in effect at the time of manufacture as required by Federal or State regulations.

(2) Ensure that the manufacture, shipment, operation, maintenance, and final disposition of the materiel can be accomplished with a minimum emission of air pollutants.

(3) Provide in technical publications, appropriate information and instructions on air pollution controls for engine driven equipment and on maintenance and monitoring procedures for minimizing pollutant emissions.

*g.* Commanding General, US Health Services Command will—

(1) Assist The Surgeon General in fulfilling his responsibilities for the health and welfare aspects of the Air Pollution Control Program.

(2) Provide personnel for conducting field investigations and special studies on sources of air pollution and for recommending measures required to protect health and welfare, and to comply with stationary or mobile emission standards or ambient air quality standards (para 4–12).

*h.* Installation and activity commanders will—

(1) Monitor air emission sources within their installations or under their control and identify air emission sources requiring remedial action to ensure compliance with emission standards and ambient air quality standards.

(2) Program remedial projects and funds to control and monitor air emission sources and ambient air quality to ensure compliance with emission standards and ambient air quality standards.

(3) Cooperate with representatives of Federal, State and regional agencies in the formulation and execution of the Installation Master Plan, projects, and operations to ensure conformance with the State Implementation Plan. This includes conformance with new source emission standards; new source review procedures for Federal facilities; air pollutant control strategies such as transportation control plans, vapor recovery systems, and air pollution emergency episode plans; and the requirement to obtain a consent agreement for sources not in compliance with applicable air pollutant emission standards.

(4) Monitor the operation of motor vehicles to permit compliance with applicable Federal or State emission standards; or in the absence of applicable standards, to minimize smoke emissions.

(5) Continue mechanic and operator training programs in the prevention, control and abatement of pollution from mobile equipment.

**4–6. Reports.** Sources of air pollution will be identified, and those requiring remedial action will be reported as specified in chapter 10. An example of an exhibit prepared on a facility found not to be in compliance with specified standards as shown in figure 10–3.

**4–7. References.** See table 4–1 for related publications to be used in conjunction with this chapter.

## Section II. STANDARDS AND PROCEDURES

**4–8. Standards.** *a. General.*

(1) The Clean Air Act establishes the legal basis for improving air quality and maintaining air quality for the protection of public health and welfare. Included in its provisions are the establishment of Air Quality Control Regions, which are approximately 250 in number; the establishment of National Ambient Air Quality Standards to identify the acceptable health and welfare levels which will be permitted for a given pollutant; allowable significant air quality deterioration zones which set the allowable

**4–3**

US_00000067

amount of air quality deterioration; and the preparation of Implementation Plans by each State to provide for the attainment of primary standards by 1 July 1975, and secondary standards within a reasonable time. The Act also requires EPA to set Standards of Performance for new or modified sources of pollution; establishing source emission standards for hazardous air pollutants such as asbestos, beryllium and mercury; and controlling motor vehicle emissions.

(2) National Ambient Air Quality Standards prescribe maximum pollutant levels for particulate matter, sulfur oxides, carbon monoxide, photo chemical oxidents, hydrocarbons and nitrogen oxides (40 CFR 50). In all instances the States in their Implementation Plans have specified strict ambient air quality standards and established maximum levels for each pollutant based on the type of source. It is the applicable State standard that is to be achieved by each Army facility.

*b. Fixed facilities.*

(1) *Existing sources*—Individual pollutants are to be controlled in accordance with national primary and secondary air quality emission standards, normally those promulgated by a State. The basic reference is 40 CFR 50.

(2) *New sources*—Specific Federal emission standards are applicable to certain types of new facilities such as large fossil fuel-fired steam generators, incinerators, sulfuric and nitric acid plants, etc. Detailed information is contained in 40 CFR 60.

(3) *Air quality control regions.* Air quality control regions, criteria, and control techniques are given in 40 CFR 81.

(4) *Hazardous air pollutants.* Certain hazardous air pollutants such as asbestos, beryllium, mercury and vinyl chloride, which must be closely controlled are identified in Federal regulations promulgated by EPA. Refer to 40 CFR 61 and paragraph 6–12, for guidance on control of asbestos during demolition and prohibition on use of sprayed asbestos materials for any purpose.

*c. Mobile sources.*

(1) *Commercial or commercially-adapted vehicles.* The manufacturer is required to certify these vehicles as meeting established emission standards of the year of manufacture. Basic reference is 40 CFR 85.

(2) *Military vehicles.* Certain military vehicles are excluded from the provisions of the Clean Air Act. Those not excluded will be certified by the manufacturer as meeting standards of the year of manufacture. Basic reference is 40 CFR 85.

(3) *Replacement engines.* (40 CFR 85.)

(a) Light duty will meet the standards imposed at the year of vehicle manufacture.

(b) Heavy duty will meet the standards imposed at the year of engine manufacture.

(4) *Aircraft.* Commercial or commercially adapted aircraft will comply with standards applicable to commercial aircraft in year of manufacture. Basic reference is 40 CFR 87.

**4–9. Assessment of air quality.** The impact of emissions produced by the operation of fixed and mobile sources on air quality will be included in an Environmental Impact Assessment (EIA) or Environmental Impact Statement (EIS) of any Army proposed action. Specific information as to existing regional air quality will be provided along with the changes or impact produced by the planned action. See also paragraph 4–11b, on significant air quality deterioration zones for additional guidance. Particular attention will be given to vehicle emissions from both military and privately owned vehicles which, along with the vehicles in a nearby community, may constitute a significant source of air quality degradation and health hazard.

**4–10. Air pollution sources.** Common sources of air pollution which must be controlled include—

*a.* Heating plants over one million BTU.

*b.* Incinerators.

*c.* Large electrical power generating plants.

*d.* Manufacturing processes/acid production facilities.

*e.* Metal cleaning and treatment operations.

*f.* Spray painting operations.

*g.* POL storage and dispensing facilities.

**4–11. Air pollution abatement and control.** *a.* Existing fixed sources of air emissions are subject to Federal and State standards promulgated under the Clean Air Act. Those facilities found not in compliance with such standards are to be promptly identified and reported in

US_00000068

accordance with the procedures outlined in chapter 10. The programing and budgeting for remedial projects will conform with established procedures as in AR 37-40, AR 415-15, AR 415-25 and AR 420-10.

b. New fixed sources or major modification to existing facilities which are a source of air emissions will be designed in accordance with applicable standards. Consultation with or review by State authorities on such projects will be through the Regional Administrator of EPA at the earliest practicable time in the planning process. Further, the State air pollution control agencies will establish significant air quality deterioration zones to control the introduction of pollutants into a specified area. Deterioration zones apply only to specific category of pollutant such as particulates or nitric oxides. Zones will be established by the State and are as follows:

Zone I—Very little to zero deterioration.

Zone II—Moderate deterioration.

Zone III—May deteriorate up to the national maximum.

Implementation of these standards for Federal facilities is through the EPA review of preconstruction plans. This regulation significantly increases the power of States to control land use patterns. Therefore, all Army plans for development and expansion of facilities must consider the deterioration zone within which the affected installation is located. (40 CFR part 52.)

c. Emissions from new mobile sources such as vehicle and aircraft engines will be regulated at the time of manufacture and certified in accordance with Federal regulations issued by EPA. The alteration or removal of such emission controls installed on Army equipment is prohibited.

d. The retrofit of military vehicles not equipped with emission control devices at the time of manufacture may be required by State regulation. Commanders of installations where such controls are required will take appropriate action to have such vehicles retrofitted and to ensure that vehicles without emission controls are not operated unless a waiver or exemption as specified in paragraph 4-15 is approved.

4-12. Air emission monitoring and reporting. a. Fixed sources. Air emissions will be monitored in accordance with EPA approved State, regional or local regulations. The more common pollutants that are monitored include particulates, sulfur dioxide, carbon monoxide, oxides of nitrogen hydrocarbons, and photochemical oxidants. Mandatory monitoring is imposed where more toxic emissions, such as nitric and sulfuric acid mists and asbestos, are released to the atmosphere. Such records on emissions as may be specified by EPA will be maintained and submitted as required.

b. Mobile sources. The periodic monitoring of vehicle emissions serves to verify the effectiveness of emission controls and engine combustion efficiency. Installations having large vehicle fleets are encouraged to institute such monitoring procedures. No reports are required for these emissions monitoring operations.

c. Technical assistance. Technical assistance relating to health and welfare considerations of air pollution problems can be obtained from Commander, US Army Health Services Command (HSC-PA), Fort Sam Houston, TX 78234. Specific services available include—

(1) Collection of pollutant emission data, operating criteria and performance standards for air pollution abatement equipment.

(2) Consultation on current Federal and State air quality regulations, standards and monitoring instrumentation.

(3) Source and ambient air evaluations to demonstrate compliance of existing sources with air quality regulations or standards.

(4) Provide assistance in collection and interpretation of air quality data for development of EIA or EIS.

4-13. EPA air pollution project review. a The following type projects require review by the EPA Regional Administrator for compliance with air pollution control standards prior to the initiation of construction:

(1) Large industrial or manufacturing facilities.

(2) Certain new parking facilities to be constructed in areas covered by Standard Metropolitan Statistical Areas and Transportation Control Plans (38 major urban areas) are subject to preconstruction review by the EPA Regional Administrator (40 CFR 52). A review is required for parking facilities having a capacity of 250 or more vehicles, or where special

US_00000069

restrictions are imposed on any additional parking. In such instances, an EPA permit must be obtained for new or modification of existing parking facilities which results in a net increase of 250 or more spaces when construction commences after 1 January 1975 or when a construction contract is signed after 1 January 1975. The basic references for State implementation plans and Transportation Control Plans are 40 CFR 51 and 52 respectively.

*b.* At the request of the installation commander, such reviews may be coordinated with the Regional EPA office by the supporting Corps of Engineers District Office.

**4–14. Consent agreements.** *a.* A consent agreement is required for each existing fixed source of air pollution which exceeds applicable standards. The consent agreement must contain a compliance schedule which contains a chronological list of dates (milestones) for each major action to be completed within the overall plan to bring a polluting source into compliance.

*b.* Consent agreements are negotiated by installation representatives with EPA Regional Offices and State air pollution control authorities. Once approved by EPA, the specified date when the facility will comply with air emission standards becomes legally binding on the installation commander. Further, the installation is required to inform the appropriate EPA Regional Office and State authority in writing, of any foreseen delays in meeting the intermediate dates contained in the compliance schedules and the reasons therefore, prior to the scheduled completion date. When it becomes apparent that the ultimate compliance date can not be met for reasons beyond the control of the installation commander, a revised consent agreement should be renegotiated. In such cases the EPA Regional Administrator will be notified as soon as possible. If renegotiation of a compliance schedule is rejected by EPA, the installation commander may forward a request for an exemption (para 4–15) from compliance from standards when continued operation of the facility is essential to conduct of the DA mission.

**4–15. Exemptions.** *a.* An exemption from compliance with air pollutant emissions may only be requested for existing facilities. New facilities

are to be designed to meet established standards.

*b.* Requests for exemption from the Clean Air Act and regulations promulgated pursuant to the Act will be based on the continued operation of a particular facility being in the interests of national security and upon the requirements of Executive Order 11752. Such requests will be forwarded through channels to HQDA (DAEN–ZCE) WASH DC 20310 for necessary action.

**4–16. Transportation control plans.** *a.* In addition to regulating the emissions from fixed sources, it may be necessary for a State to impose controls over transportation in order to achieve national ambient air standards. Large metropolitan areas, such as Los Angeles, California and Baltimore, Maryland are having to resort to such measures because the major portion of air pollution in those areas is caused by motor vehicles.

*b.* Military installations and activities located within the area defined in EPA approved Transportation Control Plans are required to cooperate with local authorities in reducing vehicular traffic consistent with miltiary requirements. Although the overall requirement is to reduce both military and civilian traffic, primary emphasis should be on reducing the use of privately owned vehicles. Consequently, Installation Transportation Control Plans which may be required for a particular region by Federal regulations should be prepared and implemented as deemed necessary. Various control measures that will be considered include:

(1) Instituting a command carpooling with carpool locator program,

(2) Encouraging the use or expansion of public transportation service,

(3) Restricting available parking areas to promote carpooling,

(4) Issuing preferred parking spaces to carpool cars, and

(5) Encourage the use of bicycles/walking for short on-post trips.

*c.* Information regarding the existence of approved metropolitan Transportation Control Plans may be obtained from local air pollution control authorities or the Regional EPA Administrator.

**4–6**

US_00000070

**4-17. Air pollution emergency episode plans.** *a.* Army installations or activities located in areas susceptible to air pollution episodes (smog conditions) will cooperate with local authorities in reducing air emissions during such emergency periods. Specific contingency plans are to be developed and coordinated with the local air pollution emergency episode plans to provide for: The curtailment of all but essential services; to provide for required mission activities; announcement of notification procedures; and instructions on those control measures to be invoked during the various phases of such episodes. The following control measures are to be considered in such contingency plans:

(1) Restrict use of private automobiles by requiring car pools or use of mass transit facilities.

(2) Conduct an educational program on the hazards of air pollution episodes.

(3) Publicize episode warnings and notification procedures.

(4) Postpone all except mission-essential activities which produce air emissions, (e.g., vehicle use, operation of incinerators, etc.).

(5) Grant personnel administrative leave, but only as a last resort. This action will be coordinated with other DOD and Federal installations in the affected area.

*b.* The shut down or reduction of activities should be well coordinated with all installation personnel. The plan will be implemented on a test basis upon completion and should be reviewed and tested on a biannual basis thereafter.

*c.* Government assets provided a contractor managing a Government-owned facility, are subject to the same use restrictions during an air pollution emergency episode as those imposed on a contractor by a State on the use of his private assets.

### Table 4-1. Related Publications

Clean Air Act (42 U.S.C. 1857 et seq., as amended by the Air Quality Act of 1967. PL 90-148, by the Clean Air Amendments of 1970, PL 91-604, and by Technical Amendments to the Clean Air Act, PL 92-157).

| | |
|---|---|
| AR 11-28 | Economic Analysis and Program Evaluation of Resource Management |
| AR 37-40 | Army Production Base Support Program Report (RCS CSGLD-1123 (R1) (MIN)) |
| AR 40-4 | Army Medical Department Facilities/Activities |
| AR 70-15 | Product Improvement of Materiel |
| AR 210-50 | Family Housing Management |
| AR 405-45 | Inventory of Army Military Real Property |
| AR 415-15 | MCA Program Development |
| AR 415-25 | Real Property Facilities for Research, Development, Test and Evaluation (RDTE) |
| AR 415-35 | Minor Construction |
| AR 420-10 | General Provisions, Organization, Functions, and Personnel |
| AR 750-20 | Prevention, Control, and Abatement of Pollution from Mobile Equipment |

US_00000071

US_00000072

# CHAPTER 5

# SOLID WASTE MANAGEMENT

## Section I GENERAL

**5-1. Purpose.** This chapter defines Department of the Army policy, assigns responsibilities, and establishes procedures for the management of waste and, resource recovery and recycling programs under the provisions of the National Environmental Policy Act of 1969 (NEPA), the Solid Waste Disposal Act, as amended (Resource Conservation and Recovery Act of 1976) and DOD Directive 4165.60.

**5-2. Goal.** Procure and use Army material resources in a manner that will minimize waste production and conserve natural resources. Reuse or recylcing and reprocessing will be accomplished to the maximum extent practicable.

**5-3. Objective.** Specific objectives of the Army Solid Waste Management Program include:

*a.* Design and procure materiel of such configuration that the end item or its components can be economically restored, reconstituted, or converted to other uses, when the end item and its packaging are no longer suitable for their original purposes.

*b.* Dispose of unserviceable or excess materiel through property disposal channels or by some other means that would enable these resources to be recovered and reintroduced into the manufacturing process or reclaimed for other purposes, including use as an energy source.

*c.* Dispose of wastes not capable of being economically recycled or otherwise reclaimed, in a manner that will avoid or minimize pollution of the environment.

**5-4. Policy.** *a.* Solid and other waste materials will be recovered and recycled to the maximum extent practicable.

*b.* The quantities of solid and other waste materials will be reduced at the source wherever possible (e.g., through the use of minimum packaging, the increased use of returnable or reuseable containers, source separation for recycling, and other such reducing measures).

*c.* The use of joint or regional resource recovery facilities, is encouraged when it will be advantageous to the Army.

*d.* Optional recycling programs are those which are managed and operated by the Managing Activity (para 1-3*f*, AR 420-47) but are not required by AR 420-47. These programs are encouraged, and may either complement an installation operated program or be the sole recycling activity, provided that:

(1) Such actions will not conflict with the mandatory aspects of Source Separation and Recovery Programs required by AR 420-47.

(2) The end result is to further the recycling of trash and waste materials, and

(3) The annual cost to the Government is not greater than that of the normal solid waste disposal system.

*e.* Contracts for solid and other waste materials disposal services shall include provisions for recycling, whenever practicable.

*f.* Design, procurement, and use of materials will be accomplished in such a manner that it minimizes the generation of waste to the greatest extent feasible.

*g.* All appropriate DA installations and activities will cooperate to the extent practicable in beneficial civilian community-conducted recycling programs.

*h.* Ultimate disposal of solid waste by landfill or incineration will be done in accordance with chapter 3, AR 420-47.

*i.* All actions which implement the require-

US_00000073

ments of this regulation and which could be controversial will be assessed to determine if an Environmental Impact Statement is required, in accordance with chapter 2.

**5–5. Responsibilities.** *a.* The Chief of Engineers will exercise primary Army staff responsibility for directing the Army Solid Waste Management Program and will:—

(1) Promulgate policies and regulations on waste reduction, waste management, resource recovery, and recycling programs and waste disposal.

(2) Formulate, justify, and monitor Army programs and budgets pertaining to recycling programs.

(3) Monitor the solid waste management program and initiate reports as may be required.

(4) Maintain liaison with Office of the Assistant Secretary of Defense (Installations and Logistics), the Environmental Protection Agency and other Federal and private agencies who influence the waste management program.

(5) Coordinate with The Surgeon General on health aspects of solid waste management.

*b.* The Deputy Chief of Staff for Operations and Plans will—

(1) Ensure that the appropriate requirements documents include provisions for materiel reclamation, resource recovery, recycling, and waste management throughout the life cycle of equipment, and

(2) Authorize specialized waste handling personnel on the table of distribution and allowances (TDA) of installations.

*c.* The Deputy Chief of Staff for Research, Development and Acquisition will ensure the Research, Development, Test and Evaluation (RDTE) Program and the Army Procurement Accounting and Reporting System (APARS) Major Item Program gives proper emphasis to waste reduction, equipment maintainability, and resource recovery/recycling.

*d.* The Deputy Chief of Staff for Logistics will ensure that the Army logistical system places special emphasis on the reduction of waste, on maintainability, and on recycling, and that appropriate TDA allowances for specialized equipment are made.

*e.* The Surgeon General will—

(1) Monitor the health and welfare aspects of the waste management program, and accumulate, evaluate and disseminate data on program practices that may adversely affect the health and welfare of personnel and animals.

(2) Provide technical guidance to other headquarters, DA staff offices and appropriate commanders on health aspects involved in Solid Waste Management.

(3) Perform solid waste surveys at DA installations.

*f.* Command and installation responsibilities are as outlined in AR 420–47.

## Section II.  STANDARDS AND PROCEDURES

**5–6. Standards.** Installations and activities, in their waste disposal operations as well as in their resource recovery and recycling programs, will meet environmental pollution standards promulgated by duly authorized Federal, State, interstate, and local agencies. In addition, they will conform to the following waste management standards:

*a.* Sufficient resources will be provided for the effective management of all wastes generated. Those wastes that cannot be recovered or recycled shall be disposed of in the most cost effective manner consistent with Army waste disposal requirements (AR 420–47).

*b.* The installation commander may permit open burning when such burning does not conflict with local or State regulatory requirements, is accomplished during daylight hours, and is controlled to keep pollution of the air to a minimum.

*c.* Wastes generated by any Army installation or activity will not be disposed of by open dumping. If suitable sites for sanitary landfill operations are not available on an installation, or municipal or private facilities for disposal are not available or are not cost effective, solid waste processing may be accomplished using incinerators especially designed for that pur-

US_00000074

pose. Incinerators will be designed and operated to meet all applicable air pollution control requirements (chap. 3, AR 420-47).

d. When contracting for off-post disposal of solid wastes from Army facilities by municipal or private facilities, the contractor must comply with Federal, State, and local guidelines.

**5-7. Procedures.** a. Operation of solid Waste Collection and Disposal Systems (including Source Separation and Resource Recovery) will be in accordance with AR 420-47.

b. "Army installations will comply with all Federal, State, interstate, and local requirements, both substantive and procedural, including permits and reporting (PL 94-580)." Resource Recovery facilities established in accordance with AR 420-47 will be compatible with State and local plans.

c. Management of Army solid waste programs at the installation level generally will be accomplished by the element which is already functionally responsible for refuse collection and disposal. Recyclable/marketable materials

will be referred to the Defense Property Disposal Service (DPDS) for sale.

d. Duplication of effort will be avoided in the collecting, sorting, and transporting of recoverable waste by combining new and existing efforts. Military Exchanges and Commissary Stores, which purchase or lease processing equipment, may salvage and dispose of their recoverable resources.

**5-8. Reports.** a. Sources of solid waste will be identified, and those requiring remedial action will be reported as specified in chapter 10. An example of an exhibit prepared on a typical solid waste facility found not to be in compliance with specified standards is at figure 10-5, (RCS DD-I&L(SA)1383).

b. The Managing Activity of a recycling program will complete an Annual Report of Solid Waste Source Separation and Resource Recovery/Recycling Operations in accordance with AR 420-47, (RCS DD-I&L(A)1436).

**5-9. References.** Table 5-1 is a list of publications related to solid waste management.

## Table 5-1. Related Publications

The National Environmental Policy Act of 1969 (NEPA), 42 USC 432 et seq.

Solid Waste Disposal Act, as amended, 42 USC 3251 et. seq. (Resource Conservation and Recovery Act of 1976, PL 94-580)

Public Law 93-552, Military Construction Authorization Act, FY 1975

Executive Order 11752, Prevention, Control and Abatement of Environmental Pollution at Federal Facilities, 38 FR 34793, 19 December 1973

Department of Defense Directive 5126.15, Delegation of Authority with Respect to Facilities and Equipment for Metal Scrap Baling or Shearing, or for Melting or Sweating Aluminum Scrap

Department of Defense Directive 4165.60, Solid Waste Management—Collection, Disposal, Resource Recovery, and Recycling Program

DOD Manual 4160.21M, Defense Disposal Manual, June 1973, authorized by DOD Directive 4160.21, Department of Defense Personal Property Disposal Program

AR 11-28 _____ Economic Analysis and Program Evaluation for Resource Management

AR 37-108_____ General Accounting and Reporting for Finance and Accounting Offices

US_00000075

**Table 5-1. Related Publications—Continued**

AR 37-120 _____ Procurement of Equipment and Missiles, Army Management of the PEMA Appropriation, Policies and Procedures

AR 40-5 _____ Medical Services, Health and Environment

AR 235-5 _____ Management of Resource, Commercial and Industrial Type Functions

AR 415-15 _____ MCA Program Development

AR 420-47 _____ Facilities Engineering, Solid Waste Management

AR 750-36 _____ Maintenance of Supplies and Equipment—Rebuild and Retread of Pneumatic Tires

TM 5-634 _____ Refuse Collection and Disposal; Repairs and Utilities

TM 5-814-5 _____ Sanitary Engineering—Sanitary Landfills

Environmental Protection Agency Guidelines for the Thermal Processing of Solid Wastes and for the Land Disposal of Solid Wastes (40 CFR 240 and 241)

Environmental Protection Agency Guidelines for Solid Waste Storage and Collection (40 CFR 243)

Environmental Protection Agency Guidelines for Resource Recovery Facilities (40 CFR 245)

Environmental Protection Agency Guidelines for Source Separation for Materials Recovery (40 CFR 246)

US_00000076

# CHAPTER 6

# HAZARDOUS AND TOXIC MATERIALS MANAGEMENT

## Section I. GENERAL

**6–1. Purpose.** The provisions contained in this chapter implement the requirements of the Atomic Energy Act, as amended; the Energy Reorganization Act of 1974 and the Clean Air Act, as amended; the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) as amended by the Federal Environmental Pesticide Control Act (FEPCA) of 1972; the Federal Water Pollution Control Act (FWPCA), as amended; the Marine Protection, Research and Sanctuaries Act of 1973 (MPRSA)—Ocean Dumping; the Solid Waste Disposal Act (SWDA), as amended; and the Toxic Substances Control Act of 1976. Detailed guidance on oil and hazardous liquid substances, spill prevention and contingency plans appears in chapter 9.

**6–2. Goal and objectives.** The Department of the Army's (DA) goal is to control hazardous and toxic materials to minimize hazards to health, and damage to the environment. The following objectives are necessary to achieve this goal:

*a.* All material developed and procured by the Army is to be designed to minimize health and environmental hazards during research, development, testing, production, use, storage, and disposal.

*b.* Limit, to the extent practicable, the use of toxic and/or hazardous materials, and employ procedures which provide maximum safety during storage, use, and disposal when less toxic or hazardous substitutes are not available.

*c.* Develop safe and environmentally acceptable methods for the storage and disposal of materials which are inherently hazardous or potentially dangerous due to the quantities involved.

*d.* Provide properly trained personnel for the management, use, storage, and disposal of hazardous and toxic materials.

**6–3. Explanation of terms.** *a. Certification.* The recognition by a certifying agency that a person is competent and thus authorized to use and supervise the use of restricted use pesticides.

*b. Certified applicator.* Any individual who is certified to use or supervise the use of any restricted use pesticide covered by his certification.

*c. Class 1 disposal site.* The location (e.g., sanitary landfill) where any final deposition of hazardous or toxic waste, after proper processing, may occur. Such a facility complies with EPA guidelines for the disposal of solid wastes as prescribed in 40 CRF Part 241.

*d. Disposal.* To abandon, deposit, inter or otherwise discard waste as a final action after its use has been achieved, a use is no longer intended, or its use has been declared excess, suspended or cancelled.

*e. Effluent standard.* A State or Federal effluent standard or limitation to which a discharge is subject under the FWPCA amendments of 1972, including, but not limited to, effluent limitations, standards of performance, toxic effluent standards and prohibitions, and pretreatment standards. This includes a prohibition of any discharge established, for any toxic pollutant described in 307(a) of the FWPCA as amended.

*f. General use pesticide.* Pesticide for general public use not on EPA Restricted Use Pesticide listing.

*g. Hazardous and toxic material management.* For environmental purposes, the systematic and purposeful control over the production, procurement, storage, handling, use, and dis-

6–1

US_00000077

posal of materials or substances which are either hazardous to life because of their inherent toxicity or a potential danger because of the quantities involved.

*h. Hazardous substance.* An element or compound or mixture (other than oil as covered in chap. 9) which, when discharged in any quantity into or upon the navigable or coastal waters, presents an imminent and substantial danger to the public health or welfare, including fish, shellfish, wildlife, shoreline, and beaches (e.g., hazardous substances include some strong acids, strong bases, organic solvents, certain metals and their compounds, other strong oxidizers, or other bulk-stored chemicals used in manufacturing processes and maintenance or repair operations). (Designation of and determination of removaility of hazardous substances will be addressed in Title 40 CFR Part 116).

*i. Hazardous waste.* Any waste or combination of wastes which, if not effectively controlled, pose a potential hazard to human health or living organisms because they are nondegradable, persistent in nature, lethal, or may otherwise cause or tend to cause detrimental cumulative effects. Such materials include wastes which are corrosive, flammable, toxic, irritants, strong sensitizers or which generate pressure through decomposition, heat or other means.

*j. Ocean dumping.* The disposal of hazardous or toxic materials (including pesticides, pesticide containers, pesticide-related wastes, other hazardous chemical stocks, pharmaceutical stocks of drugs, radioactive materials, explosive ordnance or chemical warfare agents) in or on the oceans and seas as defined in the MPRSA (PL 92-532).

*k. Open burning.* The disposal by burning of hazardous or toxic materials or their wastes in any fashion other than by incineration in an approved hazardous waste incinerator.

*l. Open dumping.* The placing of hazardous or toxic materials or their wastes in a land site in a manner which does not protect the environment and is exposed to the elements, vectors, and scavengers.

*m. Pest.* Includes, but is not limited to, any insect, rodent, nematode, fungus, weed, or any form of plant or animal life or virus, bacterial organism or other micro-organism (except vi-

ruses, bacteria, or other micro-organisms on or in living man or other animals) which is normally considered to be a pest or which the Army may declare to be a pest in accordance with public law or national policy.

*n. Pest management.* Pest control in which one or more control methods are selected for use in an integrated program that incorporates a series of alternative control strategies including parasites, predators, pathogens, cultural practices and chemicals, to achieve economic pest control with least disruption of the environment.

*o. Pesticide.* Any substance or mixture of substances intended for preventing, destroying, repelling, attracting, or mitigating any pest and any substances or mixture of substances intended for use as a plant regulator, defoliant, or desiccant.

*p. Pesticide-related wastes.* All pesticide-containing wastes or pesticide-containing by-products which are to be discarded, but which, pursuant to acceptable pesticide manufacturing or processing operations, are not ordinarily a part of or contained within an industrial waste stream discharged into a sewer or the waters of a State.

*q. Processing.* To neutralize, detoxify, incinerate, biodegrade, or otherwise treat a hazardous or toxic waste to remove its harmful properties or characteristics for disposal.

*r. Restricted use pesticide.* A pesticide that is classified for restricted use under the provisions of section 3(d)(1)(C) of the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 USC 135 et seq.) and other legislation supplementary thereto and amendatory itself.

*s. Soil injection.* The emplacement of hazardous or toxic materials or their wastes by ordinary tillage practices within the plow layer of a soil.

*t. Toxicity.* The property of a substance or mixture of substances to cause any adverse physiological effects on any of the biological mechanisms of an organism.

*u. Toxic pollutant.* Pollutants or combinations of substances (including disease-causing agents) which, after discharge and upon exposure, ingestion, inhalation, or assimilation into any organism—either directly from the environment or indirectly by ingestion through food

US_00000078

chains—will cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations in such organisms or their offspring. (A list of toxic pollutants will be given in 40 CFR Part 129).

*v. Waste.* Any material for which no use or reuse is intended and which is to be discarded.

*w. Water dumping.* The disposal of hazardous or toxic materials or their wastes in or on lakes, ponds, rivers, sewers, or other water systems as defined in the FWPCA (33 USC 1251 et seq.).

**6–4. Policies.** The Department of the Army will—

*a.* Exercise positive management over the research, development, procurement, production, use, handling, storage and disposal of hazardous and toxic material. Priority will be given to instituting measures required to protect health or control pollution.

*b.* Comply with environmental quality policies and procedures specified in this regulation and those standards established by the applicable Federal, State, interstate, or local authority for the control of hazardous and toxic materials and substances.

*c.* Use nonhazardous nontoxic materials to the extent practicable.

*d.* Conserve resources and, to the extent practicable, dispose of hazardous and toxic materials and waste by reprocessing, recycling, and/or re-using.

*e.* Program and budget sufficient resources for the effective management and environmental control of pesticides, hazardous chemical stocks, pharmaceuticals, radioactive materials, explosives, and chemical agents in accordance with DA regulations and in consonance with any other applicable Federal, State, or local objectives.

*f.* Conform with Federal regulations and guidelines respecting pesticides, promulgated pursuant to the provisions of FIFRA as amended (sec II of this chap.).

*g.* Acquire and use only those pesticides registered with the Environmental Protection Agency (EPA) (para 6–6a).

*h.* Monitor for the residual effects of pesticides on military installations in furtherance of the National Pesticide Monitoring Program.

*i.* Conform with applicable Federal regulations, standards, and guidelines promulgated and adopted in accordance with the Atomic Energy Act, as amended (42 USC 2011), Energy Reorganization Act of 1974, or by EPA on discharges of radioactivity. This restriction does not apply to emergency operations conducted by Explosive Ordnance Disposal or Technical Escort personnel (sec V of this chap.).

*j.* Prohibit the disposal (by open dumping, water dumping, well injection, or open burning) of pesticides, hazardous chemical stocks, pharmaceutical stocks and drugs, radioactive materials, explosive ordnance, or chemical warfare agents directly into the air, water, or land environment in a manner hazardous to man or animals or if it will cause unreasonable adverse effects on the environment (para 6–7f below).

*k.* Conform with Federal regulations and guidelines respecting dumping of material into ocean waters in accordance with the MPRSA and the FWPCA as amended.

*l.* In the absence of published national standards, guidance on acceptable methods and maximum concentrations pertaining to the use, storage, discharge or disposal of hazardous and toxic substances are to be referred through major command headquarters to the USA Health Services Command.

*m.* Comply fully with the DOD Pest Management Program.

**6–5. Responsibilities.** *a.* Department of the Army Staff.

(1) The Inspector General and Auditor General will—

(*a*) Exercise primary Army Staff responsibility for overall supervision of Army Safety Program Activities as established by AR 385–10.

(*b*) Provide assistance and guidance on the safety aspects of the storage, use, handling, and disposal of hazardous and toxic substances.

(2) The Deputy Chief of Staff for Operations and Plans will—

(*a*) Ensure that Required Operational Capability (ROC) documentation for new material involving potentially hazardous materials requires that safe and environmentally acceptable methods for storage and disposal of these materials be developed or included as part of procurement specifications.

(*b*) Provide single DA contact point for all

6–3

US_00000079

chemical warfare activities including demilitarization and disposal.

(3) The Deputy Chief of Staff for Research, Development and Acquisition will ensure that all materiel developed by the Army is designed to minimize health and environmental hazards during research and development, production, testing, storage, use and disposal.

(4) The Chief of Engineers will—

(a) Exercise primary Army Staff responsibility for coordinating guidance and promulgrating environmental protection regulations concerning hazardous and toxic material management within the Army.

(b) Provide technical instructions and guidance on the implementation of pest management programs.

(c) Coordinate with The Surgeon General to establish Army criteria, instructions, and corrective measures involving pollution from hazardous and toxic materials.

(d) Promote the reclamation, recycling, or safe disposal of excess and outdated chemicals, particularly the stocks of cancelled or excess pesticides and superseded chemicals.

(5) The Surgeon General will—

(a) Establish health criteria and standards and monitor health and welfare aspects of the Hazardous and Toxic Material Management Program.

(b) Develop environmental toxicology data and recommend standards for safe storage, use, discharge and disposal of hazardous and toxic materials.

(c) Provide technical instructions and guidance for the DA Pest Management Programs in disease vector control, pesticide monitoring, health, safety, and the training of pesticide applicators.

(d) Coordinate with the Chief of Engineers in establishing criteria, instructions, and corrective measures involving pollution from hazardous and toxic materials.

(6) The Judge Advocate General will provide guidance, as required on interpretation of FIFRA, FEPCA, FWPCA, MPRSA, SWMA and other Federal, State, and local laws and regulations.

b. Commanding General, US Army Material Development and Readiness Command (DARCOM) will—

(1) Establish training programs for logistical personnel involved in the production, testing, and storage of explosives and chemical munitions and for those handling radioactive materials, hazardous and toxic chemicals, and products.

(2) Conduct research and technological investigations in support of the hazardous and toxic materials pollution abatement efforts related to industrial facilities operated by DARCOM. This includes development of alternative less polluting industrial processes, development of industrial waste recycling systems, evolvement of treatment processes and design criteria, and development of safe and profitable disposal methods.

(3) Ensure compliance with DA and other Federal regulations on the disposal of chemical agents and munitions (sec III and V of this chap.).

(4) Procure materials for Army use which will minimize health and environmental hazards during production, use, storage, and disposal.

c. Commanding General, US Army Health Services Command will—

(1) Conduct training activities to ensure proficiency in the application, handling, storage, use, and disposal of pesticides to qualify pest control personnel for certification in accordance with the FIFRA 1972, as amended, and EPA guidelines.

(2) Provide personnel for conducting field investigations and special studies concerning hazardous and toxic materials and for recommending measures required to protect health and welfare and to comply with standards.

(3) Conduct the DA Pesticide Monitoring Program in accordance with AR 40-5 to complement the National Pesticide Monitoring Program.

d. Major Army commanders will—

(1) Establish a program for the control of hazardous and toxic materials management for the protection of the health and welfare of personnel and the natural environments.

(2) Program and budget for necessary resources required for hazardous and toxic materials management and pest management programs.

(3) Certify and recertify as necessary, personnel employed in pest control activities after determination that personnel have received

6-4

adequate training from an authorized and qualified source and have demonstrated proficiency in the application, handling, storage, use and disposal of pesticides in accordance with FIFRA, as amended. Such certification should identify the specific areas in which personnel are fully qualified.

*e.* Installation and activity commanders will—

(1) Supervise the procurement, use, storage, and disposal of hazardous and toxic materials and chemicals and initiate appropriate procedures to protect the health and welfare of personnel who are exposed to their use.

(2) Comply with the procedures on the handling, use, and storage of hazardous and toxic materials which are under development and will be published by the Department of the Army. In the absence of DA regulations, Army activities will cooperate with Federal, State, or local agencies in meeting their standards.

(3) Use nonhazardous and nontoxic materials in installation and activity operations and procedures, when practicable.

(4) Ensure that at least two personnel at each installation involved in the pest management programs and on application of pesticides are certified in accordance with EPA and DOD directives, and AR 420–74 and 420–76 procedures.

(5) Maintain liaison and cooperate with representatives of Federal, State, and local authorities engaged in regional pest control operations and pollution control and abatement.

(6) Dispose of hazardous and toxic materials in accordance with EPA-approved and DA-approved procedures (sec II, III, and IV of this chap.). Chemical warfare agents will be disposed of in accordance with detailed plans approved by DOD (sec V of this chap.).

(7) Ensure that waste effluent discharges from radioactive isotope activities are in accordance with applicable rules, regulations, and requirements of the Nuclear Regulatory Commission (10 CFR, Part 20) and the policies and guidance of the Environmental Protection Agency as published in Title 10 CFR.

(8) Program and budget for resources necessary to conduct an effective Hazardous and Toxic Materials Management Program at each Army installation.

(9) Conduct an annual review and inspection of pest control shop to ensure that a sound Pest Management Program is established and followed, and that prescribed procedures in the handling, use and disposal of pesticides and pesticide containers are being followed.

(10) Promote a positive integrated Pest Management Program to minimize the excessive use of unneeded chemical pesticides.

## Section II. PESTICIDE MANAGEMENT PROGRAM

**6–6. Implementing guidelines.** *a.* DA will procure and use only those pesticides approved by and registered pursuant to FIFRA. Use of a pesticide other than those registered and approved for specific application in accordance with their labeling is illegal under FIFRA.

*b.* Some pesticides are on the EPA list of toxic pollutants for which water effluent standards are being developed. The list includes, but is not limited to substances such as aldrin, dieldrin, cadmium and all cadmium compounds, cyanide and all cyanide compounds, DDD (TDE), DDE, DDT, endrin, mercury and all mercury compounds, toxaphene (chlorinated camphene), mirex, chlordane, heptachlor and kepone. If the registration of any pesticide has been suspended or finally cancelled by EPA,

DA organizations will only use such pesticides in accordance with the EPA suspension or cancellation order. MACOM professional pest management personnel, DAEN–FEB and DAEN–ZCE will be contacted for suspended or cancelled pesticide information.

*c.* The concentration of pesticide residue contained in waste water discharges should not exceed the levels specified by the National Pollutant Discharge Elimination System (NPDES) permit issued to an installation.

*d.* The storage, use, handling, and disposal of pesticides will conform to safety and health standards established by HQDA based on regulations published in the Federal Register and Code of Federal Regulations by EPA, HEW, DOT and other appropriate Federal agencies.

6–5

US_00000081

Army publications that apply to the conduct of pest control activities are given in table 6–1.

**6–7. Procedures.** *a.* The following requirements are applicable to pesticides in the two EPA rating system classes, highly toxic and moderately toxic (toxicity categories I and II respectively), 39 F.R. 15237. Pesticides and used pesticide containers will be stored in a secure, dry, ventilated, single purpose, fire resistive room, building, or covered area. Pesticide formulations will be stored separately, inventoried semiannually and identified with warning signs in accordance with the EPA toxicity rating and Department of Transportation warning systems for pesticide labeling, and checked bimonthly for corrosion and leaks (39 F.R. 15235–15241). Large quantities of excess pesticides and used pesticide containers awaiting disposal will be stored in a secure and separate area and will be checked bimonthly for corrosion and leaks. Where applicable, the outside of each storage area will be labeled with appropriate "DANGER," "POISON," "PESTICIDE STORAGE" signs and local fire department hazard signal signs.

(1) Emergency detoxification and decontamination equipment, sink and showers, eye lavage, protective clothing, and rubber gloves will be provided pesticide handlers in accordance with AR 420–74, AR 420–76, and AR 385–32.

(2) A viable accident prevention and environmental protection program will be maintained within the installation pest control service areas. Signs will be posted within the pesticide storage area indicating the type and common name of the pesticides being stored.

(3) A complete inventory of pesticides on hand will be maintained by the pesticide control services personnel indicating the number and identity of containers stored.

*b.* Pesticide application and other insect and rodent control will be accomplished by or under the direct and continuing supervision of a trained and certified applicator (AR 420–74 and AR 420–76). SOP's will be prepared by installation pesticide users on the application of pesticides. These SOP's will be reviewed by the appropriate MACOM engineer and/or medical entomologist, or agronomist (for herbicide application). MACOM's may delegate authority to installation level when adequate professional capability exists at this installation.

*c.* DA directives will give a categorization for pesticide use. Categorization listings will identify those pesticides which may be used by a trained and certified applicator as well as by other than a trained and certified applicator.

*d.* EPA pesticides registered under FIFRA, will be used by the certified pesticide control services personnel, and usage will be in accordance with DA directives and label requirements. In the event it is desired to use special use or State registered pestidides, approval will be obtained from the MACOM entomologist/agronomist, DAEN–FEB and DAEN–ZCE.

*e.* Pesticides in excess of installation requirements will be reported through channels to the Commander, US Army Materiel and Petroleum Activity Center, New Cumberland Army Depot, New Cumberland, PA 17070, in accordance with paragraph 77, chapter VI, Defense Disposal Manual 4160.21M. Disposition instructions will be requested. However, every effort should be made to use the pesticide for the purposes originally intended, at the prescribed dosage rates, provided they are currently legal under all Federal, State, and local laws and regulations.

*f.* Only approved methods will be used in the disposal of small quantities of certain excess or unusable pesticides (39 FR 15239). Accepted methods of rinse and disposal of pesticide containers have been developed in accordance with EPA recommended procedures. Guidance thereon will be issued by DAEN–ZCE. Technical assistance concerning containers not covered may be obtained from: Commander, US Army Environmental Hygiene Agency (USAEHA), Aberdeen Proving Ground, MD 21010. Small quantities of used, suspended or cancelled pesticides may be disposed of in a Class 1 disposal site or its equivalent. These "small" quantities vary with different pesticides and will be determined by Commander, USAEHA.

*g.* The judicious application of herbicides will be observed in natural resources management operations. Alternative methods of plant control such as mowing, controlled burning, etc., should be employed if economically feasible

US_00000082

rather than the use of herbicides if at all possible.

h. Prohibited procedures.

(1) No pesticide, pesticide-related waste, pesticide container, or residues from a pesticide container will be disposed of in such a manner as to cause or allow: Open dumping; water dumping; well injection; direct exposure which may result in contamination of food or feed supplies, or a manner inconsistent with its label or labeling. Rare exceptions to these prohibited procedures may be granted by the regional administrator of EPA in accordance with the MPRSA and FWPCA amendments of 1972.

(2) Normally, no pesticide, pesticide-related waste, pesticide container, or residue from a pesticide container shall be disposed of in such a manner inconsistent with its label or labeling or in such a manner as to cause or allow open burning. Small quantities of combustible containers, not to exceed 50 pounds or the quantity emptied in a single work day, whichever is less (except those formerly containing organic beryllium, selenium, mercury, lead, cadmium, or arsenic compounds) may be burned by the applicator in open fields where—

(a) Due regard is given to wind direction in relation to receptors such as population centers, field workers, domestic animals, and surface water supplies;

(b) Such open burning is consistent with Federal, State, or local ordinances; and

(c) Provisions are made to avoid contamination of surface and groundwater to levels in excess of standards promulgated by the Public Health Service, US Department of Health, Education, and Welfare for potable water.

i. Immediate emergency assistance on a pesticide spill that threatens life or gross contamination of the environment may be obtained by calling (800) 424-9300 or in Washington, DC (202) 483-7616 (chap. 6, AR 420-76).

j. Application of pesticides, including aerial dispersal, may require the filing of an Environmental Impact Statement (EIS). The continuation of ongoing pest control operations which have been assessed and found to have no significant adverse environmental effect may not require the preparation of an EIS. However, a change of pesticide, rate of application, application technique or the initiation of a special or new operation, will require preparation of a new Environmental Impact Assessment (EIA) or the updating of a previous assessment. Where new pesticide programs are proposed, the command entomologist or agronomist will be consulted. Copies of each EIA prepared will be retained on file at the installation. (See chap. 2 for EIA/EIS procedures.)

6-8. Monitoring. a. The DA Pesticide Monitoring Program is the responsibility of the US Army Health Services Command (AR 40-5). It complements the National Pesticide Monitoring Program to ensure that the use of pesticides does not constitute a threat to human health or hazard to the environment. The program determines pesticide residue levels in substances such as surface water, soil, sediments, fish, and birds.

b. Army installation commanders having pest control management activities will support the DA Pesticide Monitoring Program. Technical assistance in this area may be obtained from Commander, US Army Environmental Hygiene Agency, Aberdeen Proving Ground, MD 21010.

6-9. Reports (RCS DD-I&L (AR) 1080) and (RCS DD-I&L (SA) 1383). a. Pest Control Summary Report (RCS DD-I&L (AR) 1080). Continuing reports will be made on the use of pesticides as required by AR 420-76.

b. The Environmental Protection Control Report—Pesticide Pollution Category 6, (RCS DD-I&L (SA) 1383). The Pesticide Pollution Control Report is designed to provide information on a phased and coordinated plan for prevention or control of pesticide pollution for submission to Office of the Secretary of Defense and Office of Management and Budget. Examples to be included in such a report are disposal facilities, storage facilities or shop remodeling relating to prevention, control or abatement of pollution from pesticides. The report is the Army's fiscal plan for abatement of pesticide pollution resulting from Army activities. See chapter 10 for reporting procedures and guidance.

US_00000083

**Table 6–1. Pest Control Publications**

| Publication | Title | Pest Control Application |
|---|---|---|
| Chap. 5, AR 40–5 | Health and Environment | health aspects of medical entomology & pesticides |
| AR 40–574 | Aerial Dispersal of Pesticides and Utilities; Operation and Maintenance | policies & procedures for aerial dispersal of pesticides |
| AR 385–32 | Protective Clothing and Equipment | responsibilities, policy & procedures for providing protective clothing & equipment |
| AR 420–74 | Natural Resources—Land, Forest and Wildlife Management | special training for herbicide handlers |
| AR 420–76 | Pest Control Services | prevention of environmental pollution by pesticides; policy on use of persistent pesticides; guidance on pesticide disposal; procedure and format for submission of the Pest Control Summary Report |
| TM 5–629 | Herbicide Manual for Noncropland Weeds | herbicides for noncropland weeds |
| TM 5–630 | Ground Maintenance and Land Management | safety precautions in using herbicides |
| TM 5–632 | Military Entomology Operational Handbook | guidance & techniques on dispersal & use of pesticides |

## Section III. HAZARDOUS CHEMICAL STOCKS (EXCLUDING CHEMICAL WARFARE AGENTS)

**6–10. Implementing guidelines.** *a.* Existing or promulgated hazardous chemical management standards in this regulation apply to all Army facilities. Storage, use, handling, and disposal of hazardous chemical stocks will conform to published DA policies, standards, and procedures (tables 6–1 and 6–2).

*b.* With the exception of oils and other liquid petroleum products (chap. 9), it is difficult to identify materials which should be classified as hazardous or toxic. Hazards to be considered include flammability, radioactivity, reactivity, toxicity, bioconcentration, irritation, allergenic, or genetic activity. Certain chemicals, such as asbestos, cadmium, lead, mercury, beryllium, cyanide, toxaphene, polyvinyl chloride, polychlorinated biphenyls (PCB's), fluorine compounds, selenium, arsenic, and certain pesticides are recognized as hazardous and special storage and handling are necessary even for small quantities. Other materials, however, are more difficult to categorize since excessive amounts of almost anything can be harmful

**6–8**

US_00000084

when released. EPA is currently defining criteria and establishing effluent standards for hazardous substances and toxic pollutants (including some pesticides) under the Federal Water Pollution Control Act amendments of 1972 (39 FR 30466). Effluent standards will be published by EPA for these hazardous substances which can reasonably be anticipated to be discharged into navigable waters and which will pose an imminent and substantial danger to public health and welfare. Upon issuance in the Federal Register, DA installation commanders will follow required restrictions and guidelines on their discharge or disposal.

c. Chapter 3 lists requirements under the National Pollutant Discharge Elimination System and other applicable Federal, State, and local standards.

d. Ocean dumping, as a rule, will not be considered an acceptable means of disposing of hazardous and toxic substances, pesticides, radioactive wastes, or chemical warfare agents. Only under special circumstances, and after coordination with EPA, will ocean dumping and transportation for such dumping be allowed.

6-11. Procedures. The hazardous chemical management procedures in this regulation are presented as preferred methods by which the requirements of the environmental standards and the objectives of DA policies can be achieved. If techniques other than the following are used, commanders will demonstrate in advance that the techniques to be employed will satisfy the environmental quality standard in this regulation or those established by the appropriate Federal, State, or local authority.

a. All measures to prevent accidental pollution of the environment by uncontrolled release of hazardous chemicals to the air, water, or land environment will be taken by all Army activities.

(1) Installations storing, handling, or transferring hazardous chemicals will include within their Spill Prevention Control and Countermeasure (SPCC) Plan, procedures to prevent, control and report accidental releases of these substances to the environment. (See chap. 9, on requirements for SPCC plans.)

(2) Effluent standards for toxic pollutants are found in 40 CFR Part 129, and the designation of hazardous substances will be found in 40 CFR Part 116.

b. Storage facilities for chemicals (excluding pesticides) hazardous to health and welfare and detrimental to the environment, will be located according to the nature of the chemicals, storage site, protective enclosures, and operating procedures. Adequate measures will be taken for inventorying chemicals semiannually, for controlling hazards, and for monitoring the environment.

c. Appropriate safety materials and protective clothing and equipment will be kept on hand for emergency treatment, decontamination, cleanup, and for area warning signs and labels.

d. No hazardous chemical, or its container, which will cause adverse effects on the environment, will be used or disposed of in a manner inconsistent with instructions on its label or inconsistent with use or disposal procedures established by Federal, State, or local laws or regulations.

e. Ultimate disposal of unserviceable and excess hazardous chemical stocks.

(1) Hazardous chemical stocks that are unserviceable and/or have been declared excess to DA requirements will be reported to the local Defense Property Disposal Office (PDO) for merchandising. The stocks will remain the property of the generating agency until ultimate disposal.

(2) Disposal of hazardous chemical stocks on which PDO disposition cannot be obtained may be made by contract with commercial firms, provided it is in accordance with appropriate Federal, State, or local laws and regulations and the commercial firm is licensed or otherwise approved to dispose of the chemical stocks by the appropriate authorities.

(3) Disposal guidance can be obtained from the Commander, US Army Edgewood Arsenal, who, in conjunction with Commander, US Army Environmental Hygiene Agency, Aberdeen Proving Ground, MD 21010, will provide data. Requests for disposal guidance should include Federal Stock Number (FSN), full no-

US_00000085

menclature, appropriate military specification or standard indicated on label, quantity of issue, total quantity of issue, total quantity requiring disposal (pounds, gallons, liters, etc.), and condition of containers.

(4) Commanders of installations and activities who are responsible for disposing of hazardous chemicals will maintain records indicating quantities of hazardous chemicals disposed of, disposal method used, and disposal site location (e.g. removal of polychlorinated biphenyls (PCB) from transformers).

*f.* The transport of dangerous or hazardous chemicals is subject to the provision of PL 91-121 (50 USC 1511-1516) and AR 55-56. Chapter 216, AR 55-355 requires DA compliance with CFR Title 14 (air transportation), Title 49 (highway and rail transportation), and Title 46 (water transportation). Further, AR 55-228 governs water transport of hazardous materials and TM 38-250 prescribes the provisions for the transportation of dangerous materials by military aircraft.

*g.* Immediate short-term (30 minutes or less) emergency assistance on a chemical spill transportation problem may be obtained by calling Chem Trec (800) 424-9300 or in Washington, DC, area code (202) 483-7616. This service is available only for short-term transportation problems and provides information on spills, leaks, fire and explosion.

**6-12. Special authorization.** *a.* A notification must be made to EPA for the operation, construction or modification of a source of hazardous air pollutants (asbestos, beryllium, or mercury); Federal Register, 6 April 1973 (38 FR 8820) and 3 May 1974 (39 FR 15396), 25 Oct 1974 (39 FR 38064) and 14 Oct 1975 (40 FR 48292) (Exempt Report paragraph 7-2*o* AR 335-15). Sprayed asbestos materials will not be used in construction for any purpose and controls are placed on asbestos handling during demolition operations. When Federal, State, or local regulations establish other permit systems, DA directives will provide guidance and compliance schedules, as appropriate.

*b.* Transportation of hazardous items is covered in AR 55-56, Title 49 CFR 170-189 and Department of Transportation hazardous materials regulations.

*c.* Installation commanders will comply with permits required under the provisions of the National Pollutant Discharge Elimination System (NPDES).

**6-13. Monitoring.** Environmental monitoring will be in accordance with requirements established in chapters 3 and 4 and the NPDES.

**6-14. Reports.** Installation commanders will report, as required, on the inventory, use, and disposal of hazardous chemical stocks, on recurring reports under the NPDES, and as required on accident/incident reports required by AR 385-40 and AR 50-6.

## Section IV.  PHARMACEUTICAL STOCKS, BIOLOGICAL WASTES, AND DRUGS

**6-15. Procedures.** The pharmaceutical disposal procedures in this regualtion are preferred methods and apply to both existing and new Army facilities.

*a.* No pharmaceutical stock or its container will be disposed of in a manner inconsistent with instructions or its label; or instructions provided in SB 8-75 series supply bulletins; or inconsistent with disposal procedures established by appropriate Federal, State, or local laws and regulations.

*b.* Pharmaceutical stocks in excess to medical facility requirements will be reported through medical supply channels in accordance with AR 40-61 and disposition instructions will be requested.

*c.* Destruction of banned, outdated, and unserviceable pharmaceutical stocks will be in accordance with instructions provided in SB 8-75 series bulletins. Assistance in determining applicability of disposal procedures may be obtained by request to Commander, US Army Environmental Hygiene Agency, Aberdeen Proving Ground, MD 21010.

*d.* Army installation commanders disposing of pharmaceutical stocks by land burial will

US_00000086

maintain records on quantities disposed, disposal method used, and disposal site location.

e. Biological, surgical and hospital-type hazardous or toxic waste materials will be used, handled, stored and disposed of in accordance with AR 40–5 and AR 40–61. Technical assistance on special problems in handling unusual, hazardous or toxic chemical and biological materials can be obtained by requests addressed to:

(1) CONUS—Commander, US Army Health Services Command, ATTN: HSC–PA–H, Fort Sam Houston, TX 78234.

(2) OVERSEAS (including Hawaii)—HQDA (DASG–HCH), WASH DC 20310.

**6–16. Special authorizations.** Policies and procedures for obtaining written approval applicable to investigative drugs in humans are outlined in AR 40–7.

**6–17. Monitoring.** Environmental monitoring will be in accordance with requirements established in chapters 3 and 4 under the NPDES.

**6–18. Reports.** Installation commanders will provide reports on disposition of pharmaceutical drugs as required.

## Section V. RADIOACTIVE MATERIALS, EXPLOSIVES, AND CHEMICAL WARFARE AGENTS

**6–19. Radioactive materials and nuclear accidents and incidents.** a. Policies and procedures applicable to nuclear accidents and incidents are given in AR 40–13, AR 50–5, AR 360–5, AR 385–40, and AR 755–15. The handling, use, and disposal of radioactive materials will be in accordance with applicable Army regulations and will be in such a manner so as not to contribute to pollution of the environment; within imminent safety and health considerations. Procedures may be found in Army guidance dealing with medical services, nuclear weapons and materiel, transportation and travel, explosives, safety, logistics, and disposal of supplies and equipment directives.

b. The handling and control of radioactive material and other sources of ionizing radiation will be in accordance with AR 40–37 and AR 700–52. The temporary storage of radioactive materials, prior to shipment for transfer or disposal, will be in accordance with AR 40–5, AR 40–37, AR 700–52, AR 755–15, TM 3–261 and 10 CFR Part 20.

c. The shipment and disposal of radioactive materials will be in accordance with AR 55–55, AR 755–15, and DOT and Nuclear Regulatory Commission regulations.

d. For existing activities, the local disposal of radioactive materials by release to the sanitary sewage systems and other radioactive effluents to the environment will be as low as readily achievable and in accordance with AR 755–15 and rules, regulations and the requirements of the Nuclear Regulatory Commission and the Environmental Protection Agency.

e. Special problems on radioactive waste disposal will be referred through command channels to Commander, US Army Materiel Development and Readiness Command (ATTN: AMCSF–P), 5001 Eisenhower Avenue, Alexandria, VA 22333.

f. All nuclear reactor facilities will be monitored for discharges of gaseous, liquid or particulate effluents to prevent contamination of the environment in accordance with chapter 4, AR 385–80.

g. Installation commanders will provide reports on handling, use, inventory or disposal of radioactive materials and monitoring as requested by DA, EPA, Nuclear Regulatory Commission or other Federal agencies, and on nuclear accidents/incidents as required by AR 385–40.

h. The Environmental Protection Control Report—Radiation Pollution, Category 4 (RCS DD–I&L (SA) 1383). The radiation section of the semiannual environmental pollution control report is designed to provide information to HQDA on phased or coordinated plans for prevention or control of radiation pollution for submission to Office of the Secretary of Defense

US_00000087

and Office of Management and Budget. See chapter 10 for reporting procedures and guidance.

*i.* All new activities and modification of existing facilities which involve the continuous release of radioactive materials in effluents to air, water or sanitary sewerage systems will not exceed 1 percent of the activity concentration as specified in National Council on Radiation Protection and Measurement Report No. 22 (National Bureau of Standards Handbook No. 69) and 10 CFR Part 20 when averaged over 1 month. Batch releases will be averaged over the actual time of release and will not exceed the levels/concentrations as stated above.

**6–20. Explosive ordnance.** *a.* Policies and procedures applicable to explosive ordnance materials are contained in AR 75–1, AR 75–14, AR 75–15, AR 385–60, AR 385–64, and AR 755 series regulations dealing with disposal of supplies and equipment. The disposal of deteriorated ammunitions and explosives will be in accordance with Army regulations in the 75, 385 and 755 series. Every effort will be made to dispose of these wastes so as not to contribute to the pollution of the environment within personnel safety considerations for Explosive Ordnance Disposal and Technical Escort Emergency Operations.

*b.* Deteriorated or unused explosives, munitions and rocket propellants may only be open-burned in nonurban areas and under conditions acceptable to Regional EPA and appropriate State Air Pollution Control authorities. Where there is an official prohibition against burning

of such wastes, notification of restrictions and/or requests for assistance will be submitted through command channels to DAEN–ZCE.

*c.* Installation commanders will provide reports to DA, as requested, on the handling, use, inventory or disposal of explosive materials and on explosive accidents/incidents as required in AR 385–40.

**6–21. Chemical warfare agents.** *a.* The handling, use, and disposal of chemical warfare agents, ammunition, and explosive materials will be in accordance with Army regulations, and will be in such a manner so as not to contribute to the pollution of the environment. Procedures may be found in Army directives dealing with transportation and travel, explosives, safety, and disposal of supplies and equipment. The safety program for chemical agents and associated weapon systems is prescribed in AR 385–61. Further, disposal of chemical warfare agents will be planned in accordance with the National Environmental Policy Act of 1969, PL 91–190 (42 USC 4321 et seq.), Military Appropriation Acts PL 91–121, section 409 and PL 91–441, section 506.

*b.* Installation commanders will provide reports through command channels to DA as requested on handling, use, inventory, or disposal of chemical warfare agents and as required on chemical accidents/incidents as outlined in AR 385–40. Disposal guidance can be obtained from the Commander, US Army Edgewood Arsenal who, in conjunction with the Commander, US Army Environmental Hygiene Agency, Aberdeen Proving Ground, MD 21010 will provide data.

**Table 6–2.   Related Publications**

Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) as amended by the Federal Environmental Pesticide Control Act of 1972, Public Law 92–516. (Title 7 U.S.C. 135–135K, 136–136Y (1972).)

Federal Water Pollution Control Act Amendments of 1972 (Title 33 U.S.C. 1151 et seq.).

Marine Protection, Research and Sanctuaries Act of 1972 (86 Stat. 1052).

Solid Waste Disposal Act as amended (Title 42 U.S.C. 3251 et seq.).

AR 40–5 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Health and Environment.

## Table 6–2. Related Publications—Continued

| | |
|---|---|
| AR 40–7 | Use of Investigational Drugs in Humans and the Use of Schedule I Controlled Drug Substances. |
| AR 40–13 | Radiological Emergency Medical Teams (REMT). |
| AR 40–37 | Licensing and Control of Radioactive Materials for Medical Purposes. |
| AR 40–61 | Medical Logstics Policies and Procedures. |
| AR 40–574 | Real Property Operation and Maintenance, Aerial Dispersal of Pesticides. |
| AR 50–5 | Nuclear Surety. |
| AR 50–6 | Chemical Surety. |
| AR 55–55 | Transportation of Radioactive and Fissile Materials Other Than Weapons. |
| AR 55–56 | Transportation of Dangerous or Hazardous Chemical Materials. |
| AR 55–228 | Transportation by Water of Explosives and Hazardous Cargo. |
| AR 55–355 | Military Traffic Management Regulation. |
| AR 75–1 | Malfunctions Involving Ammunition and Explosives. |
| AR 75–14 | Interservice Responsibilities for Explosive Ordnance Disposal. |
| AR 75–15 | Responsibilities and Procedures for Explosive Ordnance Disposal. |
| AR 360–5 | General Policies. |
| AR 385–10 | Army Safety Program. |
| AR 385–16 | System Safety. |
| AR 385–30 | Safety Color Code Markings and Signs. |
| AR 385–32 | Protective Clothing and Equipment. |
| AR 385–40 | Accident Reporting and Records. |
| AR 385–60 | Coordination with Armed Services Explosives Safety Board. |
| AR 385–61 | Safety Program for Chemical Agents and Associated Weapon Systems. |
| AR 385–64 | Ammunition and Explosives Safety Standards. |
| AR 385–80 | Nuclear Reactor Health and Safety Program. |
| AR 420–74 | Natural Resources—Land, Forest, and Wildlife Management. |

US_00000089

**Table 6–2. Related Publications—Continued**

AR 420–76 _____ Pest Control Services.

AR 700–52 _____ Licensing and Control of Sources of Ionizing Radiation.

AR 750–20 _____ Prevention, Control, and Abatement of Pollution from Mobile Equipment.

AR 755–15 _____ Disposal of Unwanted Radioactive Material.

TM 3–261 _____ Handling and Disposal of Unwanted Radioactive Material.

TM 5–629 _____ Herbicide Manual for Noncropland Weeds.

TM 5–630 _____ Ground Maintenance and Land Management.

TM 5–632 _____ Military Entomology Operational Handbook.

TM 38–250 _____ Packaging and Materials Handling: Preparation of Hazardous Materials for Military Air Shipment.

**Table 6–3. Pesticide Container Disposal Guidelines**

Recommended Interim Guidelines for Disposal of
Emulsifiable Concentrate Metal Containers

Step 1.   Empty containers in the normal manner and allow to drain for one minute into the spray or mix tank.

Step 2.   FIRST RINSE.
     a. Add the correct amount of water rinse solution:

| *Container size* | *Minimum water rinse solution* |
| --- | --- |
| Less than one gal _____ | One-fourth container volume |
| One gal _____ | One quart |
| Five gal _____ | Two quarts |
| Fifteen gal _____ | 1.5 gal |
| Thirty gal _____ | Three gal |
| Fifty-five gal _____ | Five gal |

     b. Replace closure.

     c. Rotate and up end container to get rinse over all interior surfaces.

     d. Drain rinse into the spray or mix tank.

Step 3.   SECOND RINSE.
     a. Repeat step 2 a thru c.
     b. Puncture head of the metal container near the edge adjacent to the pour spout and drain the rinse into the spray or mix tank.

         *Note:* If 15–55 gallon containers are to be recycled through a registered drum reconditioner, DO NOT PUNCTURE the containers.

US_00000090

**Table 6–3. Pesticide Container Disposal Guidelines—Continued**

Recommended Interim Guidelines for Disposal of Emulsifiable
Concentrate Metal Containers—Continued

Step 4. THIRD RINSE.

a. Repeat step 2, but gently rotate the drum to rinse interior of the container being careful not to spill rinse through the punctured area.

b. Metal containers up to and including five gallon size:

(1) Allow rinsed container to drain for one minute into the spray or mix tank.

(2) Crush the rinsed container and bury in sanitary landfill in conformance with State and local standards, or recycle through a properly equipped metal reclaiming firm, if applicable.

c. Metal containers, 15–55 gallon capacity:

(1) Allow the rinsed container to drain for one minute into the spray or mix tank.

(2) Replace all closures, accumulate rinsed drums in a secure area, and:

(a) Recycle through a registered drum reconditioner*; or

(b) Return to a pesticide manufacturer or formulator for refilling with the same chemical class of pesticide providing such return and reuse is legal under currently applicable US Department of Transportation regulations*; or

(c) Recycle as scrap metal through a metal reclaiming firm.

(3) If drums are not recycled, they should be rinsed and punctured as outlined in step 3, crushed and buried in a sanitary landfill in conformance with State and local standards.

---

*Note:* Never re-use emptied pesticide containers.

* Information on registered drum reconditioners "Re-use of Specification 17 Series Steel Drums" and the re-use of empty pesticide containers may be obtained from:
Department of Transportation
Office of Hazardous Materials
Operations Division
400 Sixth Street, S.W.
Washington, DC 20590

Recommended Interim Guidelines for Disposal of
Technical Grade Metal Containers

Step 1. Empty container should be allowed to drain for one minute into the spray tank.

Step 2. Replace closure.

Step 3. Accumulate unrinsed empty drums in a secure area, and:

a. Store pending receipt of DOD disposal instructions; or

b. Return empty drums to a registered drum reconditioner* or a pesticide manufacturer or formulator for refilling with the same chemical class of pesticide as previously contained provided such return and refilling is legal under current applicable US Department of Transportation regulations*; or

US_00000091

Table 6–3.  Pesticide Container Disposal Guidelines—Continued

Recommended Interim Guidelines for Disposal of
Technical Grade Metal Containers—Continued

c. Recycle as scrap metal through a metal reclaiming firm having
EPA and State approved burning equipment suitable for
incineration of pesticides.

---

\* Information on registered drum reconditioners "Re-use of Specification 17 Series
Steel Drums" and the re-use of empty pesticide containers may be obtained from:

Department of Transportation
Office of Hazardous Materials
Operations Division
400 Sixth Street, S.W.
Washington, DC 20590

Recommended Interim Guidelines for Disposal of
Specified Containers (Bait, Dust, Aerosol & Granule)

Step 1.  Empty container in the normal manner.

a. Residue should be completely removed from bait, dust and
granule containers.

b. Aerosol containers should be completely expended.\*

Step 2.  Crush container with the exception of aerosol containers.

Step 3.  Dispose container in the sanitary landfill in conformance with
State and local standards, or accumulate and recycle the crushed
metal containers through a properly equipped metal reclaiming
firm, if applicable.

---

*Note:* Never re-use emptied pesticide containers.

\* In expending aerosol containers, some propellant usually remains. This propellant
can be ignited if a large quantity of aerosol cans are crushed while being disposed in
sanitary landfill operations. The vapors of propellant (in sufficient volume) can be sucked
over the hot bulldozer engine by its fan and such vapors can ignite, consuming the
equipment and operator in flames. Therefore, never store spent aerosol cans for disposal
at one time; rather dispose them either singly or in quantities of no more than six cans.

Recommended Interim Guidelines for Disposal of
Water Wettable Powder Containers (Metal and Paper)

Step 1.  Empty container in the normal manner.

Step 2.  Rinse container three times, each time using a volume of water
equal to approximately 10 percent of the container capacity and
adding the rinse water to the spray tank. This rinse water should
be calculated as part of the required diluent.

Step 3.  Rinsed metal containers can be crushed and sold as scrap metal,
if applicable. Unsalvaged containers should be rendered unuseable
and buried in an approved sanitary landfill in conformance with
State and local standards.

US_00000092

**Table 6–3. Pesticide Container Disposal Guidelines—Continued**

Recommended Interim Guidelines for Disposal of One Gallon Oil Solution
Ready-Mix Metal Containers (6840–844–7355 Diazinon 0.5 Percent;
6840–180–6069 Baygon Household Spray 1 Percent)

Step 1. Empty container in normal manner.

Step 2. Puncture top of metal container near the edge adjacent to the pour spout and allow to drain for 5 minutes into the spray tank.

Step 3. The empty container should be crushed and buried in an approved sanitary landfill in conformance with State and local standards.

*Note:* Never re-use emptied pesticide containers.

US_00000093

**Table 6–4.  Recommended Procedures for Repackaging Liquid Pesticides
and Disposition of Empty Containers**

1. Observe prescribed safety procedures during all operations to prevent spilling of, or exposure of personnel to the pesticides, and

    a. Stay up wind while pouring pesticides.

    b. Do not drink, eat, smoke, or use tobacco in pesticide handling areas.

    c. Wear neoprene or neoprene coated gloves and a neoprene or Buna-N rubber apron while repackaging.

    d. Wear face shields or chemical goggles during repackaging.

    e. Do not put fingers in mouth or rub eyes while repackaging.

    f. Wash hands before eating, smoking, or using the toilet and immediately after repackaging.

    g. Wear protective clothing; remove contaminated clothing immediately and launder before wearing again.

    h. Work clothes and street clothes should not be stored in the same locker.

    i. Workers should shower at end of each shift or upon completion of repackaging operations.

    j. Respirators or gas masks with proper canisters approved for the particular type of exposure by the US Bureau of Mines or the National Institute for Occupational Safety and Health should be available. Combat masks (M17, M17A1) should not be used.

    k. Leaking containers should be repackaged under the supervision of the installation Facilities Engineer's pest management personnel.

2. Approved containers for repackaging liquid pesticides are:

    *Five gallon*—FSN 8110–282–2520, Drum Metal: New; 22 USS sheet metal gage steel; enamel exterior; nonremovable ends, 13⁹⁄₁₆ in. outside H, 11¹⁄₄ in. OD; five gal normal filled capacity; bail attached to top; spout; FED PPP–P–704, Type I, Class 8, push-pull spout.

    *Fifty-five gallon*—FSN 8110–597–2353, Drum, Shipping and Storage: 16 USS sheet metal gage steel; enamel exterior; nonremovable cover, 35¹⁄₁₆ in. outside H, 23⁷⁄₁₆ in. OD; 55 gal capacity; two expanded outward rolling hoops; bung and vent located in end; re-usable; FED PPP–D–729, Type I.

3. When repackaging liquid pesticides, the interior surface of each metal drum, FSN 8110–282–2520 and FSN 8110–597–2353, shall be completely lined with two coats, .0015 inch total thickness, of bisphenol epoxide and phenol-formaldehyde resins mixture conforming to MIL–V–12276D, Type III, class optional.

4. Empty the leaking container into one of the above approved containers and mark as shown in paragraph 8 or 9.

    *Note:* Do Not Combine Pesticides During Repackaging.

5. After emptying the contents of a container, puncture the top of the container near the edge adjacent to the pour spout and allow one-gallon containers one additional minute and larger containers 3 to 5 additional minutes to drain.

6. With storage, some pesticides develop sludges or crystals that solidify and adhere to the bottom of the container. Should this occur, dissolve with

US_00000094

**Table 6–4. Recommended Procedures for Repackaging Liquid Pesticides and Disposition of Empty Containers—Continued**

a solvent and add the dissolved sludge to the new container being used to repackage the contents of the leaking container. Pesticides containing sludges are considered unserviceable.

7. Container Rinse Procedures.

a. Rinse the empty container three times, each time using a volume of the normal diluent equal to approximately 10 percent of the container's capacity. Example: The diluent for 5 percent DDT, FSN 6840–253–3892, is kerosene; diluents for other pesticides are indicated on the pesticide container labels.

| Container Size | Minimum Diluent Required for Each Rinse |
|---|---|
| One gallon | 1.0 quart |
| Five gallon | 2.0 quarts |
| Fifiteen gallon | 1.5 gallons |
| Thirty gallon | 3.0 gallons |
| Fifty-five gallon | 5.0 gallons |

b. Add the correct amount of rinse solution and GENTLY ROTATE the container for one minute to get the rinse over interior surfaces avoiding spillage of the rinse through the leaking areas.

c. Drain the rinse into an approved container.

*Note:* Never re-use emptied pesticide containers.

(1) For a pesticide declared SERVICEABLE, drain the rinse into a separate container. DO NOT DRAIN THE RINSE INTO THE CONTAINER BEING USED TO REPACKAGE THE CONTENTS OF THE LEAKING CONTAINER. (Serviceability must be verified by a quality assurance test.)

(2) For a pesticide declare UNSERVICEABLE, drain the rinse into the container being used to repackage the contents of the leaking container.

d. Repeat paragraphs 7b and c (second rinse).

e. Repeat paragraphs 7b and c (third rinse), and;

(1) Allow to drain for 5 minutes into one of the above approved containers.

(2) Crush and bury empty containers in a sanitary landfill in conformance with Federal, State and local standards or recycle rinsed containers to a commercial metal reclaiming firm having EPA and/or State approval burning equipment suitable for incineration of pesticides.

8. Labeling containers of UNSERVICEABLE pesticides (diluted or undiluted) and rinse solutions.

a. Marking shown on one side of drum will not occupy more than the upper one-third of the side:

(1) WASTE MATERIAL NOT APPROVED FOR USE.

(2) FSN—Repackaged.

(3) Nomenclature and percentage.

(4) Type and quantity of rinse solution added to repackaged container.

6–19

US_00000095

**Table 6–4.   Recommended Procedures for Repackaging Liquid Pesticides and Disposition of Empty Containers—Continued**

    (5) Total quantity in gallons.

    (6) Level of protection and date packaged (B-month/year).

    (7) Gross weight and cube.

  b. Marking shown on drum head or ends not removed in order to use contents (applies to 55 gallon drums only):

    (1) WASTE MATERIAL NOT APPROVED FOR USE.

    (2) FSN—Repackaged.

    (3) Total quantity.

9. Labeling containers of SERVICEABLE pesticides.

  a. Marking shown on one side of drum will not occupy more than the upper one-third of the side:

    (1) FSN—Repackaged.

    (2) Nomenclature and percentage.

    (3) Total quantity in gallons.

    (4) Level of protection and date packaged (B-month/year).

    (5) Gross weight and cubs.

  b. Marking shown on drum head or ends not removed in order to use contents (applies to 55 gallon drums only):

    (1) FSN.

    (2) Nomenclature and percentage.

    (3) Total quantity.

    (4) Lot or batch numbers.

    (5) Date of pack (earliest repackage date).

    (6) Contract number(s).

    (7) Name and address of the contractor(s).

  c. Marking shown on the diametrically opposite side of the container from that containing the identification marking will be located in the upper one-third of the side:

    (1) Contract, purchase, or delivery order number(s).

    (2) Name(s) and address(es) of prime contratcor(s).

  d. In order for repackaged pesticides to be considered serviceable, returned to the supply system, transferred or sold for use as originally intended, an additional label which conforms with the original EPA or USDA registered label to include the registration number must be attached. If the item does not have an EPA or USDA registered label, the additional label must then conform to the labeling instructions contained in the original military or Federal specification for each line item.

10. Storage.

  a. Store UNSERVICEABLE repackaged pesticides with other UN-SERVICEABLE pesticides and hold pending DOD disposal instructions.

  b. Store SERVICEABLE repackaged pesticides with other SERVICE-ABLE pesticides and use for intended purpose.

US_00000096

Table 6–4. Recommended Procedures for Repackaging Liquid Pesticides and Disposition of Empty Containers—Continued

11. Reference.

39 FR 15235–15241, 1 May 1974, Environmental Protection Agency, Pesticides and Pesticide Containers, Regulations for acceptance and Recommended Procedures for Disposal and Storage.

US_00000097

US_00000098

# CHAPTER 7

# ENVIRONMENTAL NOISE ABATEMENT

## Section I. GENERAL

**7–1. Purpose.** The provisions contained in this chapter implement the provisions of the Noise Control Act of 1972, (PL 92–574) and Federal Regulations promulgated pursuant to this Act, including Executive Order 11752, Office of Management and Budget Circular No. A–106, and EPA procedures for Reporting Proposed Pollution Abatement Projects For Federal Facilities.

**7–2. Goal and objectives.** The Department of the Army (DA) goal is to control noise produced by Army activities to protect the health and welfare of its members and the public within, adjacent to, and surrounding Army installations. The following objectives are necessary to achieve this goal:

*a.* Assess the environmental impact of noise produced by Army activities and mitigate harmful or objectionable effects to the maximum extent practicable.

*b.* Comply with applicable Federal, State, interstate and local standards pertaining to noise, consistent with military requirements.

*c.* Achieve noise abatement through the application of engineering noise reduction procedures, administrative noise control measures, modern land use planning and procurement of less noisy equipment.

*d.* Incorporate noise control provisions, consistent with national security requirements, into the development and procurement of weapons systems and other military equipment for use in combat operations; and in the design and siting of facilities.

**7–3. Explanation of terms.** *a. Administrative noise control measures.* Policy decisions and administrative actions taken to regulate the conduct of training, operations and activities for the purpose of relocating, rescheduling, or restricting activity to abate or control noise; e.g., decisions on the time of day, site, and number of operations, firing schedules, flight patterns, etc.

*b. Ambient noise.* The all encompassing noise associated with a given environment, usually a composite of sounds from many sources.

*c. Decibel (dB).* Unit of measure indicating the sound pressure level of a measured sound. dBA indicates that the sound level is measured through the A-weighting network of a sound level meter.

*d. Engineering noise reduction.* Control of noise at the source, path or receptor site through use of acoustical engineering techniques. Among other techniques, this involves enclosures, absorbent materials, and barriers.

*e. Environmental noise.* The intensity, duration, and character of sounds from all sources.

*f. Impulsive noise (also referred to as impulse or impact noise).* Noise with abrupt onset, high intensity, short duration—typically less than one second. This type of noise can be produced by weapons fire, explosions, punch presses, and drop hammers, and consists of a short burst of acoustical energy of either a single impulse or a series of impulses.

*g. Land use planning.* That aspect of master planning wherein the best possible use is made of available land areas by considering, among other factors, mission and environmental protection requirements.

7–1

US_00000099

*h. Noise control management.* The abatement of noise through use of low-noise-emission products, engineering noise reduction, or administrative noise control measures.

*i. Noise pollution control standards.* Noise emission standards for products adopted in accordance with provisions of the Noise Control Act of 1972 or provisions of State, interstate, and local standards for control and abatement of environmental noise.

**7–4. Policies.** The Department of the Army will—

*a.* Comply with all DOD and applicable Federal, State and local noise control standards promulgated pursuant to the Noise Control Act in the planning, siting, design, construction and operation of Army controlled facilities and installations. The aim is to promote an environment for all people free from noise that jeopardizes their health and welfare.

*b.* Procure commercial equipment and products, or those adapted for military use, that are in compliance with established Federal noise standards and give priority to use of low-noise-emission products within reasonable cost and mission limitations.

*c.* Incorporate noise control provisions in the design and procurement of vehicles, aircraft, weapons systems and other military-unique equipment for use in combat operations to the extent that essential operational capabilities are not significantly impaired.

*d.* Include the impact of environmental noise in any assessment of an Army action or program.

*e.* Institute measures to reduce and/or control the generation of noise from flying and flying-related activities and comply with DOD Instruction 4165.57 on Air Installations Compatible Use Zones (AICUZ).

*f.* Periodically monitor Army installations and their environs to ensure that applicable Federal, State, interstate and local noise standards are met.

**7–5. Responsibilities.** *a.* Department of the Army Staff.

(1) The Chief of Engineers will—

(*a*) Promulgate basic policies, guidance and regulations for the control of environmental noise produced by military equipment (aircraft, vehicles, etc.), and that resulting from the conduct of various types of military training activities (DAEN–ZCE).

(*b*) Monitor the structural engineering aspects of the environmental noise pollution control program to assure that facilities on Army real property satisfies established noise control standards (DAEN–MC).

(*c*) Provide guidelines and assistance for the selection of architectural and engineering measures to be employed, to control noise levels in conjunction with installation master planning or the siting of new facilities (e.g., siting considerations, noise barriers or berms, operational controls, and sound attenuation in new and existing structures) (DAEN–MC).

(*d*) Coordinate noise abatement criteria, standards, policies, and corrective measures with The Surgeon General, and The Inspector General and Auditor General (Army Director of Safety).

(*e*) Incorporate noise attenuation measures in the design and construction of new structures and provide technical assistance on noise attenuation techniques for existing structures (DAEN–MC).

(2) The Deputy Chief of Staff for Operations and Plans will—

(*a*) Monitor operations and activities to assure control of noise produced by military equipment, aircraft and vehicles, resulting from the conduct of various types of military training activities.

(*b*) Ensure compliance with appropriate noise standards during test and evaluation of Army materiel and during operational testing.

(3) The Deputy Chief of Staff for Research, Development and Acquisition will—

(*a*) Monitor compliance with applicable noise control standards during the development and testing of new material.

(*b*) Process and staff requests for exemptions (para 7–15) for military-unique equipment

US_00000100

where essential operational characteristics are significantly impaired by adherence to applicable noise standards, and where the equipment is deemed essential to mission accomplishment.

(4) The Surgeon General will—

(a) Monitor health and welfare aspects of environmental noise within the Department of the Army to assure that the required degree of noise control is maintained.

(b) Issue health and medical policy guidance obtained from liaison with other Federal agencies assigned responsibility for environmental noise control.

(c) Coordinate in the development of noise abatement criteria, standards and corrective measures with the Chief of Engineers and when appropriate with Director of Safety, HQDA.

b. Commanding General, US Army Health Services Command will—

(1) Accumulate, evaluate, and disseminate data on environmental noise conditions that may adversely affect the health of men and animals.

(2) Conduct environmental noise studies when requested, provide acoustical technical assistance for preparation of Environmental Impact Assessments (EIA) or Environmental Impact Statements (EIS), and make recommendations on programs or projects to achieve noise pollution control.

(3) Provide technical consultation to commanders on health aspects of environmental noise control and assist in the development of environmental noise abatement programs for facilities and activities.

c. Commanding General, US Army Materiel Development and Readiness Command and other materiel development and procurement agencies will—

(1) Procure equipment or materiel which complies with DA adopted noise emission standards and retrofit existing vehicles as appropriate, to reduce noise to acceptable levels.

(2) Initiate and forward requests for waiver of noise standards for military equipment to DAEN–ZCE when it has been determined that compliance with such standards would significantly degrade the required military capability of the equipment.

(3) Pursue a research and development,

test and evaluation program for the abatement or control of noise from military equipment.

d. Major Army commanders will—

(1) Comply with applicable Federal, State, interstate, and local standards regarding environmental noise control and abatement.

(2) Establish a program for an initial survey and periodic review of environmental noise control.

(3) Program and budget for those resources required for environmental noise control.

(4) Report resource requirements for the conduct of the noise pollution control program in accordance with chapter 10.

e. Installation and activity commanders will—

(1) Comply with applicable Federal, State, interstate, and local standards regarding environmental noise.

(2) Identify continuous or recurring sources of noise at an installation or by an activity which exceed standards; are an annoyance to others; are injurious to health; and develop remedial projects or procedures to reduce such noise to acceptable levels.

(3) Monitor the conduct of training activities producing inherently high noise levels for the purpose of minimizing its effect on nearby military and civilian populations.

(4) Maintain liaison with appropriate Federal, State, and local noise pollution abatement authorities, for the purpose of noise control measures insofar as installation and military operational requirements permit in accordance with chapter 1.

(5) Program and budget for resources necessary to conduct an effective noise control program.

(6) Maintain a log of citizen complaints of noise produced by Army activities.

**7–6. Reports.** Sources of noise pollution will be identified and those requiring remedial action will be reported as specified in chapter 10. An example of an exhibit prepared on a typical environmental noise control project is at figure 10–7.

**7–7. References.** See table 7–1 for related publications to be used in conjunction with this chapter.

US_00000101

## Section II. STANDARDS AND PROCEDURES

7-8. **Standards.** *a.* Undue exposure to noise may be detrimental to the health and welfare of Department of the Army personnel and members of civilian communities adjacent to military installations. Consequently it is necessary to assess major sources of noise to ensure there are no adverse impacts. Normally this is accomplished by making sound level measurements and comparing them to established noise standards which include:

(1) Occupational noise level standards—a noise exposure standard established for the protection of hearing of workers by the Army Surgeon General and/or under the Occupational Safety and Health Act.

(2) Product noise source emission standards—maximum noise levels that may be produced by specified items of equipment under the authority of the Noise Control Act or State, interstate and local standards.

(3) Environmental noise standards—property use and/or operational noise levels that are permitted under those conditions specified in Federal, State, interstate and local standards and regulations.

*b.* Occupational noise level standards applicable to the Army are contained in AR 40-5, AR 385-10, TB MED 251 and MIL–STD–1474(MI).

*c.* Product noise emission standards are published in the Code of Federal Regulations (CFR). Army materiel excluded from compliance with such emission standards at the time of manufacture are aircraft, vehicles, weapons systems and other products produced for combat use. Commercially manufactured products or those adapted for general military use will comply with the following Federal noise standards:

(1) Commercial Aircraft—14 CFR Parts 21, 36 and 91.

(2) Motor Carrier Noise Emission Standards—40 CFR Part 202 and 23 CFR Part 772 (section 18 of Noise Control Act only).

(3) Motors and Engines—40 CFR Part 206.

(4) Railroad Noise Emission Standards—40 CFR Part 201.

(5) Construction Equipment—40 CFR Part 204.

(6) Transportation Equipment—40 CFR Part 205.

*d.* MIL–STD–1474(MI), Noise Limits for Army Materiel, establishes acoustical noise limits for Army materiel and prescribes the testing requirements and measurement techniques for determining conformance to the noise limits therein.

*e.* Environmental noise will be assessed and controlled in accordance with the provisions set forth herein.

7-9. **Noise measurement standards.** *a.* Noise pollution control standards are applicable to both existing and new Army facilities.

*b.* Army facilities and activities will comply with applicable Federal, State, interstate, and local noise standards unless a waiver is specifically obtained in accordance with paragraph 7-15. Where no applicable noise regulations and standards exist, installation commanders will minimize noise intrusions into areas surrounding the installations to prevent them from being a source of complaint. An EPA manual that provides general guidance in the absence of specific standards is listed in table 7-1.

*c.* Measurements in decibels (dBA) should be used for measuring continuous sound levels from Army activities or facilities. For impulse noise such as weapons firing and explosives, the EPA has recommended dBC.

*d.* Environmental noise levels should be identified using an equivalent sound level description system known as Leq/Ldn. This new methology supplements and replaces earlier techniques such as Composite Noise Ratings (CNR) and Noise Exposure Forecast (NEF). The basic reference is EPA Document 550/9–74–004, *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety,* March 1974. It is available from the US Government Printing Office. Use will be made of this descriptor system in discussing noise implications in all EIA's and EIS's. Other rating schemes may be used, but should be related to Leq/Ldn. $L_c$dn is recommended by EPA for blast and impulse noise on an interim basis pending further research and study.

7-10. **Assessment of noise.** The impact of environmental noise whose source is located on

7-4

Army-controlled property will be included in an EIA or an EIS of any Army proposed action. Analyses of such significant sources of environmental noise as airfields and firing ranges should be based on field measurements by acoustical techniques.

a. Technical assistance on land use management or real property associated noise problems (e.g., blast noise, etc.) can be obtained from US Army Construction Engineering Research Laboratory (CERL), P.O. Box 4005, Champaign, IL 61820. A helpful reference on this matter is the CERL document, User Manual for the Acquisition and Evaluation of Operational Blast Noise Data, Technical Report E–42, CERL, June 1974 (NTIS, see table 7–1).

b. Technical assistance to include field surveys and the preparation of environmental noise pollution evaluations relating to health and welfare considerations of all types of environmental noise problems can be provided by the US Army Environmental Hygiene Agency. Requests for assistance should be sent to Commander, US Army Health Services Command (HSC–PA), Fort Sam Houston, TX 78234. This assistance includes—

(1) The evaluation of existing or potential noise problems which are evidenced by complaints, litigation, or official inquiries;

(2) The assessment of those situations where existing or proposed civilian-community actions may adversely impact noise-sensitive areas located on Army installations;

(3) The assessment of those situations where a proposed civilian community action may be adversely impacted from an ongoing Army activity;

(4) The recommendation of measures to mitigate an existing or potential adverse noise impact;

(5) The evaluation of Department of the Army activities to ensure that they comply with applicable noise standards and regulations; and

(6) The conduct of environmental noise assessments as input to EIS's, excluding all projects involving land management and acquisition.

c. Technical assistance, such as information and technical documents, is also available from the EPA. Inquiries may be sent directly to EPA Office of Noise Abatement & Control,

Washington, DC 20460, or to the noise representative in the respective EPA Region (fig. 9–1 and table 9–3).

7–11. Noise sources. Common sources of environmental noise produced by military activities that may require some form of noise control include—

a. Aircraft operations and training.

b. Vehicles (combat and noncombat) operations and training.

c. Weapons firing, explosives and demolition operations and training (blast noise, para 7–9d).

d. Fixed noise sources (power plants and generators, manufacturing plants, industrial facilities, carpenter shops, dynamometer buildings, etc.).

e. Electrical and electronic equipment.

f. Construction equipment operations and training.

g. Recreational activities (e.g., snowmobiles, trailbikes, etc.).

h. All other noise sources that exceed 55 dBA measured at a distance of 50 feet from the source.

7–12. Noise control. a. Control of new and existing sources of environmental noise can normally be achieved by applying singly or in combination noise reduction at the source, altering the path of noise, and noise reduction at the receptor site. Further, low-noise-emission products and equipment will be acquired wherever possible.

b. Engineering noise controls, establishment of noise buffer zones, site design and building construction for noise control, and similar land use planning techniques will be employed in the siting and design of new military structures and facilities.

c. Projects and resources required to control sources of environmental noise, reported in accordance with paragraph 7–6, will be programed and budgeted using established procedures.

d. To preclude the need for expensive engineering noise reduction techniques, the impact of environmental noise should be integrated into military land use planning. Attention will be given such matters in the master planning process (AR 210–20) with particular emphasis on—

7–5

US_00000103

(1) Routes of high volume traffic flow.

(2) Family housing area locations.

(3) Location of off-post residential areas.

(4) Sites of hospital complexes.

(5) Sites for on-post and off-post school facilities.

(6) Sites for new ranges, impact areas and airfields.

e. The identification of critical noise rating contours at an installation for the purpose of aiding in land use planning will be a required component of each installation master plan (AR 210-20). Assistance in preparing data for these contours can be obtained through the Office Chief of Engineers (DAEN-MCE-P) and Construction Engineering Research Laboratory (CERL). Requests for such assistance are to be forwarded in accordance with reference CERL Technical Report E-42, table 7-1. Blast noise, helicopter noise, and truck noise programs are under development and OCE will issue Technical Reports in each area.

f. Technical assistance in quantifying noise problems, identifying possible violation of standards, making noise surveys for inclusion in environmental impact assessments or impact statements, etc., may be requested from the US Army Environmental Hygiene Agency (USAEHA) in accordance with paragraph 7-10b.

7-13. Noise complaints. While not to be used as the sole criterion for judging the severity of environmental noise impacts, citizen complaints may be indicators of situations where noise control measures will be necessary. Such complaints should be logged, investigated, and appropriate corrective measures taken wherever possible. In many instances, such problems can be resolved to the mutual satisfaction of the Army and the community through direct consultation among those involved.

7-14. Low-noise-emission products. Under Section 15 of the Noise Control Act of 1972 (PL 92-574), the US Environmental Protection Agency is responsible for administering a national program for the development of low-noise-emission products. EPA certifies new products whose noise emissions are significantly below the EPA source emission standards for these products as low-noise-emission products. Such certified products of a commercial nature will be acquired by purchase by the Army in lieu of other products if the Administrator of General Services determines that the product costs no more than 125 percent of the retail price of the least expensive type of product for which these are certified substitutes. Those products found to meet the low-noise-emission criteria will be announced as available through regular supply procurement sources (40 CFR Part 203 and Noise Control Act of 1972, section 15).

7-15. Waivers and exemptions from noise standards. Requests for exemption or waiver of a Federal or State noise standard will be forwarded through channels to HQDA (DAEN-ZCE) WASH DC 20310 who will take appropriate action to obtain OSD approval. Waivers will be requested for the specified period of time (normally one year) needed to permit compliance. Exemptions must be fully justified on the basis of mission accomplishment and military necessity.

US_00000104

## Table 7-1. Related Publications

Executive Order 11514, Protection and Enhancement of Environmental Quality, 7 March 1970 (35 FR 4247).

Executive Order 11752, Prevention, Control, and Abatement of Environmental Pollution at Federal Facilities, 19 December 1973 (38 FR 243).

DOD Instruction 4165.57, Air Installations Compatible Use Zones, 30 July 1973.

Noise Control Act of 1972, PL 92-574 (86 Stat. 1248).

Amendment to the Federal Aviation Act of 1958 to require Aircraft Noise Abatement (PL 90-411).

AR 40-5 _____ Health and Environment.

AR 210-20 _____ Master Planning for Army Installations.

AR 385-10 _____ Army Safety Program.

AR 750-20 _____ Prevention, Control, and Abatement of Pollution from Mobile Equipment.

TB MED 251 _____ Noise and Conservation of Hearing.

MIL-STD 1474 (MI), Noise Limits for Army Materiel.

User Manual for the Acquisition and Evaluation of Operational Blast Noise Data, Technical Report E-42, Construction Engineering Research Laboratory, June 1974. Available under AD No. 782-911/2G1 from National Technical Information Service (NTIS), Springfield, VA 22151.

Predicting Community Response to Blast Noise, Technical Report E-17, Construction Engineering Research Laboratory, December 1973. Available under AD No. 773-690 from NTIS, Springfield, VA 22151.

HUD Dept. Circular 1390.2, Noise Abatement and Control: Department Policy, Implementation Responsibilities, and Standards.

EPA Document #550/9-74-004, Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety (March 1974).

US_00000105

US_00000106

# CHAPTER 8

# HISTORIC PRESERVATION

## Section I. GENERAL

**8-1. Purpose.** This chapter sets forth guidance and procedures to be used by the Department of the Army in the implementation of Executive Order 11593, "Protection and Enhancement of the Cultural Environment" (36 FR 8921, 16 USC, 470), in accordance with:

The Antiquities Act of 1906 (34 STAT 225, 16 USC 431 et seq.),

The Historic Sites Act of 1935 (49 STAT 666, 16 USC, 461 et seq.),

The National Historic Preservation Act of 1966 (80 STAT 915, 16 USC 470 et seq.),

The National Environmental Policy Act of 1969 (83 STAT 852, 42 USC 4321 et seq.),

The Archeological and Historic Preservation Act of 1974 (88 STAT 174, 16 USC 469 et seq.).

**8-2. Goal and objectives.** The Department of the Army goal is to protect through preservation, restoration, or rehabilitation all sites, structures and objects of historical, architectural, archeological, or cultural significance located on Army-controlled property. Objectives in attaining this goal are to identify, report and take those actions necessary to protect and preserve those Army-controlled properties (Historic Properties).

**8-3. References.** Related publications which should be used in conjunction with this regulation are contained in table 8-1.

**8-4. Policy.** The National Historic Preservation Act of 1966 (PL 89-665) establishes a national policy for historic preservation stating "that the historical and cultural foundations of the nation should be preserved as a living part of our community life and developed in order to give a sense of orientation to the American people." Therefore, it is the policy of the Department of the Army to—

*a.* Locate, inventory, evaluate, and nominate to the Secretary of the Interior all properties under Army jurisdiction or control that appear to qualify for inclusion in the National Register of Historic Places (National Register).

*b.* Administer and maintain historic properties which are under Army control or jurisdiction in a spirit of stewardship and trusteeship for future generations.

*c.* Assess all Army-controlled activities to minimize, eliminate, or mitigate any adverse impact on historic properties.

*d.* Initiate, plan and budget for support of programs necessary to preserve, restore, or rehabilitate historic properties.

*e.* Coordinate, when applicable, plans, programs, procedures, and activities with the Advisory Council on Historic Preservation, the Secretary of Interior, State Historic Preservation Officers, The National Trust For Historic Preservation, the Smithsonian Institution, and other Federal, State, or local historic organizations.

*f.* Encourage and assist the Secretary of the Interior, non-Federal public agencies, local historical societies or similarly oriented organizations to administer and maintain historic properties where such activity does not adversely impact on the performance of the Army mission.

**8-5. Definitions.** Definitions as used in these procedures are contained in subparagraph 800.3, 36 CFR 800 (app).

8-1

**8-6. Responsibilities.** *a.* The Chief of Engineers will exercise primary Army Staff responsibility for directing and coordinating a Preservation Program for Army-controlled historic properties. The Chief of Engineers will—

(1) Promulgate policy and regulations on protection and enhancement of the cultural and historic environment which reflect Department of Defense guidance and policy.

(2) Establish and monitor the program to preserve, restore, or rehabilitate all Army-controlled properties of historical, architectural, archeological, or cultural significance.

(3) Monitor surveys to identify all Army-controlled properties of historical, architectural, archeological, or cultural significance.

(4) Provide guidance and direction to Army installations on the preparation of nominations to the National Register and reports submitted under Section 106 of PL 89-665 and Executive Order 11593, as implemented in 36 CFR 800 (app).

(5) Maintain, as part of the Inventory of Real Property, a record of all Army-controlled properties listed in the National Register. This record will include a copy of the nomination forms with all attachments for each listing and a record of all reports and memoranda of agreement as required under 36 CFR 800 (app).

(6) Review and evaluate construction programs and master plans to minimize or eliminate adverse impacts on Army-controlled properties of historical, architectural, archeological, or cultural significance.

(7) Ensure that all actions undertaken with this guidance have been coordinated, where applicable, with local historical societies; State Historic Preservation Officers (SHPO); the Secretary of the Interior; the Advisory Council on Historic Preservation; the Smithsonian Institution; and the National Trust for Historic Preservation (app).

(8) Issue guidance and provide technical assistance on the development and execution of historic preservation projects.

(9) Process permits to authorize archeological investigations (AR 405-80).

*b.* The Chief of Military History will—

(1) Publish a comprehensive listing of Army-controlled properties listed in the National Register to include the historic significance, photographs and other factors as deemed appropriate. This publication will be updated with a supplement published every 3 years thereafter.

(2) Provide professional support as requested.

*c.* Major Army commands (MACOM). Major Army commanders will develop programs, in accordance with TM 5-801-1, Historic Preservation, which will encompass, at a minimum, the following:

(1) The conduct of initial, and triennial surveys thereafter, of installations under their control or jurisdiction to identify all properties of historical, architectural, archeological, or cultural significance.

(2) The programing and budgeting of funds for the maintenance through preservation, restoration, or rehabilitation of structures, sites and objects of historical, architectural, archeological, or cultural significance.

(3) The retention and use of historic properties which are a functional part of Army installations or are so located that their disposal is impractical.

(4) The nomination to the National Register of all Army-controlled properties which appear to meet the minimum criteria established by the Secretary of the Interior (app).

(5) The coordination of proposed actions having an effect on a registered and/or nominated historic property with the SHPO and the Advisory Council on Historic Preservation as required by 36 CFR 800 (para 8-10 and app).

(6) The inclusion, where applicable, of evidence of compliance with 36 CFR 800 in each environmental assessment or Environmental Impact Statement (para 8-10).

(7) The maintaining of a record of each property under their control or jurisdiction which is listed in the National Register including a copy of the nomination forms with all attachments and a record of all reports and Memoranda of Agreement as required under 36 CFR 800.

(8) The protection of archeological sites by ensuring that all investigations, excavations and salvage activities are undertaken with the written concurrence of the Secretary of the Interior and the Smithsonian Institution in accordance with AR 405-80.

US_00000108

## Section II.  STANDARDS AND PROCEDURES

8-7. **Standards.** The preservation, restoration, rehabilitation and maintenance of historic properties under Army control or jurisdiction will be accomplished in accordance with the standards and procedures established by the Secretary of the Interior and as promulgated by the Chief of Engineers in TM 5-801-1, Historic Preservation.

8-8. **Procedures for preparing nominations to the National Register (RCS DOI-1005).** Procedures for preparing nomination forms for Army-controlled properties which appear to qualify for listing in the National Register of Historic Places are contained in TM 5-801-1. Completed forms will be forwarded through channels to HQDA (DAEN-FEB-P) WASH DC 20314. RCS DOI-1005 applies.

8-9. **Funding of historic preservation activities.** a. Funding for the requirements for historic properties will be accomplished through regular programing/budgeting channels.

b. Historic properties in the Army Family Housing inventory will be funded in the Family Housing Management Account (FHMA). Requirements for historic properties other than family housing will be supported by the appropriation financing all other real property maintenance activities on the installation.

c. Projects for restoration and/or rehabilitation of historic properties, which include construction-type work in excess of $50,000, will be included in the installation's military construction programs for accomplishment under Military Construction Army (MCA) or FHMA programing procedures as outlined in AR 415-15 and AR 210-50. Block 25 of DD Form 1391 (Military Construction Project Data) of these projects will contain a statement identifying the project as supporting a historic property listed in the National Register.

d. Projects for preservation of registered historic places, which include construction-type work not in excess of $50,000, will be identified and processed for approval by the appropriate approving authority, as reflected in AR 415-35 and/or AR 420-10, and will be programed and budgeted in the normal budget cycle. Require-

ments will be identified to the proper supporting appropriation (FHMA, Operation and Maintenance, Army (OMA), Operation and Maintenance, Army Reserve (OMAR), etc.) in the installation and command budget submissions as supporting a historic property listed in the National Register (AR 415-15).

8-10. **Utilization of historic properties.** a. Historic properties which are a functional part of Army installations or are so located that their disposal or outleasing is impractical will be preserved and maintained by the installation commander. All efforts will be made to utilize these properties for military purposes in order to justify funds expended under this program. The concept of "adaptive use" (TM 5-801-1) for these properties compatible with their cultural values will be observed, whenever possible. Where this is not possible, a stabilization project will be developed to prevent further deterioration of the property.

b. In all instances, the planned use of a historic property listed in the National Register will be reviewed with the SHPO and the Advisory Council on Historic Preservation in accordance with 36 CFR 800 (para 8-11 and app).

c. Historic properties which would be more adequately administered by the Department of the Interior, non-Federal public agencies, local historical societies, or similarly oriented organizations should not be retained by the Army. Therefore, when there is no adverse impact on the performance of the Army mission, the installation commander may recommend, in the Analytical Report of the Installation Master Plan, the disposal of a historic property for historic monument purposes in accordance with AR 405-90 and the Federal Property and Administrative Services Act of 1949 as amended, or recommend its outleasing for historic preservation, park, and recreation or similar purposes in accordance with AR 405-80. In the latter case, the installation commander's recommendations must include assurances that the grantee has a viable plan for use of the property in a manner compatible with preservation objectives and policies. In such instances, the installation commander will notify

8-3

the SHPO and the Advisory Council on Historic Preservation and, if appropriate, consummate a "Memorandum of Agreement" that the proposed action will not adversely affect the historical, architectural, archeological, or cultural value of the property (para 8-11).

**8-11. Compliance procedures.** *a.* The applicable Federal regulation that contains the review requirements of section 106 of PL 89-665 and Executive Order 11593 is 36 CFR 800, Procedures for the Protection of Historic and Cultural Properties, and is included in its entirety in the appendix.

*b.* Any action which may have an effect on a National Register property or an historic place which appears eligible for listing in the National Register must go through two integral but separate review procedures. First, the environmental impact assessment (chap. 2) must identify cultural resources potentially affected by the proposed action. Second, where the identification of cultural resources indicates that properties included in the National Register will be affected, evidence of compliance with the review requirements of 36 CFR 800 will be included in the environmental impact assessment and/or EIS. Comments by the Advisory Council on Historic Preservation should be included in the EIA or draft EIS and must be included in the final EIS.

*c.* If there is an effect, but it is determined that the action will not have an adverse effect, a description of the proposed action together with the commander's determination of "no adverse effect" will be forwarded to the SHPO for comments. If the SHPO concurs in the findings, then a copy of this correspondence will be forwarded to the Executive Director of the Advisory Council on Historic Preservation (para 8-11*f* below). If there is no reply within 45 days, the action may proceed.

*d.* If it appears that there will be an adverse effect, the installation commander will prepare a technical report documenting the identification of cultural resources, the assessment of the impact of the undertaking on those resources, and the feasibility of mitigative measures. All mitigative measures proposed to minimize adverse effects on properties included or eligible for inclusion in the National Register should have the concurrence of the SHPO and

the Advisory Council on Historic Preservation and should be documented in a memorandum of agreement signed by all three parties. In most cases, an onsite inspection/consultation by the signees is required as part of the development of the Memorandum of Agreement. All correspondence regarding the determination of "no adverse effect" (para 8-11*b* above) or in obtaining a Memorandum of Agreement is to be forwarded to the parties directly involved, with information copies to the appropriate major command and HQDA (DAEN-MCZ-E) WASH DC 20314.

*e.* If a Memorandum of Agreement cannot be consummated, the case will be forwarded through Army channels to HQDA (DAEN-MCZ-E) WASH DC 20314, who will in turn forward it to the Advisory Council on Historic Preservation for review and evaluation. Where a Memorandum of Agreement cannot be obtained or an unfavorable ruling is obtained from the Advisory Council, then an Environmental Impact Statement containing the comments of the Advisory Council must be prepared covering the basic action and the proposed mitigative measures. If it is determined that the Army should proceed with the proposed action and that action will result in the destruction or major alteration of the property, then records of the property, including measured drawings, photographs, and written data will be prepared for deposit in the Library of Congress as part of the Historic American Buildings Survey or the Historic American Engineering Records in accordance with the standards promulgated by the Office of Archeology and Historic Preservation, Department of the Interior, WASH DC 20240. (TM 5-801-1 explains the standards and para 8-12 discusses archeology).

*f.* Advice on matters relating to implementing 36 CFR 800 may be obtained from the Advisory Council on Historic Preservation as indicated below:

(1) Eastern Area _____ Executive Director
Advisory Council on
  Historic Preservation
Suite 430
1522 K Street, NW
Washington, DC 20005
Telephone: (202) 254-3974

(2) Western Area _____ Director, Western Office
Advisory Council on
Historic Preservation
PO Box 25085
Denver, CO 80225
Telephone: (303) 234-4946

**8–12. Archeological sites.** *a.* The Secretary of the Army, under the authority of 16 U.S.C. 432, may issue archeological permits on Army-controlled installations after referral of the permit application to the Smithsonian Institution for his recommendations (AR 405–80).

*b.* All Army-controlled property will be surveyed to identify and locate archeological sites. Due to the magnitude of such surveys, installation commanders will establish coordination with the appropriate field offices of the National Park Service, SHPO and/or EO 11593 consultant, to review current Army plans, programs, and activities which may lead to the destruction of an archeological site and to develop survey schedules for affected areas. Since Army activities may necessarily lead to destruction of archeological sites, the survey must include value judgments assessing the relative significance of the surveyed sites so that destruction of the more significant archeological sites may be avoided.

*c.* The National Park Service may not be able to provide timely surveys of archeological resources necessary for preparation of legally sufficient environmental statements on Army activities. In these cases, the installation commander is authorized to contract with outside experts for the survey of archeological sites after receipt of a written turndown by the National Park Service, except as limited in (2) below. Copies of all such surveys should be furnished appropriate field officials of the National Park Service.

(1) While such inventories generally would be confined to a literature search and a reconnaissance of the affected area, there may be occasions when testing of archeological sites will be necessary in order to establish the need for the National Park Service to budget full-scale archeological survey programs at a later date.

(2) In any instance where estimated contract cost of such work exceeds $25,000, the matter must be referred to HQDA (DAEN–MCZ–E) WASH DC 20314 prior to consummation of a contract.

*d.* A copy of the program requirements for archeological investigations and salvage activities as jointly determined by the installation commander and the National Park Service will be provided HQDA (DAEN–MCZ–E) WASH DC 20314, in order to assist in overall program coordination between DAEN–MCZ–E and the Office of Archeology and Historic Preservation, Department of the Interior.

*e.* Salvage activities.

(1) Procedures for authorizing archeological activities on Army-controlled property are contained in AR 405–80.

(2) Installation commanders are responsible for instituting security measures for the protection of an archeological site during salvage operations. Assistance in salvage operations may be made when determined to be within the capability of the installation.

(3) Permits for archeological investigations and salvage activities will identify a museum responsible for preserving artifacts found as a result of the investigation. Therefore, where appropriate, permits for archeological investigations on Army-controlled property will designate the post museum as the recipient of all specimens. If the post museum is not appropriate, the Commanding General, US Army Center of Military History will determine which museum will be designated.

*f.* In the event that a suspected archeological site is encountered during construction or some other form of activity, operations in the area will be suspended until the Secretary of the Interior is consulted and the site is investigated by a professional archeologist approved by the Secretary of the Interior. All construction contracting procedures, both through direct contracting or by the District Engineer, will be amended to require the provision to obtain expert archeological analysis as required. Installation commanders and District Engineers are authorized to expend funds appropriated for Army activities for the survey and salvage of scientific, historic, archeological, and paleontological resources which are being or may be irreparably lost or damaged as a result of those Army activities. Such expenditures may not exceed one percent of the project amount.

8–5

US_00000111

**8-13. National Historic Landmarks.** *a.* The National Park Service regularly surveys historic properties under the National Historic Landmark Program. Designation of a National Historic Landmark automatically places the property in the National Register of Historic Places.

*b.* Notification from the Department of the Interior that Army-controlled property has been designated as a National Historical Landmark will be forwarded through channels to HQDA (DAEN-MCZ-E) WASH DC 20314. Also, subsequent correspondence regarding the landmark such as plaque application, notifications of annual visits and other related matters will be forwarded to the Deparment of the Interior with information copies to HQDA (DAEN-MCZ-E) WASH DC 20314.

### Table 8-1. Related Publications

The National Register of Historic Places—1972. USDI (Available from the Superintendent of Documents, US Government Printing Office, Washington, DC 20402. Price $7.80 domestic prepaid, or $7.25 GPO Bookstore. Stock No. 2405–0294).

The National Register of Historic Places—Supplement—1974. USDI (Available from Superintendent of Documents, US Government Printing Office, Washington, DC 20402. Price $9.45. Stock No. 2405–00542).

| | |
|---|---|
| AR 210–20 | Master Planning for Army Installations. |
| AR 405–80 | Granting Use of Real Esate. |
| AR 405–90 | Disposal of Real Estate. |
| AR 415–15 | MCA Program Development. |
| AR 415–35 | Minor Construction. |
| AR 420–10 | General Provisions, Organization, Function and Personnel. |
| AR 420–70 | Buildings and Structures. |
| AR 870–5 | Military History: Responsibilities, Policies and Procedures. |

US_00000112

# CHAPTER 9

# OIL AND HAZARDOUS SUBSTANCES SPILL CONTROL AND CONTINGENCY PLANS

## Section I. GENERAL

**9–1. Purpose.** This chapter sets forth the procedures for the control of discharges of oil and hazardous substances under the Federal Water Pollution Control Act (FWPCA) Amendments of 1972 and as promulgated by US Environmental Protection Agency and US Coast Guard Regulations. Further guidance on hazardous and toxic materials management appears in chapter 6.

**9–2. Goal and objectives.** The Department of the Army goal, in support of national policy, is to prevent the discharge of oil and hazardous substances and to provide for the prompt, coordinated response to contain and clean up spills should they occur. Objectives for attaining this goal are to—

*a.* Transport, store, handle, and dispose of oil, fuels, lubricant products, and hazardous liquid substances in a safe and environmentally acceptable manner.

*b.* Institute a responsive alert procedure in the event of a spill and be prepared to rapidly respond in the containment and cleanup of a spill.

*c.* Plan for and cooperate with other Federal, State, interstate, and local Government agencies to ensure that the public health and welfare are provided adequate protection from discharge of oils and other hazardous liquid substances.

**9–3. Explanation of terms.** For the purpose of this regulation and AR 500–60, the following apply:

*a. Advisory agencies.* Department or agencies which can make major contributions during response activities for certain types of discharges. These agencies are: the Nuclear Regulatory Commission; Department of Health, Education and Welfare; Department of Justice; Federal Disaster Assistance Administration; and Department of State.

*b. Applicable water quality standards.* The water quality standards adopted by the State and approved by EPA pursuant to Section 303 of the Federal Water Pollution Control Act or promulgated by EPA pursuant to that section.

*c. Coastal waters.* Generally those US waters navigable by or to be established by deep draft vessels, the contiguous zone, the high seas, and other waters subject to tidal influence.

*d. Contiguous zone.* The entire zone established by the United States or to be established by the United States under Article 24 of the Convention on the Territorial Sea and the Contiguous Zone. This is the zone contiguous to the territorial sea which extends 200 miles seaward from the baseline from which the territorial sea is measured.

*e. Discharge.* Includes but is not limited to any spilling, leaking, pumping, pouring, emitting, emptying, or dumping. For the purpose of the Spill Prevention Control and Countermeasure Plan (SPCC Plan) and the Installation Spill Contingency Plan (ISCP), the term discharge will not include any discharge of oil which is authorized by a permit issued by a Federal or State authority; i.e., issued pursuant to section 13 of the River and Harbor Act of 1899 (30 Stat. 1121, 33 U.S.C. 407 or sections 402 or 405 of the FWPCA Amendments of 1972 (86 Stat. 816 et seq., 33 U.S.C. 1251 et seq.).

*f. Discharge classifications.* The following classifications are provided for guidance and

9–1

US_00000113

serve as criteria for reporting and general response actions. They are not meant to imply or connote associated degree of hazard to the public health or welfare, or a measure of environmental damage. A discharge that poses a substantial threat to the public health or welfare, or results in critical public concern will be classed as a major discharge, notwithstanding the following quantitative measures.

(1) *Minor discharge.* A discharge to the inland waters of less than 1,000 gallons of oil, or a discharge of less than 10,000 gallons of oil to the coastal waters.

(2) *Medium discharge.* A discharge of 1,000 to 10,000 gallons of oil to the inland waters, or a discharge of 10,000 to 100,000 gallons of oil to the coastal waters, or a discharge of a hazardous substance in a harmful quantity as defined in EPA or Army regulations.

(3) *Major discharge.* A discharge of more than 10,000 gallons of oil to the inland waters, or more than 100,000 gallons of oil to the coastal waters, or a discharge of a hazardous substance that poses a substantial threat to the public health or welfare.

*g. Hazardous substance.* An element, compound, or mixture, (other than oil) which, when discharged in any quantity onto land or into or upon navigable or coastal waters, presents an imminent and substantial danger to the public health or welfare, including fish, shellfish, wildlife, shorelines, and beaches (e.g., hazardous substances include strong acids, strong bases, potentially toxic pesticides, or other bulk-stored chemicals used in manufacturing processes and maintenance or repair operations).

*h. Inland waters.* Generally, those waters upstream from coastal waters.

*i. Installation on-scene coordinator (IOSC).* The official predesignated by the Army installation commander to coordinate and direct Army control and cleanup efforts at the scene of an oil or hazardous substance discharge on or adjacent to an Army installation.

*j. Installation response team (IRT).* Those collective individuals on an installation designated to act in an emergency to perform those functions directed by the IOSC.

*k. National Response Center (NRC).* The Washington, DC headquarters for coordinating activities relative to pollution emergencies. It is located at Headquarters, US Coast Guard (USCG).

*l. National Response Team (NRT).* A team of representatives from the primary and advisory agencies which serves as the national body for planning and preparedness actions prior to a pollution discharge and for coordination and advice during a pollution emergency.

*m. Navigable waters of the United States.* "Navigable waters" as defined in section 502(7) of the FWPCA and includes—

(1) All navigable waters of the United States, as defined in judicial decisions prior to passage of the 1972 amendments to the FWPCA (PL 92-500), and tributaries of such waters;

(2) Interstate waters;

(3) Intrastate lakes, rivers, and streams which are utilized by interstate travelers for recreational or other purposes; and

(4) Intrastate lakes, rivers, and streams from which fish or shellfish are taken and sold in interstate commerce.

*n. Nontransportation-related onshore and offshore facilities.* Includes, but is not limited to, oil storage facilities and related equipment and appurtenances, as well as fixed bulk plant storage, terminal oil storage facilities, consumer storage, pumps, and drainage systems used in the storage of oil. These facilities include—

(1) Waste treatment facilities including in-plant pipelines, effluent discharge lines, and storage tanks, but excluding waste treatment facilities located on vessels and terminal storage tanks and appurtenances for the reception of oily ballast water or tank washings from vessels and associated systems used for off-loading vessels.

(2) Loading racks, transfer hoses, loading arms and other equipment which are appurtenant to a nontransportation-related facility or terminal facility and which are used to transfer oil in bulk to or from highway vehicles or railroad cars.

(3) Highway vehicles and railroad cars which are used for the transport of oil exclusively within the confines of a nontransportation-related facility and which are not intended to transport oil in interstate or intrastate commerce.

(4) Pipeline systems which are used for the

9-2

US_00000114

transport of oil exclusively within the confines of a nontransportation-related facility or terminal facility and which are not intended to transport oil in interstate or intrastate commerce, but excluding pipeline systems used to transfer oil in bulk to or from a vessel.

*o. Offshore facility.* Any facility of any kind located in, on, or under, any of the navigable waters of the United States other than a vessel or public vessel.

*p. Oil.* Oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil. The terms "oil" and "POL" are used interchangeably in this regulation.

*q. On-scene coordinator (OSC).* The Federal official predesignated by the EPA or the USCG to coordinate and direct Federal discharge removal efforts in approved regional contingency plans at the scene of an oil or hazardous substance discharge.

*r. Onshore facility.* Any facility (including, but not limited to motor vehicles and rolling stock) of any kind located in, on, or under any land within the United States, other than submerged land.

*s. Person.* Includes any individual, firm, corporation, association, and partnership.

*t. Potential dishcarge.* Any incident of circumstance which threatens to result in the discharge of oil or a hazardous substance.

*u. Primary agencies.* Federal departments or agencies comprising the NRT and designated to have primary responsibility and resources to promote effective operation of the National Oil and Hazardous Substances Pollution Contingency Plan. These agencies are the Departments of Commerce, Interior, Transportation, Defense, and the Environmental Protection Agency (EPA).

*v. Public health or welfare.* All factors affecting the health and welfare of man. They include but are not limited to, human health, the natural environment, fish, shellfish, wildlife, and public and private property, shorelines, and beaches.

*w. Public vessel.* A vessel owned or bareboat chartered and operated by the United States, or by a State or political subdivision thereof, or by a foreign nation, except when such vessel is engaged in commerce.

*x. Regional administrator.* The Regional Administrator of the EPA, or his designee, in and for the region in which the facility is located.

*y. Regional Response Center (RRC).* The Federal regional site for the control of pollution emergency response activities. It provides communications, information storage, and necessary personnel and facilities to promote the proper functioning and administration of regional pollution emergency response operations.

*z. Regional Response Team (RRT).* A team of regional Federal representatives of the primary or selected advisory agencies, which acts within its region as an emergency response team performing functions similar to those of the NRT.

*aa. Sheen.* An iridescent appearance on the surface of water.

*bb. Sludge.* An aggregate of oil or oil and other matter of any kind having a combined specific gravity equivalent to or greater than water.

*cc. Spill event.* A discharge of oil or hazardous substance on land or into or upon the navigable waters of the United States or adjoining shorelines in harmful quantities. For oil, a harmful quantity is that oil in excess of established State water quality standards; or that which causes a film, sheen, or discoloration on the surface of the water or adjoining shorelines; or quantities in excess of 1,000 US gallons on land. For other hazardous substances, quantity guidelines will be published by DAEN–ZCE when information is developed by EPA.

*dd. Toxic pollutant.* Those pollutants or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction), or physical deformations in such organisms or their offspring.

*ee. Vessel.* Every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water, other than a public vessel.

9–3

US_00000115

9-4. Policies. a. A capability will be established and maintained to respond in emergency situations to promptly contain and clean up accidental DA-caused oil discharges and spills of hazardous and toxic substances that occur at or near Army installations and activities.

b. Assistance will be provided to contain and clean up non-DA-caused spills under the provisions of the National Oil and Hazardous Substances Pollution Contingency Plan consistent with operational commitments.

c. All materials (including oils, fuels, petroleum products, and other hazardous chemicals) will be handled, used, and stored to avoid or minimize the possibility of an accidental spill and potential pollution of land, air, and water.

d. Storage facilities for oil and other hazardous substances (as later described herein) will be designed to incorporate such safeguards as dikes, catchment areas, and relief vessels to contain the flow of oil and hazardous liquids and to minimize the contamination of land and water resources.

e. DA agencies will cooperate with the Council on Environmental Quality, Department of Interior, Department of Transportation, the Environmental Protection Agency, and the Department of Commerce in the planning and execution of activities to minimize the possibility of discharges or mitigating the effects of spills, wherever they occur.

f. Contracts for disposal of oil or other wastes will contain provisions that require the disposal method to be in accordance with Federal, State, and/or local regulations and standards.

g. Each installation or activity with the capability of storing, dispensing, or discharging oils, oil products, and bulk quantities of liquid toxic and hazardous substances will prepare, maintain and implement a current SPCC Plan and an ISCP as specified herein. (The requirements for a spill prevention plan and a spill contingency plan may be satisfied by one plan with two distinctive sections—SPCC and ISCP.)

9-5. Implementing guidelines. a. The willful discharge of oil, petroleum products, or hazardous and toxic substances from installations, vehicles, aircraft, and watercraft onto land or into waters is prohibited except in cases of extreme emergency and if considered essential for the protection of human life. Every reasonable

precaution, therefore, will be taken to prevent the accidental discharge of oil or petroleum products on land or water or their vapors to the air.

b. Oil-water separators will be installed and maintained to reduce the oil content of oil-water wastes produced from vehicle and equipment washracks, industrial processes, steam cleaning operations, etc., to levels specified by Federal, State, or local standards.

c. The discharge of ballast water from vessels will be strictly controlled either by the use of ship-board or on-land oil-water separators capable of processing accumulated waste waters. Oil and fuel contaminated wastes produced during the cleaning of fuel storage tanks and combustion engine components will also be collected and treated for oil removal prior to discharge.

d. Waste oil produced on Army installations will be collected, segregated, and protected to avoid contamination. Where cost effective, waste oil will be used as a fuel additive in large oil burning heating plants. Waste oil will not be used as a dust palliative on roads or other surfaces. If the generating installation does not have the capability to use the waste oil, it will be offered to other installations that are located within cost-effective transportation distances. If the oil cannot be cost-effectively used, it will be reported to a Defense Property Disposal Office (PDO) in the area for disposal. If disposal to PDO is economically unfeasible installation should make arrangements with local contractors for disposal of waste products.

e. Waste water discharges will be monitored for oil content and other toxic and hazardous substances in accordance with the provisions of the permits issued under the National Pollutant Discharge Elimination System (NPDES).

f. DA will provide representatives to the RRT located in each of the Standard Federal Regions (fig. 9-1) in accordance with paragraph 9-6. The number of representatives may vary, depending upon the requirements in that Federal regional area and with details specified in each regional contingency plan.

g. The RRT will be activated automatically if a major or potentially major discharge occurs. In any other pollution emergency, the RRT may also be activated upon an oral request by any primary agency representative to the

9-4

Chairperson of the RRT. Such requests for team activation will be confirmed in writing.

*h.* During a major pollution discharge involving activation of the RRT, the IOSC may be directed and controlled by the EPA or USCG OSC.

*i.* In the event an installation commander provides assistance on non-DA-caused spills (those not covered by EPA, USCG or the National Plan) a civil support release and/or reimbursement agreement should be obtained similar to appendix A, AR 75-15. Paragraph 216011, AR 55-355, Assistance to Carriers, also provides guidance.

**9-6. Responsibilities.** *a.* Department of the Army Staff.

(1) The Chief of Engineers will—

(*a*) Promulgate basic policies and procedures for Department of the Army implementation of the National Oil and Hazardous Substances Pollution Contingency Plan (National Plan) for Army-caused discharges and for the preparation and implementation of SPCC and ISCP plans.

(*b*) Provide technical direction, design guidance, and engineering procedures to military installations on implementation of SPCC and ISCP plans.

(*c*) Provide a primary and alternate member (for Civil Works) to the RRT in each of the Standard Federal Regions as required. Nominations will be provided directly to the Chairperson of the RRT.

(2) Deputy Chief of Staff for Operations and Plans will exercise Army Staff supervision of DA support to the EPA and USCG in the cleanup of pollution discharges caused by other than Army agencies under the National Oil and Hazardous Substances Pollution Contingency Plan.

(3) The Inspector General and Auditor General (Army Director of Safety) will provide assistance and guidance on the safety aspects of the storage, use, handling, and disposal of hazardous and toxic substances.

(4) The Surgeon General will provide assistance and guidance on the health and environmental aspects of the storage, use, handling, and disposal of hazardous and toxic substances.

*b.* Major Army commanders will—

(1) Promulgate instructions for early preparation and periodic review of the ISCP for prompt identification, reporting, containment, and cleanup of accidental oil discharges and spills of hazardous and toxic substances at or near Army installations.

(2) Initiate a program for an initial survey and periodic evaluation of oil storage transfer and handling facilities for the purpose of developing an SPCC Plan for each installation.

(3) Program and budget for personnel, materials and equipment required for oil and hazardous substances spill prevention, containment and cleanup activities of DA-caused spills at Army installations.

*c.* Commanding General, FORSCOM will—

(1) Upon oral request, confirmed in writing by the EPA or USCG, provide personnel and resources support in accordance with the provisions of AR 500-60 during activation of the NRT and/or RRT and implementation of the National Oil and Hazardous Substances Pollution Contingency Plan. Such support is to be on a reimbursable basis.

(2) Provide a primary and alternate representative (for military matters) to the RRT for each Standard Federal Region as required. Nominations will be provided directly to the Chairman of the RRT.

*d.* Installation and activity commanders will—

(1) Establish SPCC plans and ISCP's and procedures to prevent spills and to ensure prompt reporting, containment, and cleanup of accidental discharges of oil and hazardous substances that occur at Army installations and nearby activities.

(2) Perform periodic surveys or inspections to verify compliance with the provisions of this regulation and to periodically test the effectiveness of SPCC Plans and ISCP's.

(3) Ensure that all fuels, oils, and hazardous materials (such as acids, bases, organic solvents, and other toxic chemicals) are used, stored and handled to avoid or minimize the possibilities of environmental pollution.

(4) Provide engineering safeguards (such as dikes, catchment areas, relief vessels) necessary to prevent pollution of navigable waters by accidental discharge of stored fuels, solvents, oils, and other chemicals.

US_00000117

(5) Identify in their ISCP (para 9–14) other possible DA resources that could be made available to the RRT if DA agencies are requested to assist in the containment and/or cleanup of a non-DA-caused spill in accordance with AR 500–60.

(6) When directed by CG, FORSCOM, provide available resources to support the OSC during implementation of the National Oil and Hazardous Substances Pollution Contingency Plan (AR 500–60).

(7) Inform the installation information officer and next higher information office about the anticipated news media coverage and local public reaction to an accidental discharge of oil or hazardous substances.

(8) Program and budget for personnel, materials, equipment, and training programs required for oil and hazardous substances spill prevention, containment and cleanup of DA-caused spills.

(9) Determine, for DA-caused off-post spills in the immediate vicinity of the installation, if his military organization is within the most reasonable distance of the pollution discharge and if he has the resource capability to respond to the discharge incident. If he does not respond to the containment and cleanup of the spill, the installation commander will ensure that the RRT and appropriate DOD agencies are notified for necessary action.

(10) Ensure that all reportable spills of oil and hazardous substances are reported through channels to DAEN–ZCE and to EPA, USCG or other civil authorities (sec IV of this chapter).

**9–7. References.** See table 9–1 for related publications to be used in conjunction with this chapter.

## Section II. SPILL PREVENTION CONTROL AND COUNTERMEASURE PLAN

**9–8. General.** Regulations have been issued by the US Environmental Protection Agency (EPA), as required by the Federal Water Pollution Control Act (FWPCA) amendments of 1972, to prevent discharges of oil into the navigable waters of the United States and to contain these discharges if they do occur. These regulations require installations having certain non-transportation-related onshore and offshore oil storage facilities (as described below) to prepare, maintain, and implement a Spill Prevention Control and Countermeasure Plan (SPCC plan) to prevent and control the discharge of oil and hazardous substances before they occur.

*a.* The SPCC Plan will identify potential sources of oil and hazardous substances and the measures required to prevent and contain any accidental discharge resulting from equipment or storage facility failure. The SPCC plan is directed by Title 40 CFR Part 112, copies of which are available from the EPA, Washington, DC 20242 or from any EPA regional office.

*b.* Army installations will prepare and implement a current SPCC plan when their oil or hazardous substance storage facilities meet any one of the following:

(1) Aggregate above-ground oil storage, at any one location on the installation, is greater than 1,320 gallons.

(2) Any single tank above-ground oil storage, at any one location on the installation, is greater than 660 gallons.

(3) Total underground oil storage, at any one location on the installation, is greater than 42,000 gallons.

(4) Single bulk storage of hazardous liquid substances (acids, chemical solvents, etc.) is greater than 500 gallons. The 500 gallon limit represents that total combined quantity of hazardous liquid substance at a single storage location on an installation.

(5) Nontransportation-related onshore and offshore facilities which, because of their location or operations, could reasonably be expected to discharge oil or hazardous material in harmful quantities into or upon the navigable waters of the United States.

*c.* For purposes of an SPCC plan, the oil storage facilities will include, but not be limited to, storage for a facility such as a heating or boiler plant, electric generating unit, fuel dispensing or transfer facility, tank car or truck loading/unloading rack, bulk fuel storage, etc. An above-ground or underground oil storage facility may be a single tank or grouping of tanks in a localized area on an installation.

US_00000118

9-9. **Preparation and implementation of plan.** *a.* An SPCC plan will be prepared expeditiously by each installation having oil or hazardous substances storage facilities as required in paragraph 9-8*b*, and each plan will be reviewed triennially and updated as necessary.

*b.* Completed plans will be fully implemented (including required construction and installation of equipment and/or training of personnel) as soon as possible after 10 January 1975. Newly activated installations will prepare an SPCC plan within 6 months after the date they begin operation and will fully implement it not later than 1 year after operations begin.

*c.* An extension of time for the preparation and full implementation of an SPCC plan beyond the times specified may be obtained from the EPA regional administrator. A copy of any request for an extension will be furnished through command channels to HQDA (DAEN-ZCE) WASH DC 20310.

9-10. **Review and evaluation.** Each SPCC plan will be—

*a.* Reviewed by a registered professional engineer (PE) and certified to have been prepared in accordance with good engineering practices, after onsite examination of the facility, and after familiarity with Title 40 CFR Part 112. This certification may be accomplished by a PE at the next higher command if no PE is available at the installation.

*b.* Original and changes maintained current and reviewed by a registered professional engineer and will be made available for onsite review by the EPA regional administrator at the office of the facilities engineer. Copies of all original plans and changes will also be filed at appropriate MACOM environmental office.

*c.* Reviewed and evaluated at least once every 3 years. If the review shows that more effective prevention and control technology will significantly reduce the likelihood of a spill event and if the technology has been field-proven and can be procured and installed at the time of the review, the DA component will amend the SPCC plan to include the more effective technology and have it certified by a registered professional engineer. Technological improvements should be included in Operation and Maintenance, Army or Major Construction, Army budgets as appropriate.

*d.* Reviewed and amended in accordance with paragraph 9-16, as required by the EPA Regional Administrator, whenever a facility has discharged more than 1,000 US gallons of oil into the navigable waters in a single spill event or when there have been two spill events within any 12-month period.

9-11. **Minimum plan requirements.** As a minimum, the SPCC plan will contain—

*a.* A detailed description of the equipment and measures specified for oil spill prevention, control, and countermeasure, including structures and equipment for diversion and containment of discharges, facility drainage, and identification of resources to clean up spills. Measures adopted should permit as far as practical reclamation of spilled substance. Many prevention and control requirements are similar to safety requirements for the design and operation of oil tanks, pipelines and pumping facilities.

*b.* A description of each nontransportation-related spill event that has occurred at the facility within the past 12 months with corrective actions taken, and plans for preventing recurrence.

*c.* An inventory list of storage, handling, and transfer facilities for which there is a reasonable possibility of a significant discharge of oil or other hazardous polluting substances. For each listing, where experience indicates a reasonable potential for equipment failure (e.g., tank overflow, rupture, or leakage), include a prediction of the direction, rate of flow, and total quantity of oil which could be discharged as a result of a major type of failure.

*d.* A graphic description showing all containment and/or diversionary structures of equipment required to prevent discharged oil from reaching a navigable water course. Included among the various preventive measures that can be employed are: Impervious berm and dike; curbing; culverting, gutters, or other drainage systems; weirs, booms, or other barriers; spill diversion ponds; and retention ponds. If it is not practicable to install structures, sorbent materials such as straw or commercial products can be used for containment or cleanup of spills at locations specified in the plan.

9-7

*e.* When it is determined that the installation of the preventative structures or equipment listed (*d* above) is not practicable, the installation commander will demonstrate fully such impracticability and include the written provisions of the Installation Spill Contingency Plan (ISCP) in this section of the SPCC plan.

**9-12. Detailed guidance.** In addition to the minimum prevention measures (para 9-11), sections of the SPCC plan will include a written analysis and complete discussion of conformance with applicable guidelines on other effective spill prevention and containment procedures. The guidelines are described in Title 40 CFR Part 112.7 paragraph (e) and cover the following areas:

*a.* Onshore facility diked storage drainage areas including valve restraints.

*b.* Onshore bulk storage tank and dike construction material, liquid alarm systems and sensing devices.

*c.* Facility transfer operations criteria for piping, valves, and inspection requirements.

*d.* Facility tank car and tank truck/loading unloading rack, barriers, and warning requirements.

*e.* Field storage, mobile, and portable fueling facilities such as bladders and tank trucks (see 40 CFR Part 112.3).

*f.* Inspections and records procedures.

*g.* Security fencing, pump control, pipeline connections, and lighting systems devices.

*h.* Personnel, training, and spill prevention procedures.

## Section III.  INSTALLATION SPILL CONTINGENCY PLAN

**9-13. General.** A National Oil and Hazardous Substances Pollution Contingency Plan was developed in accordance with the provisions of the Federal Water Pollution Control Act (FWPCA) Amendments of 1972 (33 USC 1151 et seq.) and requires Federal agencies to develop a plan to clean up discharges of oil and hazardous substances for which they are responsible. Commanders will maintain an Installation Spill Contingency Plan (ISCP) to identify resources to be used to clean up discharges on Army installations and will be prepared to provide assistance to non-DA agencies when requested. (AR 500-60 provides policy and guidance for the DA response to the National Oil and Hazardous Substance Pollution Contingency Plan to assist EPA and the USCG in spills caused by other than DA agencies.)

*a.* The ISCP will establish the responsibilities, duties, procedures, and resources to be employed, to contain and clean up accidental discharges.

*b.* All Army installations will maintain a current ISCP which will be reviewed and evaluated at least once every 3 years.

*c.* The resources identified for possible use by a RRT in support of the National Oil and Hazardous Substances Pollution Contingency Plan are to be specifically identified as an element of the ISCP.

*d.* The ISCP will be simulated at least annually by the installation commander in coordination with the responsible officers of the SPCC Plan in order to ensure timely and effective personnel and equipment response in the event of an accidental discharge.

*e.* Copies of original ISCP and any changes will be kept on file at installation facilities engineer (FE) office and at MACOM environmental office.

*f.* All Army installations will establish a thorough training program for oil spill response personnel.

**9-14. Minimum plan requirements.** As a minimum the ISCP will contain—

*a.* The name, responsibilities and duties of the IOSC. The IOSC is the official predesignated by the installation commander to coordinate and direct Army control and cleanup efforts at the scene of an Army caused oil or hazardous substance discharge on or adjacent to an Army installation.

*b.* The specification, composition, and training plans of the IRT which acts as an emergency response team performing response functions as defined and directed by the IOSC. A preplanned location for an installation response operations center.

US_00000120

*c.* IRT alert and mobilization procedures including provisions for access to a reliable communications system for timely notification of an oil or hazardous substance discharge.

*d.* A current list of positions, telephone numbers, and addresses (e.g., names of key contact people in an ISCP app) of the responsible persons and alternates on call to receive notification of an oil or hazardous substance discharge as well as the names, telephone numbers and addresses of key organizations and agencies to be notified when a discharge is discovered.

*e.* Surveillance procedures for the early detection of oil and hazardous substances discharges.

*f.* Quantities and locations of manpower, equipment, vehicles, supplies, and material resources required to expeditiously contain, recover, and remove any maximum harmful quantity of oil or hazardous substance discharged by Army activities on post or at nearby Army operations. Plans will identify specific action for various size potential spills, identified in the SPCC Plan inventory list (para 9-11c) and will identify a priority list in which various critical water uses are to be protected as a result of a discharge.

*g.* Sources of additional resources that are available to an installation for the cleanup or reclamation of a large DA-caused spill, if such a pollution spill exceeds the response capability of the installation (e.g., resources such as US Coast Guard, Air Force, Navy, or private contractors). An established, prearranged procedure for requesting assistance, and agreements for acquisition of resources, during a major disaster or response exceeding situation.

*h.* Procedures and techniques to be employed in identifying, containing, dispersing, reclaiming, and removing oil and hazardous substances used in bulk quantity on an installation. Identification of chemicals (whose technical product data has been provided to and accepted by EPA) that may be used to concentrate, neutralize, collect, disperse and remove oil or hazardous substances discharges. Pollution control actions taken will be in accordance with applicable Federal, State, or local standards, EPA guidelines, and the current National Oil and Hazardous Substances Pollution Contingency Plan.

*i.* Reporting procedures as required by paragraphs 9-15 and 9-16, in the event of an oil or hazardous substance discharge by Army activities.

*j.* Army resources useful to the RRT in the event Army agencies are tasked to aid in the cleanup of a non-Army caused spill. Specific procedures to facilitate recovery of costs encountered during cleanup of non-Army spills are given in AR 500-60.

## Section IV. REPORTS OF ARMY ACCIDENTAL OIL AND HAZARDOUS SUBSTANCE DISCHARGES

**9-15. General.** In the event of any spill, responsive actions will be taken to prevent oil and hazardous substances from entering any navigable waters or water supplies. All personnel assigned or employed by the Department of the Army will promptly report any observed oil spill, significant discharges of hazardous and toxic substances, or evidence of a spill by discovery of a slick or sheen on water from oil, gasoline, jet fuel, or other hazardous polluting substance. Spill events will be reported immediately by telephonic means to the EPA Regional Office, US Coast Guard District Office or National Response Center (800) 424-8802. On-post spill events not entering navigable waters are to be reported promptly and completely, but EPA or USCG may not require further reporting in accordance with paragraph 9-16. Off-post incidents will be reported as above and to the nearest or appropriate political jurisdiction and to the RRT at the RRC.

**9-16. Pollution Incident Report (RCS EPA-1001).** *a.* Medium and major spills (para 9-3) and any discharge of more than 1,000 US gallons of oil or a spill of more than 500 US gallons of other hazardous liquid substance into navigable waters on or adjacent to an Army installation in the United States will be promptly reported by the IOSC by telephonic means to (800) 424-

US_00000121

8802, or to the nearest USCG District Office, to the EPA Regional Office, and electronically through channels to HQDA (DAEN–ZCE) WASH DC 20310. (See figs. 9–1 and 9–2 for regions and districts.)

(1) When it has been determined by the OSC that a spill of a hazardous substance (less than 500 gallons) is in a harmful quantity or that the discharge poses a substantial threat to the public health or welfare, it will be classed as a medium or major discharge and a Pollution Incident Report will be submitted.

(2) The format for the Pollution Incident Report is given in table 9–2.

(3) Telephonic or electronic reports will be confirmed by a follow-up written message within 30 days after the spill to the EPA Regional Administrator, the NRT or RRT, as appropriate, and to DAEN–ZCE.

b. When more than 1,000 US gallons of oil (medium and major spills) or more than 500 US gallons of a hazardous liquid substance (or any major discharge of a hazardous substance) have been discharged into or upon a navigable water in a single spill or when two spill events occur within any 12-month period, this written follow-up report will contain (in addition to the items in table 9–2) the following:

(1) Description of facility from which spill originated; (including maps, flow diagrams, and topographic maps) date facility was put into operation; storage or handling capacity; and normal daily/weekly through-put.

(2) Cause of spill, including a failure analysis of system or subsystem in which the failure occurred. Describe unique problems encountered.

(3) Post spill corrective actions, including resources committed, attempts to reclaim spilled substance and/or countermeasures taken. Include a description of equipment repairs and/or replacements.

(4) Effectiveness of response and removal actions by the discharger, State, and local forces, or Federal agencies and special forces.

(5) Additional preventive measures taken or contemplated to minimize the possibility of a recurrence and recommendations to improve response actions and chances for reclaiming if a similar spill should occur.

(6) A complete copy of the SPCC plan with any amendments.

c. Based on the above spill report information, the EPA Regional Administrator may require amendments to the SPCC plan and will notify the commander concerned by certified mail. A copy of such report will also be submitted to the state water pollution control authority.

d. Upon discovery of a spill in which the pollutant may flow past the boundary of the installation, or a spill into navigable waters, or a spill from a vessel, the IOSC will notify the installation judge advocate's office to ensure that information, records, and samples adequate for legal purposes are obtained and safeguarded for future use.

9–17. Reports on DA support provided to control non-DA spills. Reports on the commitment of Army resources to spills, either requested by EPA or USCG, or by authority of the installation commander, in response to the provisions of the National Oil and Hazardous Substance Pollution Contingency Plan will be provided to Director of Military Support, HQDA (DAMO–MS) WASH DC 20310, in accordance with the provisions of AR 500–60.

9–18. Exclusions. a. Policies and procedures applicable to nuclear accidents and incidents as outlined in AR 360–5, AR 50–5, and AR 40–13 are not affected by this regulation.

b. Policies and procedures applicable to chemical agent accidents and incidents as outlined in AR 50–5 and AR 385–40 are not affected by this regulation.

US_00000122

## Table 9-1. Related Publications

Council on Environmental Quality—National Oil and Hazardous Substances Pollution Contingency Plan (40 FR 28, p. 6282, February 10, 1975).

EPA—Oil Pollution Prevention, Non-Transportation-Related Onshore and Offshore Facilities (38 FR 237, p. 34164, December 11, 1973).

The Federal Water Pollution Control Act Amendments of 1972 (Title 33 U.S.C. 1251 et seq.).

River and Harbor Act of 1899 (30 Stat 1121, U.S.C. 407).

Executive Order 11752, Prevention, Control and Abatement of Environmental Pollution at Federal Facilities (38 FR 243, p. 34793).

Marine Protection, Research and Sanctuaries Act of 1972 (86 Stat 1052).

Department of Transportation—Discharge of Oil (Title 40 U.S.C. Part 110).

Pollution Prevention, Vessel and Oil Transfer Facilities, CFR Title 33, Chapter 1, Subchapter O, US Coast Guard.

| | |
|---|---|
| AR 40-13 | Radiological Emergency Medical Teams (REMT) |
| AR 50-5 | Nuclear Surety |
| AR 50-6 | Chemical Surety |
| AR 55-355 | Military Traffic Management Regulation |
| AR 56-9 | Watercraft |
| AR 75-15 | Responsibilities and Procedures for Explosive Ordnance Disposal |
| AR 385-10 | Army Safety Program |
| AR 385-40 | Accident Reporting and Records |
| AR 500-60 | Disaster Relief |
| TB 55-1900-206-14 | Control and Abatement of Pollution by Army Watercraft |

US_00000123

Table 9-2.  Format for Pollution Incident Report (RCS EPA-1001)

| Item | Data |
|------|------|
| 1 | Name and location of installation. |
| 2 | Commander of installation and his phone number. |
| 3 | Date and time (GMT) of incident or time of discovery. |
| 4 | Severity of incident. Specify size of oil discharge (major, medium, minor). |
| 5 | Location of incident and specific areas affected by spill. |
| 6 | Cause and source of incident. |
| 7 | Type and estimated amount (barrels, gallons, liters, pounds) of pollutant. If applicable, length by width of slick. |
| 8 | Samples taken (yes or no). |
| 9 | Damage impact on surroundings (fish, wildlife, and underground waters (e.g., drinking water)). |
| 10 | Potential dangers (fire, explosion, toxic vapor, etc.). |
| 11 | Corrective action to eliminate pollution source. |
| 12 | Corrective action to remove pollutant. |
| 13 | Assistance required. |
| 14 | Estimated completion date of remedial actions. |
| 15 | Anticipated or actual reaction by news media and public to the incident. |
| 16 | Other items required in the regional contingency plan and a general discussion of the incident. |

US_00000124



STANDARD FEDERAL REGIONS
(EPA, HEW AND HUD REGIONS)

Figure 9-1

US_00000125

Table 9-3. Environmental Protection Agency Regional Offices

Environmental Protection Agency
Region I, Room 2303
John F. Kennedy Federal Building
Boston, MA 02203
Tel: (617) 223-7265

Environmental Protection Agency
Region II, Room 908
26 Federal Plaza
New York, NY 10007
Tel: (201) 548-8730

Environmental Protection Agency
Region III
Curtis Bldg.
6th and Walnut Streets
Philadelphia, PA 19106
Tel: (215) 597-9898

Environmental Protection Agency
Region IV
345 Peachtree St., N.E.
Atlanta, GA 30308
Tel: (404) 881-4062

Environmental Protection Agency
Region V
Federal Building
230 South Dearborn Street
Chicago, IL 60604
Tel: (312) 896-7591

Environmental Protection Agency
Region VI, Suite 1600
1600 Patterson St.
Dallas, TX 75201
Tel: (214) 749-3840

Environmental Protection Agency
Region VII
1735 Baltimore Ave.
Kansas City, MO 64108
Tel: (816) 374-3778

Environmental Protection Agency
Region VIII, Suite 900
1860 Lincoln Street
Denver, CO 80203
Tel: (303) 837-3880

Environmental Protection Agency
Region IX
100 California Street
San Francisco, CA 94111
Tel: (415) 556-6254

Environmental Protection Agency
Region X
1200 Sixth Avenue
Seattle, WA 98101
Tel: (206) 442-4343

Telephone numbers are 24-hour-working numbers either through automatic switching or provision of answering services.

US_00000126



UNITED STATES DEPARTMENT OF TRANSPORTATION
U. S. COAST GUARD DISTRICTS

Figure 9–2

US_00000127

## Table 9-4. Department of Transportation US Coast Guard Districts

1st Coast Guard District (I)
150 Causeway Street
Boston, MA 02114
Duty Officer: (617) 223-6650

2nd Coast Guard District
Federal Building
1520 Market Street
St. Louis, MO 63103
Duty Officer: (314) 622-4614

3rd Coast Guard District (II)
Governors Island
New York, NY 10004
Duty Officer: (212) 264-4800

5th Coast Guard District (III)
Federal Building
431 Crawford Street
Portsmouth, VA 23705
Duty Officer: (703) 393-9611

7th Coast Guard District (IV)
Room 1012, Federal Bldg.,
51 S.W. 1st Avenue
Miami, FL 33130
Duty Officer: (305) 350-5611

8th Coast Guard District (VI)
Customhouse
New Orleans, LA 70130
Duty Officer: (504) 527-6225

9th Coast Guard District (V)
1240 East 9th Street
Cleveland, OH 44199
Duty Officer: (216) 522-3984

11th Coast Guard District
Heartwell Bldg.
19 Pine Avenue
Long Beach, CA 90802
Duty Officer: (213) 590-2311

12th Coast Guard District (IX)
630 Sansome Street
San Francisco, CA 94126
Duty Officer: (415) 556-5500

13th Coast Guard District (X)
618 2nd Avenue
Seattle, WA 98104
Duty Officer: (206) 524-2902

14th Coast Guard District
P. O. Box 45
FPO San Francisco, CA 96610
Duty Officer: (808 546-7109
               (COMMERCIAL ONLY)
AUTOVON—421-4845

17th Coast Guard District
FPO Seattle, WA 98771
Duty Officer: (907) 586-7340
               (COMMERCIAL ONLY)
AUTOVON—388-1121

Telephone numbers shown are available and manned 24 hours.
(''') denotes district office where Coastal Regional Contingency Plans for standard Federal regions are available.

US_00000128

# CHAPTER 10

# ENVIRONMENTAL POLLUTION PREVENTION, CONTROL, AND ABATEMENT REPORT (RCS DD–I&L (SA) 1383)

## Section I. GENERAL

**10–1. Purpose.** *a.* This chapter provides reporting procedures to be followed within the Department of the Army to control environmental pollution from existing facilities as contained in section 3(a)(3) Executive Order 11752 of 17 December 1973, entitled, "Prevention, Control and Abatement of Environmental Pollution at Federal Facilities." This section of the Executive Order provides that "Heads of Federal agencies shall, with regard to all facilities under their jurisdiction in the United States: .... (3) Present to the Director of the Office of Management and Budget, annually, a plan to provide for such improvement in the design, construction, management, operation, and maintenance of existing facilities as may be necessary to meet applicable standards specified ...."

*b.* The report described herein will be the principal mechanism for identifying pollution control projects and those resources needed to effectively execute installation and major command environmental programs. Properly defined information presented in this report can be used as a basis for necessary programing and budget actions by DA and major commands.

*c.* These instructions implement Office of Management and Budget (OMB) Circular A–106, dated 31 Dec 74, which supersedes OMB Circular A–78 and A–81, dated 18 May 70.

**10–2. Explanation of terms.** *a.* The terms used herein will be the same as those defined in chapter 1.

*b.* The term, "project" will mean an action to achieve needed corrective measures relative to identified environmental pollution sources.

*c.* The term "cost" will mean the amount of funds required to install the necessary environmental protection measures. These funds include the capital costs of structures and equipment, irrespective of the appropriation chargeable, but not the annual maintenance and operating costs.

**10–3. Applicability.** Each active, semiactive, and Army Reserve installation operated by or for the Department of the Army, and National Guard facilities/sites supported by federally appropriated funds in the Continental United States, Alaska, and Hawaii, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Panama Canal Zone, and the Trust Territories of the Pacific, whether Army-controlled or under jurisdiction of the Army by lease or similar instrument, where environmental protection measures do not meet the current requirements and/or standards established by appropriated Federal, State, or local regulatory agencies are to be listed in the Environmental Pollution Control Report. Each installation identifying a new pollution source or environmental protection requirement will report through command channels in accordance with these instructions. Negative report will be rendered by responsible commands in the form of a listing of those installations where remedial measures are not needed to correct a source of pollution or where no additional resources are needed to meet the provisions of this regulation.

**10–4. Scope.** *a.* The report described herein consists of one exhibit to be prepared at the installation or activity level and two exhibits to

10–1

US_00000129

be prepared at the major command level. Reports are to be forwarded through channels to HQDA (DAEN–FEU) WASH, DC 20314, by 15 November and 15 May of each year. The exhibits will reflect information as of 20 October and 20 April.

b. Exhibit 1 is entitled—Proposed Project Report. Separate exhibits will be prepared for each project or activity on an installation in each of the following categories:

   (1) Air pollution.

   (2) Water pollution.

   (3) Solid waste pollution.

   (4) Radiation pollution.

   (5) Noise Pollution.

   (6) Pesticide and hazardous/toxic materials pollution.

   (7) Environmental management.

c. Exhibit 2, entitled—Status report, indicates the amount programed, appropriated, or funded; the current working estimate (CWE); and the status of each active project. Separate exhibits will be completed by the major commands for each category of projects (i.e., air, water, noise, solid waste, etc.). After the initial report, marked-up copies of the ADP printout giving an update on all previously reported projects is all that is necessary. The ADP printout to be used for this purpose will be provided by HQDA (DAEN–FEU) WASH DC 20314.

d. Exhibit 3 is entitled—Narrative report. Major commands will provide a short explanation of the objectives that will be achieved, the elements of their environmental program that will be given particular emphasis over the short term, and the extent that statutory pollution control requirements and DA environmental goals and objectives will be satisfied by executing the projects or actions listed in the report. For any specific portion of the program that requires more than 12 months to complete, an identification of the major milestones for accomplishing the various actions are also to be included.

**10–5. Responsibilities.** a. Department of the Army Staff.

(1) The Chief of Engineers will compile the overall DA report based on submissions from major commands.

(2) The Chief, Army Reserve will monitor those reports by the major commands to ensure that Reserve installations for which they provide logistic support are included in the Pollution Control Report.

(3) The Chief, National Guard Bureau will submit a report including those projects for sites or installations which are supported by Federally appropriated funds.

b. Major commands.

(1) Major commands controlling installations or activities, or providing logistical support to Reserve installations in the United States, District of Columbia, Puerto Rico, Canal Zone, Guam, American Samoa, Virgin Islands, and the Trust Territories will submit reports in accordance with this regulation.

(2) Major commands controlling installations or activities in oversea areas will submit reports identifying pollution abatement projects required for compliance with host nation regulations, international or Status of Forces Agreements.

(3) Commanding General, US Army Materiel Development and Readiness Command will submit reports on retrofit projects and programs to bring mobile sources (vehicles, aircraft and watercraft) into compliance with air, water and noise standards.

## Section II. INSTRUCTIONS FOR THE PREPARATION AND SUBMISSION OF EXHIBITS

**10–6. Exhibit 1—Proposed Project.** a. An Exhibit 1 will be prepared and maintained current for all known pollution control projects using the format in figure 10–1 and for valid environmental protection resource requirements using the format in figure 10–2. Exhibit 1's previously submitted on air and water pollution control projects which are still valid, but not yet com-

pleted, do not have to be resubmitted in the new format except when a significant change takes place to make the earlier Exhibit 1 obsolete. Exhibit 1's are not required for completed projects.

b. Exhibit 1's for new or revised projects or requirements will be submitted semiannually by 15 November and 15 May of each year to

**10–2**

DAEN–FEU based on the latest information as of 30 days prior to the above reporting dates.

c. Each project will be identified as to the category of pollution control needed (i.e., air, water, solid waste, radiation, noise, pesticides, and environmental management). Projects within a category will be assigned consecutive numbers by DAEN–FEU beginning with "1." Project numbers are for permanent identification and may not be reassigned to new projects. Existing air and water pollution control projects previously numbered under RCS DD–I&L(SA) 1383 are to be continued under their originally assigned numbers. These project numbers apply strictly to this report and are not to be confused with or to replace programing line-item numbers.

d. Each project at the same installation required for a distinct and separate purpose is to be considered a separate project. Separate projects will be reported individually using the project number assigned by DAEN–FEU.

e. Every item in figures 10–1 or 10–2 is to be completed for each project. Where no entry is appropriate, enter NA (not applicable). A specific effort must be made by the installation to obtain any information not immediately on hand.

f. The following will be reported as other relevant information:

(1) Item 10 of Exhibit 1 will include information not shown elsewhere on the exhibit which is necessary for the evaluation of the project. For example, where the command knows of changing circumstances which will affect the practicability of undertaking a project at a particular facility (e.g., replacement of a facility or a change in installation mission which would alter control needs), these changes are to be stated. If a project is discontinued, state in this item the reasons and circumstances, if any, which might lead to a re-activation of the projects (e.g., plant is put in layaway; reactivation would be based on further troop strength increase or mobilization requirements).

(2) For facilities leased by the Army which are subject to the provisions of this regulation, describe under item 10 the lease arrangements that would affect the requirement for control measures for such facilities. Such projects will

be included in Exhibit 2 with a reference in the margin to the explanation given on Exhibit 1.

(3) If a project proposed in one environmental category is likely to generate pollution of other types, item 10 is to include a brief description and how it is to be controlled.

(4) Citations or other forms of litigation by regulatory agencies or other official entities will be reported under item 10.

g. Enter in item 11, figure 10–1 or item 5, figure 10–2 known or estimated funding requirements by appropriation account (OMA, MCA, etc). (This source of project and cost data can be helpful to major commands in the development of annual budget requests to support their environmental program.)

(1) Air.

(a) Item 2. Identify the pollutant(s) by name for which the project will be required (for example: Particulate matter, sulfur oxides, hydrocarbons, carbon monoxide, nitrogen oxides, etc.).

(b) Item 3. State the amount of pollutants emitted by each point of emission being controlled within the facility. These amounts should be measured amounts if available and expressed in the same terms of the applicable emission standard, normally State standards (e.g., lb/hr, ppm, etc.) in item 8 at maximum process operating rate.

(c) Item 4. Identify the specific emission point(s) which the project will control. This identification should be specific (e.g., two coal-fired boilers in building "xyz" rather than just "boiler").

(d) Item 5. Specify the existing pollution control measures at the individual emission points. If no control measures are being utilized, so state.

(e) Item 6. Indicate the percentage of the pollutant which the control device removes.

(f) Item 7. Indicate the type control device or process modification to be utilized to control emissions.

(g) Item 8. Cite the applicable Federal, State, or local air pollution emission control standard which the facility is required to meet, referencing the specific code, chapter, and part. Also, include the date the statutory requirements became effective.

(h) Item 9. Indicate the project schedules

**10–3**

US_00000131

proposed by the installation and that required by the statutory standards listed in item 8. If the schedule for achieving compliance differs from statutory, regulatory, or other milestones and deadlines, indicate the dates the facility will meet them and explain why the statutory or regulatory dates will not be met. If a compliance schedule has been negotiated and accepted by the Regional EPA administrator, list those dates in lieu of those cited in a statute or regulation and indicate the date the compliance schedule was accepted.

(2) *Water.*

(a) *Item 2.* Describe specific pollution and nature of problem; e.g., unintercepted washrack wastes containing oil and grease; overloaded sewage treatment plant bypasses raw or partly treated sewage to river; combined sewage overflow carries untreated sewage to lake, etc. Use this item and items 3, 6, and 7 as appropriate to describe infiltration inflow problems and measures required by NPDES permit and/or by "Spill Control and Countermeasure Plans" formulated pursuant to 40 CFR 112, "Oil Pollution Prevention," and promulgated in chapter 9 of this regulation.

(b) *Item 3.* Show amount of waste generated and treated. Indicate gpd, tgd, or mgd.

(c) *Item 4.* Show whether discharge is due to water (name of receiving water and location thereon), sewer system (name), land application, subsurface (e.g., septic system, drainfield, etc.).

(d) *Item 5.* If problem as described in items 2 and 4 does not relate to an existing or proposed treatment plant, identify in this item the plant, if any, which ultimately receives, or will receive, and treats the wastewater.

(e) *Items 6 and 7.* In appropriate item, show existing and proposed ppm and/or lbs. in influent and effluent and percent removal for all principal polluting constituents. As a minimum Biochemical Oxygen Demand (BOD) (Chemical Oxygen Demand (COD) and total organic carbon (TOC) where applicable) and suspended solids data should be shown wherever possible.

(f) *Item 8.* Cite the applicable Federal, State or local discharge standard which the facility is required to meet, referencing the specific code, chapter and part. Also, include

date statutory requirement became effective. Briefly summarize the discharge limitations if a NPDES permit has not been issued. When a draft or final NPDES permit has been issued, indicate:

*1.* When a permit application was submitted;

*2.* The application and/or permit number, and the effective and expiration dates of any permit(s) issued; and

*3.* The conditions of each permit in summary form, other than the compliance dates which are to be entered in item 9.

(g) *Item 9.* Indicate the project schedules proposed by the command and as required by the standards listed in item 8. Where issued, NPDES permit schedules should be entered in the Regulation Schedule column. If the command schedule for achieving compliance differs from the regulatory, or NPDES scheduled dates indicate the date the facility will be in compliance and explain why the required dates will not be met.

(h) *Item 10.* Under lease construction arrangements, state who is responsible for obtaining NPDES permits or for meeting schedules and requirements.

(i) *Item 11.* Provide funding requirements.

(3) *Solid Waste.*

(a) *Item 2.* Indicate the activity which is not in compliance with solid waste disposal standards; i.e., waste collection, segregation of wastes, siting or operation of sanitary landfill.

*Note.* Particular attention is to be given to controlling leachate from landfill seeping into ground or surface water sources, control of surface runoff, sanitation of waste collection, and transfer systems.

(b) *Item 3.* If specific amounts of pollution are known, list or otherwise provide best estimate.

(c) *Item 4.* Give details of the problem; i.e., whatever it is that is not in compliance with standards.

(d) *Item 5.* Indicate, as applicable, quantities, types, and sources of solid waste handled; frequency of operation; year of original construction/operation; design life; and estimated remaining life.

(e) *Item 6.* Discuss effectiveness of existing solid waste management system or practices, if applicable.

**10–4**

US_00000132

(f) *Item 7.* Give brief description of proposed project which will bring operation into compliance.

(g) *Item 8.* Specify the DA, EPA, or other solid waste management guideline applicable and the specific requirement that makes the project necessary and the effective date of the regulation.

(h) *Items 9, 10 and 11.* Complete according to instructions (a through f above).

(4) *Radiation.*

(a) *Item 2.* Identify specific type of pollutant; i.e., plutonium, cobalt 60 and other substances emitting ionizing radiations.

(b) *Item 3.* Indicate levels of contamination (Curies or subunits, etc.).

(c) *Item 4.* Give details of the problem.

(d) *Item 5.* Explain current protection measures being employed, if any.

(e) *Item 6.* Discuss effectiveness of current control measures.

(f) *Item 7.* Give brief description of proposed remedial measures.

(g) *Item 8.* Specify NRC, EPA, or DA standards that are applicable and effective date of the regulation.

(h) *Items 9, 10 and 11.* Complete according to instructions (a through f above).

(5) *Noise Pollution.*

(a) *Item 2.* Specify the character of the noise if known or by answering the following questions:

1. Is the noise impulsive or nonimpulsive?

2. Is the noise on continuously or is it on-and-off intermittently?

3. When the noise is on, is it steady in level, or does the level of loudness fluctuate?

4. Is there a discernible tone or whine in the noise?

(b) *Item 3.* Specify: (1) The sound level, if measured, and the measurement methodology utilized; (2) the elevation of the noise source, and the distance from the source to the noise impacted area; (3) identify the facilities or areas affected including the nature of the activities affected by the noise intrusions; e.g., churches, schools, hospitals, homes, recreational areas, offices and business areas, etc., and (4) whether areas affected are on or off-post. Technical assistance on identification and characterization of noises should be requested from Commander, US Army Health Services Command (HSC-PA), Fort Sam Houston, TX 78234.

(c) *Item 4.* Identify the specific source of noise pollution which requires control. Report as a minimum, those sources which have been the subject of citizen complaints.

(d) *Item 5.*

1. Give description of existing level of noise control provided in terms of noise control management techniques such as engineering noise reduction, land use planning, or administrative procedures on controlling the source, path or receptor.

2. State if sources of acoustic expertise were provided by an acoustical laboratory within the Army, or from commercial acoustical consultants to obtain noise level data.

(e) *Item 6.* Describe the effectiveness of existing treatment and control measures.

(f) *Item 7.* Describe any remedial measures proposed and estimated effect in correcting the noise problem.

(g) *Item 8.* Specify those portions and effective dates of applicable Federal, State, or local noise regulations, statutes, standards to which the project responds, and the acceptable sound level permitted thereafter. If no regulations are known to apply, indicate if the nature of citizen complaints would justify some form of corrective action.

(h) *Item 9.* Indicate the project schedules proposed to comply with standards listed in item 8. If the schedule for achieving compliance differs from statutory or regulatory laws, indicate the dates the requirements will be met and explain the reasons therefor.

(i) *Item 10.*

1. Identify the complaints received on the noise source in terms of the nature and number of complaints, source of complaints (military or civilian) and how they were registered with the installation (e.g., petitions, phone calls, letters, telegrams, etc.).

2. Indicate if any legal actions are anticipated or have been initiated against the installation as a result of this reported source of environmental noise pollution.

(j) *Item 11.* Provide funding requirements.

(6) *Pesticides and hazardous/toxic materials.*

(a) Projects to be reported should involve

**10-5**

US_00000133

the control and abatement of pesticide and hazardous/toxic material pollution. Do not describe proposed and/or current programs involving the use of pesticides. Examples of pollution control projects would be measures to correct inadequate storage or disposal facilities to clean up land areas contaminated as a result of a pesticide spill, to provide mixing sinks and bathing facilities for personnel to repackage leaking chemical stocks, etc.

(b) *Item 2.* Identify the pesticide or chemical that is the source of pollution and indicate the reason for correcting existing conditions.

(c) *Items 3 thru 6.* Complete according to instructions (a through f above).

(d) *Item 7.* Describe the proposed method of disposal or nature of proposed corrective action.

(e) *Items 8 thru 11.* Complete according to instructions (a through f above).

(7) *Environmental Management.*

(a) Exhibit 1-EM (fig. 10-2) will be used to identify needed resources not included in an Exhibit 1 prepared in accordance with a previous paragraph but are required to comply with the provisions of this regulation. Items to be reported are those needed for the management of an installation environmental program and can logically include:

*1.* NEPA resources—Preparation of Environmental Assessments and Environmental Impact Statements.

*2.* Manpower resources—Full-time environmental coordinators, staff officers, instructors, etc.

*3.* Training—Schooling for operators (i.e., sewage treatment plant operators, lab technicians, pesticide applicators); training for management personnel (i.e., environmental coordinator, sanitary engineers, etc.).

*4.* Environmental surveys—Ecological or archeological surveys of an installation to obtain information needed for an Environmental Impact Assessment or an Environmental Impact Statement (EIA or EIS).

*5.* Special studies—Technical or engineering studies to define sources of pollution and identify possible remedial measures.

*6.* Other—Specify.

(b) *Item 2.* Identify the basic requirement using the identifications in subparagraphs *1* through *6* above.

(c) *Item 3.* Explain the requirement and provide a brief justification for any new or additional resources needed for the management of the installation environmental program.

(d) *Item 4.* List only those items which are quantifiable, such as number of personnel required, special equipment items, school courses, man-year requirements for studies, etc. by fiscal year.

(e) *Item 5.* Cite one-time costs or 5-year projected costs by appropriation as applicable.

(f) *Item 6.* List other relevant information and specify. (See fig. 10-9 and f above.)

h. Sample exhibits—Examples of Exhibit 1's for each of the media are shown in figures 10-3 through 10-9.

**10-7. Exhibit 2—Status Report.** a. Exhibit 2 is a command report which provides a financial summary of the projects in the program and their status. A separate Exhibit 2 is required for each media or category of projects (i.e., air, water, noise, solid waste, etc.) and will be submitted semiannually along with Exhibit 1's on 15 November and 15 May of each year.

b. Exhibit 2 will include all active projects plus those completed or discontinued subsequent to the submission of the previous report. Once a project is reported as completed or discontinued, it will be dropped from the report. The 15 May report will contain all projects which the command will submit in the next fiscal year budget. In addition, the 15 November report will reflect congressional appropriation action taken on the prior fiscal year budget.

c. The initial Exhibit 2's for each media will be prepared by the reporting command using the format in figure 10-10. Subsequent reports will be only an update of the previous command report. As each Exhibit 2 is received from a command, it will be converted to an ADP printout and returned to the reporting command by DAEN-FEU in 45-60 days for use in the next report update. The following updating procedures will be observed:

(1) One copy of a marked-up printout of the previous Exhibit 2 will accompany the semiannual report.

(2) Corrections, changes and additions will be made neatly with a RED marking pen.

**10-6**

US_00000134

(3) An asterisk in the left margin will be used to identify projects which have been completed, discontinued or changed.

(4) New projects will be added to the bottom of the appropriate media printout.

(5) Exhibit 2's submitted on 15 May will contain the amount included or proposed to be included in the President's budget for each project, or the amount actually appropriated or funded.

(6) Major Command updating will be done only for *non-MCA funded* projects. MCA funded project status will be updated by DAEN–FEU.

(7) Each revision of Exhibit 2 will reflect the information as of 20 October and 20 April as appropriate.

(8) Funding totals by appropriation type for each fiscal year and for each media reported will be provided at the bottom of the last page.

(9) Current and relevant information will be presented in the "Status" column using the following format:

(a) Indicate "PP____" if the project is in the preliminary planning stage. The blank provided should contain the estimated completion date for construction.

(b) Indicate "DES____" if the project is under design or has been designed, but is *not* under construction. The blank provided should contain the estimated completion date for construction and not the completion date of design.

(c) Indicate "CON____" if the project is under construction. The blank provided should contain the estimated completion date.

(d) Indicate "CPL____" if the project has been completed. The blank provided should contain the actual completion date.

(e) Indicate "DIS" if the project has been discontinued or dropped. Reasons should be given.

(f) Indicate "DEF" if the project has been deferred or significantly delayed. Reasons for and what corrective actions taken, if any, should be given.

(g) Indicate "OTH" if other than the

above circumstances apply. An explanation should be given.

**10–8. Exhibit 3—Narrative Report.** a. The narrative report will be a brief summary of the command environmental program. No specific format is prescribed; however, it will contain the following:

(1) Financial displays for the current FYDP period by appropriation account (MCA, PA, OMA, etc.) and by program media (air, water, noise, etc.) The elements of the program presented in the Exhibit 1–EM are to be aggregated by management activity to identify funding requirements for training, preparation of EIA/EIS, environmental surveys and studies, personnel costs, etc.

(2) An explanation of the environmental objectives to be achieved by completing the projects reported or funding those activities contained in Exhibit 1's. For any specific portion of the program that requires more than 12 months to complete, identify the major milestones for accomplishing the actions.

(3) Elements of the command program that will be given particular emphasis over the short term.

(4) Projection of when statutory pollution control requirements, Federal or State, will be satisfied by the various elements of a command.

(5) Summary of potential or pending environmental litigation involving installations within the command.

(6) Explanation of anticipated problem areas requiring DA assistance.

b. The content of the narrative report is basically a forecast of how the major command intends to accomplish its environmental program during the succeeding 12 months. This requirement should not be confused with the requirement for the annual status report (RCS DD–I&L(A)1269), specified in paragraph 1–9, chapter 1 of this regulation, which is an annual summary of environmental protection accomplishments for the specified preceding calendar year.

US_00000135

EXHIBIT 1
Circular No. A-106

ENVIRONMENTAL POLLUTION CONTROL
Proposed Project Report

AGENCY:                                          Project No.:
Media:                                           Date Prepared:
                                                 Date Revised:
                          GSA Inventory Control No.:

1. Facility:

   Name:
   Address: (city, county, state)
   Agency Contact: (name, title, telephone)

2. Specific Type of Pollution:

3. Amount of Pollution:

4. Pollution Source, and Discharge, Emission, or Deposit Point:

5. Existing Treatment and Other Control Measures:

6. Effectiveness of Existing Treatment and Control:

7. Remedial Measures Proposed and Estimated Effect in Correcting Problem:

8. Applicable Standards: (Cite the specific State, interstate, local, or Federal regulation and specific requirement for which the project is needed.)

9. Project Schedule:

| | Agency Schedule Mo./Year | Regulation Schedule Mo./Year |
|---|---|---|
| Design (Completion) | | |
| Construction (Start) | | |
| Construction (Completion) | | |
| Operation (Start) | | |
| Final Compliance | | |

10. Other Relevant Information:

11. Funding Schedule:

*Figure 10-1*

10-8

US_00000136

EXHIBIT 1-EM

ENVIRONMENTAL POLLUTION CONTROL
Proposed Management Requirement

Date Prepared:
Date Revised:
GSA Inventory Control No.:

1. Facility:

   Name:
   Address: (City, county, state)
   Agency Contact: (Name, title, telephone)

2. Resource Identification:

3. Explanation and Justification of Resource Requirement: Identify why resources, personnel and/or funds are needed for the "management" or conduct of the installation environmental program.

4. Proposed Resource Schedule: List by fiscal year for the period of the FYDP, when applicable.

5. Funding: Indicate appropriation account, amounts by fiscal year and whether amount is programed or unprogramed.

6. Other Relevant Information:

*Figure 10-2*

US_00000137

EXAMPLE
EXHIBIT 1
Circular No. A–106

ENVIRONMENTAL POLLUTION CONTROL
Proposed Project Report

AGENCY: Department of the Army
Media: air

Project No.: A–078C
Date Prepared: 5/26/73
Date Revised: 2/11/74

GSA Inventory Control No.:

1. Facility:

Name: ABC Army Ammunition Plant
Address: Kingstown, George County, SC
Agency Contact:   MJR B.A. Smith Facility Engineer
                          (615) 765–4321

2. Specific Type of Pollution: $NO_2$

3. Amount of Pollution: 4,500 #/hr when process is operated at maximum rate.

4. Pollution Source, and Discharge, Emission, or Deposit Point: Nitric Acid Plant No. 13, Bldg. A.

5. Existing Treatment and Other Control Measures: NO control measures.

6. Effectiveness of Existing Treatment and Control: 0% Removal efficiency.

7. Remedial Measures Proposed and Estimated Effect in Correcting Problem:
   Construct packed column control device 94% efficient to achieve full compliance.

8. Applicable Standards:
   (1) State: State Air Code, Chapter V, S113.a(ii)
   (2) Region:
   (3) Actual standard or exact citation: Maximum of 450 #/hr allowed as per the XYZ test method; effective date of emission standard is 1/31/72.

9. Project Schedule:

| | Agency Schedule Mo./Year | Regulation Schedule Mo./Year |
|---|---|---|
| Design (Completion) _____ | 4/74 | 4/74 |
| Construction (Start) _____ | 10/74 | 9/74 |
| Construction (Completion) _____ | 1/75 | 11/74 |
| Final Operation (Start) _____ | 6/75 | 5/75 |
| Final Compliance _____ | 7/75 | 9/75 |

Explanation of difference between items 8 and 9: project advanced to provide margin of safety.

10. Other Relevant Information:
    Citizens complaints received on 12/15/73.
    Suits initiated on 12/30/73 by Onaconda Environmental Study Group.

*Figure 10–3*

US_00000138

11. <u>Funding (PEMA):</u>
    <u>(Thousands, $000)</u>

| | FY 76 | FY 77 | FY 78 | FY 79 | FY 80 |
|---|---|---|---|---|---|
| Programed ($000)* | 875 | 0 | 0 | 0 | 0 |
| Unprogramed | 0 | 0 | 0 | 0 | 0 |

*Included as part of plant modernization program.

*/2A*

*Figure 10-3*—Continued.

10-11

US_00000139

EXAMPLE
EXHIBIT 1
Circular No. A-106

ENVIRONMENTAL POLLUTION CONTROL
Proposed Project Report

AGENCY: Department of the Army                Project No.: A-999b.
Media: Water                                  Date Prepared: 2/29/72
                                              Date Revised: 12/26/73
                                  GSA Inventory Control No.: 45678

1. Facility:

   Name: Camp Faraway
   Address: Mulch City, Enny County, SD
   Agency Contact:  Col. John Smith, Facilities Engineer
                    (615) 755-0022

2. Specific Type of Pollution:
   Domestic sewage, partly treated. Existing treatment plant overloaded. Excess flow bypassed to river. Influent includes small amounts (.01 mgd) of filter backwash from water treatment plant containing precipitates of alum, iron, and manganese.

3. Amount of Pollution:
   Total flow: 6.2 mgd. Treated: 4.0 mgd.

4. Pollution Source, and Discharge, Emission, or Deposit Point:
   Secondary treatment plant discharges to Obstacle River, 3 miles below Mulch City water supply intake.

5. Existing Treatment and Other Control Measures:
   Secondary—high rate trickling filter plant, final sedimentation, and chlorination. Design Capacity = 4.0 mgd.

6. Effectiveness of Existing Treatment and Control:

| Principal Constituent | Influent | Treated Effluent | % Removal |
|---|---|---|---|
| BOD 5 | 235 ppm | 36 ppm | 83 |
| Suspended solids | 392 ppm | 60 ppm | 85 |
| Total phosphorous as P | 8.98 ppm | 4.67 ppm | 48 |
| Total Nitrogen as N | 24.96 ppm | 21.14 ppm | 15 |

7. Remedial Measures Proposed and Estimated Effect in Correcting Problem:
   Replace existing treatment plant with AWT plant: chemical/activated sludge/multi-media filtration to achieve 95 percent removals or better. Design capacity = 7.5 mgd.

8. Applicable Standards:
   State Standards:
      SD Code: Water Poll—Chapter 61, 1960 Supp.
      SD Code: Public Health—Chapter 27, 1960 Supp.
      Water Quality Standards for Surface Waters: Reg E-1.10A (Rev.)
   Federal Regulations:  40 CFR 125,133
                         PL 92-500, SS 301, 313
                         PL 92-500, S 402-NPDES
                         NPDES Permit Number—SD0012345
                         Permit Period—1974-1979

*Figure 10-4*

10-12

US_00000140

9. Project Schedule:

| | Agency Schedule Mo./Year | Regulation Schedule Mo./Year |
|---|---|---|
| Design (Completion) | 4/75 | N/A |
| Construction (Start) | 6/75 | 5/75 |
| Construction (Completion) | 2/77 | 1/77 |
| Operation (Start) | 4/77 | N/A |
| Final Compliance | 6/77 | 7/77 |

Regulation schedule as required by NPDES permit.
State water quality standard requires adequate secondary treatment by 1/74.
Unable to meet State requirement because of design problems and funding cycle. State has permitted delay on condition NPDES permit deadline is met.

10. Other Relevant Information:
Installation may become surplus in FY 75 or FY 76 leading to project discontinuance.

11. Funding (MCA):

| | FY 76 | FY 77 | FY 78 | FY 79 | FY 80 |
|---|---|---|---|---|---|
| Programed ($000) | 0 | 8,000 | 0 | 0 | 0 |
| Unprogramed | 0 | 0 | 0 | 0 | 0 |

*Figure 10-4*—Continued.

US_00000141

EXAMPLE
EXHIBIT 1
Circular No. A–106

ENVIRONMENTAL POLLUTION CONTROL
Proposed Project Report

AGENCY: Department of the Army
Media: Solid Waste

Project No.: A–001
Date Prepared: 2/11/74
Date Revised:
GSA Inventory Control No.:

1. Facility:

   Name: Camp Faraway
   Address: Mulch City, Enny County, SD
   Agency Contact:   Col. John Smith, Facilities Engineer
                     (615) 755–0022

2. Specific Type of Pollution:
   Camp landfill.

3. Amount of Pollution:
   Leachate of high BOD concentration.

4. Pollution Source, and Discharge, Emission, or Deposit Point:
   Landfill is used for disposal of installation wastes. Due to frequent rains, wastes build up high moisture content and leachate, which emanates from side of fill. Also, area is noted to be a common breeding ground for flies and mosquitos, and is generally unsightly.

5. Existing Treatment and Other Control Measures:
   a. Landfill receives 10 tons per day of solid waste altogether, 5 from the Camp and 5 from the nearby Lindberg Air Base. It consists mainly of normal municipal-type wastes delivered on Monday, Wednesday and Friday of each week. Once a week a large load of oily rags is dumped in one corner of the landfill site.
   b. Landfill was first opened in Summer of 1970 and is designed to operate until 1990.
   c. Some control of run-off waters is exercised by a trench on the downhill side of landfill draining into a settling pond.

6. Effectiveness of Existing Treatment and Control:
   Trench prevents run-off waters from entering local bay waters, but does not solve vector, or aesthetic problems, nor does it minimize the amount of leachate forming.

7. Remedial Measures Proposed and Estimated Effect in Correcting Problem:
   Purchase of bulldozer to compact and cover wastes, minimize formation of leachate, control vectors, and improve general appearance. Relocate landfill to area with better drainage.

8. Applicable Standards:
   EPA Guidelines for Land Disposal of Solid Wastes, published in Federal Register July 1, 1974, requirements under sections 241.204, 241.207, 241.208, 241.209, and 241.210.

*Figure 10–5*

US_00000142

9. <u>Project Schedule</u>:

|  | Agency Schedule<br>Mo./Year | Regulation Schedule<br>Mo./Year |
|---|---|---|
| Design (Completion) | N/A | N/A |
| Construction (Start) | N/A | N/A |
| Construction (Completion) | N/A | N/A |
| Begin Procurement Action | 7/75 | N/A |
| Operation (Start) | 7/76 | N/A |
| Final Compliance | 7/76 | N/A |

10. <u>Other Relevant Information</u>:
Station planning to build an incinerator in 1980 to extend life of landfill.

11. <u>Funding (PEMA)</u>:

|  | FY 76 | FY 77 | FY 78 | FY 79 | FY 80 |
|---|---|---|---|---|---|
| Programed | 0 | 0 | 0 | 0 | 0 |
| Unprogramed ($000) | 30 | 0 | 0 | 0 | 0 |

<u>Funding (OMA)</u>:

|  | FY 76 | FY 77 | FY 78 | FY 79 | FY 80 |
|---|---|---|---|---|---|
| Programed ($000)<br>(Engr'g Study) | 3 | 0 | 0 | 0 | 0 |
| Unprogramed ($000)<br>(Const new landfill) | — | 10 | — | — | — |

*Figure 10–5*—Continued.

US_00000143

EXAMPLE
EXHIBIT 1
Circular No. A-106

*          ENVIRONMENTAL POLLUTION CONTROL
Proposed Project Report

AGENCY: Department of the Army                     Project No.: A-001
Media: Radiation                                   Date Prepared: 6/14/74
                                                   Date Revised: 6/15/74
                                        GSA Inventory Control No.:

1. Facility

   Name: Camp Faraway, Power Reactor
   Address: Mulch City, Enny County, SD
   Agency Contact:   Col. John Smith, Facilities Engineer
                     (615) 755-0022

2. Specific Type of Pollution:
   Tritium in primary water cooling system.

3. Amount of Pollution:
   Tritium concentrations exceed new NRC, EPA and DA standards for discharge
   of primary coolant water.

4. Pollution Source and Discharge, Emission or Deposit Point:
   Primary coolant water discharged to holding tank and then periodically released to Lake Enny.

5. Existing Treatment and Other Control Measures:
   Holding tank before release to lake.

6. Effectiveness of Existing Treatment and Control:
   Only limited decay obtained from retention in holding tank.

7. Remedial Measures Proposed and Estimated Effect in Correcting Problem:
   Redesign holding tank system to include addition of ion exchanger.

8. Applicable Standards and Regulations:

   10 CFR Parts 20 and 50, 40 CFR Part 190 and AR 385-80.

*Figure 10-6*

US_00000144

9. <u>Project Schedule</u>:

|  | Agency Schedule<br>Mo./Year | Regulation Schedule<br>Mo./Year |
|---|---|---|
| Design (Completion) _____ | 2/75 | N/A |
| Construction (Start _____ | 5/75 | N/A |
| Construction (Completion) _____ | 7/75 | N/A |
| Operation (Start) _____ | 8/75 | N/A |
| Final Compliance _____ | 8/75 | N/A |

10. <u>Other Relevant Information</u>:
None.

11. <u>Funding (MCA)</u>:
(account)

|  | FY 76 | FY 77 | FY 78 | FY 79 | FY 80 |
|---|---|---|---|---|---|
| Program ($000) _____ | 375 | _____ | _____ | _____ | _____ |

*Figure 10-6*—Continued.

US_00000145

EXAMPLE
EXHIBIT 1
Circular No. A–106

ENVIRONMENTAL POLLUTION CONTROL
Proposed Project Report

AGENCY: Department of the Army                    Project No.: A–001
Media: Noise                                                   Date Prepared: 6/1/74
                                                                      Date Revised:
                                          GSA Inventory Control No.: 45678

1. Facility:

   Name: Camp Faraway
   Address: Mulch City, Enny County, SD
   Agency Contact:   Col. John Smith, Facilities Engineer
                             (615) 755–0022

2. Specific Type of Pollution:
   Noise is broadband with discernible tones. (Noise is nonimpulsive; it is continuous at a steady
   in level, but with a discernible tone).

3. Amount of Pollution:
   The source measures 75 dBA at the property line. Source is 20 feet from boundary line at a
   height of 15 feet.
   Facilities or areas affected: Civilian school and housing (off the installation).

4. Pollution Source, and Discharge, Emission, or Deposit Point:
   One power plant with forced draft fans and cooling tower.

5. Existing Treatment and Other Control Measures:
   No noise control exists.
   Acoustic expertise—Acoustics, Inc., Chicago, IL.

6. Effectiveness of Existing Treatment and Control:
   None.

7. Remedial Measures Proposed and Estimated Effect in Correcting Problem:
   Installation of commercially available mufflers on all forced draft fans and noise enclosure on
   cooling tower. It is expected that this action will lower the sound level below the background
   noise.

8. Applicable Standards:
   Mulch Noise Ordinance, Section 4–12, Chapter 17 of the Municipal Code of Mulch, requires that
   the noise level at the boundary line in business and commercial districts not exceed 62 dBA.

*Figure 10–7*

US_00000146

9. Project Schedule:

| | Agency Schedule Mo./Year | Regulation Schedule Mo./Year |
|---|---|---|
| Design (Completion) _____ | 9/76 | N/A |
| Construction (Start) _____ | 11/74 | N/A |
| Construction (Completion) _____ | 2/77 | N/A |
| Operation (Start) _____ | 3/77 | N/A |
| Final Compliance _____ | 4/77 | N/A |

The standards require immediate compliance. Agency schedule provides for earliest possible installation of control measures.

10. Other Relevant Information:
   (a) Community complaints have included 26 telephone calls, 15 letters, and 3 personal visits. Nature of complaints centered upon annoyance. (Log of noise complaints attached.)
   (b) Legal action has not been initiated, but may be by County School Board.

11. Funding (OMA):
   (a) Mufflers on forced draft fans

| | FY 76 | FY 77 | FY 78 | FY 79 | FY 80 |
|---|---|---|---|---|---|
| Programed ($000) _____ | _____ | 25 | _____ | _____ | _____ |
| Unprogramed _____ | _____ | _____ | _____ | _____ | _____ |

   (b) Enclosures on cooling tower

| | FY 76 | FY 77 | FY 78 | FY 79 | FY 80 |
|---|---|---|---|---|---|
| Programed _____ | _____ | _____ | _____ | _____ | _____ |
| Unprogramed ($000) _____ | _____ | 10 | _____ | _____ | _____ |

*Figure 10-7*—Continued.

US_00000147

EXAMPLE<br>
EXHIBIT 1<br>
Circular No. A-106

ENVIRONMENTAL POLLUTION CONTROL<br>
Proposed Project Report

AGENCY: Department of the Army                         Project No.: A-002
Media: Pesticides & Hazardous/Toxic Materials          Date Prepared: 9/15/74
                                                       Date Revised:
GSA Inventory Control No.:

1. <u>Facility</u>:

   Name: Camp Faraway
   Address: Mulch City, Enny County, SD
   Agency Contact:   Col. John Smith, Facilities Engineer
                     (615) 755-0022

2. <u>Specific Type of Pollution</u>:
   The following pesticides registered for the control of pests: malathion, diazinon, chlorpyrifos, propoxur, lindane, chlordane.

3. <u>Amount of Pollution</u>:
   Quantities of pesticide concentrate mixed per month:
   Malathion, 10 gal; diazinon, 10 gal; chlorpyrifos, 7 gal; propoxur, 10 gal; lindane, 2 gal; chlordane, 10 gal.

4. <u>Pollution Source, and Discharge, Emission, or Deposit Point</u>:
   N/A.

5. <u>Existing Treatment and Other Control Measures</u>:
   Mixing sink with sump.

6. <u>Effectiveness of Existing Treatment and Control</u>:
   Sink too small. Inadequate neutralization and sump capacity. Requires manual baling.

7. <u>Remedial Measures Proposed and Estimated Effect in Correcting Problem</u>:
   Replace small mixing sink with larger double mixing sink. Install a neutralization and holding tank with sump pump for pesticide rinses.

8. <u>Applicable Standards</u>:
   Executive Order #11643—Environmental Safeguards on Activities for Animal Damage Control on Federal Lands, February 8, 1972. Additionally, the EPA, under statutory authority of Section 4, Federal Insecticide, Fungicide, and Rodenticide Act, as amended by the Federal Environmental Pesticide Control Act.

9. <u>Project Schedule</u>:

| | Agency Schedule Mo./Year | Regulation Schedule Mo./Year |
|---|---|---|
| Design (Completion) | 10/75 | N/A |
| Construction (Start) | 1/76 | N/A |
| Construction (Completion) | 3/76 | N/A |
| Operation (Start) | 4/76 | N/A |

<i>Figure 10-8</i>

US_00000148

10. <u>Other Relevant Information</u>:
    Other stocks of suspended or finally cancelled pesticides will be stored until proper disposal methods are developed.
    Inventory:   5 percent DDT in oil—350 gallons
                 75 percent DDT wettable powder—220 lb.

11. <u>Funding Schedule (OMA)</u>:

|                    | FY 76 | FY 77 | FY 78 | FY 79 | FY 80 |
|--------------------|-------|-------|-------|-------|-------|
| Programed ($000)   | 3.0   | 0     | 0     | 0     | 0     |
| Unprogramed        | 0     | 0     | 0     | 0     | 0     |

*Figure 10-8*—Continued.

US_00000149

EXHIBIT 1–EM

ENVIRONMENTAL POLLUTION CONTROL
Proposed Management Report

Date Prepared: 1 Oct 74
Date Revised:
GSA Inventory Control No.: <u>12345</u>

1. <u>Facility</u>:

Name: Fort Stoner
Address: Podunk, Organ County, SD
Agency Contact:   COL J. J. Jones, Facility Engineer,
                  AV 823–1555.

2. <u>Resource Identification</u>:
Training.

3. <u>Explanation and Justification of Resource Requirement</u>:
Training is required for sewage treatment plant superintendent, operators and laboratory technician to meet certification standards of South Dakota. A new sewage treatment plant will be put into operation in December 1975 and trained personnel will be required to operate it. Current personnel are not familiar with the operation of the new plant and require instructions on State requirements and standards.

4. <u>Proposed Resource Schedule</u>:
Training offered at University of South Dakota. Attendance at one-week courses is as follows:

|                    | FY 75 | FY 76 | FY 77 | FY 78 | FY 79 |
|--------------------|-------|-------|-------|-------|-------|
| Superintendent     | 1     |       |       |       |       |
| Operator           |       | 2     | 2     | 1     | 1     |
| Lab Technician     |       | 1     |       |       |       |

5. <u>Funding (OMA)</u>:

|                     | FY 75 | FY 76 | FY 77 | FY 78 | FY 79 |
|---------------------|-------|-------|-------|-------|-------|
| Programed ($000)    | 0.2   | 0.6   |       |       |       |
| Unprogramed ($000)  |       |       | 0.4   | 0.2   | 0.2   |

6. <u>Other Relevant Information</u>:
Outyear requirements reflect training for new hires.

*Figure 10–9*

US_00000150

**EXHIBIT 2**

_____ POLLUTION STATUS REPORT

(Media)

Appropriation Account: _____ (OMA, MCA, etc.)

AGENCY: _____

AGENCY CONTACT: _____

TELEPHONE: _____

Page _____ of _____

Reporting Date _____

| Project No. | Project Name & Location (GSA Inventory Control No.) | PROJECT COSTS ($1,000's) | Present Cost Estimate | Status |
|---|---|---|---|---|
| | | Amt. in President's Budget or Agency Plan or amount appropriated or funded | | |
| | | FY-2  FY-1  Current FY  FY+1  FY+2  FY+3 | | |
| | | | | |

Note: Provide totals on the last page for each appropriation account.

_Figure 10-10_

US_00000151

US_00000152

APPENDIX

PROCEDURES FOR THE PROTECTION OF HISTORIC AND CULTURAL
PROPERTIES

FRIDAY, JANUARY 25, 1974
WASHINGTON, DC

Volume 39—Number 18

PART II

FEDERAL REGISTER

ADVISORY COUNCIL ON
HISTORIC PRESERVATION

PROCEDURES FOR THE
PROTECTION OF
HISTORIC AND CULTURAL
PROPERTIES

Establishment of New Chapter and Part

US_00000153

### Title 36—Parks, Forests, and Public Property

## CHAPTER VIII—ADVISORY COUNCIL ON HISTORIC PRESERVATION

### PART 800—PROCEDURES FOR THE PROTECTION OF HISTORIC AND CULTURAL PROPERTIES

Pursuant to the National Historic Preservation Act of 1966 (80 Stat. 915, 16 U.S.C. 470) and Executive Order 11593, May 13, 1971, "Protection and Enhancement of the Cultural Environment" (36 FR 8921, 16 U.S.C. 470), the Advisory Council on Historic Preservation has established Procedures for Compliance, set forth in the FEDERAL REGISTER of February 28, 1973 (38 FR 5388), to implement the purpose of those authorities. Proposed revisions to those procedures were published in the FEDERAL REGISTER of November 5, 1973 (38 FR 30464) and 30 days were allowed for public comment. Federal agencies were also solicited to consult with the Advisory Council with regard to the development of procedures for the protection of non-federally owned historic and cultural properties as required by section 1(3) of Executive Order 11593.

In response to comments received by the Advisory Council and in consultation with Federal agencies, the proposed procedures have been revised to incorporate suggestions from the Federal and State agencies and private citizens. It is the purpose of this notice, through publication of revised "Procedures for the Protection of Historic and Cultural Properties," to apprise the public as well as government agencies, associations, and all other organizations and individuals interested in historic preservation, that the following procedures are hereby adopted as set forth below. The procedures will appear in the Code of Federal Regulations in Title 36, Chapter 8 at Part 800. The procedures are being codified because they affect State and local governmental agencies, private organizations, and individuals, in addition to Federal agencies, to which they are specifically directed, and because of the resultant need to make them widely and readily available.

Federal agencies are advised that the procedures set forth certain steps for agencies to follow to fulfill their obligations pursuant to section 1(3) of Executive Order 11593 and to use as a guide in the development of their required internal procedures in consultation with the Council. The Advisory Council reiterates its solicitation of Federal agencies to consult with the Council on the development of those procedures. Inquiries regarding such consultation, as well as inquiries regarding the substance of and compliance with the procedures in general, should be directed to the Executive Secretary, Advisory Council on Historic Preservation, Suite 430, 1522 K Street NW., Washington, D.C. 20005.

Effective date: January 25, 1974.

ROBERT R. GARVEY, Jr.,

*Executive Director, Advisory Council on Historic Preservation.*

### RULES AND REGULATIONS

A new Chapter VIII, Advisory Council on Historic Preservation, containing Part 800, Procedures for the Protection of Historic and Cultural Properties, is added to title 36, CFR, reading as set forth below.

Sec.
800.1   Purpose and authorities.
800.2   Coordination with agency requirements under the National Environmental Policy Act.
800.3   Definitions.
800.4   Agency procedures.
800.5   Consultation process.
800.6   Council procedures.
800.7   Other powers of the Council.
800.8   Criteria of effect.
800.9   Criteria of adverse effect.
800.10  National Register criteria.

AUTHORITY: Pub. L. 89–665, 80 Stat. 915, (16 U.S.C. 470); E.O. 11593, 3 CFR 1971 Comp., p. 154.

§ 800.1 Purpose and authorities.

(a) The National Historic Preservation Act of 1966 created the Advisory Council on Historic Preservation, an independent agency of the Executive branch of the Federal Government, to advise the President and Congress on matters involving historic preservation. Its members are the Secretary of the Interior, the Secretary of Housing and Urban Development, the Secretary of the Treasury, the Secretary of Commerce, the Attorney General, the Secretary of Transportation, the Secretary of Agriculture, the Administrator of the General Services Administration, the Secretary of the Smithsonian Institution, the Chairman of the National Trust for Historic Preservation and 10 citizen members appointed by the President on the basis of their outstanding service in the field of historic preservation.

(b) The Council reviews Federal, federally assisted, and federally licensed undertakings affecting cultural properties as defined herein in accordance with the following authorities:

(1) *Section 106 of the National Historic Preservation Act.* Section 106 requires that Federal, federally assisted, and federally licensed undertakings affecting properties included in the National Register of Historic Places be submitted to the Council for review and comment prior to the approval of any such undertaking by the Federal agency.

(2) *Section 1(3) of Executive Order 11593, May 13, 1971, "Protection and Enhancement of the Cultural Environment."* Section 1(3) requires that Federal agencies, in consultation with the Council, establish procedures regarding the preservation and enhancement of non-federally owned historic and cultural properties in the execution of their plans and programs. After soliciting consultation with the Federal agencies, the Advisory Council has adopted procedures, set forth in §§ 800.3 through 800.10, to achieve this objective and Federal agencies should fulfill their responsibilities under section 1(3) by following these procedures. The Council further recommends that Federal agencies use these procedures as a

US_00000154

RULES AND REGULATIONS

guide in the development, in consultation with the Council, of their required internal procedures.

(3) *Section 2(b) of Executive Order 11593, May 13, 1971, "Protection and Enhancement of the Cultural Environment."* Federal agencies are required, by section 2(a) of the Executive Order, to locate, inventory, and nominate properties under their jurisdiction or control to the National Register. Until such processes are complete, Federal agencies must submit proposals for the transfer, sale, demolition, or substantial alteration of federally owned properties eligible for inclusion in the National Register to the Council for review and comment. Federal agencies must continue to comply with section 2(b) review requirements, even after the initial inventory is complete, when they obtain jurisdiction or control over additional properties that are eligible for inclusion in the National Register or when properties under their jurisdiction or control are found to be eligible for inclusion in the National Register subsequent to the initial inventory.

### § 800.2 Coordination with agency requirements under the National Environmental Policy Act.

Section 101(b) (4) of the National Environment Policy Act (NEPA) declares that one objective of the national environmental policy is to "preserve important historic, cultural, and natural aspects of our national heritage and maintain, wherever possible, an environment which supports diversity and variety of individual choice." In order to meet this objective, the Advisory Council instructs Federal agencies to coordinate NEPA compliance with the separate responsibilities of the National Historic Preservation Act and Executive Order 11593 to ensure that historic and cultural resources are given proper consideration in the preparation of environmental impact statements. Agency obligations pursuant to the National Historic Preservation Act and Executive Order 11593 are independent from NEPA and must be complied with even when an environmental impact statement is not required. However, where both NEPA and the National Historic Preservation Act or Executive Order 11593 are applicable, the Council on Envirnomental Quality, in its *Guidelines for the Preparation of Environmental Impact Statements* (40 CFR Part 1500), directs that compliance with section 102(2)(C) of NEPA should, to the extent possible, be combined with other statutory obligations—such as the National Historic Preservation Act and Executive Order 11593—to yield a single document which meets all applicable requirements. To achieve this objective, Federal agencies should undertake, to the fullest extent possible, compliance with the procedures set forth below whenever properties included in or eligible for inclusion in the National Register are involved in a project to ensure that obligations under the National Historic Preservation Act and Executive Order 11593 are fulfilled during the preparation of a draft environmental impact statement required under section 102(2) (C) of NEPA. The Advisory Council recommends that compliance with these procedures be undertaken at the earliest stages of the environmental impact statement process to expedite re-

view of the statement. Statements on projects affecting properties included in or eligible for inclusion in the National Register should be sent directly to the Advisory Council for review. All statements involving historic, architectural, archeological, or cultural resources, whether or not included in or eligible for inclusion in the National Register, should be submitted to the Department of Interior for review.

### § 800.3 Definitions.

As used in these procedures:

(a) "National Historic Preservation Act" means Public Law 89–665, approved October 15, 1966, an "Act to establish a program for the preservation of additional historic properties throughout the Nation and for other purposes," 80 Stat. 915, 16 U.S.C. 470, as amended, 84 Stat 204 (1970) and 87 Stat. 139 (1973) hereinafter referred to as "the Act."

(b) "Executive Order" means Executive Order 11593, May 13, 1971, "Protection and Enhancement of the Cultural Environment," 36 FR 8921, 16 U.S.C. 470.

(c) "Undertaking" means any Federal action, activity, or program, or the approval, sanction, assistance, or support of any other action, activity or program, including but not limited to:

(1) Recommendations or favorable reports relating to legislation, including requests for appropriations. The requirement for following these procedures applies to both: Agency recommendations on their own proposals for legislation and agency reports on legislation initiated elsewhere. In the latter case only the agency which has primary responsibility for the subject matter involved will comply with these procedures.

(2) New and continuing projects and program activities: directly undertaken by Federal agencies; or supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance; or involving a Federal lease, permit, license, certificate, or other entitlement for use.

(3) The making, modification, or establishment of regulations, rules, procedures, and policy.

(d) "National Register" means the National Register of Historic Places, which is a register of districts, sites, buildings, structures, and objects, significant in American history, architecture, archeology, and culture maintained by the Secretary of the Interior under authority of section 2(b) of the Historic Sites Act of 1935 (49 Stat. 666, 16 U.S.C. 461) and section 101(a)(1) of the National Historic Preservation Act. The National Register is published in its entirety in the FEDERAL REGISTER each year in February. Addenda are published on the first Tuesday of each month.

(e) "National Register property" means a district, site, building, structure, or object included in the National Register.

(f) "Property eligible for inclusion in the National Register" means any district, site, building, structure, or object which the Secretary of the Interior determines is likely to meet the National Register Criteria. As these

US_00000155

determinations are made, a listing is published in the FEDERAL REGISTER on the first Tuesday of each month, as a supplement to the National Register.

(g) "Decision" means the exercise of agency authority at any stage of an undertaking where alterations might be made in the undertaking to modify its impact upon historic and cultural properties.

(h) "Agency Official" means the head of the Federal agency having responsibility for the undertaking or a subordinate employee of the Federal agency to whom such authority has been delegated.

(i) "Chairman" means the Chairman of the Advisory Council on Historic Preservation, or such member designated to act in his stead.

(j) "Executive Director" means the Executive Director of the Advisory Council on Historic Preservation established by Section 205 of the Act, or his designated representative.

(k) "State Historic Preservation Officer" means the official within each State, authorized by the State at the request of the Secretary of the Interior, to act as liaison for purposes of implementing the Act, or his designated representative.

(l) "Secretary" means the Secretary of the Interior, or his designee authorized to carry out the responsibilities of the Secretary of the Interior under Executive Order 11593.

§ 800.4  Agency procedures.

At the earliest stage of planning or consideration of a proposed undertaking, including comprehensive or area-wide planning in which provision may be made for an undertaking or an undertaking may be proposed, the Agency Official shall take the following steps to comply with the requirements of section 106 of the National Historic Preservation Act and sections 1(3) and 2(b) of Executive Order 11593.

(a) Identification of resources. As early as possible and in all cases prior to agency decision concerning an undertaking, the Agency Official shall identify properties located within the area of the undertaking's potential environmental impact that are included in or eligible for inclusion in the National Register.

(1) To identify properties included in the National Register, the Agency Official shall consult the National Register, including monthly supplements.

(2) To identify properties eligible for inclusion in the National Register, the Agency Offical shall, in consultation with the appropriate State Historic Preservation Officer, apply the National Register Criteria, set forth in Section 800.10, to all properties possessing historical, architectural, archeological, or cultural value located within the area of the undertaking's potential environmental impact. If the Agency Official determines that a property appears to meet the Criteria, or if it is questionable whether the Criteria are met, the Agency Official shall request, in writing, an opinion from the Secretary of the Interior respecting the property's elibility for inclu-

sion in the National Register. The Secretary of the Interior's opinion respecting the elibility of a property for inclusion in the National Register shall be conclusive for the purposes of these procedures.

(b) Determination of effect. For each property included in or eligible for inclusion in the National Register that is located within the area of the undertaking's potential environmental impact, the Agency Official, in consultation with the State Historic Preservation Officer, shall apply the Criteria of Effect, set forth in Section 800.8, to determine whether the undertaking has an effect upon the property. Upon applying the Criteria and finding no effect, the undertaking may proceed. The Agency Official shall keep adequate documentation of a determination of no effect.

(c) Effect established. Upon finding that the undertaking will have any effect upon a property included in or eligible for inclusion in the National Register, the Agency Official, in consultation with the State Historic Preservation Officer, shall apply the Criteria of Adverse Effect, set forth in § 800.9, to determine whether the effect of the undertaking is adverse.

(d) Finding of no adverse effect. Upon finding the effect not to be adverse, the Agency Official shall forward adequate documentation of the determination, including evidence of the views of the State Historic Preservation Officer, to the Executive Director for review. Unless the Executive Directive notes an objection to the determination within 45 days after receipt of adequate documentation, the Agency Official may proceed with the undertaking.

(e) Finding of adverse effect. Upon finding the effect to be adverse or upon notification that the Executive Director does not accept a determination of no adverse effect, the Agency Official shall: (1) Request, in writing, the comments of the Advisory Council; (2) notify the State Historic Preservation Officer of this request; (3) prepare a preliminary case report; and (4) proceed with the consultation process set forth in Section 800.5.

(f) Preliminary case report. Upon requesting the comments of the Advisory Council, the Agency Official shall provide the Executive Director and the State Historic Preservation Officer with a preliminary case report, containing all relevant information concerning the undertaking. The Agency Official shall obtain such information and material from any applicant, grantee, or other beneficiary involved in the undertaking as may be required for the proper evaluation of the undertaking, its effects, and alternate courses of action.

§ 800.5  Consultation process.

(a) Response to request for comments. Upon receipt of a request for advisory Council comments pursuant to Section 800.4(e), the Executive Director shall acknowledge the request and shall initiate the consultation process.

(b) On-site inspection. At the request of the Agency Official, the State Historic Preservation Office, or the Executive Director, the Agency Official shall conduct an

US_00000156

on-site inspection with the Executive Director, the State Historic Preservation Officer and such other representatives of national, State, or local units of government and public and private organizations that the consulting parties deem appropriate.

(c) *Public information meeting.* At the request of the Agency Official, the State Historic Preservation Officer, or the Executive Director, the Executive Director shall conduct a meeting open to the public, where representatives of national, State, or local units of government, representatives of public or private organizations, and interested citizens can receive information and express their views on the undertaking, its effects on historic and cultural properties, and alternate courses of action. The Agency Official shall provide adequate facilities for the meeting and shall afford appropriate notice to the public in advance of the meeting.

(d) *Consideration of alternatives.* Upon review of the pending case and subsequent to any on-site inspection and any public information meeting, the Executive Director shall consult with the Agency Official and State Historic Preservation Officer to determine whether there is a feasible and prudent alternative to avoid or satisfactorily mitigate any adverse effect.

(e) *Avoidance of adverse effect.* If the Agency Official, the State Historic Preservation Officer, and the Executive Director select and unanimously agree upon a feasible and prudent alternative to avoid the adverse effect of the undertaking, they shall execute a Memorandum of Agreement acknowledging avoidance of adverse effect. This document shall be forwarded to the Chairman for review pursuant to Section 800.6(a).

(f) *Mitigation of adverse effect.* If the consulting parties are unable to unanimously agree upon a feasible and prudent alternative to avoid any adverse effect, the Executive Director shall consult with the Agency Official and the State Historic Preservation Officer to determine whether there is a feasible and prudent alternative to satisfactorily mitigate the adverse effect of the undertaking. Upon finding and unanimously agreeing to such an alternative, they shall execute a Memorandum of Agreement acknowledging satisfactory mitigation of adverse effect. This document shall be forwarded to the Chairman for review pursuant to Section 800.6(a).

(g) *Memorandum of Agreement.* It shall be the responsibility of the Executive Director to prepare each Memorandum of Agreement required under these procedures. In preparation of such a document the Executive Director may request the Agency Official to prepare a proposal for inclusion in the Memorandum, detailing actions to be taken to avoid or mitigate the adverse effect.

(h) *Failure to avoid or mitigate adverse effect.* Upon the failure of consulting parties to find and unanimously agree upon a feasible and prudent alternative to avoid or satisfactorily mitigate the adverse effect, the Executive Director shall request the Chairman to schedule the undertaking for consideration at the next Council meeting and notify the Agency Official of the request. Upon notification of the request, the Agency Official shall delay

further processing of the undertaking until the Council has transmitted its comments or the Chairman has given notice that the undertaking will not be considered at a Council meeting.

§ 800.6 Council procedures.

(a) *Review of Memorandum of Agreement.* Upon receipt of a Memorandum of Agreement acknowledging avoidance of adverse effect or satisfactory mitigation of adverse effect, the Chairman shall institute a 30-day review period. Unless the Chairman shall notify the Agency Official that the matter has been placed on the agenda for consideration at a Council meeting, the memorandum shall become final: (1) Upon the expiration of the 30-day review period with no action taken; or (2) when signed by the Chairman. Memoranda duly executed in accordance with these procedures shall constitute the comments of the Advisory Council. Notice of executed Memoranda of Agreement shall be published in the FEDERAL REGISTER monthly.

(b) *Response to request for consideration at Council meeting.* Upon receipt of a request from the Executive Director for consideration of the proposed undertaking at a Council meeting, the Chairman shall determine whether or not the undertaking will be considered and notify the Agency Official of his decision. To assist the Chairman in this determination, the Agency Official and the State Historic Preservation Officer shall provide such reports and information as may be required. If the Chairman decides against consideration at a Council meeting, he will submit a written summary of the undertaking and his decision to each member of the Council. If any member of the Council notes an objection to the decision within 15 days of the Chairman's decision, the undertaking will be scheduled for consideration at a Council meeting. If the Council members have no objection, the Chairman shall notify the Agency Official at the end of the 15-day period that the undertaking may proceed.

(c) *Decision to consider the undertaking.* Upon determination that the Council will consider an undertaking, the Chairman shall: (1) Schedule the matter for consideration at a regular meeting no less than 60 days from the date the request was received, or in exceptional cases, schedule the matter for consideration in an unassembled or special meeting; (2) notify the Agency Official and the State Historic Preservation Officer of the date on which comments will be considered; and (3) authorize the Executive Director to prepare a case report.

(d) *Content of the case report.* For purposes of arriving at comments, the Advisory Council prescribes that certain reports be made available to it and accepts reports and statements from other interested parties. Specific informational requirements are enumerated below. Generally, the requirements represent an explication of elaboration of principles contained in the Criteria of Effect and in the Criteria of Adverse Effect. The Council notes, however, that the Act recognizes historical and cultural resources should be preserved "as a living part of our community life and development." Consequently, in arriv-

US_00000157

## RULES AND REGULATIONS

ing at final comments, the Council considers those elements in an undertaking that have relevance beyond historical and cultural concerns. To assist it in weighing the public interest, the Council welcomes information not only bearing upon physical, sensory, or esthetic effects but also information concerning economic, social and other benefits or detriments that will result from the undertaking.

(e) *Elements of the case report.* The report on which the Council relies for comment shall consist of:

(1) A report from the Executive Director to include a verification of the legal and historical status of the property; an assessment of the historical, architectural, archeological, or cultural significance of the property; a statement indicating the special value of features to be most affected by the undertaking; an evaluation of the total effect of the undertaking upon the property; a critical review of any known feasible and prudent alternatives and recommendations to remove or mitigate the adverse effect;

(2) A report from the Agency Official requesting comment to include a general discussion and chronology of the proposed undertaking; when appropriate, an account of the steps taken to comply with section 102(2) (A) of the National Environmental Policy Act of 1969 (83 Stat. 852, 42 U.S.C. 4321); an evaluation of the effect of the undertaking upon the property, with particular reference to the impact on the historic, architectural, archeological and cultural values; steps taken or proposed by the agency to take into account, avoid, or mitigate adverse effects of the undertaking; a thorough discussion of alternate courses of action; and, if applicable and available, a copy of the draft environmental statement prepared in compliance with section 102 (2)(C) of the National Environmental Policy Act of 1969;

(3) A report from any other Federal agency having under consideration·an undertaking that will concurrently or ultimately affect the property, including a general description and chronology of that undertaking and discussion of the relation between that undertaking and the undertaking being considered by the Council;

(4) A report from·the State Historic Preservation Officer to include an assessment of the significance of the property; an identification of features of special value; an evaluation of the effect of the undertaking upon the property and its specific components; an evaluation of known alternate courses of action; a discussion of present or proposed participation of State and local agencies or organizations in preserving or assisting in preserving the property; an indication of the support or opposition of units of government and public and private agencies and organizations within the State; and the recommendations of his office;

(5) A report by any applicant or potential recipient when the Council considers comments upon an application for a contract, grant, subsidy, loan, or other form of funding assistance, or an application for a Federal lease, permit, license, certificate, or other entitlement for use. Arrangements for the submission and presentation of reports by applicants or potential recipients shall be made through the Agency Official having jurisdiction in the matter; and

(6) Other pertinent reports, statements, correspondence, transcripts, minutes, and documents received by the Council from any and all parties, public or private. Reports submitted pursuant to this section should be received by the Council at least two weeks prior to a Council meeting.

(f) *Coordination of case reports and statements.* In considerations involving more than one Federal department, either directly or indirectly, the Agency Official requesting comment shall act as a coordinator in arranging for a full assessment and discussion of all interdepartmental facets of the problem and prepare a record of such coordination to be made available to the Council. At the request of the Council, the State Historic Preservation Officer shall notify appropriate governmental units and public and private organizations within the State of the pending consideration of the undertaking by the Council, and coordinate the presentation of written statements to the Council.

(g) *Council meetings.* The Council does not hold formal hearings to consider comments under these procedures. Two weeks notice shall be given, by publication in the FEDERAL REGISTER, of all meetings involving Council review of Federal undertakings in accordance with these procedures. Reports and statements will be presented to the Council in open session in accordance with a prearranged agenda. Regular meetings of the Council generally occur on the first Wednesday and Thursday of February, May, August and November.

(h) *Oral statements to the Council.* A schedule shall provide for oral statements from the Executive Director; the referring Agency Official presently or potentially involved; the applicant or potential recipient, when appropriate; the State Historic Preservation Officer; and representatives of national, State, or local units of government and public and private organizations. Parties wishing to make oral remarks shall submit written statements of position in advance to the Executive Director.

(i) *Comments by the Council.* The comments of the Council, issued after consideration of an undertaking at a Council meeting, shall take the form of a three-part statement, including an introduction, findings, and a conclusion. The statement shall include notice to the Agency Official of the report required under section 800.6(j) of these procedures. Comments shall be made to the head of the Federal Agency requesting comment or having responsibility for the undertaking. Immediately thereafter, the comments of the Council will be forwarded to the President and the Congress as a special report under authority of section 202(b) of the Act and published as soon as possible in the FEDERAL REGISTER. Comment shall be available to the public upon receipt of the comments by the head of the Federal agency.

(j) *Report of agency action in response to Council comments.* When a final decision on the undertaking is reached by the Federal Agency, the Agency Official shall

A–6

US_00000158

submit a written report to the Council containing a description of actions taken by the Federal Agency subsequent to the Council's comments; a description of actions taken by other parties pursuant to the actions of the Federal Agency; and the ultimate effect of such actions on the property involved. The Council may request supplementary reports if the nature of the undertaking requires them.

(k) *Records of the Council.* The records of the Council shall consist of a record of the proceedings at each meeting, the case report prepared by the Executive Director, and all other reports, statements, transcripts, correspondence, and documents received.

(l) *Continuing review jurisdiction.* When the Council has commented upon an undertaking pursuant to Section 800.6 such as a comprehensive or area-wide plan that by its nature requires subsequent action by the Federal Agency, the Council will consider its comments or approval to extend only to the undertaking as reviewed. The Agency Official shall ensure that subsequent action related to the undertaking is submitted to the Council for review in accordance with § 800.4(e) of these procedures when that action is found to have an adverse effect on a property included in or eligible for inclusion in the National Register.

## § 800.7 Other powers of the Council.

(a) *Comment or report upon non-Federal undertaking.* The Council will exercise the broader advisory powers, vested by section 202(a) (1) of the Act, to recommend measures concerning a non-Federal undertaking that will adversely affect a property included in or eligible for inclusion in the National Register: (1) upon request from the President of the United States, the President of the U.S. Senate, or the Speaker of the House of Representatives, or (2) when agreed upon by a majority vote of the members of the Council.

(b) *Comment or report upon Federal undertaking in special circumstances.* The Council will exercise its authority to comment to Federal agencies in certain special situations even though written notice that an undertaking will have an effect has not been received. For example, the Council may choose to comment in situations where an objection is made to a Federal agency finding of "no effect."

## § 800.8 Criteria of effect.

A Federal, federally assisted, or federally licensed undertaking shall be considered to have an effect on a National Register property or property eligible for inclusion in the National Register (districts, sites, buildings, structures, and objects, including their settings) when any condition of the undertaking causes or may cause any change, beneficial or adverse, in the quality of the historical, architectural, archeological, or cultural character that qualifies the property under the National Register Criteria.

## § 800.9 Criteria of adverse effect.

Generally, adverse effects occur under conditions which include but are not limited to:

(a) Destruction or alteration of all or part of a property;

(b) Isolation from or alteration of its surrounding environment;

(c) Introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting;

(d) Transfer or sale of a federally owned property without adequate conditions or restrictions regarding preservation, maintenance, or use; and

(e) Neglect of a property resulting in its deterioration or destruction.

## § 800.10 National Register criteria.

(a) "National Register Criteria" means the following criteria established by the Secretary of the Interior for use in evaluating and determining the eligibility of properties for listing in the National Register. The quality of significance in American history, architecture, archeology, and culture is present in districts, sites, buildings, structure, and objects of State and local importance that possess integrity of location, design, setting, materials, workmanship, feeling and association and:

(1) That are associated with events that have made a significant contribution to the broad patterns of our history; or

(2) That are associated with the lives of persons significant in our past; or

(3) That embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

(4) That have yielded, or may be likely to yield, information important in prehistory or history.

(b) *Criteria considerations.* Ordinarily cemeteries, birthplaces, or graves of historical figures, properties owned by religious institutions or used for religious purposes, structures that have been moved from their original locations, reconstructed historic buildings, properties primarily commemorative in nature, and properties that have achieved significance within the past 50 years shall not be considered eligible for the National Register. However, such properties will qualify if they are integral parts of districts that do meet the criteria or if they fall within the following categories:

(1) A religious property deriving primary significance from architectural or artistic distinction or historical importance;

(2) A building or structure removed from its original location but which is the surviving structure most importantly associated with a historic person or event;

(3) A birthplace or grave of a historical figure of outstanding importance if there is no appropriate site or building directly associated with his productive life;

(4) A cemetery which derives its primary significance

US_00000159

**RULES AND REGULATIONS**

from graves of persons of transcendent importance, from age, from distinctive design features, or from association with historic events;

(5) A reconstructed building when accurately executed in a suitable environment and presented in a dignified manner as part of a restoration master plan, and when no other building or structure with the same association has survived;

(6) A property primarily commemorative in intent if design, age tradition, or symbolic value has invested it with its own historical significance; or

(7) A property achieving significance within the past 50 years if it is of exceptional importance.

[FR Doc. 74-1986 Filed 1-24-74; 8:45 am]

0001104986

US_00000160

The proponent agency of this regulation is the Office of the Chief of Engineers. Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) direct to HQDA (DAEN-ZCE), WASH DC 20310.

By Order of the Secretary of the Army:

BERNARD W. ROGERS
*General, United States Army*
*Chief of Staff*

Official:

J. C. PENNINGTON
*Brigadier General, United States Army*
*The Adjutant General*

DISTRIBUTION:
To be distributed in accordance with DA Form 12-9A requirements for AR, Installations plus Facilities Engineering.
*Active ARMY:* C
*ARNG:* A
*USAR:* A

☆ U. S. GOVERNMENT PRINTING OFFICE : 1978  260-809/3179

US_00000161

PENTAGON LIBRARY

0001104986