IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL, | Civil Action No. |
| | 1:22-cv-03136-SDG |
| Plaintiff, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## THE UNITED STATES OF AMERICA'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND MEMORANDUM OF LAW IN SUPPORT

The United States of America ("United States"), by counsel, moves to

dismiss Plaintiff Dwight G. Tyndall's Second Amended Complaint (ECF No. 45)

for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure

12(b)(1). The grounds for the United States' motion are more particularly set forth

in the accompanying memorandum of law.

Dated: April 16, 2026.

Respectfully submitted,

**THE UNITED STATES OF AMERICA**

1

BRETT A. SHUMATE
Assistant Attorney General,
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General,
Torts Branch

J. PATRICK GLYNN
Director, Torts Branch

ALBERT K. LAI
Assistant Director


*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS, Virginia Bar No. 80149
CAROLINE W. STANTON
Trial Attorney, Torts Branch
Environmental Tort Litigation Section
United States Department of Justice
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 702-4998
E-mail: Jennifer.E.Adams@usdoj.gov
*Counsel for the United States*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No.

1:22-cv-03136-SDG

## MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION

### I.   INTRODUCTION

Plaintiff Dwight G. Tyndall seeks recovery from the United States under the Federal Tort Claims Act ("FTCA") for the 1997 death of his wife, Deborah Tyndall. Tyndall alleges three acts or omissions by the United States Army as the basis for his claims: (1) improper waste disposal at Fort Gillem from 1941 until approximately 1980; (2) failure to timely remediate contamination at Fort Gillem; and (3) failure to warn of the contamination.

The FTCA waives the United States' sovereign immunity for money damages caused by negligent or wrongful acts of federal employees, when a private person would be liable for such conduct under state law. 28 U.S.C.

1

§ 1346(b)(1). When such conduct is "based upon the exercise or performance or the failure to exercise or perform a discretionary function," the United States retains immunity under the FTCA's discretionary function exception. 28 U.S.C. § 2680(a). The Army's decisions here were discretionary and susceptible to policy analysis. Because the United States has not waived sovereign immunity for such decisions, this Court lacks subject matter jurisdiction.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  FACTUAL HISTORY

The Tyndalls lived approximately 200 yards north of Fort Gillem from 1977 to 1982. 2d Am. Compl. ("SAC") ¶ 13, ECF No. 45. Tyndall alleges that, from 1941 until approximately 1980, the Army disposed of harmful waste at the North Landfill Area ("NLA") of Fort Gillem, resulting in contaminated surface water, groundwater, soil, and sediment on the installation. *Id.* ¶¶ 2, 23.[1] Tyndall contends

---

[1] The United States disputes that the Army disposed of "harmful waste" in the NLA "until approximately 1980." SAC ¶ 2. As Tyndall alleges, and all of the available evidence indicates, "[t]he most serious water quality impact concerns the contaminated materials buried in the installation perimeter areas during the period from 1948 to 1972." *Id.* ¶ 63 (quoting 1980 Installation Assessment, ECF No. 20-1)). *See, e.g.,* ECF No. 20-1, at 30 (Fig. 8) (documenting burial of DDT in 1965, burning and burial of petroleum, oil, and lubricant (POL) products from 1949 to 1964); 39 (describing burial of various contaminated materials "during the past 35 years"); 48-49 (documenting burial of leaking bomb in 1946); 42 (documenting burning and burial of medical items from 1962 to 1975); 44 (documenting discovery of buried metallic sodium in 1974 and burial of "numerous chemicals, medicinals, and insecticides" in 1973); 45 (summarizing "Items Buried at FTG");

that harmful substances migrated off base, contaminated his property ("Tyndall Property"), and exposed his wife to harmful substances. *Id.* ¶¶ 2-3. Mrs. Tyndall was diagnosed with non-Hodgkin's Lymphoma in 1982 and passed away in 1997. *Id.* ¶¶ 15-17.

Tyndall alleges several sources of contamination: (1) waste disposed in "some 356 locations" in the NLA "used for localized landfilling, trenching, burning, indiscriminate burial, and surface disposition," *id.* ¶¶22-23, 25, 27; (2) discharge of polluted effluent from an Industrial Waste Treatment Plant, *id.* ¶¶ 30-34; (3) overflow of a Holding Pond, which held polluted effluent from the Industrial Waste Treatment Plant, *id.* ¶¶ 36-37; (4) operation of two sewage treatment plants—the Eastern Sewage Treatment Plant from 1941 to 1951 and the Western Sewage Treatment Plant from 1951 to 1978, *id.* ¶¶ 40-43; and (5) discharge of polluted stormwater through the northern Storm Drain System, *id.* ¶¶46-48.

### B. Procedural History

In August 2022, Tyndall brought suit under the FTCA, alleging that the Army caused the wrongful death of his wife. *See* Compl., ECF No. 1. Specifically, Tyndall alleged that the Army (1) improperly disposed of toxic waste; (2) failed to remediate the toxic waste; and (3) failed to warn nearby landowners of the dangers

---

*see also* ECF No. 20-2 at 126 (explaining that the NLA was used for waste disposal from 1941 to the mid-1970s).

posed by the toxic waste. *Id.* On August 27, 2024, the United States moved to dismiss Tyndall's Complaint under the discretionary function exception. ECF No. 17. On March 26, 2025, the Court denied the motion without prejudice. ECF No. 23. The Court noted that, while the FTCA likely barred Tyndall's claims based on failure to remediate and failure to warn, disputed factual issues regarding the Army's alleged improper waste disposal warranted jurisdictional discovery. *Id.* at 4-5. Recognizing Tyndall's *pro se* status and "the technical nature of the legal issues in this case," the Court appointed counsel to help Tyndall conduct jurisdictional discovery as to the existence of specific and mandatory directives governing the Army's conduct at Fort Gillem. *Id.* at 10.

On February 13, 2026, after jurisdictional discovery, Tyndall filed his Second Amended Complaint, ECF No. 45.[2] Tyndall now alleges: (1) Negligence, based on the Army's alleged breach of its duties to (a) handle, discharge, and dispose of waste; (b) remediate known contamination; and (c) warn residents of the contamination; (2) Trespass, on the basis that the Army's actions caused contaminants to migrate to the Tyndall Property; (3) Nuisance, on the basis that the contamination interfered with the Tyndalls' right to peacefully enjoy their

---

[2] Tyndall filed his First Amended Complaint prior to jurisdictional discovery. ECF No. 36.

property; and (4) Wrongful Death, on the basis that the Army's contamination of Fort Gillem caused Mrs. Tyndall's death.

Tyndall alleges that the United States violated mandatory and specific duties regarding waste disposal as reflected in: (1) the Refuse Act of 1899; (2) Army Manual TM 5-634; (3) USACE Manual EM 385-1-1; (4) 42 C.F.R. Part 76, which incorporated a Public Health Service 1968 publication entitled Sanitary Landfill Facts; (5) Executive Order 11507; (6) Army Manual TM 5-814-5; (7) 40 C.F.R. Part 241 and Army Regulation AR 420-47; (8) Army Regulation AR 200-1; (9) Clean Water Act and Georgia Water Quality Control Act; and (10) Mandatory Procedures in Taking Private Property. *See id.* ¶¶ 94-169. All but one of those directives (the Refuse Act of 1899) were issued after 1941, when Tyndall alleges the Army began disposing of harmful substances in the NLA. *Id.*

### III.   LEGAL STANDARD

"As a sovereign entity, the United States is immune from suit unless it consents to be sued." *Cuadrado-Concepcion v. United States*, 851 F. App'x 985, 987 (11th Cir. 2021). The "plaintiff has the burden of showing an unequivocal waiver of sovereign immunity." *Payne v. United States Dep't of Veterans Affairs*, No. 1:17-CV-3068-TWT, 2017 U.S. Dist. LEXIS 227962, at *4 (N.D. Ga. Dec. 28, 2017) (citing *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). Challenges to subject matter jurisdiction are either facial or factual. *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th

5

Cir. 1999). In a factual challenge, the Court need not accept the truth of the plaintiff's allegations and may rely on the Complaint, undisputed facts in the record, and the Court's resolution of disputed facts. *Id.*

Because the terms of the FTCA are jurisdictional, the plaintiff bears the burden to "prove that the discretionary function exception does not apply." *Cuadrado-Concepcion*, 851 F. App'x at 990 (quoting *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002)). Absent a waiver, subject matter jurisdiction is lacking, and the claims must be dismissed. *United States v. Testan,* 424 U.S. 392, 399 (1976). "Courts are required to 'strictly observe' all terms and conditions that accompany a waiver of sovereign immunity," and all ambiguities must be "interpreted in one direction—in favor of immunity." *Smith v. United States*, 14 F.4th 1228, 1231 (11th Cir. 2021) (citations omitted).

## IV.   ARGUMENT

The FTCA's limited waiver "is subject to 13 exceptions that claw back the government's immunity in certain circumstances." *Martin v. United States*, 605 U.S. 395, 400 (2025). Pertinent here, the FTCA's discretionary function exception retains sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion

involved be abused." 28 U.S.C. § 2680(a). A two-part test determines if the discretionary function exception applies. *See OSI*, 285 F.3d at 950.

*First*, the court must consider whether the conduct at issue involved an "element of judgment or choice" for the acting employee. *United States v. Gaubert*, 499 U.S. 315, 322 (1991). This inquiry focuses on whether "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* If it does not, "it will be presumed that the particular act involved an element of judgment or choice." *Zelaya*, 781 F.3d at 1330 (quoting *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993)).

*Second*, "[i]f the allegedly tortious act *did* involve an element of judgment, courts proceed to the second step of the analysis and ask 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" ECF No. 23 at 3-4 (quoting *Gaubert*, 499 U.S. at 322–23). Under this second prong, courts "focus on 'the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one we would expect inherently to be grounded in considerations of policy.'" *OSI*, 285 F.3d at 951 (quoting *Autery*, 992 F.2d at 1530-31). The exception is not "limited to decisions at the policy or planning level," nor does it require an "actual 'weighing of policy considerations.'" *Id.* at 950-51 (quoting *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997)). Rather,

7

if the decision allows discretion, there is a "strong presumption" that the conduct is grounded in the policies of that provision. *Gaubert*, 499 U.S. at 324.

The discretionary function exception preserves sovereign immunity even when the government was negligent. *See Dalehite v. United States*, 346 U.S. 15, 33-34 (1953); *accord Martin v. United States*, No. 1:24-CV-3341-SEG, 2025 U.S. Dist. LEXIS 226037, at *19 (N.D. Ga. Sept. 25, 2025) (explaining that the inquiry "is not about how poorly, abusively, or unconstitutionally the employee exercised his or her discretion" or "whether the employee actually weighed social, economic, and political policy considerations before acting" (citations omitted)). Here, Tyndall's claims are based upon the Army's alleged improper waste disposal, inadequate remediation, and failure to warn. Because the discretionary function exception protects these actions, Tyndall's claims should be dismissed for lack of subject matter jurisdiction.

### A. THE DISCRETIONARY FUNCTION EXCEPTION BARS TYNDALL'S CLAIMS REGARDING REMEDIATION AND FAILURE TO WARN.

As of March 26, 2025, when the Court issued its Order on the United States' first Motion to Dismiss, Tyndall "ha[d] not identified, nor ha[d] the Court found, any directive prescribing a mandatory course of conduct for the Army to follow, either in remediating toxic waste or in protecting the public from toxic waste exposure, at least not before Tyndall moved away from Fort Gillem in 1982." ECF No. 23 at 4-5. Tyndall has not identified any specific and mandatory directives

8

regarding when the Army had to remediate the contamination or notify the public of such contamination. *See* SAC, *passim.* Nor can he rebut the "strong presumption" that the Army's decisions surrounding its remediation and notification efforts were grounded in policy. *Gaubert*, 499 U.S. at 324. Indeed, courts have consistently recognized that such decisions are inherently grounded in policy considerations. *See, e.g.*, *Horton*, 2014 U.S. Dist. LEXIS 83474, at *18 ("[D]ecisions concerning remediation of contamination . . . and public notification of contamination are subject to policy considerations." (citing cases)). Accordingly, as this Court correctly forecast, the discretionary function exception applies to the Army's remediation and notification efforts at Fort Gillem, thus depriving the Court of subject matter jurisdiction over those claims. *See* ECF No. 23 at 4-5.[3]

### B. THE DISCRETIONARY FUNCTION EXCEPTION BARS TYNDALL'S CLAIMS REGARDING IMPROPER WASTE DISPOSAL.

Tyndall cannot show by a preponderance of evidence that the FTCA's discretionary function exception does *not* apply to his claims. He identifies a handful of provisions that he claims "the Army was required to follow" regarding its waste disposal activities at Fort Gillem, SAC ¶ 94, but most are wholly

---

[3] Tyndall's failure-to-warn claim would also be barred by the FTCA's misrepresentation exception, which applies not only to affirmative misrepresentations, but also to "the government's failure to use due care in obtaining and communicating information." *JBP Acquisitions, L.P. v. United States ex rel. FDIC*, 224 F.3d 1260, 1264 (11th Cir. 2000)).

inapplicable to the Army's conduct as alleged, and none prescribed a mandatory and specific course of action for disposing waste at Fort Gillem. In addition, as the Eleventh Circuit has long held, "[d]isposal of waste on a military base 'involves policy choices of the most basic kind.'" *OSI*, 285 F.3d at 953 (quoting *Aragon v. United States*, 146 F.3d 819, 826 (10th Cir. 1998)).

### 1. *Tyndall identifies directives that are wholly inapplicable to his claims.*

As an initial matter, the FTCA permits liability only where (1) the plaintiff's alleged damages were "caused by" the actions of a federal employee acting in the scope of employment; and (2) "the United States, if a private person, would be liable" for such actions. 28 U.S.C. § 1346(b). Here, Tyndall alleges violations of several directives that fail to satisfy even these basic requirements. *See, e.g.*, *Pieper v. United States*, No. CCB-15-2457, 2016 U.S. Dist. LEXIS 106007, at *16 (D. Md. Aug. 11, 2016) (noting that plaintiffs must show "how any violation of [a directive] is connected to the conduct they are challenging or how it caused their injuries"), *aff'd*, 2017 U.S. App. LEXIS 20796 (4th Cir. Md., Oct. 20, 2017); *Loughlin v. United States*, 286 F. Supp. 2d 1, 18 (D.D.C. 2003) ("To cancel discretionary function immunity, a directive must not only be specific and mandatory, it must also be *relevant* to the claims underlying the suit.").

### a. Refuse Act of 1899

Tyndall first alleges that Section 13 of the Refuse Act of 1899 ("Section 13"), was a mandatory directive governing the Army's waste disposal at Fort Gillem. *See* SAC ¶¶ 96-101. Tyndall characterizes Section 13 this way:

> Under section 13 of the Rivers and Harbors Act of 1899, known as the Refuse Act of 1899, it is unlawful to discharge or to cause or suffer to be discharged "any refuse matter of any kind or description whatever . . . into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water . . . ." 33 U.S.C. § 407.

*Id.* ¶ 96 (ellipses in original).

Tyndall's creative quoting of Section 13 omits important phrases that render it irrelevant to Tyndall's claims. Section 13 prohibits the discharge of refuse "either *from or out of any ship*, *barge*, or other *floating craft* of any kind, or from the *shore*, *wharf*, *manufacturing establishment*, or *mill* of any kind," or "*on the bank* of any navigable water, or *on the bank* of any tributary of any navigable water." 33 U.S.C. § 407 (emphasis added). Tyndall does not allege that the Army disposed of waste from any of these locations. *See, e.g.*, SAC ¶ 2 (alleging that the Army "disposed of harmful waste *at Fort Gillem* . . . [that] *migrated off-base* and into surrounding residential areas and streams" (emphasis added)); *id.* ¶ 101. In short, Section 13 does not apply to the discharge of waste containing contaminants *on land* that eventually migrate to a navigable water or its tributary.

11

Tyndall also alleges that the Army failed to obtain a permit pursuant to the Refuse Act of 1899. SAC ¶ 100. Whether the Army failed to obtain a permit under the Refuse Act is "entirely unrelated to [Tyndall's] substantive tort claim," *Loughlin*, 286 F. Supp. 2d at 18, as it was allegedly the Army's negligent waste disposal—not its failure to obtain a permit—that caused his wife's illness and death. *See, e.g.*, *Montijo-Reyes v. United States*, 436 F.3d 19, 25 (1st Cir. 2006) (holding the "harm to Plaintiffs' homes was allegedly caused by either negligent disposal site selection or negligent maintenance of the disposal site" and, thus, failure to obtain a permit or waiver prior to discharging dredged material in navigable waters "did not proximately cause [the alleged] harm").

### b. *Clean Water Act & Georgia Water Quality Control Act*

Tyndall also alleges that the Clean Water Act ("CWA") 1972 Amendments and the Georgia Water Quality Control Act ("GWQCA") required the Army to obtain a National Pollutant Discharge Elimination System ("NPDES") permit before discharging pollutants into navigable waters. SAC ¶¶ 146-52. As with the Refuse Act of 1899, the CWA's and GWCQA's permit provisions are irrelevant to Tyndall's allegations that the Army's negligent waste disposal caused Mrs. Tyndall's illness and death. *See, e.g.*, *Crichton v. TVA*, No. 3:09-CV-592, 2010 U.S. Dist. LEXIS 58972, at *19 (E.D. Tenn. June 15, 2010) (rejecting argument that "discharge of toxic pollutants into navigable waters . . . is nondiscretionary" and

12

declining to find defendant "violated a specific mandatory directive under the CWA or the [state analogue]" by discharging pollutants it "was not permitted to discharge").

In addition, neither the CWA nor the GWQCA were in effect until decades after the Army began disposing waste in the NLA, and are thus "irrelevant for the [discretionary-function] analysis." *Waverley View*, 79 F. Supp. 3d at 570. Moreover, although the CWA 1972 Amendments "provid[ed] that federal installations must 'comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution,'" they did "not expressly provide that federal dischargers must obtain state NPDES permits." *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 209, 212 (1976) (quoting 33 U.S.C. § 1323). Indeed, as Tyndall admits, federal facilities were not subject to the permitting requirements of the CWA or state law until Congress' 1977 revisions to the CWA, and Georgia was not authorized to regulate federal facilities until 1980. *See* SAC ¶¶ 148, 152; *see also* https://www.epa.gov/npdes/npdes-state-program-authority.

### c. *40 C.F.R. Part 241 and AR 420-47*

Tyndall alleges that the Army violated 40 C.F.R. Part 241 and Army Regulation 420-47, promulgated in 1974 and 1977, respectively, in its operation of existing disposal sites, modification of existing disposal sites, and initiation of new disposal sites at Fort Gillem. *See* SAC ¶¶ 131-40. However, neither provision

applied to the Army's disposal of the harmful substances of which Tyndall complains. 40 C.F.R. § 241.100 stated that its "guidelines" were "generally applicable to the land disposal of all solid waste materials,"[4] but were *not* applicable to "hazardous,[5] agricultural, and mining wastes because of the lack of sufficient information upon which to base recommended procedures." ECF No. 45-10 at US_00032485 (Section 241.100—Scope). Likewise, AR 420-47 applied to "Solid waste collection and disposal," but expressly did not apply to "Collection and disposal of salvage material (including production scrap), explosives, ammunition and incendiaries, and hazardous or infectious waste." ECF No. 45-11 at US_00000388 (Section 1-4—Responsibilities).

Moreover, these provisions were not in effect until long after the bulk of the Army's waste disposal in the NLA had already occurred. *See supra* n.1. Tyndall

---

[4] 40 C.F.R. § 241.101(v) defines "Solid wastes" as: "garbage, refuse, sludges, and other discarded solid materials resulting from industrial and commercial operations and from community activities. It does not include solids or dissolved material in domestic sewage *or other significant pollutants* in water resources; such as silt, dissolved or suspended solids in industrial wastewater effluents, dissolved materials in irrigation return flows or other common water pollutants." ECF No. 45-10 at US_00032486 (emphasis added).

[5] 40 C.F.R. § 241.101(g) defines "Hazardous wastes" as: "any waste or combination of wastes which pose a substantial present or potential hazard to human health or living organisms because such wastes are nondegradable or persistent in nature or because they can be biologically magnified, or because they can be lethal, or because they may otherwise cause or tend to cause detrimental cumulative effects." ECF No. 45-10 at US_00032486.

does not (and cannot) plausibly allege that Mrs. Tyndall's death was caused by waste disposed after, but not before, the effective date of these provisions. *See Waverley View*, 79 F. Supp. 3d at 570 (noting that provisions "implemented after the relevant waste disposal decisions had already been made" were "irrelevant for the [discretionary-function] analysis").

### d. Guidance Regarding Sanitary Landfills

Next, Tyndall identifies several provisions specific to sanitary landfills as mandatory directives governing the Army's waste disposal activities at Fort Gillem: Army Technical Manuals 5-634 ("TM 5-634") (1946 and 1958) and 5-814-5 ("TM 5-814-5") (1973); 42 C.F.R. § 76.8(a)(4) (1969); and a "guidance document" entitled "Sanitary Landfill Facts" (1968), *see id.* ¶¶ 52, 102-05, 113-18, 125-28. However, Tyndall does not allege, nor does the available evidence indicate, that harmful waste migrated into nearby water and soil from sanitary landfills, but rather from 356 waste burial sites, ravines, and trenches located in the NLA. SAC ¶¶ 26-27. In addition, none of these provisions were in effect when the Army began disposing waste in the NLA. Thus, Tyndall cannot show how any of the sanitary landfill provisions relates to the conduct he challenges or the alleged harm. *Pieper*, 2016 U.S. Dist. LEXIS 106007, at *16.

Nor does Tyndall identify any provisions that required the Army to use only sanitary landfills for its waste disposal. As TM 5-634 made clear, there were

15

multiple "suitable methods of disposal" for the Army to consider in light of various factors such as the "expenditure of money, personnel, [equipment,] and material." ECF No. 45-1 at US_00037050 (1946); *see also* ECF No. 45-2 at US_00034924-926 (1958) (describing other "suitable disposal method[s]," such as burning pits, burn-and-cover method, regulated dumps, garbage grinders, and composting). Similarly, TM 5-814-5, entitled "Sanitary Landfill," was designed to guide the Army in conducting "feasibility studies as well as for designing sanitary landfill systems for refuse disposal at Army installations," while recognizing other acceptable "method[s] of solid waste disposal" and acknowledging that the "using service will select the method of solid waste disposal to be used." ECF No. 45-9 at US_00035218. 42 C.F.R. § 76.8(a)(4), which incorporated the "Sanitary Landfill Facts" guidance document, applied only to waste that was "disposed of in sanitary landfills," SAC ¶ 113, and the provisions Tyndall cites from the "Sanitary Landfill Facts" guidance document are specific to the design, operation, and completion of sanitary landfills, *id.* ¶¶ 114-17.

Moreover, even if Tyndall had alleged migration of contaminants from sanitary landfills, none of the sanitary landfill provisions cited in the Second Amended Complaint prescribed a mandatory and specific course of action for Army employees to follow in selecting, operating, or completing sanitary landfills "so as to deprive [Army] employees of discretion." *Autery*, 992 F.2d at 1529.

16

Tyndall "cannot simply accuse the government of violating a law, regulation, or scientific standard in some general sense. The nature of the specific, mandatory constraint on its discretion must be clearly identified." *Loughlin*, 286 F. Supp. 2d at 17 (quoting *Gould Electronics, Inc. v. United States*, 2002 U.S. Dist. LEXIS 262, at *31 n.4 (E.D. Pa. Jan. 10, 2002).

### e.  *42 C.F.R. § 76.8(a)(3)*

Tyndall also alleges that the Army violated 42 C.F.R. § 76.8(a)(3) (1969), which provided that "[w]astes shall not be left in open dumps." SAC ¶ 118. However, as discussed above, Tyndall's alleged harm arose from migration of contaminants from multiple burial sites, ravines, and trenches in the NLA, not from open dumps. *See, e.g., id.* ¶¶ 25-27, 55-57, 61-63. And, like so many of the other directives discussed herein, this provision was implemented long after most of the harmful waste had already been buried at Fort Gillem, *see supra* n.1, and is thus irrelevant to Tyndall's tort claims. *Waverley View*, 79 F. Supp. 3d at 570.

### f.  *Procedures in Taking Private Property*

Characterizing the contamination at Fort Gillem as "a taking of [his] private property for public use," Tyndall identifies four statutes or regulations as "specific, mandatory procedures for the Army to follow before it could take or use private property." SAC ¶¶ 161-65. As an initial matter, Tyndall cannot rely on any of the cited "takings" directives because the FTCA waives the United States'

17

sovereign immunity only where "a private individual under like circumstances" would be liable. 28 U.S.C. § 2674; *see also Smith*, 14 F.4th at 1232 (observing that the FTCA "does not cover breaches of federal statutory or regulatory duties that do not apply to private parties"). A takings claim is asserted against the government—not against private individuals. *See Stan's Pharmacy, Inc. v. United States HHS*, No. CV 209-137, 2010 U.S. Dist. LEXIS 161224, at *6-7 (S.D. Ga. Dec. 9, 2010) (holding plaintiffs' conversion and takings claims arose "out of the United States Constitution [and] are not properly brought under the FTCA" (citing *McCollum v. Bolger*, 794 F.2d 602, 608 (11th Cir. 1986))).

Furthermore, the War Purposes Act of 1917 (40 Stat. 241), and the Land Acquisitions Authority Statute of 1956 (10 U.S.C. § 2663(a)), SAC ¶¶ 162-63, permitted the Army to acquire land by condemnation for specific military purposes, none of which are alleged here.[6] Likewise, the Uniform Relocation

---

[6] The War Purposes Act permitted the Army to acquire land by condemnation as "needed for the site, location, construction, or prosecution of works for fortifications, coast defenses, military training camps, and for the construction and operation of plants for the production of nitrate and other compounds and the manufacture of explosives and other munitions of war and for the development and transmission of power for the operations of such plants." 40 Stat. 241.

The Land Acquisitions Authority Statute permitted condemnation proceedings for "(A) the site, construction, or operation of fortifications, coast defenses, or military training camps; (B) the construction and operation of plants for the production of nitrate and other compounds, and the manufacture of

Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. § 4651(8)), and 32 C.F.R. § 552.37(h)(1), apply only when the government seeks to acquire an interest in real property "by exercise of the power of eminent domain," which Tyndall does not allege. *See* SAC ¶¶ 164-65. Accordingly, because Tyndall fails to allege "that [any takings directive] was violated in the conduct challenged," *Anderson v. United States*, 606 F. Supp. 3d 1040, 1054 (E.D. Wash. 2022), such directives are irrelevant for purposes of the discretionary-function analysis.

### 2. *Tyndall fails to identify any specific, mandatory directives governing the Army's waste disposal at Fort Gillem.*

The remaining provisions identified in Tyndall's Second Amended Complaint, even if applicable during at least *part* of the relevant time period,[7] were not sufficiently mandatory and specific to demonstrate that the United States unequivocally waived its sovereign immunity regarding Tyndall's claims.

### a. *USACE Manual EM 385-1-1*

Tyndall identifies two provisions in engineer manual EM 385-1-1 issued by the Army Corps of Engineers ("USACE") in 1958, 1967, and 1977, "which

---

explosives or other munitions of war; or (C) the development and transmission of power for the operation of plants under subparagraph (B)." 10 U.S.C. § 2663(a)(1).

[7] As Tyndall must concede, none of the provisions discussed here were in effect until long after the Army had already disposed much of the contaminated waste in the NLA. *See supra* n.1.

established general safety requirements for all USACE activities and operations."

SAC ¶ 108. One provision "prohibited contamination or pollution of any river,

stream, or public water," *id.* ¶ 109, and another stated that "disposal of surplus or

excess materials and containers shall be by burial in a manner which will not

contaminate or pollute water supply, ground water, or streams," *id.* ¶ 110.

However, as this Court observed, "agency manuals that provided 'only objectives

and principles' for government employees to follow" do "not create any

mandatory obligation sufficient to overcome the discretionary function

exception." ECF No. 23 at 6 (quoting *OSI*, 285 F.3d at 952). As the Eleventh Circuit

has made clear, the United States retains "protection of the discretionary function

exception" where a "general guideline" does not "specifically prescribe[] a course

of action" or "embody[] a fixed or readily ascertainable standard" governing the

alleged conduct. *Autery*, 992 F.2d at 1529 (emphasis omitted).

Here, EM 385-1-1 did not prescribe a specific course of action for Army

employees to avoid contaminating or polluting nearby water, nor did it "embody[]

a fixed or readily ascertainable standard" for determining whether the Army's

disposal would be in a manner that would not contaminate or pollute the water.

*Id.*[8] Furthermore, EM 385-1-1 authorized the Army to use its discretion in

---

[8] *See also Pieper*, 2016 U.S. Dist. LEXIS 106007, at *12-13 (holding a similar provision, that handling of materials "shall be carried out so as to avoid or minimize the possibilities for water and air pollution," gave discretion to the Army

deviating from the General Safety Requirements "where literal application of a requirement to a specific job has impractical aspects," *see* ECF No. 45-3 at 4, ECF No. 45-4 at US_00034338, and expressly authorized alternate methods of disposal "with the approval of the governmental representative in charge," ECF No. 45-4 at US_00034364. Thus, EM 385-1-1 "clearly granted the Army discretion with respect to the implementation of the safety regulations contained in the manual." *Gould Elecs.*, 2002 U.S. Dist. LEXIS 262, at *28 (considering provision in same manual).

### b. *Executive Order 11507*

Tyndall also points to Section 4(a)(5) of Executive Order ("EO") 11507 (1970), which stated, "No waste shall be disposed of or discharged in such a *manner as could result* in the pollution of ground water which would endanger the health or welfare of the public." SAC ¶ 123 (emphasis added). Like EM 385-1-1, EO 11507 allowed for discretion in determining the appropriate manner of disposal because it did not provide a specific course of action for determining whether the disposal "could result in the pollution of ground water." *Id.* Moreover, although Section 4(a)(5) and other provisions of EO 11507 "contain seemingly mandatory language such as 'shall,' such "provisions, when read in context, are not mandatory." *Pieper*,

---

because it "'[did] not 'specifically prescribe[] a course of action for [the Army] to follow' in its waste management procedures" (quoting *Berkovitz*, 486 U.S. at 536)).

21

2016 U.S. Dist. LEXIS 106007, at *11 (recognizing that Executive Order 11507's "provisions were closer to 'statements of policy goals' than directives and . . . not sufficiently specific to bind the Army" (quoting *Waverley View*, 79 F. Supp. 3d at 570 n.6, 570-71)). Thus, because EO 11507 did not provide a specific course of action for the Army to follow, it is "'far too general to serve as . . . mandatory regulation[s]' for purposes of the [discretionary function exception]." *Pieper*, 2016 U.S. Dist. LEXIS 106007, at *13 (citations omitted).

### c. *Army Regulation AR 200-1*

Tyndall also alleges that Army Regulation 200-1 ("AR 200-1"), promulgated in 1978 (more than thirty years after the Army began disposing waste in the NLA), required the Army to prohibit waste "disposal (by open dumping, water dumping, well injection, or open burning) directly into the air, water, or land environment in a manner hazardous to man or animals or if it will cause unreasonable adverse effects on the environment." SAC ¶ 142.[9]

Although Tyndall characterizes this provision of AR 200-1 as a requirement, *see id.*, it is actually one of several broad "Policies" found in AR 200-1's Hazardous and Toxic Materials Management section. *See* ECF No. 45-12 at US_00000079. The Army implemented AR 200-1 to "provide general Department of the Army policy

---

[9] This provision also appeared in the 1975 version of AR 200-1. *See* ECF No. 17-4 at 55988.

on environmental protection," *id.* at US_00000003, and its general purpose was to "prescribe[] policies, assign[] responsibilities, and establish[] procedures for the protection and preservation of environmental quality for the Department of the Army in peacetime," *id.* at US_00000007. *See Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (observing that, although "policy guidelines certainly outline general policy goals," such "guidelines can be considered mandatory only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions.").

Furthermore, AR 200-1 did not specifically dictate how a federal employee was to determine whether a certain substance or disposal method was hazardous or adverse to the environment. Thus, "it [must] be presumed that the [Army's waste disposal decisions] involved an element of judgment or choice." *Zelaya*, 781 F.3d at 1330; *see also Waverley View*, 79 F. Supp. 3d at 576 (finding AR 200-1 was "not sufficiently specific" because it did not "prescribe a specific course of conduct" regarding releasing "hazardous chemicals into the environment").

Finally, AR 200-1 necessarily authorized the Army to use discretion in achieving its goal "to minimize the adverse effects on the quality of the human environment without impairment to the Army's mission." ECF No. 45-12 at US_00000007. AR 200-1 provided that the "environmental consequences of any proposed action will be *considered* during the planning process and will be

23

*evaluated* along with the technical and economic *factors* in the *decisionmaking* process." *Id.* at US_00000008 (emphasis added). And, "[i]nsofar *as essential mission constraints permit*," the Army's "programs and actions will be planned, initiated, and carried out in a manner to *minimize* polluting or degrading the environment." *Id.* (emphasis added). These are just a few provisions of AR 200-1 that demonstrate the discretion necessary to further the Army's goals and objectives. *See, e.g., Daigle*, 972 F.2d at 1540 (finding requirement that EPA remedial action "attain a degree of cleanup . . . at a minimum which assures protection of human health and the environment" was a general "health and safety provision[]" as opposed to a "specific, mandatory directive[]").

Tyndall also alleges that the Army had no discretion or judgment when developing programs to "[i]dentify, quantify, and report all sources of water pollution and take appropriate action to eliminate or reduce them to acceptable levels." SAC ¶ 143. To the contrary, this provision required the Army to use its discretion in identifying "all sources of water pollution," as well as determining "acceptable levels" of pollution and the "appropriate actions" to "eliminate or reduce them." *Id.* To be sure, "even if a regulation applies, a government employee's conduct still involves judgment if the regulation affords the employee discretion in its implementation." *A.B. v. United States*, No. 7:23-cv-01691-RDP,

24

2025 U.S. Dist. LEXIS 38487, at *11 (N.D. Ala. Mar. 4, 2025) (citing *Varig Airlines*, 467 U.S. at 820; *Cohen v. United States*, 151 F.3d 1338, 1343 (11th Cir. 1998)).

### 3. The Army's Waste Disposal Decisions Were Grounded in Policy Considerations.

Because Tyndall has not identified any specific and mandatory directive governing the Army's waste disposal decisions at Fort Gillem, "it must be presumed that the [Army's] acts [were] grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. Indeed, as this Court recognized, to survive a motion to dismiss, it is Tyndall's burden to "introduce evidence sufficient to rebut the factual presumption that waste disposal practices at military installations will implicate policy consideration." ECF No. 23 at 9 (citations omitted).

The Eleventh Circuit, like many other courts, has held that "[d]isposal of waste on a military base 'involves policy choices of the most basic kind.'" *OSI*, 285 F.3d at 953 (quoting *Aragon*, 146 F.3d at 826). Because Tyndall cannot rebut the strong presumption that the Army's discretionary waste disposal decisions were grounded in policy, regardless of whether or not the Army actually weighed such policy considerations, *OSI*, 285 F.3d at 950-51, the second prong of the discretionary-function test is satisfied.

### V. CONCLUSION

For the reasons stated herein, the United States respectfully requests that this Court dismiss Tyndall's claims for lack of subject matter jurisdiction.

Respectfully Submitted,

**THE UNITED STATES OF AMERICA**

BRETT SHUMATE
Assistant Attorney General,
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General,
Torts Branch

J. PATRICK GLYNN
Director, Torts Branch

ALBERT K. LAI
Assistant Director


*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS, Virginia Bar No. 80149
CAROLINE W. STANTON
Trial Attorneys, Torts Branch
Environmental Tort Litigation Section
United States Department of Justice
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 702-4998
E-mail: Jennifer.E.Adams@usdoj.gov
*Counsel for the United States*

26

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL,

          Plaintiff,

v.

UNITED STATES OF AMERICA,

          Defendant.

Civil Action No.

1:22-cv-03136-SDG

### CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing motion and memorandum have been prepared using Book Antiqua, 13 point font.

/s/ Jennifer E. Adams
JENNIFER E. ADAMS
*Trial Attorney*

27

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Civil Action No. <br><br> 1:22-cv-03136-SDG |

CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2026, a true and correct copy of the foregoing was served on all users who are registered to use the court's electronic filing system.

/s/ Jennifer E. Adams
JENNIFER E. ADAMS
*Trial Attorney*

28