**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

Civil Action No. 1:22-cv-03136-SDG

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

FACTUAL BACKGROUND ...................................................................... 2

LEGAL STANDARD ................................................................................ 4

ARGUMENT ............................................................................................. 5

    I.    Each directive identified in the SAC applied to, and was violated by, the Army's operations at Fort Gillem. ...........................................6

        A.    The Army violated the Refuse Act of 1899. ...............................6

        B.    The Army lacked discretion to trespass on or use private property without following mandatory condemnation procedures. ..................................................................................8

        C.    The Army violated numerous garbage disposal directives. ......11

        D.    The Army violated 40 C.F.R. pt. 241 and AR 420-47. ............13

    II.    The Army's violations of mandatory duties caused Mrs. Tyndall's cancer and untimely death. .................................................................14

        A.    The SAC sufficiently alleges proximate causation. ..................14

        B.    The SAC sufficiently alleges factual causation because the Army continued disposing of waste after each directive was issued. .................................................................................18

    III.    The applicable waste disposal directives were mandatory and specific enough to overcome the discretionary function exception. .........................................................................................20

        A.    Garbage Disposal Directives ....................................................20

        B.    EM 385-1-1 .............................................................................21

        C.    AR 200-1 .................................................................................23

IV.    The Army's waste disposal operations, by their carelessness and inattentiveness, were not grounded in public policy considerations. .................................................................................24

CONCLUSION ............................................................................. 25

**INTRODUCTION**

For nearly 40 years, the United States Army's disposal of waste at Fort Gillem caused widespread contamination of surface water, groundwater, soil, and sediment. The Army adopted no plan or reasoned method for waste disposal at Fort Gillem—it spread waste, often at random, without regard for the environment. As just one example, the Army would indiscriminately dump dangerous chemicals over the edges of ravines and into streams that flowed to residential areas. The Army's disposal practices were improper, unlawful, and simply careless.

For Dwight Tyndall and his family, who lived yards from Fort Gillem, this carelessness came at a cost. Due to years of exposure to harmful contaminants, Tyndall's wife, Deborah, developed cancer, from which she tragically died.

Now, the Government seeks to evade responsibility for Mrs. Tyndall's death, arguing that it is immune from suit under the Federal Tort Claims Act's discretionary function exception. This argument fails. The Army lacked discretion to dispose of waste in the way it did because mandatory directives prescribed a specific course of conduct for disposal practices. The Army violated these directives, which in turn caused Mrs. Tyndall's cancer. Alternatively, the discretionary function exception does not apply because the Army's carelessness was not a permissible exercise of discretion with respect to waste disposal. The Court should deny the Government's Motion.

1

## FACTUAL BACKGROUND

From 1977 to 1982, Dwight and Deborah Tyndall, and their two children, lived fewer than 200 yards north of Fort Gillem—a military installation in Conley, Georgia that operated from the 1940s until 2011. ECF 45, Second Amended Complaint ("SAC") ¶¶ 13, 18. For decades, the United States Army contaminated surface water, groundwater, soil, and sediment on and near Fort Gillem by improperly disposing of waste. *Id.* ¶ 2. In the North Landfill Area, which spanned more than 300 acres near the fort's northern boundary, the Army disposed of harmful substances such as pesticides, chloroform, and volatile organic compounds from 1941 until 1980. *Id.* ¶¶ 23, 26. The Army had no master plan for disposing of that waste. *Id.* ¶ 25. Instead, it spread waste across the North Landfill Area using trenching, burning, localized landfilling, indiscriminate burial, and surface deposition. *Id.*[1]

The Army's haphazard disposal practices caused waste to migrate onto the nearby Tyndall Property. For example, the Army randomly dumped waste over the edge of ravines and into the Western Stream—a stream that originated on or near Fort Gillem and flowed north through the Tyndall Property—causing contaminants

---

[1]    The Army carelessly released harmful contaminants from other locations across Fort Gillem as well. *See* SAC ¶¶ 30–35 (the Industrial Waste Treatment Plant); *id.* ¶¶ 36–39 (the Holding Pond); *id.* ¶¶ 40–45 (the Eastern and Western Sewage Treatment Plants); *id.* ¶¶ 46–48 (the Storm Drain System).

to transport directly to the Tyndall Property. *Id.* ¶¶ 14, 27(a). Contamination occurred when surface runoff from rainfall flowed over exposed burial sites and into the Western Stream. *Id.* ¶ 27(b). Harmful substances also infiltrated the soil below burial and dump sites, contaminating groundwater that ultimately found its way to the Tyndall Property. *Id.* ¶ 27(c)–(e). Other means of contamination contributed to the overwhelming pollution of the Tyndall Property.[2] And the contamination persisted for years after the Tyndalls moved. *Id.* ¶¶ 68–77.

All the while, the Army knew that harmful waste was migrating outside installation boundaries. After all, migration was readily observable and contemporaneous reports documented widespread pollution problems. *Id.* ¶¶ 55–57, 60–64. Not only that, the Army also knew its waste was *contaminating* nearby properties, like the Tyndall Property, and even accepted responsibility for the contamination. For example, in the early 1960s and in 1973, the Army agreed to compensate owners of nearby waterbodies for fish kills that happened due to

---

[2]    *See, e.g.,* SAC ¶ 27(d) (contaminated leachate flowed out of burial sites and into the Western Stream and groundwater); *id.* ¶ 27(e) (waste discarded in trenches reached the groundwater and migrated onto the Tyndall Property); *id.* ¶ 28 (contamination of drinking water sources near the Tyndall Property); *id.* ¶ 31 (discharge of polluted effluent from the Industrial Waste Treatment Plant into Conley Creek, which flowed near the Tyndall Property); *id.* ¶¶ 36–38 (contaminated water at the Holding Pond flowed into Conley Creek and reached soil and groundwater); *id.* ¶ 42 (discharge of polluted effluent from Sewage Treatment Plants into tributaries of Conley Creek); *id.* ¶¶ 47–48 (similar allegations related to the Storm Drain System).

contamination from Fort Gillem. *Id.* ¶¶ 58–59.

Because of the Army's improper disposal practices, the Tyndalls, and Mrs. Tyndall in particular, were unknowingly exposed to chemical carcinogens and other harmful substances as they went about their daily lives. *Id.* ¶¶ 3, 83–87. From this exposure, Mrs. Tyndall developed cancer and ultimately succumbed to her illness in 1997, after ten grueling years of treatment. *Id.* ¶¶ 3, 16–17.

## LEGAL STANDARD

Contrary to the Government's suggestion, ECF 47 at 8, the Motion asserts a facial, not factual, challenge to subject-matter jurisdiction because it presents no extrinsic evidence and asks the Court to consider "only the [SAC] and the attached exhibits." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008). On a facial challenge, the plaintiff retains the "safeguards" afforded him on a Rule 12(b)(6) motion, "and the court must consider the allegations in the plaintiff's complaint as true." *Id.* (citation modified). And to defeat a facial challenge in the FTCA context specifically, the plaintiff need only "allege a plausible claim that falls outside the discretionary function exception." *Douglas v. United States*, 814 F.3d 1268, 1276 (11th Cir. 2016).[3]

---

[3] Alternatively, if the Court construes the Motion as a factual attack, there remain two important limitations on the Court's ability to make independent factual determinations. First, the Motion may be deemed a factual challenge only as to issues on which the Government has proffered evidence; where no evidence

## ARGUMENT

The Government argues that it is immune from suit under the discretionary-function exception to the Federal Tort Claims Act's ("FTCA") waiver of sovereign immunity.[4] The Court's analysis is guided by a two-step inquiry. First, the Court "consider[s] the nature of the conduct and determine[s] whether it involves an element of judgment or choice." *Douglas*, 814 F.3d at 1273 (citation modified). Second, "if the conduct at issue involves the exercise of judgment," courts decide "whether that judgment is grounded in considerations of public policy." *Id*. (citation omitted). The discretionary function exception applies only if *both* elements are satisfied.

This case is resolved against the Government at step one. Mandatory and specific directives governed the Army's waste disposal practices at Fort Gillem, yet the Army violated those directives, resulting in the contamination of the Tyndall Property. The Court need not reach step two, but if it does, the facts show

---

has been provided, Plaintiff's allegations must be accepted as true. *See Brons v. United States*, No. 1:14-CV-00864, 2015 WL 630433, at *3 (N.D. Ga. Feb. 12, 2015). And second, with respect to issues that intertwine with the merits—such as when, where, and how the Army disposed of waste—the Court must view the jurisdictional facts as it would at summary judgment, construing all inferences in favor of Plaintiff as the non-moving party. *Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990).

[4]    This exception precludes government liability for "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government[.]" 28 U.S.C. § 2680(a).

that the Government's careless disposal practices could not have been grounded in any consideration of policy. The Court should deny the Government's motion.[5]

## I.      Each directive identified in the SAC applied to, and was violated by, the Army's operations at Fort Gillem.

The Government argues several statutes, regulations, and other authorities cited by Tyndall are "wholly inapplicable" to his claims—either because they did not govern the Army's operations at Fort Gillem, or because Tyndall has not adequately alleged any violation by the Army. ECF 47 at 12. These arguments fail.

### A.      The Army violated the Refuse Act of 1899.

Tyndall alleges the Army's waste disposal violated the Refuse Act in two ways: (1) by disposing of waste on land that later migrated into tributaries of navigable waters and (2) by depositing waste from the shore directly into tributaries of navigable waters. SAC ¶¶ 14, 27, 31, 34, 37, 42, 47–48, 55–57, 61, 97–98. Improperly construing the SAC narrowly, however, the Government suggests only the first category of "indirect" discharges is alleged. ECF 47 at 13. It then argues—without citation to authority—that the Refuse Act does not prohibit the disposal of waste on land in a manner that causes it to migrate into waters. *Id.*

The Government's interpretation of the Refuse Act conflicts with decades of precedent and the Army's own Refuse Act regulations. In fact, the Government has

---

[5]      Tyndall does not dispute that the discretionary function exception bars his claims regarding remediation and failure to warn. *See* ECF 47 at 10–11.

successfully prosecuted people for the conduct alleged here—depositing material on (or under) land that then migrates into waters.[6] And the Army's regulations at the time show that the Refuse Act prohibited both "direct" and "indirect" discharges. 33 C.F.R. § 209.131(d) (1972); *see also* 36 Fed. Reg. 6,564, 6,565 (Apr. 7, 1971) ("The Refuse Act is considered to apply to all direct and indirect discharges or deposits . . . including discharges or deposits from . . . Federal facilities or installations"). The SAC plausibly alleges multiple indirect discharge violations of the Refuse Act. SAC ¶¶ 27, 33, 39, 44, 55–57, 61.

Tyndall also alleges *direct* discharge violations that satisfy even the Government's more restrictive (and incorrect) interpretation of the Refuse Act. Fairly construed, the SAC alleges the Army discharged refuse directly from the "shore" into tributaries of navigable waters, no matter how narrow a definition of that term one accepts. For example, Tyndall states the Army dumped waste directly "over the edge of ravines" containing streams and discharged effluent from waste treatment facilities into waters. *Id.* ¶¶ 27(a), 31, 37, 42, 47–48. Accordingly,

---

[6]     *See, e.g.*, *United States v. White Fuel Corp.*, 498 F.2d 619, 622 (1st Cir. 1974) (upholding conviction under Refuse Act where oil leached underground from a tank farm and percolated through soil before reaching waters, noting "[t]hat the discharge was more of an indirect percolation than a direct flow is, of course, immaterial"); *United States v. Esso Standard Oil Co. of P.R.*, 375 F.2d 621, 623 (3d Cir. 1967) (holding that indirect discharges of petroleum that occurred on land and flowed over a road and another company's property, into the sea, violated Section 13); *see also United States v. Sexton Cove Ests., Inc.*, 526 F.2d 1293, 1297 n.8 (5th Cir. 1976).

Tyndall's Refuse Act allegations survive the discretionary function exception.

**B.    The Army lacked discretion to trespass on or use private property without following mandatory condemnation procedures.**

The SAC alleges the Army's waste disposal caused a permanent invasion and occupation of the Tyndall Property. SAC ¶¶ 14, 160–69. It is undisputed this occupation constituted a taking—that is, a condemnation of the Tyndall Property. *See Hansen v. United States*, 65 Fed. Cl. 76, 120 (2005) (chemical contamination that "persist[ed] for an indefinite period, at least several years," was a taking). While the Army could take private property for military use, federal statutes and regulations required it to follow a specific process, which it failed to do for the Tyndall Property. SAC ¶¶ 162, 164–65. The resulting occupation was thus outside the discretionary function defense *and* gives rise to liability for trespass. *See Hatahley v. United States*, 351 U.S. 173, 180–81 (1956) (rejecting discretionary function defense where federal rangers took private property without following statutory notice requirements, as this violation rendered the "acts . . . wrongful trespasses not involving discretion on the part of the agents").

The Government raises two arguments in response, neither of which persuades. First, the Government argues it retains sovereign immunity for violations of the condemnation directives. This is so, the Government claims, because federal agencies are liable under the FTCA only when a private person would be liable for the same conduct, and private parties cannot condemn property.

ECF 47 at 19–20.

But this argument confuses the tort claim being asserted with the distinct concept of the discretionary function exception. Substantively, the FTCA makes the Government liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *see United States v. Olson*, 546 U.S. 43, 46–47 (2005) (explaining "private person analogies"). A private person who invades another's property with contaminants is liable for trespass in Georgia, which is one of the claims asserted in the SAC. *See* O.C.G.A. § 51-9-7. Tyndall does not, however, assert any takings claim against the Government, contrary to its suggestion. ECF 47 at 20.

The duty involved in the discretionary function exception is different. It asks whether otherwise tortious conduct should be protected because the Government was acting within the discretion the legislature has delegated to it to carry out governmental functions. To establish no such discretion existed, or that discretion was otherwise constrained, plaintiffs often rely on requirements and directives that apply only to the Government's conduct. *See Berkovitz v. United States*, 486 U.S. 531, 542 (1988) (discretionary function exception was overcome by directives governing the regulatory approval of vaccine licenses and vaccine lots). That is precisely what Tyndall has done in citing the condemnation directives.

9

Second, the Government contends that it only had to follow the mandatory condemnation procedures if it condemned property for purposes enumerated by the statute, and not if it condemned property for other purposes. ECF 47 at 20–21. But, as the Government concedes, the relevant statutes applied to property taken by the Army for the "site, construction, or operation of fortifications" and "military training camps," such as Fort Gillem. *Id.* at 20 n.7; *see also id.* at 20 n.6. As alleged, the Army disposed of waste on the Tyndall Property as part of its *operation* of Fort Gillem. SAC ¶¶ 18–20, 26, 30, 36, 40–41, 47. This is a condemnation or seizure for a statutorily enumerated purpose, *id.* ¶¶ 162, 166, and the statutes prescribed the only way the Army could take and use private property for that purpose.[7] *Id.* ¶ 163; *see* 10 U.S.C. § 2663(a), (f) (applying to acquisition "by condemnation, eminent domain, or seizure").

That the Army had no discretion to use or occupy the Tyndall Property, except by the statutory condemnation procedures, is supported by *Simons v. United States*, 413 F.2d 531 (5th Cir. 1969). There, the Fifth Circuit held trespass claims are not subject to the discretionary function exception "since the Government has no authority or discretion over land not under its control." *Simons*, 413 F.2d at

---

[7]    Similarly, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. § 4651) and 32 C.F.R. § 552.37 required the Army to institute condemnation proceedings to acquire property absent an agreement with the landowner. *See* 42 U.S.C. § 4651(8); 32 C.F.R. § 552.37(a), (h).

534.[8] After all, "a discretionary function can only be one within the scope of authority of an agency," *Usoyan v. Republic of Turkey*, 6 F.4th 31, 40 (D.C. Cir. 2021), and an agency has no authority to take private property without compensation. The discretionary function exception does not protect the Army's trespass, for which the Government is liable to the same extent as a private party.

### C.    The Army violated numerous garbage disposal directives.

Tyndall alleges the Army failed to conform its land disposal operations to several garbage disposal directives that prohibited open dumping and mandated the use of sanitary landfills (or similarly protective methods). SAC ¶¶ 106, 119–20, 129. These directives included TM 5-634, TM 5-814-5, 42 C.F.R. § 76.8(a)(3) and (a)(4), and the "Sanitary Landfill Facts" document. Again improperly construing the SAC narrowly, the Government argues neither "sanitary landfills" nor "open dumps" are identified as sources of environmental contamination at Fort Gillem, and so the garbage disposal directives are irrelevant. ECF 47 at 17, 19.

But Tyndall *does* allege the Army tried to use sanitary landfills[9] at Fort

---

[8]    The *Simons* holding that trespass claims are not subject to the discretionary function exception controls the current case. *See Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (Fifth Circuit decisions prior to 1981 are "binding as precedent in the Eleventh Circuit.").

[9]    Notably, the Government does not define a "sanitary landfill" despite arguing none is alleged here. During the relevant time, the term did not have a precise meaning but referred broadly to a "method of disposing of refuse by compacting it without burning, covering it daily with a layer of compacted earth,

Gillem, though it failed to properly construct, operate, and maintain them. SAC ¶¶ 106, 119–20, 129. The SAC explains that, although waste was not confined solely to sanitary landfills, the Army did engage in "landfilling" and "trenching," *id.* ¶ 25, which are well-recognized procedures for sanitary landfilling.[10] That the Army did not follow all requirements of a sanitary landfill—and thus did not safely dispose of its waste—does not mean the Army was not subject to sanitary landfill requirements. This argument by the Government is circular: it claims that, because it did not follow the sanitary landfill requirements, it did not operate a "sanitary" landfill and thus was not bound by the requirements. This cannot be right.

Nor does it help the Government that the garbage disposal directives acknowledged suitable disposal methods other than sanitary landfills. ECF 47 at 17–18. Where the Army did not use "landfilling" and "trenching" at Fort Gillem, the SAC alleges it engaged in "burning, indiscriminate burial, and surface disposition" of waste. SAC ¶ 25. The garbage disposal directives are explicit that

---

and forming it into cells sealed by earth walls and cover." ECF 45-2 at US_00034881.

[10]    *See, e.g.*, ECF 45-1 at US_00037064 ("[The sanitary fill method's] principle is simple—garbage and refuse are dumped in *trenches*, compacted, and covered each day.") (emphasis added); *id.* at US_00037066–67, US_00037070–77 (discussing the specifications and operating procedures for trenches); ECF 45-2 at US_00034900–11 (same); ECF 45-7 at 16 (identifying two "general methods" of sanitary landfilling—"the area method, and the *trench method*") (emphasis added); ECF 45-9 at US_00035220 (same).

open or unregulated dumping,[11] which includes methods like surface disposition, indiscriminate burial, and certain burning, are *prohibited* and *never suitable* at federal facilities.[12] *Id.* ¶¶ 106(d), 120. So, even if the Army could choose among different disposal methods, open dumping was forbidden.

**D.    The Army violated 40 C.F.R. pt. 241 and AR 420-47.**

Finally, the Government argues 40 C.F.R. pt. 241 and AR 420-47 did not apply because they excluded "hazardous" waste from their disposal directives. *See* ECF 47 at 15–16. That argument is mistaken. Tyndall alleges non-hazardous materials, such as food products, were disposed of at Fort Gillem in addition to any hazardous waste. SAC ¶ 26. So, the Army had to follow the planning directives in 40 C.F.R. pt. 241 and AR 420-47, many of which were designed specifically to *exclude* inappropriate, unsafe types of waste from land disposal sites. *E.g.*, *id.*

---

[11]    An "open dump" or "unregulated dump" described "a land disposal site at which solid wastes are disposed of in a manner that does not protect the environment, is susceptible to open burning, and is exposed to the elements, vectors, and scavengers." *E.g.*, ECF 45-10 at US_00032486.

[12]    *See, e.g.*, ECF 45-1 at US_00037051–52 ("requiring proper collection and disposal of refuse and effacement of all unregulated dumps"; describing "[a]pproved collection and disposal procedures . . . in sections II through V"; and attaching photographs of prohibited surface disposition of waste); ECF 45-2 at US_00034882 (setting forth procedures "for eliminating an unregulated dump"); ECF 45-6 at 7 ("Wastes shall not be left in open dumps."); ECF 45-7 at 9 (distinguishing the sanitary landfill from "the traditional open, frequently burning, dump"); ECF 45-9 at US_00035218 ("The procedures [of waste disposal] which are generally available are contractual arrangement, sanitary landfill, and incineration"—not open or unregulated dumps.).

13

¶¶ 133, 138, 140. By disregarding these planning requirements, the Army selected and used disposal sites that were susceptible to environmental contamination, especially by the hazardous substances that were, but never should have been, dumped there in the first place. *Id.* ¶¶ 139–40.

## II. The Army's violations of mandatory duties caused Mrs. Tyndall's cancer and untimely death.

To avoid dismissal on discretionary function grounds, the allegedly breached duty "must also bear a causal relationship to plaintiffs' injuries." *JGE ex rel. Tasso v. United States*, 772 F. App'x 608, 611 (10th Cir. 2019). The Government makes proximate and factual causation arguments, all of which fail.

### A. The SAC sufficiently alleges proximate causation.

First, the Government makes proximate cause challenges to three mandatory directives—the Refuse Act, the Clean Water Act, and the Georgia Water Quality Control Act ("GWQCA"). Broadly speaking, each statute prohibits the discharge of pollutants into covered waters, except in strict compliance with a permit. SAC ¶¶ 96, 146, 149. That the Army illegally discharged pollutants into the Western Stream is not disputed by the Government. And the SAC plainly alleges those illegal, and thus nondiscretionary, discharges caused the harm. *Id.* ¶¶ 98–99, 101, 153–56. That alone is sufficient to show causation.

The Government, however, appears to take the causation requirement a step further, suggesting Tyndall must show specifically that the Army's failure to

14

obtain a discharge permit is what caused the harm. ECF 47 at 14–15. This standard

is not consistent with the Supreme Court's treatment of the discretionary function

exception. *See Berkovitz*, 486 U.S. at 542–43 (where the agency failed to review

mandatory safety data before issuing a vaccine license, the Court did not require

plaintiff to show that the license would have been denied had the agency followed

the nondiscretionary process). But even under the Government's incorrect framing

of causation, the SAC passes muster.

As the SAC and the case law explains, the requirement to apply for and

obtain a permit under the relevant statutes is no mere rubberstamp. Rather, a

discharge permit "restricts the quantity, rate, and concentration of pollutants that

the point source may emit into the water and provides a schedule for compliance

with the water quality standards and effluent limitations applicable to that point

source." *Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869, 871 (7th Cir. 1989). Had the

Army applied for the required permits, it would have needed to disclose

information about the specific pollutants in its discharges. SAC ¶¶ 157–58. And

the permitting agencies would have exercised regulatory control over those

discharges, establishing limitations to meet water quality standards and protect

human health and the environment. *Id.* ¶ 137, 158. This applies equally to the

Refuse Act, the Clean Water Act, and the GWCA.[13] Thus, Tyndall sufficiently alleges that the Army's failure to apply for the necessary permits exposed Mrs. Tyndall to harmful contamination, causing her cancer. *Id.* ¶¶ 101, 159.

The Government's reliance on *Montijo-Reyes v. United States*, 436 F.3d 19 (1st Cir. 2006), and *Crichton v. TVA*, No. 3:09-CV-592, 2010 U.S. Dist. LX 58972 (E.D. Tenn. June 15, 2010), to undermine the Refuse Act and the Clean Water Act, respectively, is unavailing. ECF 47 at 14–15. First, the Refuse Act's discharge prohibition and permitting scheme are not equivalent to the water quality certificate in *Montijo-Reyes*. The harm alleged there—sand and dust blowing on homes from a dredge disposal site—was not regulated by water quality standards and was not the type of harm contemplated by the Clean Water Act. *See Montijo-Reyes*, 436 F.3d at 25–26. So, the plaintiff could not show how compliance with

---

[13] Mirroring Tyndall's Clean Water Act and GWQCA allegations, the regulations under Section 13 of the Refuse Act, 33 C.F.R. § 209.131 (1972), required the Army Corps of Engineers, as permitting authority, to evaluate the effects of a proposed discharge on water quality standards and other values, *id.* § 209.131(d)(5); consult with expert federal agencies on those impacts and any advisable permit conditions, *id.* § 209.131(d)(6)–(7); and deny a permit application if it would be inconsistent with water quality standards or related considerations. *Id.* § 209.131(d)(8), (11)(iii). To that end, the Army, as applicant, would have had to "fully identify the character of the discharge(s) or deposit(s)," including "data pertaining to chemical content, water temperature differentials, toxins, sewage, amount and frequency of discharge or deposit and the type and quantity of solids involved, if any." *Id.* § 209.131(g). The Army's discharges could not have been permitted as is under the applicable water quality standards at that time. SAC ¶¶ 137, 140, 158.

standards designed to preserve and enhance *water quality*, would protect *homes* "from the indirect effects of dredged material disposal." *Id.* at 26. By contrast, the Refuse Act prohibits the very conduct that Tyndall alleges exposed his wife to harmful contamination—discharges of refuse into waters. *See United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 671 (1973) (recognizing pollution as part of "the serious injury to our watercourses … sought to be remedied" by the Act) (citation modified).

Meanwhile, the Government cites *Crichton* to suggest the Clean Water Act is not actionable for discretionary function purposes. ECF 47 at 14–15. The court's reasoning in *Crichton* is curious: it draws a distinction—found nowhere in the FTCA and supported by no case law—between statutes prohibiting *conduct*, which are not discretionary, and statutes prohibiting the *result* of challenged conduct, which are discretionary. *See* 2010 U.S. Dist. LX 58972, at *19. But this logic has no bounds: violating a directive is always the *result* of some other *conduct*. And in any event, the Clean Water Act and its regulations did require specific conduct by the Army before it could discharge into the Western Stream.[14]

---

[14]    *See, e.g.*, 38 Fed. Reg. 13,528, 13,531 (May 22, 1973) (requiring federal agencies with pre-existing discharges to apply for a permit by April 16, 1973); 37 Fed. Reg. 25,898, 25,898, 25,904 (Dec. 5, 1972) (mandating applications forms, which became effective by 38 Fed. Reg. 19,894 (July 24, 1973), that all point-source operators had to complete for a permit and that required disclosure of the type, volume, locations, and toxicity of pollutant discharges).

17

At most, *Crichton* should be confined to the unique facts of that case. There, the plaintiff sued the Tennessee Valley Authority after the catastrophic failure of a coal ash containment dike, spilling coal ash sludge into adjacent waters and private properties. *See id.* at *2. On these facts, it is hard to imagine how TVA could have complied with the Clean Water Act's discharge prohibition or permitting requirement, considering the dike failure and resulting discharge were sudden and accidental. In contrast, the SAC alleges the Army continuously, foreseeably, and knowingly discharged pollutants into waters before and after the Clean Water Act's enactment in 1972. SAC ¶¶ 21, 49, 55–64, 153.

### B. The SAC sufficiently alleges factual causation because the Army continued disposing of waste after each directive was issued.

For other mandatory directives, the Government raises a factual causation argument—that they were promulgated after the Army began disposing of waste at Fort Gillem and thus could not have caused Mrs. Tyndall's cancer.[15] There are several problems with this argument.

At the outset, the Government overlooks a critical allegation that, on its own, defeats any timing challenge. That is, the Army's waste disposal activities continued *for three years* after even the last directive identified in the SAC (AR

---

[15]    *See* ECF 47 at 15 (Clean Water Act and GWQCA); *id.* at 16–17 (40 C.F.R. pt. 241 and AR 420-47); *id.* at 17–19 ("Guidance Regarding Sanitary Landfills"); *id.* at 19 (42 C.F.R. § 76.8(a)(3)).

18

420-47) was issued in 1977. SAC ¶¶ 23, 138, 148. In those intervening years, Tyndall alleges the Army "continued to operate existing disposal sites, modified disposal sites, and initiated new disposal sites at Fort Gillem," while failing to comply with waste disposal requirements. *Id.* ¶ 139. Thus, unlike in *Waverley View Investors, LLC v. United States*, 79 F. Supp. 3d 563 (D. Md. 2015), where "the majority of the provisions were adopted after the Army had *stopped* disposing of waste," *id.* at 570 (emphasis added), here the Army persisted after the adoption of all directives identified in the SAC. At the pleading stage, nothing more is required to connect the Army's violations of the directives to Mrs. Tyndall's illness, given that she was exposed to the Army's hazardous contamination until 1982.[16] SAC ¶ 13.

It is impossible to engage substantively with the Government's timing argument without raising complex evidentiary questions that are premature at this stage. To answer definitively whether a particular manual issued on a particular date caused the harms alleged—as the Government asks the Court to do—requires

---

[16]    Causation is even clearer for the earlier directives contested by the Government—TM 5-634 (1946 and 1958), "Sanitary Landfill Facts" (1968), 42 C.F.R. pt. 76 (1969), the Clean Water Act (1972), TM 5-814-5 (1973), and 40 C.F.R. pt. 241 (1974). SAC ¶¶ 52, 102, 104, 113, 125, 131. Contrary to the Government's suggestion, ECF 47 at 15, federal facilities were required to obtain a Clean Water Act permit when the statute was enacted in 1972. SAC ¶¶ 146–47, 154; *see EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 220 (1976) (recognizing EPA as the "permit-issuing authority" for federal dischargers before the 1977 amendments subjecting them to state permitting programs).

fact and expert testimony. Discovery will elucidate critical questions such as *where* and *when* certain substances were disposed of; *whether* and *when* those substances migrated into the Western Stream and the Tyndall Property; and, based on their concentrations and toxicity, *to what extent* those substances may have contributed to Mrs. Tyndall's cancer. Until experts have their say on such fact-intensive issues, it is impossible to dismiss the relevance of any directive cited in the SAC. These issues will be resolved during merits discovery. *See Pavone v. Am. Contract Sys., Inc.*, No. 2:24-cv-1054, U.S. Dist. LX 199912, at *6 (M.D. Fla. Oct. 9, 2025) (under Rule 12(b)(6) standard, declining defendant's "invitation to require Plaintiffs to provide expert-level causation analysis in their pleadings").

## III.   The applicable waste disposal directives were mandatory and specific enough to overcome the discretionary function exception.

The Government challenges some directives as insufficiently "mandatory" and "specific," such that the Army retained discretion over its waste disposal practices. *See* ECF 47 at 23. "Government conduct does not involve an element of judgment or choice, and thus is not discretionary, if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." *Downs v. U.S. Army Corps of Eng'rs*, 333 F. App'x 403, 408 (11th Cir. 2009) (citation modified).

### A.   Garbage Disposal Directives

To begin, the Government makes a passing argument that several "sanitary

20

landfill provisions" did not prescribe "a mandatory and specific course of action for Army employees to follow in selecting, operating, or completing sanitary landfills[.]" ECF 47 at 18. Other than this vague, cursory statement—and citations to general legal principles—the Government makes no specific reference to any directive or allegation it believes is deficient. *See id*. at 18–19. In any event, each directive *did* require the Army to follow specific procedures and make specific determinations in selecting, operating, and completing disposal sites, as alleged in the SAC and confirmed by its exhibits. SAC ¶¶ 102–06, 113–20, 125–29; *see Woodman v. United States*, No. 87-116-Civ-J-14, 1995 U.S. Dist. LX 2787, at *109 (M.D. Fla. Jan. 24, 1995) (holding TM 5-634 imposed a nondiscretionary duty on Navy's disposal of waste), *rev'd on other grounds sub nom. Andrews v. United States*, 121 F.3d 1430 (11th Cir. 1997).

### B.    EM 385-1-1

Next, the Government contests EM 385-1-1 on the grounds it did not embody a fixed or readily ascertainable standard. ECF 47 at 22. Not so. The manual contained provisions that "prohibited contamination or pollution of any river, stream, or public water," SAC ¶ 109, and that "[d]isposal of surplus or excess materials and containers shall be by burial in a manner which will not contaminate or pollute water supply, ground water, or streams." *Id.* ¶ 110. Unlike

21

the standard in *Autery v. United States*, 992 F.2d 1523 (11th Cir. 1993),[17] a requirement not to contaminate or pollute the water supply through waste burial *is* a readily ascertainable standard. *See Downs*, 333 F. App'x at 413 n.5 ("[a] defined safety or other construction standard can create a mandatory duty to meet that standard, by whatever means"); *Woodman*, 1995 U.S. Dist. LX 2787, at *109 (addressing EM 385-1-1). Here, the Army not only could, but in fact did, determine its waste disposal was polluting surface water and groundwater. SAC ¶¶ 21, 49–65.

While the Government selectively highlights discretionary language in EM 385-1-1, its own brief reveals that any exercise of discretion was conditioned on nondiscretionary acts, which the Army did not take here. *See* ECF 47 at 23. In particular, an "adaptation" from literal application of the manual was authorized— but only with approval from designated personnel, for a "specific job," and if it would "meet[] the obvious intent of the requirement." ECF 45-3 at 4; ECF 45-4 at US_00034338. Similarly, alternative methods of disposal were allowed—but only if they "assur[ed] the same degree of control" and were approved by "the government representative in charge." ECF 45-4 at US_00034365. Tyndall does

---

[17]   The policy in *Autery* directed employees to "make every effort within the constraints of budget, manpower, and equipment available to recognize and report" hazardous trees. 992 F.2d at 1528 (citation omitted). That exemplifies an unascertainable standard.

22

not allege, and the Government offers no evidence, that the Army complied with these threshold procedural requirements before deviating from EM 385-1-1.[18] *See Berkovitz*, 486 U.S. at 544 (where a regulatory scheme governed vaccine licensing, "[t]he agency has no discretion to deviate from this mandated procedure").

### C.    AR 200-1

The Government argues AR 200-1 was closer to a statement of policy goals than mandatory directives. ECF 47 at 24–27. Yet AR 200-1 established a specific procedural requirement—in the "Responsibilities" section, not the "Policies" section—to "develop programs" that "[i]dentify, quantify, and report all sources of water pollution and take appropriate action to eliminate or reduce them to acceptable levels." SAC ¶ 143. While the Government reads discretion into some elements of this procedure, what is not discretionary is that the Army *actually develop* a program that meets each element, which it allegedly did not do. *Id.* ¶ 144(b); *see Buckler v. United States*, 919 F.3d 1038, 1053 (8th Cir. 2019) (recognizing "some duties are mandatory in that they must be performed *in some*

---

[18]    That the court in *Gould Electronics, Inc. v. United States*, No. 99-1130, 2002 U.S. Dist. LX 262 (E.D. Penn. Jan. 10, 2002), overlooked the effect of these provisions, fatally undermines its conclusion. *See id.* at *28. It also appears the manual at issue in *Gould* granted greater discretion than EM 385-1-1, which animated the court's reasoning. *Compare id.* (describing safety requirements "not as rules to be super-imposed"), *with* ECF 45-3 at 4 (EM 385-1-1 was "mandatory to all missions under command of the Chief of Engineers"), *and* ECF 45-4 at US_00034338 (similar language).

*fashion*, even if the manner in which they are performed involves protected

discretion," and holding that "[a]lthough the [mine] inspector possessed discretion

as to the manner in which he reviewed documentation . . . he was wholly without

discretion to not conduct at least some review of training materials").

**IV.    The Army's waste disposal operations, by their carelessness and inattentiveness, were not grounded in public policy considerations.**

Even if no mandatory and specific directive constrained the Army here (and

many did), the discretionary function exception still does not apply.

Government conduct is protected only if it is of the kind that is "grounded in

social, economic, [or] political policy" and should be protected from judicial

second-guessing. *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991).

Importantly, some "otherwise-discretionary acts are obviously outside the scope of

the discretionary-function exception." *Swafford v. United* States, 839 F.3d 1365,

1370 (11th Cir. 2016) (citation modified). That is because the discretionary

function exception "applies only to conduct that involves the *permissible exercise*

*of policy judgment*." *Berkovitz*, 486 U.S. at 539 (emphasis added). So, even when

the government is afforded a "range of choice," it is "simply not a permissible

exercise of discretion" to "choos[e] to accept a dangerously unsafe" condition.

*Swafford*, 839 F.3d at 1372 (citation modified) (once the government built and

maintained a set of stairs, "failure to maintain [it] in a safe condition is simply not

a permissible exercise of policy judgment"); *see also Gaubert*, 499 U.S. at 325 n.7

24

(a government employee negligently driving a car while on official business "can hardly be said to be grounded in regulatory policy"). In a similar vein, at least three circuits have held that conduct marked by *carelessness* or *laziness* never qualifies for the discretionary function exception.[19]

As outlined in the SAC, the Army displayed exactly this kind of carelessness in its disposal of waste at Fort Gillem and in its knowing contamination of the environment and the Tyndall Property. *E.g.*, SAC ¶¶ 25, 27, 37, 56, 58–59, 61, 95, 156. Based on the Army's sheer incompetence and carelessness, this Court should decline to shield the Government from liability. Carelessness is not a policy choice—it is the absence of considered choice altogether, which cannot be "susceptible to policy analysis" under *Gaubert*.[20] *Gaubert*, 499 U.S. at 325.

## CONCLUSION

Plaintiff respectfully requests that the Court deny the United States' Motion.

---

[19] *See Rich v. United States*, 811 F.3d 140, 147 (4th Cir. 2015); *Coulthurst v. United States*, 214 F.3d 106, 111 (2d Cir. 2000); *Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003). The Eleventh Circuit is now considering an appeal that squarely raises this issue. *See* Plaintiffs-Appellants' Supplemental Brief (ECF 54) at 60–64, *Martin v. United States*, No. 23-10062 (11th Cir. Sept. 22, 2025).

[20] Some circuits have read the discretionary function exception to cover carelessness. *See Willis v. Boyd*, 993 F.3d 545, 549 (8th Cir. 2021); *Lam v. United States*, 979 F.3d 665, 682 (9th Cir. 2020); *Ball v. United States*, 967 F.3d 1072, 1077 (10th Cir. 2020). But these decisions cannot be squared with the narrow purpose Congress gave the exception, which is to avoid any challenge to "the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act" through a tort suit. *United States v. Varig Airlines*, 467 U.S. 797, 809 (1984).

Respectfully submitted this 30th day of April, 2026.

/s/ John L. Fortuna
John L. Fortuna
Georgia Bar No. 435149
Mathieu Erramuzpe
Georgia Bar No. 795208
Ari Gordin
Georgia Bar No. 649384
Michael Creswell
Georgia Bar No. 196080
**JONES FORTUNA LLC**
111 New Street, Suite A
Decatur, GA 30030
404-850-3832
jfortuna@jonesfortuna.com
merramuzpe@jonesfortuna.com
agordin@jonesfortuna.com
mcreswell@jonesfortuna.com

/s/ Cameron B. Roberts
Michael A. Caplan
Georgia Bar No. 601039
Cameron B. Roberts
Georgia Bar No. 599839
Alex Estroff
Georgia Bar No. 680155
**CAPLAN COBB LLC**
75 Fourteenth Street NE, Suite 2700
Atlanta, GA 30309
Phone: 404-596-5600
mcaplan@caplancobb.com
croberts@caplancobb.com
aestroff@caplancobb.com

*Counsel for Plaintiff Dwight G. Tyndall*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(C) in Times New Roman, 14-point font.

This 30th day of April, 2026.

*/s/ Cameron B. Roberts*
Cameron B. Roberts
Georgia Bar No. 599839

*Counsel for Plaintiff Dwight G. Tyndall*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I caused a true and correct copy of the foregoing document to be filed with the clerk's office by this Court's CM/ECF system, which will serve a true and correct copy of the same upon all counsel of record.

This 30th day of April, 2026.

/s/ Cameron B. Roberts
Cameron B. Roberts
Georgia Bar No. 599839

*Counsel for Plaintiff Dwight G. Tyndall*

28