IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No.

1:22-cv-03136-SDG

**REPLY IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION**

## I.   INTRODUCTION

Tyndall asks this Court to engage in "judicial 'second-guessing'" of the Army's decisions regarding waste disposal at Fort Gillem, *United States v. Gaubert*, 499 U.S. 315, 323 (1991), many of which were made long before pollution caused by solid waste disposal became a national concern warranting federal legislation. *See, e.g.*, *Gallatin v. Cherokee Cnty.*, 563 F. Supp. 940, 942 (E.D. Tex. 1983); ECF No. 47-7 at iii (observing that "solid waste disposal . . . entered the national limelight . . . with the passage of the Solid Waste Disposal Act of 1965"). In so doing, Tyndall invites this Court to view the Army's decisions through a lens enhanced by decades of scientific knowledge, technology, and legislation to conclude *in*

1

*hindsight* that the Army disposed of waste at Fort Gillem "without regard for the environment." Pl's Opp. at 1, ECF No. 48.

The Army had discretion to determine the method and manner of its waste disposal, and was "free to weigh environmental policies against security and military concerns." *OSI, Inc. v. United States*, 285 F.3d 947, 953 (11th Cir. 2002). As courts have observed, the military's "industrial waste disposal decisions" made during wartime, including World War II, the Korean Conflict, the Berlin crisis, and the Vietnam War, "undoubtedly were subject to defense and security considerations which encompass[ed] the heart of military policy" and thus took precedence over other concerns. *Aragon v. United States*, 146 F.3d 819, 826, 827 (10th Cir. 1998); *cf. Abreu v. United States*, 468 F.3d 20, 27-28 (1st Cir. 2006) (recognizing the "particularly strong argument for limiting the rule of *Gaubert* where the exercise of military authority is involved, in view of the numerous cases cautioning the courts to avoid interfering with the exercise of discretionary military authority"). Because Tyndall fails to prove that the discretionary function exception does not apply to the Army's waste disposal decisions, his claims should be dismissed.[1]

## II.   ARGUMENT

---

[1] Tyndall concedes that the discretionary function exception bars his claims regarding failure to timely remediate and failure to warn. *See* Pl.'s Opp. at 6 n.5.

2

## A. THE ARMY WAS NOT BOUND BY DIRECTIVES THAT WERE NOT IN EFFECT WHEN IT DISPOSED OF WASTE AT FORT GILLEM.

Tyndall alleges that the Army disposed of waste at Fort Gillem "from 1941 until approximately 1980," SAC ¶ 23, but by his own allegations, "[t]he most serious water quality impact [at Fort Gillem] concern[ed] the contaminated materials buried in the installation perimeter areas during the period from 1948 to 1972." SAC ¶ 63; *see also* ECF No. 47 at 2 n.1 (enumerating various items buried or discovered at Fort Gillem between 1949 and 1975). In his attempt to escape the discretionary function exception, Tyndall identifies several directives[2] placed into effect after the Army had already buried various contaminated materials at Fort Gillem, including a leaking bomb (1946); petroleum, oil, and lubricant (POL) products (1949-1964); DDT (1965); and medical items (1962-1975). He also identifies directives placed into effect *after* 1972,[3] when most, if not all, of the contaminated material had already been disposed of.[4] Because directives not in

---

[2] TM 5-634 (1946, 1958); Land Acquisitions Authority Statute of 1956; 32 CFR § 552.37(h)(1) (1957); EM 385-1-1 (1958, 1967); Sanitary Landfill Facts (1968); 42 C.F.R. Part 76 (1969); Executive Order 11507 (1970); Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970; Clean Water Act (1972).

[3] TM 5-814-5 (1973); 40 C.F.R. Part 241 (1974); AR 420-47 (1977); Clean Water Act (1977 – federal facility permitting provisions); AR 200-1 (1978); Georgia Water Quality Control Act (1980 – authorization to issue permits to federal facilities).

[4] Tyndall misidentifies the conduct at issue for the discretionary function analysis when he argues the Army's waste disposal activities continued *for three years* after even the last directive identified in the SAC (AR 420-47) was issued in 1977," Pl.'s Opp. at 18-19. Tyndall's alleged harm is based upon the Army's

place when the Army disposed of waste could not have possibly governed the Army's waste disposal at Fort Gillem, such directives cannot satisfy Tyndall's burden to prove that the discretionary function does not apply.

### B. THE ARMY'S WASTE DISPOSAL WAS NOT SUBJECT TO THE REFUSE ACT, CLEAN WATER ACT, AND GEORGIA WATER QUALITY CONTROL ACT PERMITTING REQUIREMENTS.

Tyndall argues that the Refuse Act, Clean Water Act ("CWA"), and the Georgia Water Quality Control Act ("GWQCA") all contained mandatory directives prohibiting discharge of pollutants into covered waters, "except in strict compliance with a permit." Pl.'s Opp. at 14. By not obtaining a permit allowing pollution to migrate outside Fort Gillem's boundaries, Tyndall contends that the Army's waste disposal was "illegal, and thus nondiscretionary." *Id.* As previously discussed, the Army was not subject to the permitting provisions of the CWA and GWQCA until 1977 and 1980, respectively, *see* ECF No. 47 at 12-13,[5] and the

---

alleged disposal of contaminated materials between 1948 and 1972, which then migrated to the Tyndall Property. The conduct at issue cannot be the Army's disposal activities after 1977, because by that time, the alleged toxic materials had already begun its migration to and/or reached the Tyndall Property, causing the alleged injuries. Thus, the Army's subsequent conduct, and whether it complied with subsequent directives, has no causal nexus with Tyndall's claims.

[5] "Congress did not intend to make failure to comply with a nonexistent program a crime." *United States v. Pa. Indus. Chem. Corp.*, 461 F.2d 468, 476 (3d Cir. 1972) ("There is a vast difference . . . between a conviction of one who fails to secure an available permit and a conviction of one who fails to secure a permit which is unavailable.").

permitting provisions of the Refuse Act were not initiated until December of 1970. *See Jentgen v. United States*, No. 415-77, 1980 U.S. Ct. Cl. LEXIS 1232, at *81-82 (Ct. Cl. Nov. 25, 1980) (citing 35 Fed. Reg. 19627 (1970)). Furthermore, even after 1970, the Army's disposal of waste at Fort Gillem was not subject to the Refuse Act's permitting requirements as interpreted at that time.

Tyndall alleges that the "Army discharged refuse directly from the 'shore' into tributaries of navigable waters." Pl.'s Opp. at 7. However, during the time of the Army's waste disposal, "federal regulation," including the Refuse Act, "was limited to ensuring that 'traditional navigable waters'—that is, interstate waters that were either navigable in fact and used in commerce or readily susceptible of being used in this way—remained free of impediments." *Sackett v. EPA*, 598 U.S. 651, 659 (2023) (citations omitted)).[6] Tyndall does not allege that waste disposed of within the boundaries of Fort Gillem impeded navigation of interstate waters.

Tyndall also argues that the Army's waste disposal was an "indirect

_____

[6] This definition "persisted up to the enactment of the CWA." *Sackett*, 598 U.S. at 698 (Thomas, J., concurring). *See United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 670-72 (1973) ("It is undisputed that prior to December 1970 the Army Corps of Engineers consistently construed [the Refuse Act] as limited to water deposits that affected navigation."); *United States v. Std. Oil Co.*, 384 U. S. 224, 226 (1966) (spilling oil in a navigable water prohibited by the Refuse Act because "its presence in our rivers and harbors is both a menace to navigation and a pollutant"); *United States v. Republic Steel Corp.*, 362 U.S. 482, 487-91 (1960) ("diminution of the navigable capacity of a waterway" required for violation of the Refuse Act).

discharge" governed by the Refuse Act because material buried "on (or under) land)" at Fort Gillem later "migrate[d] into waters." *See* Pl.'s Opp. at 7 & n.6. Such indirect migrations are not discharges into navigable waters as contemplated by the Refuse Act, and none of the cases Tyndall cites in support dictate otherwise.[7]

Even if the Army's waste disposal were subject to the Refuse Act, Tyndall still fails to explain how failing to obtain a permit proximately caused his wife's illness and death. He surmises that, "[h]ad the Army applied for the required permits, it would have needed to disclose information about the specific pollutants in its discharges," and "the permitting agencies would have exercised regulatory control over those discharges." Pl.'s Opp. at 15. He further speculates that, once the Army disclosed the character of the discharges, the disposal "could not have been permitted" and Mrs. Tyndall would not have been exposed to the contaminants and developed cancer. *Id.* at 16 & n.13. Tyndall has no basis for this series of speculations and thus fails to demonstrate how not obtaining a permit

---

[7] *See United States v. White Fuel Corp.*, 498 F.2d 619 (1st Cir. 1974) ("immense accumulation" of oil that seeped from "an oil tank farm, with its inherent risk of spills, leaks, and seepage," into undisputedly "navigable waters of the United States"); *United States v. Esso Standard Oil Co.*, 375 F.2d 621 (3d Cir. 1967) (petroleum flowed "by gravity alone" from a tank farm across a dirt road and neighboring property into "adjoining coastal waters"); *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976) (noting in dicta that the Refuse Act could be violated by "indirect discharges merely onto land or onto a non-navigable water but which in turn are likely to wash into navigable waters").

could have caused Mrs. Tyndall's illness and death.

Tyndall's attempts to distinguish the instant case from *Crichton v. TVA*, No. 3:09-CV-592, 2010 U.S. Dist. LEXIS 58972 (E.D. Tenn. June 15, 2010) and *Montijo-Reyes v. United States*, 436 F.3d 19 (1st Cir. 2006) are unavailing. First, considering the "accidental" nature of the discharge in *Crichton*, Tyndall finds it "hard to imagine how TVA could have complied with the Clean Water Act's discharge prohibition or permitting requirement." Pl.'s Opp. at 18. However, it is just as hard to imagine how the Army could have anticipated as early as the 1940s that pollutants buried at Fort Gillem could unintentionally migrate outside its boundaries and into nearby water decades later. In any event, Tyndall merely "assert[s] that there was a prohibited result"—discharging refuse without a permit—without showing how such conduct proximately caused his wife's illness and death. *Crichton*, 2010 U.S. Dist. LEXIS 58972, at \*19.[8] Like the court in *Crichton*, this Court should look beyond the "ultimate result of the challenged conduct"—

---

[8] In *Montijo-Reyes*, the challenged conduct was "the discharge of dredged material in navigable waters without necessary water quality permits," *Montijo-Reyes*, 436 F.3d at 24 n.6, which the court held "did not proximately cause [the] harm," *id.* at 25. Although Tyndall attempts to distinguish *Montijo-Reyes* from this case by pointing out that "sand and dust blowing on homes from a dredge disposal site . . . was not the type of harm contemplated by the Clean Water Act," Pl.'s Opp. at 16, he fails to explain how pollutants migrating into water decades after being buried on (or under) land was the type of harm contemplated by the permitting provisions of the Refuse Act, CWA, or GWQCA.

the discharge of pollutants in violation of statutes and permits — and consider "whether there was a violation of a specific, mandatory statute or regulation in the conduct leading up to the [alleged] violation." *See also Mays v. TVA*, 699 F. Supp. 2d 991, 1013 (E.D. Tenn. 2010).

### C. TYNDALL FAILS TO IDENTIFY SPECIFIC AND MANDATORY DIRECTIVES PLACING THE ARMY'S CONDUCT OUTSIDE THE DISCRETIONARY FUNCTION EXCEPTION.

The discretionary function exception is to be strictly construed in favor of the United States with all ambiguities "interpreted in one direction—in favor of immunity." *Smith v. United States*, 14 F.4th 1228, 1231 (11th Cir. 2021) (citations omitted). Tyndall fails to satisfy his heavy burden of proving that the discretionary function exception does not apply.

#### 1. CONDEMNATION PROCEDURES

Tyndall argues that the Army's waste disposal at Fort Gillem "constituted a taking—that is, a condemnation of the Tyndall Property," for the "statutorily enumerated purpose" of the "'site, construction, or operation of fortifications' and 'military training camps,' such as Fort Gillem." Pl.'s Opp. at 8, 10.[9] He contends that federal takings statutes "required [the Army] to follow a specific process"

---

[9] Even if the Army's waste disposal was "part of its *operation* of Fort Gillem," Pl.'s Opp. at 10, Tyndall fails to explain how the subsequent migration of pollutants onto the Tyndall Property was part of such operation contemplated by the condemnation statutes.

before it "could take [his] private property for military use," and those statutes can serve as mandatory directives supporting his trespass tort claim and escaping the discretionary function. *Id.* at 8. This argument fails, as Tyndall misunderstands the distinction between a taking and a tort.

"[A] taking only results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Spencer v. Benison*, 5 F.4th 1222, 1233 (11th Cir. 2021) (quoting *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003)). "[A] taking does not occur merely because the governmental action burdens or restricts some particular right or interest in a parcel of land; rather, before a taking occurs, the government must deny the owner all or an essential use of his property." *Cook v. Cleveland State Univ.*, 13 F. App'x 320, 321-22 (6th Cir. 2001) (citation omitted)). Because Tyndall's allegations fail to demonstrate an intentional invasion of Tyndall's property interest, rather than an "incidental or consequential injury inflicted by [the Army's waste disposal]"), *Spencer*, 5 F.4th at 1233, he cannot point to statutory takings procedures to escape the discretionary function exception.

### 2. SANITARY LANDFILL GUIDANCE

Tyndall argues that, simply because "the Army did not follow all requirements of a sanitary landfill . . . does not mean the Army was not subject to

sanitary landfill requirements." Pl.'s Opp. at 12. Rather, Tyndall contends that the Army was unequivocally required "to follow specific procedures and make specific determinations in selecting, operating, and completing [all] disposal sites." *Id.* at 21 (citing SAC ¶¶ 102-06 (TM 5-634); 113-20 (42 C.F.R. Part 76); 125-29 (TM 5-814-5)). This is not supported by the text of the cited directives, which expressly do not apply to disposal sites generaly, nor do such directives mandate a specific and mandatory course of action regarding the Army's waste disposal.

### a. *TM 5-634 & TM 5-814-5*

Tyndall points to the Army's technical manuals TM 5-634 and TM 5-814-5 as mandatory directives governing the Army's selection, operation, and completion of disposal sites. SAC ¶¶ 102-06; 125-29.[10] However, as the Eleventh Circuit has held, and as this Court has observed, such internal manuals do not "create any mandatory obligation sufficient to overcome the discretionary function exception." ECF No. 23 at 6 (quoting *OSI*, 285 F.3d at 952); *see also Sanchez v. United States*, 707 F. Supp. 2d 216, 232 (D.P.R. 2010) (noting that "courts have been extremely reluctant to find that any manual, particularly one that relates to

---

[10] A similar argument was made, and accepted, in *Clark v. United States*, 660 F. Supp. 1164, 1172 (W.D. Wash. 1987) (finding that Air Force "manuals made it mandatory that the effect on groundwater be considered when siting and operating waste disposal facilities on military installations"), but that decision "was rendered in April, 1987, well before the Supreme Court 'restated and clarified the scope of the discretionary function exception.'" *OSI*, 285 F.3d at 952 (citing *Berkovitz v. United States*, 486 U.S. 531, 538 (1988)).

the military, could be considered a 'mandatory' guideline"), *aff'd*, 671 F.3d 86 (1st Cir. 2012).

Tyndall fails to identify any mandatory specific directive in TM 5-634 or TM 5-814-5 that removed all judgment and discretion from the Army's waste disposal decision making at Fort Gillem.[11] TM 5-634 was a "guide[]" that "describe[d] the factors contributing to efficient collection and disposal of the refuse generated at installations and facilities," ECF No. 45-2 at US_00034881, and gave the Army the discretion to select and implement the "system which best meets local requirements and the requirements of sanitation and fire protection," *id.* at US_00034884. Similarly, TM 5-814-5 described both the advantages and disadvantages of sanitary landfills, ECF No. 45-9 at US_00035218-19, as well as various factors to consider when deciding whether to construct a sanitary landfill or other suitable method of disposal, *id.* at US_00035220-21. Because none of these provisions "mandate[d] the specific manner that the [Army] must conduct" waste disposal at Fort Gillem, the Army had the discretion to determine "the precise

---

[11] Tyndall asserts that the court in *Woodman v. United States*, No. 87-116-Civ-J-14, 1995 U.S. Dist. Lexis 2787 (M.D. Fla. Jan. 24, 1995) held that "TM 5-634 imposed a nondiscretionary duty on Navy's disposal of waste." Pl.'s Opp. at 21. However, the Eleventh Circuit reversed *Woodman*, holding that "the discretionary function exception foreclose[d] *all* tort claims against the Navy except those related to the" mandatory duty imposed by contract. *Andrews v. United States*, 121 F.3d 1430, 1441-42 (11th Cir. 1997) (emphasis added).

11

manner in which to conduct the activity." *Vance v. United States*, No. 3:19-CV-283, 2019 U.S. Dist. LEXIS 218557, at *14 (E.D. Tenn. Dec. 20, 2019).

           b.  *42 C.F.R. § 76.8(a) & Sanitary Landfill Facts*

Tyndall argues that 42 C.F.R. § 76.8(a)(3)-(4) and Sanitary Landfill Facts "prohibited open dumping and mandated the use of sanitary landfills (or similarly protective methods)." Pl.'s Opp. at 11. Tyndall fails to acknowledge, however, that the contaminated materials disposed at Fort Gillem from 1948 to 1972 were buried underground, not disposed in open dumps. ECF No. 47 at 2 n.1. Tyndall also fails to explain how these provisions constitute specific and mandatory directives removing the Army's judgment and discretion regarding waste disposal.

42 C.F.R. Part 76 was intended to disallow "emissions to the atmosphere from Federal facilities and buildings" that "endanger health or welfare," and to "minimize[]" emissions that "are likely to be injurious or hazardous to people, animals, vegetation, or property." *See* ECF No. 45-6 at 343. This necessarily required discretion to determine which emissions would "endanger health or welfare," were likely "injurious or hazardous," or the extent to which such emissions should be "minimized." *Id. See, e.g.*, *Bretches v. United States*, No. CV-24-00286-TUC-SHR, 2025 U.S. Dist. LEXIS 188894, at *8-9 (D. Ariz. Sep. 24, 2025) (direction in a safety manual to "eliminate or minimize physical . . . conditions which are causing, or which have the potential to cause harm, to persons, property,

12

or the environment" did not "mandate a specific course of conduct Defendant was required to follow").

Similarly, Sanitary Landfill Facts was "a guidance document" that provided "general information on the state-of-the-art of one basic, acceptable, and effective method of solid waste disposal—the sanitary landfill," and was "offered as an aid to the growing number of people involved with planning and development in solid waste disposal management." *See* ECF No. 45-7 at iii. It was not a specific and mandatory directive for purposes of the discretionary function exception. *See, e.g.*, *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1177 (10th Cir. 2008) (field guide that provides a "ready reference" does not set forth mandatory directives); *Compagnie Mar. Marfret v. San Juan Bay Pilots Corp.*, 532 F. Supp. 2d 369, 381 & n.14 (D.P.R. 2008) (manual "intended only for the internal guidance of personnel" was not mandatory).

### c.   *40 C.F.R. pt. 241 & AR 420-47*

Tyndall argues that 40 C.F.R. Part 241 and Army Regulation 420-47, which expressly did not apply to hazardous waste, nonetheless governed the Army's waste disposal because he also alleged disposal of "non-hazardous materials, such as food products." Pl.'s Opp. at 13. It is unclear how two directives related to non-hazardous materials, promulgated *after* the Army had already disposed of the harmful substances, could possibly have governed the Army's waste disposal

13

activities years earlier. In any event, Tyndall fails to identify any mandatory and specific directive that removed the Army's judgment and discretion in making its waste disposal decisions.

40 C.F.R. Part 241 expressly acknowledged that, although its guidelines were "organized into mandatory requirements and recommended procedures," ECF No. 45-10 at US_00032480, "the flexibility of the requirements/procedures concept allows great latitude and professional judgment on compliance, thereby accommodating local needs, situations, practices, and economic conditions," *id.* at US_00032481. Similarly, while AR 420-47 directed that certain wastes would be identified for exclusion, AR 420-47 provided various "criteria used in considering whether a waste is unacceptable." ECF No. 45-11 at US_00000394. Accordingly, even if labeled as "requirements," these directives "can be considered mandatory only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions." *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995).

### 3.  AR 200-1

Tyndall argues that AR 200-1's "procedural requirement" that the Army develop programs to eliminate or reduce water pollution was "not discretionary." Pl.'s Opp. at 23. Not only does Tyndall fail to demonstrate how the Army's alleged failure to comply with this requirement after its promulgation in 1978 (long after

14

the harmful materials were already disposed) could have possibly caused Mrs. Tyndall's illness and death, AR 200-1 "left discretion to the government agents executing that guideline." *Hatcher v. United States*, 855 F. Supp. 2d 728, 732 (E.D. Tenn. 2012); *cf. In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318, 1350 (N.D. Ga. 2016) (recognizing that, although an agency regulation used "mandatory language with respect to the need to deliver clean drinking water, . . . the manner in which this objective was to be achieved was left to the agency").

### D. THE ARMY'S DECISIONS WERE GROUNDED IN POLICY CONSIDERATIONS.

Tyndall argues that, even if the first prong of the discretionary function is met, the Army's waste disposal decisions "were not grounded in public policy considerations" based on "the Army's sheer incompetence and carelessness." Pl.'s Opp. at 24, 25. Tyndall's carelessness argument "ignores the plain language of the FTCA which stipulates that the discretionary function exception applies 'whether or not the discretion involved be abused.'" *M.M.B.B. v. United States*, No. 1:24-CV-5031-TWT, 2025 U.S. Dist. LEXIS 179717, at *16 n.3 (N.D. Ga. Sep. 15, 2025) (quoting 28 U.S.C. § 2680(a)). Thus, he fails to rebut the presumption that the Army's waste disposal practices were grounded in policy considerations.

### III.   CONCLUSION

For the reasons stated herein, the United States respectfully requests that this Court dismiss Tyndall's claims for lack of subject matter jurisdiction.

Respectfully Submitted,

**THE UNITED STATES OF AMERICA**

BRETT SHUMATE
Assistant Attorney General
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General
Torts Branch

J. PATRICK GLYNN
Director, Torts Branch

ALBERT K. LAI
Assistant Director


*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS, Virginia Bar No. 80149
CAROLINE W. STANTON
Trial Attorneys, Torts Branch
Environmental Tort Litigation Section
United States Department of Justice
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 702-4998
E-mail: Jennifer.E.Adams@usdoj.gov
*Counsel for the United States*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DWIGHT G. TYNDALL, individually, and as surviving spouse and personal representative of DEBORAH E. TYNDALL, and as executor of the estate of DEBORAH E. TYNDALL,<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>      Defendant. | Civil Action No.<br><br>1:22-cv-03136-SDG |

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing motion and memorandum have been prepared using Book Antiqua, 13 point font.

/s/ Jennifer E. Adams
JENNIFER E. ADAMS
*Trial Attorney*

17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DWIGHT G. TYNDALL, individually,
and as surviving spouse and personal
representative of DEBORAH E.
TYNDALL, and as executor of the
estate of DEBORAH E. TYNDALL,

        Plaintiff,

v.

UNITED STATES OF AMERICA,

        Defendant.

Civil Action No.

1:22-cv-03136-SDG

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2026, a true and correct copy of the foregoing was served on all users who are registered to use the court's electronic filing system.

/s/ Jennifer E. Adams
JENNIFER E. ADAMS
*Trial Attorney*

18